## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:24-cv-2665

JASON ALLEN, an individual,

Plaintiff,

v.

SHIRA PERLMUTTER, IN HER OFFICIAL CAPACITY AS REGISTER OF

COPYRIGHTS AND DIRECTOR OF THE UNITED STATES COPYRIGHT OFFICE;

AND THE UNITED STATES COPYRIGHT OFFICE,

Defendants.

---

## PLAINTIFF'S COMPLAINT AND REQUEST FOR DECLARATORY RELIEF AND DEMAND FOR JURY TRIAL

---

Plaintiff Jason Allen alleges as follows:

## <u>INTRODUCTION</u>

1.      This is a civil action seeking declaratory judgment that the work plaintiff submitted to the U.S. Copyright Office is capable of formal Copyright registration.  Plaintiff Jason Allen ("Plaintiff"), by and through undersigned counsel, brings this action against the United States Copyright Office ("Defendant") seeking declaratory relief under the Administrative Procedure Act (5 U.S.C. § 701 et seq.) and the Copyright Act (17 U.S.C. § 701(e)).

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (Federal

Question jurisdiction) and 5 U.S.C. § 702 (Administrative Procedures Act jurisdiction).

3.      Venue is proper in this district under 28 U.S.C. § 1391(e) because Defendant

resides in this district, and a substantial part of the events or omissions giving rise to the

claim occurred in this district.

## PARTIES

4.      Plaintiff Jason Allen is an individual residing in the State of Colorado at all times

relevant to this complaint.

5.      As described more fully below, Plaintiff is the applicant for the Copyright

Registration for a work entitled Théâtre D'opéra Spatial.

6.      Defendant United States Copyright Office is an agency of the United States

Government responsible for registering copyright claims and maintaining records of

copyright ownership with its principal office located at 101 Independence Ave SE,

Washington, D.C. 20559-6000.

7.      Defendant Shira Perlmutter is named in her official capacity as the Register of

Copyrights and Director of the United States Copyright Office. Under 17 U.S.C. § 701,

the powers and duties of the Copyright Office are vested in the Register.

## **BACKGROUND**

8.      Allen uses AI tools such as the Midjourney program to assist in the creation of artistic works, which he displays and sells to the public.

9.      Allen filed an application to register the copyright of one particular AI-assisted work, Théâtre D'opéra Spatial ("the Work"), with the U.S. Copyright Office in September 2022. Allen considers himself the author and owner of the copyright in the Work.

10.     In a final agency action, Defendants denied the copyright registration application on the basis that the Work "lacks the human authorship necessary to support a copyright claim."

11.     In the months since the final agency action was issued, infringement of the Work has crushed the Plaintiff's ability to monetize his artistic creation. For example, in a Facebook post, a man living in Australia named Adrian Elton has incorporated, or rather copied, the entire Work created by Plaintiff into another artwork he created. A screenshot of        the        Facebook        post,        available        at https://www.facebook.com/groups/officialmidjourney/permalink/650055357286032/,        is attached hereto as **Exhibit 1.** Adrian states, "They say that 'great artists steal,' but as the IP never vested in Jason, no theft has occurred." (See **Exhibit 1**).

12.     The central dilemma we face was very well stated by an author who discussing the controversy regarding the copyrightability of AI generated images and the implications for businesses and individuals using AI-generated images for profit: "[What] makes me more

nervous is actually the thing written between the lines: We know Jason doesn't own the image. But it's never been said who does." Pres Maxson, *A Twisty Plot of AI & Human Creativity,* PMax Substax (April 08, 2024), https://presmaxson.substack.com/p/a-twisty-plot-of-ai-human-creativity?r=1dgqhf&utm_medium=ios&triedRedirect=true.

13.     Another example of unauthorized use of the Plaintiff's art is attached as **Exhibit** 2, showing a screenshot of the Esty marketplace with an unauthorized reproduction for sale. (See **Exhibit** 2, accessed on September 25, 2024 and available at https://shorturl.at/SUebc).

14.     The denials are subject to judicial review under the Administrative Procedure Act ("APA") 5 U.S.C. § 704. Plaintiff seeks injunctive and other relief as set forth below. Because the Register's denial of a copyright registration application is, by the statute's plain terms, an action taken by the Register under the Copyright Act, the APA governs judicial review. *Darden v. Peters*, 488 F.3d 277, 283 (4th Cir. 2007).

15.     This matter is ripe for judicial review as the use of Artificial Intelligence tools becomes more pervasive in our society.  The negative media attention surrounding the Work may have influenced the Copyright Office Examiner's perception and judgment, v seemed thus viewing it in a less favorable light.  In many instances, a Copyright Examiner may not even be able to distinguish an artwork that used AI tools to assist in the creation from one which does not use any computerized tools, thus making the review process entirely arbitrary.

**ORIGIN OF THE WORK**

16.     Plaintiff initially envisioned a detailed image of women in Victorian dresses wearing space helmets. He wanted to bring that vision to life using the Generative AI tool called "Midjourney." He selected the colors, the style, and the era of the artwork, and arranged the elements in the image to represent the women dressed in elegant Victorian dresses performing opera on stage, their attire presenting a juxtaposition between old-world charm and a futuristic twist. He selected and arranged the elements to depict each performer wearing a space helmet, creating a striking contrast between the classical and the sci-fi elements. Plaintiff set the stage in a grand theater, with an audience watching intently, overlooking a large circular window through which the vast expanse of the outer world is visible, adding an otherworldly ambiance to the performance.

17.     To achieve the desired image, Plaintiff input a text prompt directing the AI to create an image with his exact specifications and waited for Midjourney to produce an output based on his instructions. After about one minute (sometimes longer)[1], the AI generated four different images or variations based on his prompt. Plaintiff carefully reviewed these images to determine which parts of his instructions were effective and which were not. He then rephrased, added, or deleted portions of his instructions to clarify his vision. He noticed that some elements were missing from the AI-generated images, indicating that certain parts of his instructions were not even considered. To address this, he emphasized

---

[1] This is how long it took Midjourney to generate output using "fast" mode in version 2 which was used in creating the Work.

these elements in subsequent instructions to ensure the AI incorporated them into the final image.

18.    As detailed in correspondence between Plaintiff and the original Copyright Examiner assigned to his file, attached hereto as **Exhibit 3**, Plaintiff repeated this elaborate process six hundred twenty-four times. (See **Exhibit 3**).

19.    Creating an image using the Midjourney tool requires more than the bare minimal mental effort. In reality, it is a tedious, complicated, and often frustrating endeavor. The number six hundred twenty-four is not insignificant. Imagine doing six hundred twenty-four takes of the same scene in a movie. Any director would be frustrated if their cameraman couldn't capture their desired vision despite repeated instructions after every single take. In such a situation, directors often complain that they have tried to explain it to the cameraman in every possible way, but he either refuses to understand or is too incompetent. Consequently, the director would likely replace him with another cameraman.

20.    To put it into perspective, the world record for the most takes of a movie scene is 148—nothing compared to 624. *Most retakes for one scene with dialogue,* Guinness World Book of Records (2024), ://www.guinnessworldrecords.com/world-records/74583-most-retakes-for-one-scene-with-dialogue.

21.    Using Midjourney requires creators to carefully craft prompts to achieve their desired results. Numerous guides and blogs, such as *Crafting Exceptional Prompts for Midjourney,* Harpa.AI (2024), https://harpa.ai/blog/ultimate-midjourney-prompts-guide, and *Midjourney Prompts,* Midjourney (2023), https://docs.midjourney.com/docs/prompts, have been published to teach users the art of prompt writing. Below is a summary of key points from those guides:

  i.    **Be Specific:** Mention specific elements, styles, colors, and compositions they want in the image. *Example: Instead of saying something general like "a beautiful landscape," they need to be more descriptive and say something like "a serene mountain landscape at sunrise with a clear blue sky, lush green trees, and a calm river reflecting the sunlight."*

  ii.    **Use Adjectives and Modifiers**: Include adjectives and modifiers to give the AI more context about the desired mood, style, and details. *Example: "A vintage, sepia-toned photograph of an old European street market, bustling with people and brightly colored stalls."*

  iii.    **Iterate and Refine**: After receiving the initial outputs, creators need to analyze which parts of the prompt were well interpreted and which were not. They are then required to refine their prompts to emphasize or de-emphasize certain elements. *Example: If the initial image lacks detail in a specific area, you might refine the prompt to say, "Add more intricate details with cupids, wings, and hearts to the architecture in the background."*

iv.  **Experiment with Word Placement**: The order of words can affect how the AI prioritizes different elements. *Example: Midjourney processes "a cat sitting on a sunny windowsill" very differently from "a sunny windowsill with a cat sitting on it."*

v.  **Incorporate Artistic Styles**: Mentioning styles like "impressionist," "abstract," or "photorealistic," can guide the AI. *Example: "A surreal photorealistic landscape with melting clocks and dreamlike scenery."*

vi.  **Review and Edit**: Use tools like Gigapixel AI and Adobe Photoshop to further refine and enhance the generated images. This allows for adjustments in resolution, clarity, and additional elements that might not have been captured perfectly by the AI.

22.    Plaintiff conducted extensive testing of the outputs generated based on his prompts. Through 624 iterations, he noted the results produced by each word and its placement within the prompt. By studying the AI's behavior, he learned when Midjourney focused on specific parts of his instructions and when it ignored them altogether. He realized that guiding the AI to incorporate all elements required a process of trial and error, akin to a director working with a cameraman. Just as a cameraman needs repeated instructions on what to focus on, Midjourney needed precise and repeated guidance. During his experimentation, Plaintiff developed a "writing technique" for crafting effective prompts, ensuring the AI accurately captured his vision.

23.    This means that Midjourney took at least 624 minutes to generate the images, if not more. On average, Plaintiff spent between 5 and 15 minutes 15 minutes each time four images were generated to review them, determine which instructions were followed

by the AI, understand how they were interpreted, and decide what to add or delete in his next set of instructions to achieve his desired output. With an average review time of 10 minutes, total time would be estimated at 6240 minutes plus 624 minutes equaling 6864 minutes = 114.4 hours selecting, arranging, and instructing the AI on what he wanted it to generate.

24.     Additionally, it is important to consider the time he spent thoughtfully crafting each instruction, taking breaks to return with fresh eyes, reflecting on what he might be doing wrong, understanding why the AI was unable to comprehend all his instructions, and devising creative solutions to tackle these issues.

25.     It is clear that the Work was not generated by Midjourney through the mere input of a few prompts. The creative selection and arrangement of elements in the image were entirely directed by the Plaintiff, who meticulously crafted the instructions. After each output was generated, much like a director requesting multiple takes of each scene from a cameraman, Plaintiff made the creative decisions on whether or not to retain, remove, enhance, or alter the elements present in the output, or to add new ones. Midjourney, lacking autonomous creativity, simply executed the detailed guidance provided by the Plaintiff. Plaintiff's extensive effort and careful direction were crucial in creating the image, far surpassing the role of the AI tool.

26.     After using 624 prompts, Plaintiff was somewhat satisfied with a set of four base images Midjourney finally generated.  These initial base versions were raw and required

upscaling and further modification for clarity and detail.  Plaintiff had to address all of these issues. To enhance the resolution and refine the clarity of the image, he used Gigapixel AI. He meticulously adjusted the digital settings of the image with Gigapixel AI, ensuring that every detail was perfected. Following this, he employed Adobe Photoshop to add additional elements, further refining and enhancing the image. This multi-step process required significant effort and expertise, transforming the raw AI-generated outputs into the final polished work.

27.     After meticulously working on the images, Plaintiff ultimately finalized three. Out of these, he preferred the Work the most and subsequently applied to register its copyright in his name.

28.      The Work was not created by Midjourney merely through inputting a few prompts or pressing a button. Midjourney did not engage in any creative selection or arrangement of the image elements. Instead, it simply followed the meticulously crafted instructions provided by the Plaintiff. Midjourney, lacking independent creativity, did not generate the image on its own. Midjourney, much like Gigapixel and Adobe Photoshop, only assisted Plaintiff in creating the Work.

29.      Plaintiff created the Work, which combines unique elements of visual art and spatial design to produce a distinct and expressive piece.

### **HISTORY OF THE APPLICATION/ RECONSIDERATION PROCESS**

30.     On September 21, 2022, Plaintiff submitted an application for Copyright registration of the Work to the U.S. Copyright Office.

31.     In subsequent communications with the Copyright Examiner prior to the formal Refusal, Allen provided further detail about six hundred twenty-four prompts that he input to create the satisfactory version of the Work, and the Copyright Office Examiner indicated that registration of the prompts alone may be permissible. Allen declined to limit his claim to the portion of the Work that excludes the entirety of the Midjourney-assisted image or the Gigapixel AI enhancements.

32.     On December 13, 2022, the Copyright Office initially refused registration, noting that "all of the pictorial and graphic content within the deposit is attributable to the AI - - your client did not paint, sketch, color, or otherwise fix any of the deposit. . . As for your position that your client is responsible for the AI's results, in our view this does not define human author and authorship as we understand it. Only human authorship should be deposited and claimed, and you have not done this." (See **Exhibit 4**, First Refusal of Registration dated December 13, 2022).

33.     On January 24, 2023, a First Request for Reconsideration was submitted, pointing out that the Examiner misapplied the "human authorship" requirement; Copyright law focuses on the origin of the idea expressed; Mr. Allen contributed original authorship to create a unique work; AI tools should be treated like other tools available to artists; the Examiner considered improper factors, such as the publicity surrounding Mr. Allen's Colorado State Fair victory, which was controversial due to the AI tools used; and

numerous public policy reasons required registration of the Work. (See **Exhibit** 5, First Request for Reconsideration dated January 24, 2023).

34.     On June 6, 2023, the Copyright Office continued their Refusal, offering to allow registration of the prompts and Photoshop enhancements, but excluding the portion of the Work created using the Midjourney and Gigapixel AI tools. (See **Exhibit 6**, Response to First Request for Consideration, dated June 06, 2023).

35.     The Office further incorrectly noted that "Mr. Allen had no control over how the artificial intelligence tool analyzed, interpreted, or responded to these prompts. Nor did he exercise any control over the actual creation, development, or execution of the image that Midjourney rendered on his screen. Simply put, the resulting image was the output of the artificial intelligence technology, and your correspondence does not identify any specific creative authorship in this image that can be attributed to Mr. Allen." *Id.*

36.      In the First Refusal, the Office noted that "the modifications Mr. Allen made with Adobe Photoshop were the result of human authorship and they contain a sufficient amount of original authorship to be registered as a derivative work." (See **Exhibit** 4). But the Office then declined to extend protection to the enhancements made with Gigapixel AI. *Id.*

37.     The Office did not address the Examiner's apparent review of the Work outside the four corners of the application, noting simply that the Office may consider the "author's creative process to determine the extent to which a human being exercised control" and created the Work. *Id.* at 10.

38.      Allen filed a Second Request for Reconsideration on July 12, 2023, attached hereto as **Exhibit 7**, based on new and different arguments. On September 5, 2023, the Copyright Review Board issued a final refusal, attached hereto as **Exhibit 8,** affirming the Copyright Office's prior refusals to register the Work without disclaiming "AI-generated material."

**STANDARD OF REVIEW**

39.      *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2261 (2024) recently clarified that the Administrative Procedures Act requires that "courts decide legal questions by applying their own judgment. . . and set aside any such action inconsistent with the law as they interpret it. And it prescribes no deferential standard for courts to employ in answering those legal questions." *Id*.   Therefore, the Court should give the Copyright Office decision some weight, but also review the factual situation and law with a fresh set of eyes. *See Paul Morelli Design, Inc. v. Tiffany And Co.*, 200 F. Supp. 2d 482, 486 (E.D. Pa. 2002) (noting that "[s]ince the statute permits a party whose application was denied to sue for copyright infringement, Congress did not intend, in our view, narrowly to constrain a jury or a court from finding a rejected work to be copyrightable and infringed. While the decision of the Copyright Office [is] entitled to some deference, [a jury is] not bound by that decision and must decide for itself the issue of copyrightability of the jewelry designs involved.") *Id.*

40.    The Tenth Circuit has noted that in "extremely limited" circumstances, a court may supplement the administrative record or consider extra-record evidence. *Rocky Mountain Peace & Just. Ctr. v. United States Fish & Wildlife Serv.,* 40 F.4th 1133, 1160 (10th Cir. 2022), citing *Am. Mining Cong. v. Thomas,* 772 F.2d 617, 626 (10th Cir. 1985). Known as the *American Mining Congress* exceptions, they include when (1) "the record is deficient because the agency ignored relevant factors it should have considered," (2) "the agency considered factors that were left out of the formal record," and (3) "evidence coming into existence after the agency acted demonstrates that the actions were right or wrong." *Rocky Mountain Peace & Just. Ctr*, Id. at 1160.

41.    Other courts have upheld a standard whereby a reviewing court will "set aside agency action, findings, and conclusions that are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Darden*, 488 F.3d at 283.

42.    Plaintiff submits that fully deferring to the agency's decision without a closer examination of their rationale will be a pointless exercise which wastes both the Court's and Plaintiff's limited resources and will not provide the necessary protection to the Work, clarification of the Copyright Office's hazy guidance and ad hoc treatment of AI-assisted creations, or the Plaintiff's ability to assert its rights against the many infringers.

43.    In a note in *Bonazoli v. R.S.V.P. Int'l, Inc.,* 353 F. Supp. 2d 218, 221 (D.R.I. 2005) the court declined to address the degree of deference which should be accorded to the Copyright Office altogether, by stating that it is "unclear." *Id.* The Court then compared *Norris Indus., Inc. v. Int'l Tele. & Tele. Corp.,* 696 F.2d 918, 922 (11th Cir.1983) which

applies an abuse of discretion standard, with *Ward v. Nat'l Geographic Soc'y,* 208 F.Supp.2d 429, 444–48 (S.D.N.Y.2002) which makes an independent determination, and *Paul Morelli,* 200 F.Supp.2d at 485. *Id.* The Court in *Bonazoli* held "the question of how much deference is appropriate has not been addressed by the First Circuit. However, since the degree of deference accorded to the Copyright Office does not affect this Court's conclusion, the issue need not be resolved here." 353 F. Supp. 2d at 221.

44.   Regardless of what standard of review the Court chooses to use, it is clear that the refusal of registration should at least be reviewed to determine whether it was "arbitrary and capricious."

## **ARGUMENT**

## I.   **USCO'S DENIAL OF COPYRIGHT REGISTRATION IS AN ARBITRARY AND CAPRICIOUS AGENCY ACTION AND NOT IN ACCORDANCE WITH THE LAW**

45.   The Copyright Office registration refusal is arbitrary and capricious if it fails to examine a submitted work for the minimum standards imposed by the Copyright Office: fixed in a tangible medium, sufficiently original, and containing human authorship. 17 U.S.C. § 102(a). The Copyright Act affords protection to "original works of authorship fixed in any tangible medium of expression, now known or later developed… either directly *or with the aid of a machine or device.*" *Id.* (emphasis added). Courts have broadly interpreted this statute and the Compendium of Copyright Practices, allowing registration so long as a work is both **original** and contains **human authorship.**

A.     **The Work is Sufficiently Original**

46.     Courts have found "it is now settled beyond question that practically anything novel can be copyrighted," even if there is only a "faint trace of originality." *Dan Kasoff, Inc. v. Novelty Jewelry Co.,* 309 F.2d 745, 746 (2d Cir. 1962). "All that is needed to satisfy both the Constitution and the statute is that the 'author' contributed something more than a 'merely trivial' variation, something recognizably 'his own. . .. No matter how poor artistically the 'author's' addition, it is enough if it be his own." *Alfred Bell & Co. v. Catalda Fine Arts,* 191 F.2d 99, 102–03 (2d Cir. 1951).

47.     "Original, as the term is used in copyright, means only that the Work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity." *Feist Publications, Inc. v. Rural Telephone Service Company, Inc.,* 499 U.S. 340, 345 (1991) (citation omitted).

48.     In numerous cases, even the slightest bit of creativity, such as mere selection and arrangement of data being copied from an already compiled directory, was considered to have a modicum of creativity and was hence, copyrightable. *Le Book Publishing, Inc. v. Black Book Photography, Inc.,* 418 F. Supp. 2d 305 (S.D.N.Y. 2005). If the artist goes about "selecting and arranging the costume, draperies, and other various accessories in said photograph, arranging the subject so as to present graceful outlines, arranging and disposing the light and shade, suggesting and evoking the desired expression," it is considered original. *Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53, 55 (1884).

49.     The Work meets the widely accepted standard for originality. Plaintiff independently visualized the image and then created it with the assistance of a machine, and the Work possesses a large degree of creativity. Plaintiff used Midjourney to assist him in creating a specific image juxtaposing the Victorian age of elegance with space age wonder.

**B.     The Work Contains Human Authorship**

50.      "Copyright law only protects 'the fruits of intellectual labor' that 'are founded in the creative powers of the mind.'" *Trade-Mark Cases,* 100 U.S. 82, 94 (1879). U.S. Copyright Office, *Compendium of U.S. Copyright Office Practices* § 306 (3d ed. 2021). The Compendium also states that "copyright law is limited to original intellectual conceptions of the author." *Id.*

51.     As is understood generally, human authorship involves the exercise of creative control and decision-making in the production of the Work.  E.g., *Real World Media LLC v. Daily Caller, Ic.,* No. CV 23-1654 (JDB), 2024 WL 3835351, at *9 (D.D.C. Aug. 14, 2024) (noting that "weaving together of various videos to tell a story is itself copyrightable authorship and that [a party's] exact copies of portions of these videos (including the video cuts and other creative decisions) is actionable copying. Id.; citations omitted)).

52.      Here, Allen's selection, coordination, and arrangement of elements resulted in the creation of the Work. The law recognizes authorship even if the final product is created "directly or with the aid of machine or device." 17 U.S.C. § 102(a). Moreover, it is

undisputed that Midjourney requires a human to input information and is not sentient. *Midjourney Prompts,* Midjourney (2023), https://docs.midjourney.com/docs/prompts,

53.     According to the U.S. Copyright Office's Compendium of U.S. Copyright Office Practices, "[t]he Office will not register works produced by a machine or mere mechanical process that operates randomly or automatically without any creative input or intervention from a human author." U.S. Copyright Office, *Compendium of U.S. Copyright Office Practices* § 306 (3d ed. 2021). This indicates that the importance of the human element of control and creative direction for copyright protection.

54.     The Compendium of U.S. Copyright Office Practices serves as a set of guidelines for the registration process and is not the law itself. It provides interpretations and practices but does not have the binding authority of Title 17 of the U.S. Code**.** Title 17 of the U.S. Code provides the actual copyright law. It outlines the legal framework for copyright protection, including the requirement for original works of authorship to be fixed in a tangible medium of expression.

55.     The Copyright Act explicitly acknowledges that works created with the aid of machines or devices can be protected, emphasizing the importance of human creative input in the process. 17 U.S.C. § 102(a). The Work exemplifies this debate, highlighting the necessity of addressing how AI tools contribute to the creation of original works of authorship.  The statutory language supports the notion that AI-assisted artworks with substantial human creative input can indeed be eligible for copyright protection.

56.    The Work embodies Mr. Allen's authorship. As detailed above, the AI tool generates art based on the artist's specific choices in the prompting process —such as descriptions of thematic elements, adjustments of color palette, fine-tuning of the balance between abstraction and realism, iterating on textures, etc., which are input by the artist with creative intention and form the foundation of authorship. These decisions shape the final piece, reflecting the artist's unique vision and effort, resulting in a work that directly manifests their artistic vision.

57.    In this case, Allen intended to represent an image that he held in his imagination. He wanted to show women with orbs for heads, in Victorian era-style dresses juxtaposed in science fiction opera house setting, staring through a portal in the center of the hall. He used 624 prompts to adjust the program's output to his desired vision. The Work meets the Copyright Office's customary standard of significant human creative input necessary to qualify for copyright protection.

58.    The U.S. Copyright Office has stated that works produced by a machine or process that operates randomly or automatically without any creative input from a human are not eligible for copyright protection. U.S. Copyright Office, *Compendium of U.S. Copyright Office Practices* § 313.2 (3d ed. 2021). In the case of Jackson Pollock, his works are copyrightable because, despite the seemingly random nature of his drip paintings, Pollock exercised *creative intent* and originality in their creation. His method, though unconventional and perhaps seemingly random, was a deliberate and original process driven by his artistic vision.  See, e.g., *Novelty Textile, Inc. v. Windsor Fashions, Inc.*, No. CV1205602BROMANX, 2013 WL 12114062, at *6 (C.D. Cal. Aug. 21, 2013); see also

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 569, 115 S. Ct. 2338, 2345, 132 L. Ed. 2d 487 (1995) (noting that a "succinctly articulable message is not a condition of expression," and noting that the work of Jackson Pollock is "unquestionably shielded" as a creative work.).

## II. SECTION 313.2 OF THE COMPENDIUM OF COPYRIGHT PRACTICES PERMITS COPYRIGHT OF THE WORK

59.     The Office's use of §313.2 of the Compendium of Copyright Office Practices to deny copyright protection for the Work rests on a misinterpretation of the section's text. Section 313.2 specifies that copyright will be denied for works where "the traditional elements of authorship in the work... were actually conceived and executed not by man but by machine." U.S. Copyright Office, *Compendium of U.S. Copyright Office Practices* § 313.2 (3d ed. 2021). This language provides a straightforward two-part test for determining whether a work is "basically one of human authorship" where the machine is "merely an assisting instrument":

a.     The machine must have "conceived of" the traditional elements of authorship, and

b.     The machine must have executed the traditional elements of authorship. Id.

### A.     A Human Conceived of the Elements of Authorship

60.     The first element of determining whether a machine conceived of a work cannot be met in this case of AI-assisted art, and as a human functions in the development of

20

the Work. Neither a machine nor an artificial intelligence program independently created the Work. Rather, it is a result of a prompt dialogue resulting from a conceptual framework provided by a human.

61.     The prompt serves as the initial creative input, embodying the human's original idea and vision for the artwork. The AI system functions merely as a tool to assist in the actualization of the human's creative ideal, akin to a cameraman, executing the human-conceived "director's" prompt to generate the final image. Indeed, just as a photographer may take hundreds of photographs, discarding all but the single one that realizes their original idea, Mr. Allen issued more than 600 prompts before generating one that is sufficiently consistent with his conception of what the final product should be. Even then, Mr. Allen had to make individual adjustments outside of Midjourney in order to realize his ideal final product.

62.     The Midjourney system is inherently multimodal, requiring human interaction in order to function in more ways that just providing prompts. Human decisions must be made in order for certain paths in latent space to be taken, and the number of branching possibilities is infinite. Allen chose many paths, manipulating the machine to do what he wanted, gradually refining, and arriving at the image he wanted to create.

**B.     A Human Executed the Elements of Authorship**

63.     The second element of the test outlined in §313.2—that the machine must have "executed" the traditional elements of authorship—also fails in this case. *Id*. While the AI system performed some of the traditional artistic elements, similar to how a camera or digital audio workstation may, this execution was done at the behest of a human. Similarly, a calculator executes traditional mathematical principles, which are already known, but the equation made and input by the human drives the answer. Theorems authored by mathematicians are not credited to the calculators they use.

64.     The examples provided in §313.2 support this distinction. The common link between the provided examples is that they either (1) mechanically change the format of a work without altering its artistic content, such as a work which has been adjusted and otherwise remained the same, or converting a works medium from VHS to DVD. Or (2) They display purely mechanical outputs entirely disconnected from human intervention, such as the arbitrary shapes of stitches produced by a weaving machine.

65.     The Work falls into neither of these categories. Mr. Allen did not click a single button upon which the AI-generated the image randomly. Rather, he actively directed the creation process through hundreds of prompts, meticulously shaping the scene and directly influencing the final output. Furthermore, he made material adjustments in Photoshop after the AI produced the "final" generation. The extensive human intervention and creative control which Mr. Allen exerted over the process display his use of the machine as a tool for the realization of his artistic and creative concept.

66.     Even if only one element of the test to determine human vs machine authorship is unmet, the Work is of human authorship, and copyright may not be denied. In this case, *neither* element of the test is met. The refusal to register the copyright claim in the Work should be set aside, and the registration allowed.

67.     In the *Thaler v. Perlmutter* case, the plaintiff had originally listed his "creativity machine" as the author of a work which he then attempted to register for Copyright protection.   *Thaler v. Perlmutter,* 687 F. Supp. 3d 140, 142 (D.D.C. 2023).   Later, he attempted to argue "various legal theories under which a copyright in the computer's work would transfer to him, as the computer's owner; for example." *Id.* at 145.

68.     The Copyright Office (and later the court) indicated that a machine cannot be the author of a work because the Copyright Act cannot be interpreted to protect "new forms of technology *operating absent any guiding human hand*."   *Id.* at 146.   However, in the case at hand, the Copyright Office suggests that neither may a human, who guides a machine to create a desired output, be considered an author and claim Copyright ownership of the Work.   This leaves a black hole and unaddressed dilemma as to who actually owns and has created a work that was generated by a human using AI assistance.

**III. The Office Misapplied the Human Authorship Requirement and Ignored the Expression of Ideas of the Mind**

69.     The Office found that the "initial image generated by Midjourney and the upscaling performed by Gigapixel AI lack the human authorship that is essential for copyright protection." (See **Exhibit 6, Response to First Request for Reconsideration,** dated June 6, 2023). In doing so, the Office misapplied the "human authorship" requirement and ignored the fundamental principle that copyright is meant to be granted to expressions of ideas originating from a human mind. This decision not only undermines the core principles of copyright law but also fails to recognize the human creativity that is essential and inextricably intertwined with the creation of the Work.

70.     The Copyright Office cites *Burrow-Giles,* 111 U.S. at 56 as supporting its denial of registration; however, a close reading of that case would cause the opposite result.  In *Burrow-Giles*, the Supreme Court intended to provide "authors" with the exclusive right to their "writings," regardless of whether the tool used to create them was novel or widely used. The Burrow-Giles Court found that by use of the term "writings," that "Congress very properly has declared these to include all forms … by which the ideas in the mind of the author are given visible expression". *Id.,* 111 U.S. at 58.

71.     The Office cites the same passage, arguing that because the text includes examples of "writing," AI tools cannot be included in this definition. (See **Exhibit 6** at 4-5). However, this argument entirely ignores the immediate next line, in which the Court states that the "only reason why photographs were not included in the extended list in the act of 1802 is, probably, that they did not exist". *Burrow-Giles,* 111 U.S. at 58. The same is true for AI tools.  The emergence of new technology necessitates the creation of new

laws to regulate its use, rather than stifling creativity. By denying copyright protection to the Plaintiff's Work, the decision goes against the Constitution's mandate to promote the progress of science and the useful arts.

72.     The photographer in Burrows-Giles had created a "useful, new, harmonious, characteristic, and graceful picture. . . . entirely from his own original mental conception, to which he gave visible form by posing the [subject] in front of the camera, selecting and arranging the costume, draperies, and other various accessories in said photograph, arranging the subject so as to present graceful outlines, arranging and disposing the light and shade, suggesting and evoking the desired expression, and from such disposition, arrangement, or representation, made entirely by plaintiff, he produced the picture." *Id, 111 U.S. at 60*. Just as the photographer gave visual form to his mental image of the photograph through the use of the camera, Mr. Allen gave visual form to his mental image of the Theater D'Opera Spatial through his use of AI technologies.

73.     Our courts consistently interpret the Copyright Act in light of technological evolution, and indeed, copyright law is intended to "promote the progress of science and useful arts" by protecting the expressions of creative ideas. *Id, 111 U.S. at 56*. Just as the advent of the camera ushered in a previously unimagined art form, AI-assisted art holds the potential to do the same. This evolution should be embraced as a positive development in the creative landscape. When photography first gained popularity, critics argued that it lacked skill and artistry, yet it has since become a highly respected and valued art form.

74.   As Jackson Pollock said, "Modern artists have found new ways and new means of making their statements... the modern painter cannot express this age… in the old forms of the Renaissance or of any other past culture." And "technique is just a means of arriving at a statement." AI art is driven by human direction and creativity. It is a technique that allows an artist to arrive at a statement, an image formulated in their mind, and given expression by a modern tool. As such, it should be recognized and protected, ensuring that innovation in art, science, and technology continues to thrive.

**IV. The Mechanical Processes of Midjourney Were Guided by Creative and Artistic Input Sufficient to Permit Copyright Protection.**

75.   In its second and final Refusal, the Office concludes that Mr. Allen's "sole contribution to the Midjourney Image was inputting the text prompt that produced it". (See **Exhibit 8** at 6). The Office follows this up with a high-level description of the way it understands that Midjourney processes information to produce its outputs, stating that:

> the steps in that process were ultimately dependent on how the Midjourney system processed Mr. Allen's prompts. According to Midjourney's documentation, prompts "influence" what the system generates and are "interpret[ed]" by Midjourney and "compared to its training data." As the Office has explained, "Midjourney does not interpret prompts as specific instructions to create a particular expressive result," because "Midjourney does not understand grammar, sentence structure, or words like humans." It is the Office's understanding that, because Midjourney does not treat text prompts as direct instructions, users may need to attempt hundreds of iterations before landing upon an image they find satisfactory. (See **Exhibit 8** at 8).

76.   For the Office to contend that Mr. Allen did not exert creative control over the Work fundamentally misunderstands the nature of creative control in the context of AI-assisted

art. The Office stated that "Mr. Allen's prompts provided general directions to elicit output from the AI technology. The prompts described the general subject, genre, category, style, and tone of the image, specified the colors he wanted to see, and how realistic he wanted the image to be. But Mr. Allen had no control over how the artificial intelligence tool analyzed, interpreted, or responded to these prompts." *First Refusal* at 6. This reasoning is contradictory.

77.     By dismissing the iterative process as merely mechanical, the Copyright Office ignores the essential role of human creativity. Mr. Allen had a specific image in mind and employed hundreds of prompt iterations to refine the output. This iterative process is the very means by which the artist effectuates their vision, guiding the AI to produce the desired outcome despite the AI's inherent variability. This deliberate and nuanced human involvement is a testament to the creative skill required to effectively use an AI art program.

78.     The multitude of revisions and adjustments made demonstrates Mr. Allen's commitment to realizing a specific mental image.  If the AI system's training data had been different and produced different outputs, he would have continued refining his prompts and making revisions to achieve his desired outcome.

79.     Mr. Allen had a specific artistic idea, conceived of in his mind, and he used Midjourney as a tool to create an artistic expression of that idea. Such creative input is on par with that expressed by other types of artists and is capable of copyright protection. The court in *Friedman v. Guetta*, No. CV 10-00014 DDP JCX, 2011 WL 3510890, at *3

(C.D. Cal. May 27, 2011) held, "Plaintiff made related decisions about light and shadow, image clarity, depth of field, spatial relationships, and graininess that were all represented in the copyrighted Photograph. Plaintiff also selected the background and perspective of the Photograph, and all of these particular artistic decisions commutatively result in the Photograph." Independent effort by the author is the cornerstone of a protectable work. *Waldman Pub. Corp. v. Landoll, Inc.,* 43 F.3d 775, 782 (2d Cir. 1994). *Burrow-Giles*, 111 U.S. at 60.

80.     Copyright protection will be granted to a photographer who conceives of and sets up a shot. "The Constitution intended that Congress should secure [to the creator] the exclusive right to use, publish, and sell" the products of intellectual invention." *Burrow-Giles*, 111 U.S. at 54. However, it is the mechanical process of the camera that ultimately "produces" the final image following the click of the shutter-release button. In a literal sense, the camera captures and develops the photograph, yet no one would dispute the photographer's authorship. Similarly, Mr. Allen conceived of the image, developed the prompt, and made adjustments to refine the output, thereby ensuring the final image reflects his mental vision.

81.     The AI system, much like a camera, is a tool through which the artist's creativity is realized in visual form. While AI art technology may be emerging and still not widely accepted, the use of advanced technology in the creative process does not undermine the artist's authorship. The Supreme Court has held, "it is clear Congress intended the scope of the copyright statute to include more than the traditional fine arts." *Mazer v. Stein*, 3 347 U.S. 201, 213 (1954).

**V. In Denying Copyright Protection to the Work, The Office has Failed to Remain Technologically Neutral.**

82.     Copyright law should remain technologically neutral, adapting to advancements in technology and ensuring the continued protection of innovative works. If the law fails to do so, it will stifle creativity and innovation in emerging fields.

83.     Photography and music created with software assistance are instructive as analogous types of machines. When cameras first became widely available, there were arguments that photography required no skill or artistry. Similarly, with the advent of digital synthesizers and digital audio workstations in music production, critics argued that these technologies removed the humanity from the art. However, both technologies are now used daily, and copyright is granted to the art they help produce. Today, we are facing a similar problem of innate bias towards modern technology.

84.     The art world is already accepting the use of AI, and the USCO is behind the times. Photoshop already has AI integration, and AI music (created by people in much the same way as the Work was, albeit with perhaps more "technical" input in the form of beat creations) get millions of listens/views on mediums like Spotify and YouTube.

85.     In its first refusal, the Office states that it "will not consider the amount of time, effort, or expense required to create the work' because they 'have no bearing on whether

a work possesses the minimum creative spark required by the Copyright Act and the Constitution." U.S. Copyright Office, *Compendium of U.S. Copyright Office Practices* § 310.7. However, the Office fails to explain with any sincerity how Mr. Allen's work fails to meet this standard of a "bare minimum creative spark." The legal bar for creativity is intentionally low, recognizing explicitly that even minimal creative input suffices for copyright eligibility. Moreover, the Work is highly creative and unique, as there are no other images, photographs, or paintings depicting women in Victorian dresses performing opera in space.

86.     There may well be situations where use of an AI tool can result in art that should not be granted copyright protection. For instance, if an AI system is instructed to autonomously generate its own prompt and create an image based solely on those self-created instructions, the resulting work would lack meaningful creative human input.  In Stephen Thaler's attempt, it was claimed that the *AI itself* conceived of and created the work independently, with Thaler seeking copyright protection on that self-generated work. *Thaler v. Perlmutter,* 687 F. Supp. 3d 140, 143 (D.D.C. 2023).

87.     The absence of substantial human involvement justified the denial of copyright protection in *Thaler*. Indeed, as Ms. Perlmutter herself has stated, "accepting a machine as the "author" of a copyrighted work would twist the [Copyright Act] into knots . .  a machine does not have a "life" or "death" against which a copyright term could be measured. 17 U.S.C. § 302(a). Thus, if a machine were allowed to be a work's author, then the copyright in that work would extend in perpetuity, flouting a foundational rule of

copyright law: that copyright terms must eventually end. *Thaler v. Perlmutter,* 2024 WL 983931, at 24-25 D.C.Cir. (Appellate Brief submitted March 6, 2024).

88.     *Thaler* contrasts sharply with Mr. Allen, whose significant creative control and artistic input throughout the iterative process clearly distinguish his request for copyright protection from those situations where copyright registration should rightly be denied. The process of prompting, correcting and re-prompting hundreds of times for the production of a specific image that was formed in the author's mind qualifies as the required "minimum creative spark." U.S. Copyright Office, *Compendium of U.S. Copyright Office Practices* § 310.7.

89.     The Office conflates discussion of Mr. Allen's 624 prompt iterations with an argument in favor of the long-since dismantled "sweat of the brow" doctrine. See **Exhibit 6** (*Second Refusal*) at 7. However, these iterations are not only a display of time expended but of Mr. Allen's desire as an author to bring visual expression to a specific image he had formulated in his mind. Among other specific details, Mr. Allen wanted to create a depiction of women in dresses evocative of the Victorian era in a science fiction opera house setting, staring through a portal in the center of the hall. This was the vision that he ruminated on for days, and he was determined to bring visual expression to it. The 624 prompts he issued, adjusted, and reissued are a testament not purely to effort, but to intentionality.

90.     Had copyright law failed to acknowledge the creative input of photographers to their photos or musicians to their music, countless innovative works would have been left

unprotected, and the rich history of photographic art and the massive cultural impact of contemporary music would not be what it is today. These tools may mechanically capture or assist in producing the Work, allowing authors to create expressions they alone could not have achieved, but it is the author's vision and creative control over these tools that make the Work original and deserving of copyright protection.

91.    By remaining technologically neutral, copyright law will continue to fulfill its purpose of promoting the progress of science and the arts. Embracing new tools and methods of creation ensures that all forms of artistic expression receive the protection they deserve. This is crucial for maintaining an environment where creativity can flourish, and new art forms can emerge. If copyright protection is denied based on the use of modern technologies such as AI tools, then would-be authors will be disincentivized to make use of new technologies to produce art for fear of being unable to protect their creations.

**VI. In Refusing Copyright Protection to the Work, the Office is Unduly Making a Value Judgment on the Work.**

92.    The Office should not examine "the designer's artistic judgment exercised independently of functional influence" as that "would require the decisionmaker to consider evidence of the creator's design methods, purposes, and reasons," whereas the Supreme Court has held that Copyright Act's text "makes clear, however, that [a court or reviewing agency's] inquiry is limited to how the article and feature are perceived, not how or why they were designed." *Star Athletica, L.L.C. v. Varsity Brands, Inc.,* 580 U.S. 405, 422–23 (2017); U.S. Copyright Office, *Compendium of U.S. Copyright Office Practices* § 310.5.

93.      These standards have been violated in the Office's examination of the Work, which seemingly caused confusion with respect to the use of AI tools generally, and the function of Midjourney in specific. The Work appears complex, detailed, and displays a level, of aesthetic grandeur sufficient to win a fine arts competition. This challenges the viewer's preconceived notions of the skill that is or should be possessed by an artist in order to create such a piece. This is not an unreasonable opinion; it is this same traditional conception of what "should" be required to produce a given work of visual expression that caused such outrage among certain people, and led to the publicity that alerted the Office of Mr. Allen's use of AI tools in the creation of the Work. Regardless of how common or even understandable such an opinion may be, technical dexterity and skill in "traditional" artistry is irrelevant to examination of a works eligibility for copyright protection. *Mazer, 3 347 U.S. at 201*.

94.      Additionally, the Office's request for information about Mr. Allen's prompting process is unusual, unduly burdensome, and, if enforced uniformly, would stifle creation and artistry. Would painters need to intend for each brush stroke and striation to have a particular impact? What about the instance where an artist merely splatters paint on a canvas? Is the human responsible for the work or the paintbrush? Do novelists now need to disclose snippets of conversation that they overheard and incorporated into their book's scenes or specify the humans on whom characters are based? The disclosure requirement cannot possibly be enforced in a fair manner.

**VII. The Office Considered Improper Factors in Making Its Decision.**

95.     The original decision to deny copyright protection to Mr. Allen's work involved the consideration of improper factors, in violation of §310 of the Compendium of U.S. Copyright Office Practices. The compendium states:

> Section 310.2: "In determining whether a work contains a sufficient amount of original authorship, the U.S. Copyright Office does not consider the aesthetic value, artistic merit, or intrinsic quality of a work."

> Section 310.5: "Evaluating the author's inspiration or intent would require the Office "to consider evidence of the creator's design methods, purposes, and reasons." Star Athletica, 137 S. Ct. at 1015. The Supreme Court has made it clear that copyrightability should be based on how a work is perceived, not how or why it was designed."

> Section 310.6: "When examining a work for original authorship, the U.S. Copyright Office will focus on the appearance or sound of the work that the author created but will not consider the amount of time, effort, or expense required to create the work.

96.     These issues have no bearing on whether a work possesses the minimum creative spark required by the Copyright Act and the Constitution. See, e.g., *Feist*, 499 U.S. at 352-354, 364 (rejecting the so-called "sweat of the brow" doctrine that provided copyright protection solely as a "reward for the hard work" of creating a work); *Star Athletica*, 137 S. Ct. at 1015 ("our inquiry is limited to how the [work is] perceived," not how it was designed). As Justice O'Connor observed, "copyright rewards originality, not effort" and "[w]ithout a doubt, the 'sweat of the brow' doctrine flouted basic copyright principles." *Feist*, 499 U.S. at 352, 354, 364."

97.     Each of these standards was violated during the Work's initial examination, and the Office declines to address this violation almost entirely in their responses to requests for reconsideration. In the original refusal, the Examiner noted that Mr. Allen "did not paint, sketch, color, or otherwise fix any of the deposit." *USCO*, 1-5IVDL1X At 1. However, it is the author's exhibition of a "minimal degree of creativity" that is the legal standard for determining a work's eligibility for copyright protection, not their ability to "paint, sketch, or color".  As the court succinctly states in *Mazer v. Stein*, 347 U.S. 201 (1954), "[i]t is clear Congress intended the scope of the copyright statute to include more than the traditional fine arts." The fact that the Examiner cited this as a reason to refuse copyright protection, along with multiple mentions that Mr. Allen did not explicitly disclose the use of AI—despite there being no requirement to disclose tools used in creation when requesting copyright registration—demonstrates the Examiner's pre-formed bias against Mr. Allen and his work. Furthermore, the Examiner learned of Mr. Allen's use of AI through the controversy surrounding his winning the Colorado Fine Arts contest, which suggests a desire to punish Mr. Allen for using a technology that the Office finds distasteful.

98.     The Office displayed this further in their granting of copyright protection in the case of AI-assisted works from Colleen Hoffenbacker; who used an AI-image creation tool to create pieces which she then went on to paint by hand. *Cascadia Daily News, Women Painters of Washington Are Making History* (Aug. 26, 2023), https://www.cascadiadaily.com/2023/aug/26/women-painters-of-washington-are-making-history/. The Office is seemingly stating with the confluence of these two decisions that AI art is acceptable, but only where the artist can recreate the image with

paint and brush. If this requirement were applied uniformly across all artistic mediums the results would be absurd; such as requiring a photographer to manually paint each picture before they may become copyrightable.

99.     The Examiner additionally requested the prompts Mr. Allen used to create the Work. This feels like somewhat of a trap. First, if no standard has been set for what particular prompts would satisfy the Examiner, then the Examiner can use the number or complexity of prompts as a proxy to reject the Work from eligibility for Copyright Protection. Second, the prompts presumably would be viewed as the "idea" instead of the "expression." We want to be clear that Allen is not attempting to gain Copyright protection of the prompts. Third, showing the prompts could have the effect of explaining a magic trick; i.e. that once it becomes known, it seems far less impressive. Similarly, the perception of the complexity of the prompts does not indicate the skill of the artist using the AI tool to create. The work should be examined without this bias. Fourth, this seems like a skills test. Presumably painters are not required to submit a video of themselves painting to prove they created the painting. The same should be true for the use of other tools. The Copyright Office's position is inconsistent with the myriad approaches to artistic expression and creation, and would unnecessarily restrict the processes artists may use, or be willing to disclose, to create their works.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

**(Administrative Procedure Act Violation for Denial of Plaintiff's Application)**

A.      Plaintiff re-alleges and incorporates by reference every allegation contained in the proceeding paragraphs.

B.      The USCO's second Refusal to register the Work constituted final agency action and Plaintiff seeks to reverse that Refusal here.

C.      Defendants' Refusal to register the copyright claim in the Work is contrary to law.

D.      The agency actions here were arbitrary, capricious, an abuse of discretion, not in accordance with the law, unsupported by substantial evidence, and in excess of Defendants' statutory authority.

E.      The denial creates an inappropriate requirement for individual Copyright Office examiners to scrutinize each work and make value judgments about registration that is contrary to the plain language of the Copyright Act ("Act"), contrary to the statutory purpose of the Act, and contrary to the Constitutional mandate to promote the progress of science.

F.      The Refusal to register the copyright claim in the Work should be set aside and the application reinstated.

## I. CLAIM FOR RELIEF

Violation of the Administrative Procedure Act and the Copyright Act

G.      Plaintiff repeats and realleges the paragraphs above as if fully set forth herein.

H.      The Refusal to register "Theatre D'Opera Spatial" is arbitrary, capricious, an abuse of discretion, and not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

I.       "Theatre D'Opera Spatial" meets the requirements for copyright protection under 17 U.S.C. § 102(a) as it is an original work of authorship fixed in a tangible medium of expression.

J.       The Work demonstrates originality and creativity, and thus qualifies for copyright protection under the minimal creativity standard established by case law (e.g., Feist, 499 U.S. at 340).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court:

A.      Find that the Refusal to register "Theatre D'Opera Spatial" is arbitrary, capricious, an abuse of discretion, and not in accordance with law;

B.      Order the United States Copyright Office to register "Theatre D'Opera Spatial" as

a copyright-protected work;

C.      Award Plaintiff reasonable attorney's fees and costs incurred in bringing this

action; and

D.      Grant such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL AND REQUEST FOR ORAL ARGUMENT**

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: September 26, 2024

Respectfully submitted,
/Tamara Pester/
Tamara S. Pester, LLC
Denver, CO
(303) 333-4696
Attorney for Plaintiff