**EXHIBITS**

| NUMBER | DESCRIPTION | PAGE |
|--------|-------------|------|
| Exhibit 1 | Facebook post – showing how Adrian Elton has incorporated, or rather copied, the entire Work created by Plaintiff into another artwork without permission. | 2-5 |
| Exhibit 2 | Another example of unauthorized use, Etsy items for sale without authorization | 6-8 |
| Exhibit 3 | Correspondence between Plaintiff and the original Copyright Examiner assigned to file. | 10-27 |
| Exhibit 4 | First Refusal of Registration dated December 13, 2022. | 28-32 |
| Exhibit 5 | First Request for Reconsideration dated January 24, 2023. | 33-41 |
| Exhibit 6 | Second Refusal/ Response to First Request for Consideration, dated June 06, 2023. | 42-55 |
| Exhibit 7 | Second Request for Reconsideration on July 12, 2023 | 56-68 |
| Exhibit 8 | Copyright Review Board final refusal/ Response to Second Request for reconsideration September 5, 2023 | 69-78 |

# EXHIBIT 1



**Midjourney Official**

Public group · 717.1K members

About   Discussion   Guides   Featured   People   Events   Media   Files

**Adrian Elton**
September 30, 2023

Super excited that my entry, "Meta Inversion # 01", is a finalist in the Ballarat International Foto Biennale's 'Prompted Peculiar – International AI Prize 2023'.

This was my artist's statement which gives some context >

– – – – – – – – – – – –
"This work is a commentary on the very nature of AI generated art, notions of authorship, intellectual property and who owns what. For this piece I have taken – without permission – AI artist, Jason Allen's, mercurial and controversial award winning AI work, "Théâtre D'opéra Spatial", and have reimagined it as a Renaissance painting that is being painted by none other than Jason Allen himself, who in this instance has been rendered as a Renaissance era painter too. They say that "great artists steal", but as the IP never vested in Jason, no theft has occurred."
– – – – – – – – – – – –

It was created using MidJourney V5.2, Adobe Photoshop V25.0 and Topaz Gigapixel V6.6.3 (as it had to be upscaled for printing for the physical exhibition)

If you'd like to do me a solid and vote for me in the 'People's Choice Award' you can click on this link and then select my name.

Cheers and happy prompting 😊

https://ballaratfoto.org/2023-prompted-peculiar-peoples.../

#ai #aiart #ballaratinternationalfotobiennale #ballaratfoto #generativeai #art #photography #promptography #ip #intellectualproperty #intellectualpropertylaw #jasonallen #greatartiststeal

9/24/24, 8:36 PM                    Midjourney Official | Super excited that my entry, "Meta Inversion # 01", is a finalist in the Ballarat International Foto Biennale's 'Prompted Peculi...



9/24/24, 8:36 PM    Midjourney Official | Super excited that my entry, "Meta Inversion # 01", is a finalist in the Ballarat International Foto Biennale's 'Prompted Peculi…

# EXHIBIT 2

9/25/24, 4:24 PM                                    Theatre Dopera Spatial Canvas Art Print - Etsy





AI Generated Art Piece | Artificial Intelligence Painting | Creative Modern Art | Futuristic Art Poster | Gift Idea | Machine Learning
DeepPaintingsStore
$53.66
FREE shipping





🚩 Report this item to Etsy

**$18.65+**
Theatre Dopera Spatial Canvas Art Print
JourneyWearGoods
★★★☆☆
Sizes *

| Select an option | ▼ |
|---|---|

Quantity

9/25/24, 4:24 PM                              Theatre Dopera Spatial Canvas Art Print - Etsy

| 1 | ▼ |
|---|---|

**Add to cart**

### Item details                                                                          ^

**Highlights**

- 🔭 Sourced by **JourneyWearGoods**

- 🧵 Supplies for making crafts

**About this item**

Make your art feel at home on this polyester canvas. With 24 sizes to choose from in both horizontal and vertical options, you can find the perfect match for your art piece. Each canvas comes with a beautiful frame made of pine wood, making it a highly giftable product.

Original artwork created by Jason Allen with Midjourney AI



Learn more about this item

### Shipping and return policies                                                          ^

- 📅 Order today to get by **Sep 30-Oct 11**

- 🚚 Cost to ship: **$22.49**

- 📍 Ships from: **North Las Vegas, NV**

Deliver to United States, 80209 ✏️

### Did you know?                                                                          ^

🤝 **Etsy Purchase Protection**

Shop confidently on Etsy knowing if something goes wrong with an order, we've got your back for all eligible purchases — see program terms

Etsy offsets carbon emissions from shipping and packaging on this purchase.

### Meet your sellers                                                                      ^

9/25/24, 4:24 PM Theatre Dopera Spatial Canvas Art Print - Etsy



Dalton
Owner of JourneyWearGoods

♡ Follow shop

| Message Dalton |

JourneyWearGoods made this item with help from
Printify, United States

Related searches



n Canvas
t

Other reviews from this shop



|
★★⯪☆☆

# EXHIBIT 3

about:blank

FROM   cop-ad@loc.gov
TO   tamara@tmbtq.com
CC
BCC

Sep 28 2022 10:28 AM

1-11743923581 Théâtre D'opéra Spatial

Dear Tamara Pester:

Please respond to the questions below within 45 days and include the [THREAD ID], using the brackets, as part of your response. The [THREAD ID] is located below the Examiner's signature block. The [THREAD ID] must be in the body of your response, NOT the subject line. If you put the [THREAD ID] in the subject line, we will not get your message.

We are aware that an Artificial Intelligence program, Midjourney program was involved in the creation of the uploaded artwork. https://www.smithsonianmag.com/smart-news/artificial-intelligence-art-wins-colorado-state-fair-180980703/. We notice that Jason Allen is named as the author on the application without any reference to Midjourney.

United States copyright law protects human-created original works of authorship. Compendium III, 306, 313.2. The copyright law protects "the fruits of the intellectual labor" that "are founded in the creative powers of the mind." Compendium III, 306.

We need to know whether the uploaded work is the result of Mr. Allen's intellectual labor, with Midjourney serving as a mere assisting instrument. Or, whether Midjourney conceived and executed the uploaded work.

In your reply, please provide a detailed description and explanation of Mr. Allen's creative contributions that led to the creation of the final uploaded work.

• Please provide the text prompts/command inputs that Mr. Allen typed into the Midjourney to achieve the final version of the work that he is seeking to register.

• Tell us about Jason Allen's interaction with Midjourney. Were there revision cycles to get Midjourney to create an artwork that Mr. Allen wanted? How many revisions were needed? If Mr. Allen did input some preexisting art/text into Midjourney to create the work, please attach a copy of it to your reply.

IMPORTANT NOTE: The THREAD ID appearing at the end of this message MUST be included within the body of your response in order for your message to be properly routed. When replying to this message, make sure to copy the whole THREAD ID, including brackets, and paste it into the body of your response, preferably after the greeting. DO NOT include the THREAD ID in the subject line of your reply. If you put the THREAD ID in the subject line, we will not get your message.

Failure to comply exactly with our instructions will result in your email not being connected to your application, and your case will be closed without further correspondence from us.


Sincerely,

Examiner Mander
U.S. Copyright Office
Office of Registration Policy and Practice
Visual Arts Division
www.copyright.gov

When replying to this email, please include the following thread id (entire line) within the body of your response to expedite routing to the correct office.

[THREAD ID:1-5ELPKG5]

about:blank

FROM    Tamara Pester Schklar (tamara@tmbtq.com)                                                        Sep 30 2022 1:06 PM
TO      cop-ad@loc.gov
CC
BCC     jasonallen.cs@gmail.com

Théâtre D'opéra Spatial Copyright: 1-11743923581

[THREAD ID:1-5ELPKG5] : Théâtre D'opéra Spatial 1-11743923581

Dear Examiner Mander,

Our answers are below.

Please let us know if you have any further questions or concerns.

Thank you!


Tamara Pester Schklar
Attorney and Owner

TMBTQ, a trademark law boutique of Tamara S. Pester, LLC

Phone: 303-333-4696
Email: tamara@tmbtq.com
Web: https://www.tmbtq.com
https://www.learntrademarks.com

Your referrals are the best compliment! Please consider the environment before printing. This message is sent by or on behalf of a lawyer, may contain privileged or confidential information, and is intended solely for the individual or entity to whom it is addressed. If you received this message in error, please notify the sender immediately and delete this message!
-----Original message-----
From: "cop-ad@loc.gov" [cop-ad@loc.gov]
Sent: Wednesday, Sep 28 2022 10:28 AM
To: tamara@tmbtq.com
Subject: 1-11743923581 Théâtre D'opéra Spatial

Dear Tamara Pester:

Please respond to the questions below within 45 days and include the [THREAD ID], using the brackets, as part of your response. The [THREAD ID] is located below the Examiner's signature block. The [THREAD ID] must be in the body of your response, NOT the subject line. If you put the [THREAD ID] in the subject line, we will not get your message.

We are aware that an Artificial Intelligence program, Midjourney program was involved in the creation of the uploaded artwork. https://www.smithsonianmag.com/smart-news/artificial-intelligence-art-wins-colorado-state-fair-180980703/. We notice that Jason Allen is named as the author on the application without any reference to Midjourney.

United States copyright law protects human-created original works of authorship. Compendium III, 306, 313.2. The copyright law protects "the fruits of the intellectual labor" that "are founded in the creative powers of the mind." Compendium III, 306.

We need to know whether the uploaded work is the result of Mr. Allen's intellectual labor, with Midjourney serving as a mere assisting instrument. Or, whether Midjourney conceived and executed the uploaded work.

In your reply, please provide a detailed description and explanation of Mr. Allen's creative contributions that led to the creation of the final uploaded work.

• Please provide the text prompts/command inputs that Mr. Allen typed into the Midjourney to achieve the final version of the work that he is seeking to register.

*The specific string of prompts and inputs are confidential and we are not able to disclose the entire strings that Mr. Allen input to achieve the initial version of the work product. However, a generalization and description of the type of prompts used for this work can be provided.*
*To preface this description, it should be noted that Mr. Allen used artistic, dramatic, and sophisticated language, terminology, adjectives, and keywords to develop this prompt. The beginning of the prompt focuses on the overall subject of the piece. This is a "big picture description." Next, another "big picture description" was given, as a way of instructing the software that Mr. Allen is combining two ideas. Then, similar to a film director, Mr. Allen informs what "type of scene" is being expressed, which also has an intended effect on the composition. At this point, the main bulk of the image's concept is established, and Mr. Allen can begin describing in detail more information to further develop the piece. For this, he begins to describe quite literally how the image is presented, that is to say, what the overall image's genre and category is. Then certain professional artistic terms which direct the tone of the piece are input. From here, a description of how lifelike the artist wanted the piece to appear was added. Next, a description for what Mr. Allen desired to occur in terms of how colors were used. Then a description to further define the composition was included. After that, words that describe how to "finish" the piece are input. Then, some final terms about what style/era the artwork should depict. Finally, a writing technique that Mr. Allen has established from extensive testing is input at the end to give the image the final emotional impact that makes the image "pop." Once the prompt is finished, Mr. Allen appends it with various parameters which further instruct the software how to develop the image. The entirety of this prompt and parameters is called a "command." Once he had researched, tested, and developed the command, Mr. Allen executed the command into Midjourney to complete the process.*

   • Tell us about Jason Allen's interaction with Midjourney.

*The work was a result of Mr. Allen's intellectual labor in that it was conceived using his creative imagination, knowledge, and experience to realize a vision which he translated into a series of descriptive, creative instructions using his skills as a creative writer and art director. These creative instructions are known as a "prompt" which he inputs into a text-to-image multimodal artificial intelligence software called Midjourney. In addition to the prompt, there are initialization texts called "parameters" which are similar to code scripts, which Mr. Allen appended into the prompt when input to the software. Parameters instruct the software to behave in ways specific to the user's vision for the content's output, and there are many. Midjourney did not conceive any creative form of input for this work, and is not capable of executing operations independently of the user, thus further demonstrating the software is a digital tool and assisting instrument Mr. Allen took numerous actions and steps to create the work including writing, editing, making textual creative decisions, making visual creative decisions, curating, upscaling, executing variants, executing a large number of iterations, making cosmetic adjustments and edits manually to the image, and digital preparation for the work to be suitable for print/distribution.*

   • Were there revision cycles to get Midjourney to create an artwork that Mr. Allen wanted? How many revisions were needed?

*Mr. Allen input numerous revisions and text prompts **at least 624 times** to arrive at the initial version of the work. Once Mr. Allen had this initial version, he made several variations of it. Finally, a variation that was desired to be completed was chosen by Mr. Allen to "upscale." To upscale in Midjourney means to make the image larger, with more detail, and continued expansion upon the prompts instructions. Mr. Allen calls this upscaled version of the image a "completion." Mr. Allen takes this completion and brings it into photoshop, where further visual edits are made to beautify and adjust various cosmetic details/flaws/artifacts etc. This is called a "pass", and Mr. Allen made 2 passes for this image. Once the final image was complete, Mr. Allen proceeded to upscale it again, this time using another photo program, to make the image high enough resolution to be suitable for reproduction via print.*

   • If Mr. Allen did input some preexisting art/text into Midjourney to create the work, please attach a copy of it to your reply.

about:blank

*Mr. Allen did not input any preexisting art or text into Midjourney.*

IMPORTANT NOTE: The THREAD ID appearing at the end of this message MUST be included within the body of your response in order for your message to be properly routed. When replying to this message, make sure to copy the whole THREAD ID, including brackets, and paste it into the body of your response, preferably after the greeting. DO NOT include the THREAD ID in the subject line of your reply. If you put the THREAD ID in the subject line, we will not get your message.

Failure to comply exactly with our instructions will result in your email not being connected to your application, and your case will be closed without further correspondence from us.


Sincerely,

Examiner Mander
U.S. Copyright Office
Office of Registration Policy and Practice
Visual Arts Division
www.copyright.gov


When replying to this email, please include the following thread id (entire line) within the body of your response to expedite routing to the correct office.

[THREAD ID:1-5ELPKG5]

about:blank

FROM   cop-ad@loc.gov                                                                                      Oct 4 2022 11:56 AM
TO     tamara@tmbtq.com
CC
BCC

Théâtre D'opéra Spatial Copyright: 1-11743923581

You must respond to this message within 45 days and include the THREAD ID, which is located below the Examiner's signature block. The THREAD ID must be in the body of your response, NOT the subject line. If you put the THREAD ID in the subject line, we will not get your message.

Dear Tamara Pester Schklar,

Thank you for your reply. You explained that after Mr. Allen's multiple interactions with Midjourney, he achieved an "initial version of the image". After, he used Photoshop to edit the image.

Please upload the initial version of the image that Mr. Allen accepted from Midjourney and the version of the image after Mr. Allen completed his visual edits.

Please describe in detail the edits that Mr. Allen made. You mentioned that he used photoshop "where further visual edits are made to beautify and adjust various cosmetic details/flaws/artifacts etc." Please explain what this entails.

You also mentioned that he upscales the image again, with another photo program, "to make the image high enough resolution to be suitable for reproduction via print." What is the name of the program that Mr. Allen used to do this? Please explain which changes were made using it.

Did Mr. Allen add any new creative work to the image?


UPLOAD INSTRUCTIONS

1) Log into your eCO account at https://eco.copyright.gov/eService_enu/.
2) On the Home page, click on "Open Cases" under "Check Registration Case Status."
3) In the list of open cases, click on case number 1-11743923581.
4) Click the green "Select files to upload" button which will open a dialogue box allowing you to browse and select files from your computer.
5) Highlight the file(s) you want and click "Open" in the dialogue box.
6) On the main screen, confirm the file(s) you want are displayed. (To remove a file, click the orange "Remove" button.)
7) Click the blue "Start upload" button. When the upload is successful, "Successfully uploaded" will display next to the filename(s).
8) When you are satisfied the correct files are uploaded, click on the green "Click here to complete your submission" button on the right.

You will receive an automated e-mail confirming your upload. (Please allow up to one hour.) Please be sure to check your spam folder for the upload confirmation email. If you do not receive the confirmation email, then your upload did not complete successfully.

NOTE: If you need to reset your password, or if you experience problems with your upload, please call our technical help desk at (202)707-3002 or by email at CSDTech@loc.gov. You will receive an e-mail confirming your upload within the hour.

IMPORTANT NOTE: The THREAD ID appearing at the end of this message MUST be included within the body of your response in order for your message to be properly routed. When replying to this message, make sure to copy the whole THREAD ID, including brackets, and paste it into the body of your response, preferably after the greeting. DO NOT include the THREAD ID in the subject line of your reply. If you put the THREAD ID in the subject line, we will not get your message.

Failure to comply exactly with our instructions will result in your email not being connected to your application, and your case will be closed without further correspondence from us.


Sincerely,

Examiner Mander
U.S. Copyright Office
Office of Registration Policy and Practice
Visual Arts Division
www.copyright.gov


[THREAD ID:1-5ELPKG5]

-----Original Message-----

From: tamara@tmbtq.com
Sent: 9/30/2022 03:06:23 PM
To: "cop-ad@loc.gov" <cop-ad@loc.gov>
Subject: Théâtre D'opéra Spatial Copyright: 1-11743923581

[THREAD ID:1-5ELPKG5] : Théâtre D'opéra Spatial 1-11743923581

Dear Examiner Mander,

Our answers are below.

Please let us know if you have any further questions or concerns.

Thank you!

Tamara Pester Schklar
Attorney and Owner

TMBTQ, a trademark law boutique of Tamara S. Pester, LLC

Phone:303-333-4696
 Email: tamara@tmbtq.com
 Web: https://www.tmbtq.com
https://www.learntrademarks.com

about:blank

Your referrals are the best compliment! Please consider the environment before printing. This message is sent by or on behalf of a lawyer, may contain privileged or confidential information, and is intended solely for the individual or entity to whom it is addressed. If you received this message in error, please notify the sender immediately and delete this message!

-----Original message-----
From: "cop-ad@loc.gov" [cop-ad@loc.gov]
Sent: Wednesday, Sep 28 2022 10:28 AM
To: tamara@tmbtq.com
Subject: 1-11743923581 Théâtre D'opéra Spatial
Dear Tamara Pester:

Please respond to the questions below within 45 days and include the [THREAD ID], using the brackets, as part of your response. The [THREAD ID] is located below the Examiner's signature block. The [THREAD ID] must be in the body of your response, NOT the subject line. If you put the [THREAD ID] in the subject line, we will not get your message.

We are aware that an Artificial Intelligence program, Midjourney program was involved in the creation of the uploaded artwork. https://www.smithsonianmag.com/smart-news/artificial-intelligence-art-wins-colorado-state-fair-180980703/. We notice that Jason Allen is named as the author on the application without any reference to Midjourney.

United States copyright law protects human-created original works of authorship. Compendium III, 306, 313.2. The copyright law protects "the fruits of the intellectual labor" that "are founded in the creative powers of the mind." Compendium III, 306.

We need to know whether the uploaded work is the result of Mr. Allen's intellectual labor, with Midjourney serving as a mere assisting instrument. Or, whether Midjourney conceived and executed the uploaded work.

In your reply, please provide a detailed description and explanation of Mr. Allen's creative contributions that led to the creation of the final uploaded work.

• Please provide the text prompts/command inputs that Mr. Allen typed into the Midjourney to achieve the final version of the work that he is seeking to register.

The specific string of prompts and inputs are confidential and we are not able to disclose the entire strings that Mr. Allen input to achieve the initial version of the work product. However, a generalization and description of the type of prompts used for this work can be provided.
To preface this description, it should be noted that Mr. Allen used artistic, dramatic, and sophisticated language, terminology, adjectives, and keywords to develop this prompt. The beginning of the prompt focuses on the overall subject of the piece. This is a "big picture description." Next, another "big picture description" was given, as a way of instructing the software that Mr. Allen is combining two ideas. Then, similar to a film director, Mr. Allen informs what "type of scene" is being expressed, which also has an intended effect on the composition. At this point, the main bulk of the image's concept is established, and Mr. Allen can begin describing in detail more information to further develop the piece. For this, he begins to describe quite literally how the image is presented, that is to say, what the overall image's genre and category is. Then certain professional artistic terms which direct the tone of the piece are input. From here, a description of how lifelike the artist wanted the piece to appear was added. Next, a description for what Mr. Allen desired to occur in terms of how colors were used. Then a description to further define the composition was included. After that, words that describe how to "finish" the piece are input. Then, some final terms about what style/era the artwork should depict. Finally, a writing technique that Mr. Allen has established from extensive testing is input at the end to give the image the final emotional impact that makes the image "pop". Once the prompt is finished, Mr. Allen appends it with various parameters which further instruct the software how to develop the image. The entirety of this prompt and parameters is called a "command." Once he had researched, tested, and developed the command, Mr. Allen executed the command into Midjourney to complete the process.
Tell us about Jason Allen's interaction with Midjourney.

The work was a result of Mr. Allen's intellectual labor in that it was conceived using his creative imagination, knowledge, and experience to realize a vision which he translated into a series of descriptive, creative instructions using his skills as a creative writer and art director. These creative instructions are known as a "prompt" which he inputs into a text-to-image multimodal artificial intelligence software called Midjourney. In addition to the prompt, there are initialization texts called "parameters" which are similar to code scripts, which Mr. Allen appended into the prompt when input to the software. Parameters instruct the software to behave in ways specific to the user's vision for the content's output, and there are many. Midjourney did not conceive any creative form of input for this work, and is not capable of executing operations independently of the user, thus further demonstrating the software is a digital tool and assisting instrument Mr. Allen took numerous actions and steps to create the work including writing, editing, making textual creative decisions, making visual creative decisions, curating, upscaling, executing variants, executing a large number of iterations, making cosmetic adjustments and edits manually to the image, and digital preparation for the work to be suitable for print/distribution.
Were there revision cycles to get Midjourney to create an artwork that Mr. Allen wanted? How many revisions were needed?
Mr. Allen input numerous revisions and text prompts at least 624 timesto arrive at the initial version of the image. Once Mr. Allen had this initial version, he made several variations of it. Finally, a variation that was desired to be completed was chosen by Mr. Allen to "upscale." To upscale in Midjourney means to make the image larger, with more detail, and continued expansion upon the prompts instructions. Mr. Allen calls this upscaled version of the image a "completion." Mr. Allen takes this completion and brings it into photoshop, where further visual edits are made to beautify and adjust various cosmetic details/flaws/artifacts etc. This is called a "pass", and Mr. Allen made 2 passes for this image. Once the final image was complete, Mr. Allen proceeded to upscale it again, this time using another photo program, to make the image high enough resolution to be suitable for reproduction via print.If Mr. Allen did input some preexisting art/text into Midjourney to create the work, please attach a copy of it to your reply.

Mr. Allen did not input any preexisting art or text into Midjourney.

IMPORTANT NOTE: The THREAD ID appearing at the end of this message MUST be included within the body of your response in order for your message to be properly routed. When replying to this message, make sure to copy the whole THREAD ID, including brackets, and paste it into the body of your response, preferably after the greeting. DO NOT include the THREAD ID in the subject line of your reply. If you put the THREAD ID in the subject line, we will not get your message.

Failure to comply exactly with our instructions will result in your email not being connected to your application, and your case will be closed without further correspondence from us.

Sincerely,

Examiner Mander
U.S. Copyright Office
Office of Registration Policy and Practice
Visual Arts Division
www.copyright.gov

When replying to this email, please include the following thread id (entire line) within the body of your response to expedite routing to the correct office.

[THREAD ID:1-5ELPKG5]

about:blank

FROM    Tamara Pester Schklar (tamara@tmbtq.com)                                                          Oct 6 2022 4:49 PM
TO      cop-ad@loc.gov
CC
BCC     jasonallen.cs@gmail.com
RE: Théâtre D'opéra Spatial Copyright: 1-11743923581

[THREAD ID:1-5ELPKG5]

Dear Examiner Mander,

Please see our comments below with *tp.

We look forward to the registration of this work.

Thank you,

     Tamara Pester Schklar
            Attorney and Owner

            TMBTQ, a trademark law boutique of Tamara S. Pester, LLC

Phone: 303-333-4696
Email: tamara@tmbtq.com
Web: https://www.tmbtq.com
https://www.learntrademarks.com
Your referrals are the best compliment! Please consider the environment before printing. This message is sent by or on behalf of a lawyer, may contain privileged or confidential information, and is intended solely for the individual or entity to whom it is addressed. If you received this message in error, please notify the sender immediately and delete this message!
-----Original message-----
From: "cop-ad@loc.gov" [cop-ad@loc.gov]
Sent: Tuesday, Oct 4 2022 11:56 AM
To: tamara@tmbtq.com
Subject: RE: Théâtre D'opéra Spatial Copyright: 1-11743923581

You must respond to this message within 45 days and include the THREAD ID, which is located below the Examiner's signature block. The THREAD ID must be in the body of your response, NOT the subject line. If you put the THREAD ID in the subject line, we will not get your message.


Dear Tamara Pester Schklar,

Thank you for your reply. You explained that after Mr. Allen's multiple interactions with Midjourney, he achieved an "initial version of the image". After, he used Photoshop to edit the image.

Please upload the initial version of the image that Mr. Allen accepted from Midjourney and the version of the image after Mr. Allen completed his visual edits.

*tp We have now uploaded the first image generated by Midjourney that Mr. Allen "accepted" in the sense that he was aesthetically attracted to it, it was similar to what he intended to create with the string of prompts, and wanted to further develop it.  This file is named named "original panel from Midjourney.png."  The final version of the image after Mr. Allen completed his visual edits was submitted with the application.

Please note that the "original panel" is one of a set of several possible images that Midjourney generated after Mr. Allen authored and executed the prompt hundreds of times, as described in our September 30, 2022 response.  Executing a prompt in Midjourney creates the very first output or "completion" -- a 2x2 grid of 4 panels of potential images, which we refer to as a "vision board".  Selecting and cropping out one "acceptable" panel out of four potential images on a vision board (after hundreds were previously generated) was a visual creative decision made by Mr. Allen.  The Midjourney machine cannot independently make creative decisions and has no ability to replicate an individual creator's particular sensibilities without very specific and repeated prompts.

Comparing the "original panel" against the final version is a good way to see the detail added, including the runic patterns in the top of the viewport archway.  The original panel was generated in a resolution of 384 x 286 pixels.  The final version was 1536 x 1024 pixels.  A comparison may also allow the Examiner to further understand the immense scope of specific human creative choices and interactions added to the original panel to produce the final work.  This newly uploaded image, "original panel from Midjourney.png " is conceptual, raw, undefined, a general visual reference, which in art director terms would be considered to be a rough concept. Mr. Allen deliberately and intentionally selected this image to upscale and do additional work on.

Please describe in detail the edits that Mr. Allen made. You mentioned that he used photoshop "where further visual edits are made to beautify and adjust various cosmetic details/flaws/artifacts etc." Please explain what this entails.

*tp The first pass of edits focused on removing what Mr. Allen subjectively determined were noticeable flaws, including removing portions from the image that were distracting from the aesthetic direction Mr. Allen wanted. Undesired visual elements which appear abnormal, such as unwanted lines, blemishes, or other such distracting matter, are called "artifacts" by Mr. Allen. Mr. Allen used Photoshop in this pass to find and erase these artifacts, which were many. A few of the most obvious of these artifacts were a crack on the floor next to the central subjects' feet, a deformed looking tower structure in the landscape's background, a dark scar in the cityscape, and a dark blemish in the sky of the background. Mr. Allen removed these artifacts from the image by defining a perimeter around the artifacts, and deleting them, leaving empty space that needs to be recreated. The second pass of edits focused on creating new content within the image to replace the empty spaces that were caused by the deletions of artifacts, and then finally making final adjustments to the image overall. To recreate the content in the empty spaces, Mr. Allen used Photoshop to paint in those areas with content aware tools, then using healing tools, blur and sharpening tools, as well as other brush tools and blending techniques, Mr. Allen finished the edits to appear as though the artifacts were never there.  Then Mr. Allen made additional alterations across the entire image using blending tools (removing miniscule flaws by blending, this is what he means by "beautifying"). Once this was done, the overall image was prepared for upscaling, by making an overall adjustment to the contrast and brightness levels, which highlight the brighter aspects while leaving the darker areas unaffected.


You also mentioned that he upscales the image again, with another photo program, "to make the image high enough resolution to be suitable for reproduction via print." What is the name of the program that Mr. Allen used to do this? Please explain which changes were made using it.

*tp After the second pass of edits were completed, Mr. Allen upscaled the image again using a software program called Gigapixel A.I. by Topaz Labs. Mr. Allen determined a sequence of settings to adjust the upscaling process, based on his initial tests with the image. Once satisfied with the results of the tests, Mr. Allen executed an upscale procedure to enhance the details and the resolution in order to make the file suitable for reproduction on physical media. The changes that are made to the image using this process are significant, as they create more detail that would otherwise be impossible just by resizing the image. Mr. Allen altered the entire image using Gigapixel A.I., bringing in new details, creating more clarity, and sharpening the image.

about:blank

Did Mr. Allen add any new creative work to the image?

*tp We consider the entire image to be a new creative work, as it involves the process of coming up with numerous descriptive prompts, selecting, generating, editing, and re-inputting additional prompts, and creating the final image using a combination of Midjourney, Photoshop, and Gigapixel A.I. The final artistic work is solely dependent on human creativity.  It would be impossible for Midjourney (or any other software program) to create artistic works on its own without specific and repeated direction from humans.*

UPLOAD INSTRUCTIONS

1) Log into your eCO account at https://eco.copyright.gov/eService_enu/.
2) On the Home page, click on "Open Cases" under "Check Registration Case Status."
3) In the list of open cases, click on case number 1-11743923581.
4) Click the green "Select files to upload" button which will open a dialogue box allowing you to browse and select files from your computer.
5) Highlight the file(s) you want and click "Open" in the dialogue box.
6) On the main screen, confirm the file(s) you want are displayed. (To remove a file, click the orange "Remove" button.)
7) Click the blue "Start upload" button. When the upload is successful, "Successfully uploaded" will display next to the filename(s).
8) When you are satisfied the correct files are uploaded, click on the green "Click here to complete your submission" button on the right.

You will receive an automated e-mail confirming your upload. (Please allow up to one hour.) Please be sure to check your spam folder for the upload confirmation email. If you do not receive the confirmation email, then your upload did not complete successfully.

NOTE: If you need to reset your password, or if you experience problems with your upload, please call our technical help desk at (202)707-3002 or by email at CSDTech@loc.gov. You will receive an e-mail confirming your upload within the hour.

IMPORTANT NOTE: The THREAD ID appearing at the end of this message MUST be included within the body of your response in order for your message to be properly routed. When replying to this message, make sure to copy the whole THREAD ID, including brackets, and paste it into the body of your response, preferably after the greeting. DO NOT include the THREAD ID in the subject line of your reply. If you put the THREAD ID in the subject line, we will not get your message.

Failure to comply exactly with our instructions will result in your email not being connected to your application, and your case will be closed without further correspondence from us.

Sincerely,

Examiner Mander
U.S. Copyright Office
Office of Registration Policy and Practice
Visual Arts Division
www.copyright.gov

[THREAD ID:1-5ELPKG5]

-----Original Message-----
From: tamara@tmbtq.com
Sent: 9/30/2022 03:06:23 PM
To: "cop-ad@loc.gov" <cop-ad@loc.gov>
Subject: Théâtre D'opéra Spatial Copyright: 1-11743923581

[THREAD ID:1-5ELPKG5] : Théâtre D'opéra Spatial 1-11743923581

Dear Examiner Mander,

Our answers are below.

Please let us know if you have any further questions or concerns.

Thank you!

Tamara Pester Schklar
Attorney and Owner

TMBTQ, a trademark law boutique of Tamara S. Pester, LLC

Phone:303-333-4696
 Email: tamara@tmbtq.com
 Web: https://www.tmbtq.com
https://www.learntrademarks.com

Your referrals are the best compliment! Please consider the environment before printing. This message is sent by or on behalf of a lawyer, may contain privileged or confidential information, and is intended solely for the individual or entity to whom it is addressed. If you received this message in error, please notify the sender immediately and delete this message!

-----Original message-----
From: "cop-ad@loc.gov" [cop-ad@loc.gov]
Sent: Wednesday, Sep 28 2022 10:28 AM
To: tamara@tmbtq.com
Subject: 1-11743923581 Théâtre D'opéra Spatial
Dear Tamara Pester:

about:blank

Please respond to the questions below within 45 days and include the [THREAD ID], using the brackets, as part of your response. The [THREAD ID] is located below the Examiner's signature block. The [THREAD ID] must be in the body of your response, NOT the subject line. If you put the [THREAD ID] in the subject line, we will not get your message.

We are aware that an Artificial Intelligence program, Midjourney program was involved in the creation of the uploaded artwork. https://www.smithsonianmag.com/smart-news/artificial-intelligence-art-wins-colorado-state-fair-180980703/. We notice that Jason Allen is named as the author on the application without any reference to Midjourney.

United States copyright law protects human-created original works of authorship. Compendium III, 306, 313.2. The copyright law protects "the fruits of the intellectual labor" that "are founded in the creative powers of the mind." Compendium III, 306.

We need to know whether the uploaded work is the result of Mr. Allen's intellectual labor, with Midjourney serving as a mere assisting instrument. Or, whether Midjourney conceived and executed the uploaded work.

In your reply, please provide a detailed description and explanation of Mr. Allen's creative contributions that led to the creation of the final uploaded work.

• Please provide the text prompts/command inputs that Mr. Allen typed into the Midjourney to achieve the final version of the work that he is seeking to register.

The specific string of prompts and inputs are confidential and we are not able to disclose the entire strings that Mr. Allen input to achieve the initial version of the work product. However, a generalization and description of the type of prompts used for this work can be provided.
To preface this description, it should be noted that Mr. Allen used artistic, dramatic, and sophisticated language, terminology, adjectives, and keywords to develop this prompt. The beginning of the prompt focuses on the overall subject of the piece. This is a "big picture description." Next, another "big picture description" was given, as a way of instructing the software that Mr. Allen is combining two ideas. Then, similar to a film director, Mr. Allen informs that "type of scene" is being expressed, which also has an intended effect on the composition. At this point, the main bulk of the image's concept is established, and Mr. Allen can begin describing in detail more information to further develop the piece. For this, he begins to describe quite literally how the image is presented, that is to say, what the overall image's genre and category is. Then certain professional artistic terms which direct the tone of the piece are input. From here, a description of how lifelike the artist wanted the piece to appear was added. Next, a description for what Mr. Allen desired to occur in terms of how colors were used. Then a description to further define the composition was included. After that, words that describe how to "finish" the piece are input. Then, some final terms about what style/era the artwork should depict. Finally, a writing technique that Mr. Allen has established from extensive testing is input at the end to give the image the final emotional impact that makes the image "pop." Once the prompt is finished, Mr. Allen appends it with various parameters which further instruct the software how to develop the image. The entirety of this prompt and parameters is called a "command." Once he had researched, tested, and developed the command, Mr. Allen executed the command into Midjourney to complete the process.
Tell us about Jason Allen's interaction with Midjourney.

The work was a result of Mr. Allen's intellectual labor in that it was conceived using his creative imagination, knowledge, and experience to realize a vision which he translated into a series of descriptive, creative instructions using his skills as a creative writer and art director. These creative instructions are known as a "prompt" which he inputs into a text-to-image multimodal artificial intelligence software called Midjourney. In addition to the prompt, there are initialization texts called "parameters" which are similar to code scripts, which Mr. Allen appended into the prompt when input to the software. Parameters instruct the software to behave in ways specific to the user's vision for the content's output, and there are many. Midjourney did not conceive any creative form of input for this work, and is not capable of executing operations independently of the user, thus further demonstrating the software is a digital tool and assisting instrument Mr. Allen took numerous actions and steps to create the work including writing, editing, making textual creative decisions, making visual creative decisions, curating, upscaling, executing variants, executing a large number of iterations, making cosmetic adjustments and edits manually to the image, and digital preparation for the work to be suitable for print/distribution.
Were there revision cycles to get Midjourney to create an artwork that Mr. Allen wanted? How many revisions were needed?
Mr. Allen input numerous revisions and text prompts at least 624 timesto arrive at the initial version of the image. Once Mr. Allen had this initial version, he made several variations of it. Finally, a variation that was desired to be completed was chosen by Mr. Allen to "upscale." To upscale in Midjourney means to make the image larger, with more detail, and continued expansion upon the prompts instructions. Mr. Allen calls this upscaled version of the image a "completion." Mr. Allen takes this completion and brings it into photoshop, where further visual edits are made to beautify and adjust various cosmetic details/flaws/artifacts etc. This is called a "pass", and Mr. Allen made 2 passes for this image. Once the final image was complete, Mr. Allen proceeded to upscale it again, this time using another photo program, to make the image high enough resolution to be suitable for reproduction via print.If Mr. Allen did input some preexisting art/text into Midjourney to create the work, please attach a copy of it to your reply.

Mr. Allen did not input any preexisting art or text into Midjourney.

IMPORTANT NOTE: The THREAD ID appearing at the end of this message MUST be included within the body of your response in order for your message to be properly routed. When replying to this message, make sure to copy the whole THREAD ID, including brackets, and paste it into the body of your response, preferably after the greeting. DO NOT include the THREAD ID in the subject line of your reply. If you put the THREAD ID in the subject line, we will not get your message.

Failure to comply exactly with our instructions will result in your email not being connected to your application, and your case will be closed without further correspondence from us.

Sincerely,

Examiner Mander
U.S. Copyright Office
Office of Registration Policy and Practice
Visual Arts Division
www.copyright.gov

When replying to this email, please include the following thread id (entire line) within the body of your response to expedite routing to the correct office.

[THREAD ID:1-5ELPKG5]

about:blank

FROM   cop-ad@loc.gov                                                                                      Oct 14 2022 12:30 PM
TO     tamara@tmbtq.com
CC
BCC

RE: Théâtre D'opéra Spatial Copyright: 1-11743923581

You must respond to this message within 45 days and include the THREAD ID, which is located below the Examiner's signature block. The THREAD ID must be in the body of your response, NOT the subject line. If you put the THREAD ID in the subject line, we will not get your message.

Dear Tamara Pester Schklar,

The artwork generated through the use of Midjourney and Gigapixel A.I. is not copyrightable. While Mr. Allen created the text prompts, Midjourney generated and delivered an image for Mr. Allen's approval. As a result, the Midjourney-generated image does not contain direct human-created authorship. Also, you explained to the Copyright Office "Mr. Allen altered the entire image using Gigapixel A.I., bringing in new details, creating more clarity, and sharpening the image." The editing of minor artifacts within the Midjourney-generated image--sharpening and balancing colors, tint, tone, and the like, even though the alterations may be highly skilled and may produce a valuable product--does not add a sufficient amount of original, creative authorship and does not warrant copyright protection.

A work must be created by a human being in order to be registered with the U.S. Copyright Office, Compendium (Third) § 313.2. Even though there might be some human creative input present in the work that is distinct from Midjourney and Gigapixel A.I.'s contribution, this human authorship cannot be distinguished or separated from the final work produced by the computer programs.

However, the final artwork does show that Mr. Allen added new creative authorship to the Midjourney-generated image. The Copyright Office considers Mr. Allen's new work to be a derivative work of the Midjourney-generated image.

As a result, we will require the completion of the limitation of claim to clarify that the registration will extend only to Mr. Allen's direct creative authorship in the image. In the Material Included space, please authorize us to exclude Midjourney's computer-generated image and the editing work done with Gigapixel A.I.

To clarify the scope of what is covered by the registration: in the Material Included space, we will include all copyrightable authorship that Mr. Allen created in the final uploaded image, for example, the addition of the runic patterns in the top of the viewport archway and also the figure in the white dress in the center of the image.

If there is any other new additional original, copyrightable authorship that Mr. Allen created in the final uploaded image that you would like us to consider, please tell us in your reply.

Sincerely,

Examiner Mander
U.S. Copyright Office
Office of Registration Policy and Practice
Visual Arts Division
www.copyright.gov


[THREAD ID:1-5ELPKG5]

-----Original Message-----

From: tamara@tmbtq.com
Sent: 10/6/2022 06:49:03 PM
To: "cop-ad@loc.gov" <cop-ad@loc.gov>
Subject: RE: Théâtre D'opéra Spatial Copyright: 1-11743923581

[THREAD ID:1-5ELPKG5]

Dear Examiner Mander,

Please see our comments below with *tp.

We look forward to the registration of this work.

Thank you,

Tamara Pester Schklar
Attorney and Owner

TMBTQ, a trademark law boutique of Tamara S. Pester, LLC

Phone:303-333-4696
 Email: tamara@tmbtq.com
 Web: https://www.tmbtq.com
https://www.learntrademarks.com

Your referrals are the best compliment! Please consider the environment before printing. This message is sent by or on behalf of a lawyer, may contain privileged or confidential information, and is intended solely for the individual or entity to whom it is addressed. If you received this message in error, please notify the sender immediately and delete this message!

-----Original message-----
From: "cop-ad@loc.gov" [cop-ad@loc.gov]
Sent: Tuesday, Oct 4 2022 11:56 AM
To: tamara@tmbtq.com
Subject: Théâtre D'opéra Spatial Copyright: 1-11743923581
You must respond to this message within 45 days and include the THREAD ID, which is located below the Examiner's signature block. The THREAD ID must be in the body of your response, NOT the subject line. If you put the THREAD ID in the subject line, we will not get your message.

Dear Tamara Pester Schklar,

Thank you for your reply. You explained that after Mr. Allen's multiple interactions with Midjourney, he achieved an "initial version of the image". After, he used Photoshop to edit the image.

Please upload the initial version of the image that Mr. Allen accepted from Midjourney and the version of the image after Mr. Allen completed his visual edits.

about:blank

*tp We have now uploaded the first image generated by Midjourney that Mr. Allen "accepted" in the sense that he was aesthetically attracted to it, it was similar to what he intended to create with the string of prompts, and wanted to further develop it. This file is named named "original panel from Midjourney.png." The final version of the image after Mr. Allen completed his visual edits was submitted with the application.

Please note that the "original panel" is one of a set of several possible images that Midjourney generated after Mr. Allen authored and executed the prompt hundreds of times, as described in our September 30, 2022 response. Executing a prompt in Midjourney creates the very first output or "completion" -- a 2x2 grid of 4 panels of potential images, which we refer to as a "vision board". Selecting and cropping out one "acceptable" panel out of four potential images on a vision board (after hundreds were previously generated) was a visual creative decision made by Mr. Allen. The Midjourney machine cannot independently make creative decisions and has no ability to replicate an individual creator's particular sensibilities without very specific and repeated prompts.

Comparing the "original panel" against the final version is a good way to see the detail added, including the runic patterns in the top of the viewport archway. The original panel was generated in a resolution of 384 x 286 pixels. The final version was 1536 x 1024 pixels. A comparison may also allow the Examiner to further understand the immense scope of specific human creative choices and interactions added to the original panel to produce the final work.This newly uploaded image, "original panel from Midjourney.png " is conceptual, raw, undefined, a general visual reference, which in art director terms would be considered to be a rough concept. Mr. Allen deliberately and intentionally selected this image to upscale and do additional work on.

Please describe in detail the edits that Mr. Allen made. You mentioned that he used photoshop "where further visual edits are made to beautify and adjust various cosmetic details/flaws/artifacts etc." Please explain what this entails.

*tp The first pass of edits focused on removing what Mr. Allen subjectively determined were noticeable flaws, including removing portions from the image that were distracting from the aesthetic direction Mr. Allen wanted. Undesired visual elements which appear abnormal, such as unwanted lines, blemishes, or other such distracting matter, are called "artifacts" by Mr. Allen. Mr. Allen used Photoshop in this pass to find and erase these artifacts, which were many. A few of the most obvious of these artifacts were a crack on the floor next to the central subjects' feet, a deformed looking tower structure in the landscape's background, a dark scar in the cityscape, and a dark blemish in the sky of the background. Mr. Allen removed these artifacts from the image by defining a perimeter around the artifacts, and deleting them, leaving empty space that needs to be recreated. The second pass of edits focused on creating new content within the image to replace the empty spaces that were caused by the deletions of artifacts, and then finally making final adjustments to the image overall. To recreate the content in the empty spaces, Mr. Allen used Photoshop to paint in those areas with content aware tools, then using healing tools, blur and sharpening tools, as well as other brush tools and blending techniques, Mr. Allen finished the edits to appear as though the artifacts were never there. Then Mr. Allen made additional alterations across the entire image using blending tools (removing miniscule flaws by blending, this is what he means by "beautifying"). Once this was done, the overall image was prepared for upscaling, by making an overall adjustment to the contrast and brightness levels, which highlight the brighter aspects while leaving the darker areas unaffected.

You also mentioned that he upscales the image again, with another photo program, "to make the image high enough resolution to be suitable for reproduction via print." What is the name of the program that Mr. Allen used to do this? Please explain which changes were made using it.

*tp After the second pass of edits were completed, Mr. Allen upscaled the image again using a software program called Gigapixel A.I. by Topaz Labs. Mr. Allen determined a sequence of settings to adjust the upscaling process, based on his initial tests with the image. Once satisfied with the results of the tests, Mr. Allen executed an upscale procedure to enhance the details and the resolution in order to make the file suitable for reproduction on physical media. The changes that are made to the image using this process are significant, as they create more detail that would otherwise be impossible just by resizing the image. Mr. Allen altered the entire image using Gigapixel A.I., bringing in new details, creating more clarity, and sharpening the image.

Did Mr. Allen add any new creative work to the image?

*tp We consider the entire image to be a new creative work, as it involves the process of coming up with numerous descriptive prompts, selecting, generating, editing, and re-inputting additional prompts, and creating the final image using a combination of Midjourney, Photoshop, and Gigapixel A.I. The final artistic work is solely dependent on human creativity. It would be impossible for Midjourney (or any other software program) to create artistic works on its own without specific and repeated direction from humans.

UPLOAD INSTRUCTIONS

1) Log into your eCO account at https://eco.copyright.gov/eService_enu/.
2) On the Home page, click on "Open Cases" under "Check Registration Case Status."
3) In the list of open cases, click on case number 1-11743923581.
4) Click the green "Select files to upload" button which will open a dialogue box allowing you to browse and select files from your computer.
5) Highlight the file(s) you want and click "Open" in the dialogue box.
6) On the main screen, confirm the file(s) you want are displayed. (To remove a file, click the orange "Remove" button.)
7) Click the blue "Start upload" button. When the upload is successful, "Successfully uploaded" will display next to the filename(s).
8) When you are satisfied the correct files are uploaded, click on the green "Click here to complete your submission" button on the right.

You will receive an automated e-mail confirming your upload. (Please allow up to one hour.) Please be sure to check your spam folder for the upload confirmation email. If you do not receive the confirmation email, then your upload did not complete successfully.

NOTE: If you need to reset your password, or if you experience problems with your upload, please call our technical help desk at (202)707-3002 or by email at CSDTech@loc.gov. You will receive an e-mail confirming your upload within the hour.

IMPORTANT NOTE: The THREAD ID appearing at the end of this message MUST be included within the body of your response in order for your message to be properly routed. When replying to this message, make sure to copy the whole THREAD ID, including brackets, and paste it within the body of your response, preferably after the greeting. DO NOT include the THREAD ID in the subject line of your reply. If you put the THREAD ID in the subject line, we will not get your message.

Failure to comply exactly with our instructions will result in your email not being connected to your application, and your case will be closed without further correspondence from us.

Sincerely,

Examiner Mander
U.S. Copyright Office
Office of Registration Policy and Practice
Visual Arts Division
www.copyright.gov

[THREAD ID:1-5ELPKG5]

-----Original Message-----

From: tamara@tmbtq.com
Sent: 9/30/2022 03:06:23 PM
To: "cop-ad@loc.gov" <cop-ad@loc.gov>
Subject: Théâtre D'opéra Spatial Copyright: 1-11743923581

[THREAD ID:1-5ELPKG5] : Théâtre D'opéra Spatial 1-11743923581

about:blank

about:blank

Dear Examiner Mander,

Our answers are below.

Please let us know if you have any further questions or concerns.

Thank you!

Tamara Pester Schklar
Attorney and Owner

TMBTQ, a trademark law boutique of Tamara S. Pester, LLC

Phone: 303-333-4696
Email: tamara@tmbtq.com
Web: https://www.tmbtq.com
https://www.learntrademarks.com

Your referrals are the best compliment! Please consider the environment before printing. This message is sent by or on behalf of a lawyer, may contain privileged or confidential information, and is intended solely for the individual or entity to whom it is addressed. If you received this message in error, please notify the sender immediately and delete this message!

-----Original message-----
From: "cop-ad@loc.gov" [cop-ad@loc.gov]
Sent: Wednesday, Sep 28 2022 10:28 AM
To: tamara@tmbtq.com
Subject: 1-11743923581 Théâtre D'opéra Spatial
Dear Tamara Pester:

Please respond to the questions below within 45 days and include the [THREAD ID], using the brackets, as part of your response. The [THREAD ID] is located below the Examiner's signature block. The [THREAD ID] must be in the body of your response, NOT the subject line. If you put the [THREAD ID] in the subject line, we will not get your message.

We are aware that an Artificial Intelligence program, Midjourney program was involved in the creation of the uploaded artwork. https://www.smithsonianmag.com/smart-news/artificial-intelligence-art-wins-colorado-state-fair-180980703/. We notice that Jason Allen is named as the author on the application without any reference to Midjourney.

United States copyright law protects human-created original works of authorship. Compendium III, 306, 313.2. The copyright law protects "the fruits of the intellectual labor" that "are founded in the creative powers of the mind." Compendium III, 306.

We need to know whether the uploaded work is the result of Mr. Allen's intellectual labor, with Midjourney serving as a mere assisting instrument. Or, whether Midjourney conceived and executed the uploaded work.

In your reply, please provide a detailed description and explanation of Mr. Allen's creative contributions that led to the creation of the final uploaded work.

• Please provide the text prompts/command inputs that Mr. Allen typed into the Midjourney to achieve the final version of the work that he is seeking to register.

The specific string of prompts and inputs are confidential and we are not able to disclose the entire strings that Mr. Allen input to achieve the initial version of the work product. However, a generalization and description of the type of prompts used for this work can be provided.
To preface this description, it should be noted that Mr. Allen used artistic, dramatic, and sophisticated language, terminology, adjectives, and keywords to develop this prompt. The beginning of the prompt focuses on the overall subject of the piece. This is a "big picture description." Next, another "big picture description" was given, as a way of instructing the software that Mr. Allen is combining two ideas. Then, similar to a film director, Mr. Allen informs what "type of scene" is being expressed, which also has an intended effect on the composition. At this point, the main bulk of the image's concept is established, and Mr. Allen can begin describing in detail more information to further develop the piece. For this, he begins to describe quite literally how the image is presented, that is to say, what the overall image's genre and category is. Then certain professional artistic terms which direct the tone of the piece are input. From here, a description of how lifelike the artist wanted the piece to appear was added. Next, a description for what Mr. Allen desired to occur in terms of how colors were used. Then a description to further define the composition was included. After that, words that describe how to "finish" the piece are input. Then, some final terms about what style/era the artwork should depict. Finally, a writing technique that Mr. Allen has established from extensive testing is input at the end to give the image the final emotional impact that makes the image "pop". Once the prompt is finished, Mr. Allen appends it with various parameters which further instruct the software how to develop the image. The entirety of this prompt and parameters is called a "command." Once he had researched, tested, and developed the command, Mr. Allen executed the command into Midjourney to complete the process.
Tell us about Jason Allen's interaction with Midjourney.

The work was a result of Mr. Allen's intellectual labor in that it was conceived using his creative imagination, knowledge, and experience to realize a vision which he translated into a series of descriptive, creative instructions using his skills as a creative writer and art director. These creative instructions are known as a "prompt" which he inputs into a text-to-image multimodal artificial intelligence software called Midjourney. In addition to the prompt, there are initialization texts called "parameters" which are similar to code scripts, which Mr. Allen appended into the prompt when input to the software. Parameters instruct the software to behave in ways specific to the user's vision for the content's output, and there are many. Midjourney did not conceive any creative form of input for this work, and is not capable of executing operations independently of the work, thus further demonstrating the software is a digital tool and assisting instrument Mr. Allen took numerous actions and steps to create the work including writing, editing, making textual creative decisions, making visual creative decisions, curating, upscaling, executing variants, executing a large number of iterations, making cosmetic adjustments and edits manually to the image, and digital preparation for the work to be suitable for print/distribution.
Were there revision cycles to get Midjourney to create an artwork that Mr. Allen wanted? How many revisions were needed?
Mr. Allen input numerous revisions and text prompts at least 624 times to arrive at the initial version of the image. Once Mr. Allen had this initial version, he made several variations of it. Finally, a variation that was desired to be completed was chosen by Mr. Allen to "upscale." To upscale in Midjourney means to make the image larger, with more detail, and continued expansion upon the prompts instructions. Mr. Allen calls this upscaled version of the image a "completion." Mr. Allen takes this completion and brings it into photoshop, where further visual edits are made to beautify and adjust various cosmetic details/flaws/artifacts etc. This is called a "pass", and Mr. Allen made 2 passes for this image. Once the final image was complete, Mr. Allen proceeded to upscale it again, this time using another photo program, to make the image high enough resolution to be suitable for reproduction via print. If Mr. Allen did input some preexisting art/text into Midjourney to create the work, please attach a copy of it to your reply.

Mr. Allen did not input any preexisting art or text into Midjourney.

IMPORTANT NOTE: The THREAD ID appearing at the end of this message MUST be included within the body of your response in order for your message to be properly routed. When replying to this message, make sure to copy the whole THREAD ID, including brackets, and paste it into the body of your response, preferably after the greeting. DO NOT include the THREAD ID in the subject line of your reply. If you put the THREAD ID in the subject line, we will not get your message.

Failure to comply exactly with our instructions will result in your email not being connected to your application, and your case will be closed without further correspondence from us.

Sincerely,

about:blank

Examiner Mander
U.S. Copyright Office
Office of Registration Policy and Practice
Visual Arts Division
www.copyright.gov

When replying to this email, please include the following thread id (entire line) within the body of your response to expedite routing to the correct office.

[THREAD ID:1-5ELPKG5]

about:blank

FROM  Tamara Pester Schklar (tamara@tmbtq.com)                                                                Oct 25 2022 8:42 AM
TO    cop-ad@loc.gov
CC
BCC   jasonallen.cs@gmail.com
RE: Théâtre D'opéra Spatial Copyright: 1-11743923581

[THREAD ID:1-5ELPKG5]

Dear Examiner Mander,

We disagree with the remarks in your October 14, 2022 communication indicating that the artwork generated using the Midjourney and Gigapixel A.I. programs is not copyrightable. You have suggested that the bulk of Mr. Allen's work was "created by" Midjourney or Gigapixel; however, these programs were merely used as tools, with Mr. Allen, a human, controlling the tools and creating the desired output. The Copyright Office itself has said that only *humans* can be creators, and in the recent *Entrance to Paradise* matter, declared that it would "not abandon its longstanding interpretation of the Copyright Act, Supreme Court, and lower court judicial precedent that a work meets the legal and formal requirements of copyright protection only if it is created by a human author." *Letter from Copyright Review Board to Ryan Abbott, February 14, 2022, at 2.* By suggesting that Midjourney and Gigapixel are the creators of Mr. Allen's work, the Copyright Office would be contradicting itself, as well as straying from well-established precedent which allows humans who have used novel tools to create a work, to own the copyright in that work.

You indicated that "balancing colors, tint, tone, and the like, even though the alterations may be highly skilled and may produce a valuable product--does not add a sufficient amount of original, creative authorship." However, as previously noted in our communications to you, the programs themselves do not actually make any decisions involved in the creative process or generation of images without human intervention and therefore can not be the creators of such images. Human creative input was essential to create the work; Midjourney and Gigapixel A.I. programs could not possibly produce artwork absent specific human input.

<u>Burrow-Giles Lithographic Co. v. Sarony</u>, 111 U.S. 53, 58 (1884), involving the copyright of a photograph, discussed the facts that made a work subject of copyright protection:  the creator made an image "entirely from his own mental conception. . . gave visible form by posing the [subject], selecting and arranging the costume, draperies, and other various accessories in said photograph, arranging the subject so as to present graceful outlines, arranging and disposing the light and shade, suggesting and evoking the desired expression, and from such disposition, arrangement, or representation, made entirely by plaintiff, he produced the picture in suit.' These findings, we think, show this photograph to be an original work of art, the product of plaintiff's intellectual invention, of which plaintiff is the author, and of a class of inventions for which the constitution intended that congress should secure to him the exclusive right to use, publish, and sell, as it has done by section 4952 of the Revised Statutes." <u>Id</u>.

Similarly, Mr. Allen in this matter input numerous creative discretion and control to utilize tools to ultimately create a visual representation of a creative work that previously existed only in his mind.  His own original mental conception was ultimately responsible for creation of the work in question.  To reiterate, as discussed in our September 30th response, Mr. Allen took a number of steps to generate the image:

*Mr. Allen used artistic, dramatic, and sophisticated language, terminology, adjectives, and keywords to develop this prompt. The beginning of the prompt focuses on the overall subject of the piece. This is a "big picture description." Next, another "big picture description" was given, as a way of instructing the software that Mr. Allen is combining two ideas. Then, similar to a film director, Mr. Allen informs what "type of scene" is being expressed, which also has an intended effect on the composition. At this point, the main bulk of the image's concept is established, and Mr. Allen can begin describing in detail more information to further develop the piece. For this, he begins to describe quite literally how the image is presented, that is to say, what the overall image's genre and category is. Then certain professional artistic terms which direct the tone of the piece are input. From here, a description of how lifelike the artist wanted the piece to appear was added. Next, a description for what Mr. Allen desired to occur in terms of how colors were used. Then a description to further define the composition was included. After that, words that describe how to "finish" the piece are input. Then, some final terms about what style/era the artwork should depict. Finally, a writing technique that Mr. Allen has established from extensive testing is input at the end to give the image the final emotional impact that makes the image "pop." Once the prompt is finished, Mr. Allen appends it with various parameters which further instruct the software how to develop the image. The entirety of this prompt and parameters is called a "command." Once he had researched, tested, and developed the command, Mr. Allen executed the command into Midjourney to complete the process.*

"Originality in rendition may reside in . . .  selection of lighting, shade, lens, angle, depth of field, composition, and other choices, such as manipulation of color balance, saturation, or contrast, that have an aesthetic effect on the final work." <u>Belair v. MGA Ent., Inc.</u>, 831 F. Supp. 2d 687, 692 (S.D.N.Y. 2011), <u>aff'd</u>, 503 F. App'x 65 (2d Cir. 2012).  Mr. Allen did all of these things, albeit using a new medium of creation.

The <u>Burrows</u> case further noted that "Congress very properly has declared [copyrightable subject matter] to include all forms of writing, printing, engravings, etchings, etc., by which the ideas in the mind of the author are given visible expression. The only reason why photographs were not included . . . .  is, probably, that *they did not exist*, as photography, as an art, was then unknown, and the scientific principle on which it rests, and the chemicals and machinery by which it is operated, have all been discovered long since that statute was enacted." <u>Id.</u> at 59.  Here, AI tools such as Midjourney certainly did not exist at the outset of the Copyright Act, but should be considered as tools available to humans in creating artwork, just as photography, screen printing, and other tools can help people express their ideas in a visual medium.  Simply because they are machines that are controlled by humans should not remove the copyrightability of the output.

The Supreme Court has more recently declared that the "requisite level of creativity is extremely low; even a slight amount will suffice. The vast majority of works make the grade quite easily, as they possess some creative spark, 'no matter how crude, humble or obvious' it might be.  Originality does not signify novelty; a work may be original even though it closely resembles other works so long as the similarity is fortuitous, not the result of copying. To illustrate, assume that two poets, each ignorant of the other, compose identical poems. Neither work is novel, yet both are original and, hence, copyrightable. <u>Feist Publications, Inc. v. Rural Tel. Serv. Co.</u>, 499 U.S. 340 (1991), quoting <u>Sheldon v. Metro–Goldwyn Pictures Corp.</u>, *81 F.2d 49*, 54 (CA2 1936).  Certainly, there was a great deal of creativity involved in the matter at hand; Mr. Allen expressed to Midjourney in words his desired result, then continuously altered the image by inputting additional commands until he was satisfied with the result.

Finally, we note that the Copyright Office opining into whether or not Mr. Allen's use of tools created an original work veers from the goal of the copyright system, which is to protect authors of works.  The Copyright process "has no such provision for previous examination by a proper tribunal as to the originality of the book, map, or other matter offered for copyright. A deposit of two copies of the article or work with the librarian of congress, with the name of the author and its title page, is all that is necessary to secure a copyright." <u>Burrow-Giles Lithographic Co. v. Sarony</u>, 111 U.S. 53 at 59–60.

Based on the existing case law and guidance from the Copyright Review Board, we decline to limit Mr. Allen's claim to augmentations to the image and exclude the entirety of the image which the author used Midjourney and Gigapixel A.I to generate.  We believe that the correct scope of copyrightable authorship that Mr. Allen is the entire image submitted to the Copyright Office and request that you please reconsider the registration.

Sincerely,



Tamara Pester Schklar
Attorney and Owner

TMBTQ, a trademark law boutique of Tamara S. Pester, LLC

about:blank

Phone: 303-333-4696
Email: tamara@tmbtq.com
Web: https://www.tmbtq.com
https://www.learntrademarks.com

Your referrals are the best compliment! Please consider the environment before printing. This message is sent by or on behalf of a lawyer, may contain privileged or confidential information, and is intended solely for the individual or entity to whom it is addressed. If you received this message in error, please notify the sender immediately and delete this message!

-----Original message-----
From: "cop-ad@loc.gov" [cop-ad@loc.gov]
Sent: Friday, Oct 14 2022 12:30 PM
To: tamara@tmbtq.com
Subject: RE: Théâtre D'opéra Spatial Copyright: 1-11743923581

You must respond to this message within 45 days and include the THREAD ID, which is located below the Examiner's signature block. The THREAD ID must be in the body of your response, NOT the subject line. If you put the THREAD ID in the subject line, we will not get your message.

Dear Tamara Pester Schklar,

The artwork generated through the use of Midjourney and Gigapixel A.I. is not copyrightable. While Mr. Allen created the text prompts, Midjourney generated and delivered an image for Mr. Allen's approval. As a result, the Midjourney-generated image does not contain direct human-created authorship. Also, you explained to the Copyright Office "Mr. Allen altered the entire image using Gigapixel A.I., bringing in new details, creating more clarity, and sharpening the image." The editing of minor artifacts within the Midjourney-generated image--sharpening and balancing colors, tint, tone, and the like, even though the alterations may be highly skilled and may produce a valuable product--does not add a sufficient amount of original, creative authorship and does not warrant copyright protection.

A work must be created by a human being in order to be registered with the U.S. Copyright Office, Compendium (Third) § 313.2. Even though there might be some human creative input present in the work that is distinct from Midjourney and Gigapixel A.I.'s contribution, this human authorship cannot be distinguished or separated from the final work produced by the computer programs.

However, the final artwork does show that Mr. Allen added new creative authorship to the Midjourney-generated image. The Copyright Office considers Mr. Allen's new work to be a derivative work of the Midjourney-generated image.

As a result, we will require the completion of the limitation of claim to clarify that the registration will extend only to Mr. Allen's direct creative authorship in the image. In the Material Excluded space, please authorize us to exclude Midjourney's computer-generated image and the editing work done with Gigapixel A.I.

To clarify the scope of what is covered by the registration: in the Material Included space, we will include all copyrightable authorship that Mr. Allen created in the final uploaded image, for example, the addition of the runic patterns in the top of the viewport archway and also the figure in the white dress in the center of the image.

If there is any other new additional original, copyrightable authorship that Mr. Allen created in the final uploaded image that you would like us to consider, please tell us in your reply.

Sincerely,

Examiner Mander
U.S. Copyright Office
Office of Registration Policy and Practice
Visual Arts Division
www.copyright.gov


[THREAD ID:1-5ELPKG5]


-----Original Message-----

From: tamara@tmbtq.com
Sent: 10/6/2022 06:49:03 PM
To: "cop-ad@loc.gov" <cop-ad@loc.gov>
Subject: RE: Théâtre D'opéra Spatial Copyright: 1-11743923581

[THREAD ID:1-5ELPKG5]

Dear Examiner Mander,

Please see our comments below with *tp.

We look forward to the registration of this work.

Thank you,

Tamara Pester Schklar
Attorney and Owner

TMBTQ, a trademark law boutique of Tamara S. Pester, LLC

Phone:303-333-4696
 Email: tamara@tmbtq.com
 Web: https://www.tmbtq.com
https://www.learntrademarks.com

Your referrals are the best compliment! Please consider the environment before printing. This message is sent by or on behalf of a lawyer, may contain privileged or confidential information, and is intended solely for the individual or entity to whom it is addressed. If you received this message in error, please notify the sender immediately and delete this message!

-----Original message-----
From: "cop-ad@loc.gov" [cop-ad@loc.gov]
Sent: Tuesday, Oct 4 2022 11:56 AM
To: tamara@tmbtq.com

about:blank

Subject: Théâtre D'opéra Spatial Copyright: 1-11743923581
You must respond to this message within 45 days and include the THREAD ID, which is located below the Examiner's signature block. The THREAD ID must be in the body of your response, NOT the subject line. If you put the THREAD ID in the subject line, we will not get your message.

Dear Tamara Pester Schklar,

Thank you for your reply. You explained that after Mr. Allen's multiple interactions with Midjourney, he achieved an "initial version of the image". After, he used Photoshop to edit the image.

Please upload the initial version of the image that Mr. Allen accepted from Midjourney and the version of the image after Mr. Allen completed his visual edits.

*tp We have now uploaded the first image generated by Midjourney that Mr. Allen "accepted" in the sense that he was aesthetically attracted to it, it was similar to what he intended to create with the string of prompts, and wanted to further develop it. This file is named named "original panel from Midjourney.png." The final version of the image after Mr. Allen completed his visual edits was submitted with the application.

Please note that the "original panel" is one of a set of several possible images that Midjourney generated after Mr. Allen authored and executed the prompt hundreds of times, as described in our September 30, 2022 response. Executing a prompt in Midjourney creates the very first output or "completion" -- a 2x2 grid of 4 panels of potential images, which we refer to as a "vision board". Selecting and cropping out one "acceptable" panel out of four potential images on a vision board (after hundreds were previously generated) was a visual creative decision made by Mr. Allen. The Midjourney machine cannot independently make creative decisions and has no ability to replicate an individual creator's particular sensibilities without very specific and repeated prompts.

Comparing the "original panel" against the final version is a good way to see the detail added, including the runic patterns in the top of the viewport archway. The original panel was generated in a resolution of 384 x 286 pixels. The final version was 1536 x 1024 pixels. A comparison may also allow the Examiner to further understand the immense scope of specific human creative choices and interactions added to the original panel to produce the final work.This newly uploaded image, "original panel from Midjourney.png " is conceptual, raw, undefined, a general visual reference, which in art director terms would be considered to be a rough concept. Mr. Allen deliberately and intentionally selected this image to upscale and do additional work on.

Please describe in detail the edits that Mr. Allen made. You mentioned that he used photoshop "where further visual edits are made to beautify and adjust various cosmetic details/flaws/artifacts etc." Please explain what this entails.

*tp The first pass of edits focused on removing what Mr. Allen subjectively determined were noticeable flaws, including removing portions from the image that were distracting from the aesthetic direction Mr. Allen wanted. Undesired visual elements which appear abnormal, such as unwanted lines, blemishes, or other such distracting matter, are called "artifacts" by Mr. Allen. Mr. Allen used Photoshop in this pass to find and erase these artifacts, which were many. A few of the most obvious of these artifacts were a crack on the floor next to the central subjects' feet, a deformed looking tower structure in the landscape's background, a dark scar in the cityscape, and a dark blemish in the sky of the background. When Mr. Allen removed these artifacts from the image by defining a perimeter around the artifacts, and deleting them, leaving empty space that needs to be recreated. The second pass of edits focused on creating new content within the image to replace the empty spaces that were caused by the deletions of artifacts, and then finally making final adjustments to the image overall. To recreate the content in the empty spaces, Mr. Allen used Photoshop to paint in those areas with content aware tools, then using healing tools, blur and sharpening tools, as well as other brush tools and blending techniques, Mr. Allen finished the edits to appear as though the artifacts were never there. Then Mr. Allen made additional alterations across the entire image using blending tools (removing miniscule flaws by blending, this is what he means by "beautifying"). Once this was done, the overall image was prepared for upscaling, by making an overall adjustment to the contrast and brightness levels, which highlight the brighter aspects while leaving the darker areas unaffected.

You also mentioned that he upscales the image again, with another photo program, "to make the image high enough resolution to be suitable for reproduction via print." What is the name of the program that Mr. Allen used to do this? Please explain which changes were made using it.

*tp After the second pass of edits were completed, Mr. Allen upscaled the image again using a software program called Gigapixel A.I. by Topaz Labs. Mr. Allen determined a sequence of settings to adjust the upscaling process, based on his initial tests with the image. Once satisfied with the results of the tests, Mr. Allen executed an upscale procedure to enhance the details and the resolution in order to make the file suitable for reproduction on physical media. The changes that are made to the image using this process are significant, as they create more detail that would otherwise be impossible just by resizing the image. Mr. Allen altered the entire image using Gigapixel A.I., bringing in new details, creating more clarity, and sharpening the image.

Did Mr. Allen add any new creative work to the image?

*tp We consider the entire image to be a new creative work, as it involves the process of coming up with numerous descriptive prompts, selecting, generating, editing, and re-inputting additional prompts, and creating the final image using a combination of Midjourney, Photoshop, and Gigapixel A.I. The final artistic work is solely dependent on human creativity. It would be impossible for Midjourney (or any other software program) to create artistic works on its own without specific and repeated direction from humans.

UPLOAD INSTRUCTIONS

1) Log into your eCO account at https://eco.copyright.gov/eService_enu/.
2) On the Home page, click on "Open Cases" under "Check Registration Case Status."
3) In the list of open cases, click on case number 1-11743923581.
4) Click the green "Select files to upload" button which will open a dialogue box allowing you to browse and select files from your computer.
5) Highlight the file(s) you want and click "Open" in the dialogue box.
6) On the main screen, confirm the file(s) you want are displayed. (To remove a file, click the orange "Remove" button.)
7) Click the blue "Start upload" button. When the upload is successful, "Successfully uploaded" will display next to the filename(s).
8) When you are satisfied the correct files are uploaded, click on the green "Click here to complete your submission" button on the right.

You will receive an automated e-mail confirming your upload. (Please allow up to one hour.) Please be sure to check your spam folder for the upload confirmation email. If you do not receive the confirmation email, then your upload did not complete successfully.

NOTE: If you need to reset your password, or if you experience problems with your upload, please call our technical help desk at (202)707-3002 or by email at CSDTech@loc.gov. You will receive an e-mail confirming your upload within the hour.

IMPORTANT NOTE: The THREAD ID appearing at the end of this message MUST be included within the body of your response in order for your message to be properly routed. When replying to this message, make sure to copy the whole THREAD ID, including brackets, and paste it into the body of your response, preferably after the greeting. DO NOT include the THREAD ID in the subject line of your reply. If you put the THREAD ID in the subject line, we will not get your message.

Failure to comply exactly with our instructions will result in your email not being connected to your application, and your case will be closed without further correspondence from us.

Sincerely,

Examiner Mander
U.S. Copyright Office
Office of Registration Policy and Practice
Visual Arts Division
www.copyright.gov

about:blank

[THREAD ID:1-5ELPKG5]

-----Original Message-----

From: tamara@tmbtq.com
Sent: 9/30/2022 03:06:23 PM
To: "cop-ad@loc.gov" <cop-ad@loc.gov>
Subject: Théâtre D'opéra Spatial Copyright: 1-11743923581

[THREAD ID:1-5ELPKG5] : Théâtre D'opéra Spatial 1-11743923581

Dear Examiner Mander,

Our answers are below.

Please let us know if you have any further questions or concerns.

Thank you!

Tamara Pester Schklar
Attorney and Owner

TMBTQ, a trademark law boutique of Tamara S. Pester, LLC

Phone:303-333-4696
Email: tamara@tmbtq.com
Web: https://www.tmbtq.com
https://www.learntrademarks.com

Your referrals are the best compliment! Please consider the environment before printing. This message is sent by or on behalf of a lawyer, may contain privileged or confidential information, and is intended solely for the individual or entity to whom it is addressed. If you received this message in error, please notify the sender immediately and delete this message!

-----Original message-----
From: "cop-ad@loc.gov" [cop-ad@loc.gov]
Sent: Wednesday, Sep 28 2022 10:28 AM
To: tamara@tmbtq.com
Subject: 1-11743923581 Théâtre D'opéra Spatial
Dear Tamara Pester:

Please respond to the questions below within 45 days and include the [THREAD ID], using the brackets, as part of your response. The [THREAD ID] is located below the Examiner's signature block. The [THREAD ID] must be in the body of your response, NOT the subject line. If you put the [THREAD ID] in the subject line, we will not get your message.

We are aware that an Artificial Intelligence program, Midjourney program was involved in the creation of the uploaded artwork. https://www.smithsonianmag.com/smart-news/artificial-intelligence-art-wins-colorado-state-fair-180980703/. We notice that Jason Allen is named as the author on the application without any reference to Midjourney.

United States copyright law protects human-created original works of authorship. Compendium III, 306, 313.2. The copyright law protects "the fruits of the intellectual labor" that "are founded in the creative powers of the mind." Compendium III, 306.

We need to know whether the uploaded work is the result of Mr. Allen's intellectual labor, with Midjourney serving as a mere assisting instrument. Or, whether Midjourney conceived and executed the uploaded work.

In your reply, please provide a detailed description and explanation of Mr. Allen's creative contributions that led to the creation of the final uploaded work.

• Please provide the text prompts/command inputs that Mr. Allen typed into the Midjourney to achieve the final version of the work that he is seeking to register.

The specific string of prompts and inputs are confidential and we are not able to disclose the entire strings that Mr. Allen input to achieve the initial version of the work product. However, a generalization and description of the type of prompts used for this work can be provided.
To preface this description, it should be noted that Mr. Allen used artistic, dramatic, and sophisticated language, terminology, adjectives, and keywords to develop this prompt. The beginning of the prompt focuses on the overall subject of the piece. This is a "big picture description." Next, another "big picture description" was given, as a way of instructing the software that Mr. Allen is combining two ideas. Then, similar to a film director, Mr. Allen informs what "type of scene" is being expressed, which also has an intended effect on the composition. At this point, the main bulk of the image's concept is established, and Mr. Allen can begin describing in detail more information to further develop the piece. For this, he begins to describe quite literally how the image is presented, that is to say, what the overall image's genre and category is. Then certain professional artistic terms which direct the tone of the piece are input. From here, a description of how lifelike the artist wanted the piece to appear was added. Next, a description for what Mr. Allen desired to occur in terms of how colors were used. Then a description to further define the composition was included. After that, words that describe how to "finish" the piece are input. Then, some final terms about what style/era the artwork should depict. Finally, a writing technique that Mr. Allen has established from extensive testing is input at the end to give the image the final emotional impact that makes the image "pop." Once the prompt is finished, Mr. Allen appends it with various parameters which further instruct the software how to develop the image. The entirety of this prompt and parameters is called a "command." Once he had researched, tested, and developed the command, Mr. Allen executed the command into Midjourney to complete the process.
Tell us about Jason Allen's interaction with Midjourney.

The work was a result of Mr. Allen's intellectual labor in that it was conceived using his creative imagination, knowledge, and experience to realize a vision which he translated into a series of descriptive, creative instructions using his skills as a creative writer and art director. These creative instructions are known as a "prompt" which he inputs into a text-to-image multimodal artificial intelligence software called Midjourney. In addition to the prompt, there are initialization texts called "parameters" which are similar to code scripts, which Mr. Allen appended into the prompt when input to the software. Parameters instruct the software to behave in ways specific to the user's vision for the content's output, and there are many. Midjourney did not conceive any creative form of input for this work, and is not capable of executing operations independently of the user, thus further demonstrating the software is a digital tool and assisting instrument Mr. Allen took numerous actions and steps to create the work including writing, editing, making textual creative decisions, making visual creative decisions, curating, upscaling, executing variants, executing a large number of iterations, making cosmetic adjustments and edits manually to the image, and digital preparation for the work to be suitable for print/distribution.
Were there revision cycles to get Midjourney to create an artwork that Mr. Allen wanted? How many revisions were needed?
Mr. Allen input numerous revisions and text prompts at least 624 timesto arrive at the initial version of the image. Once Mr. Allen had this initial version, he made several variations of it. Finally, a variation that was desired to be completed was chosen by Mr. Allen to "upscale." To upscale in Midjourney means to make the image larger, with more detail, and continued expansion upon the prompts instructions. Mr. Allen calls this upscaled version of the image a "completion." Mr. Allen takes this completion and brings it into photoshop, where further visual edits are made to beautify and adjust various cosmetic details/flaws/artifacts etc. This is called a "pass," and Mr. Allen made 2 passes for this image. Once the final image was complete, Mr. Allen proceeded to upscale it again, this time using another photo program, to make the image high enough resolution to be suitable for reproduction via print.If Mr. Allen did input some preexisting art/text into Midjourney to create the work, please attach a copy of it to your reply.

about:blank

Mr. Allen did not input any preexisting art or text into Midjourney.

IMPORTANT NOTE: The THREAD ID appearing at the end of this message MUST be included within the body of your response in order for your message to be properly routed. When replying to this message, make sure to copy the whole THREAD ID, including brackets, and paste it into the body of your response, preferably after the greeting. DO NOT include the THREAD ID in the subject line of your reply. If you put the THREAD ID in the subject line, we will not get your message.

Failure to comply exactly with our instructions will result in your email not being connected to your application, and your case will be closed without further correspondence from us.

Sincerely,

Examiner Mander
U.S. Copyright Office
Office of Registration Policy and Practice
Visual Arts Division
www.copyright.gov

When replying to this email, please include the following thread id (entire line) within the body of your response to expedite routing to the correct office.

[THREAD ID:1-5ELPKG5]

# EXHIBIT 4



**United States Copyright Office**

Library of Congress · 101 Independence Avenue SE · Washington DC 20559-6000 · www.copyright.gov

December 13, 2022

Tamara S. Pester, LLC
Attn: Tamara Pester
PO Box 6601
Denver, CO 80206
United States

Correspondence ID:    1-5IVDL1X

RE:    Theatre D'opera Spatial

Dear Tamara Pester:

We have decided that we cannot register this copyright claim because the deposit does not contain any human authorship; instead, the deposit contains only material that your client solicited from an artificial intelligence art-generator.  In fact, your client only provided prompts, instructions, or directions to the AI, but you have not deposited this human-generated material.  Instead, all of the pictorial and graphic content within the deposit is attributable to the AI - - your client did not paint, sketch, color, or otherwise fix any of the deposit.  We understand that there was much back-forth interaction between your client and the AI, but such prompts, directions, or instructions might be either in the nature of ideas, concepts, or methods (most likely), or in the nature of a fixed literary work (arguendo), but we do not have to decide this given that you have not deposited whatever your client clearly did contribute.  As for your position that the deposit fixes arguably both your client's and the AI's contributions, still you did not deposit a work that fixes only the client's alleged authorship; instead, the deposits fix alleged and inextricably merged, inseparable contributions from both parties.  As for your position that your client is responsible for the AI's results, in our view this does not define human author and authorship as we understand it.  Only human authorship should be deposited and claimed, and you have not done this.  In our view, human authorship is a Constitutional and statutory requirement of respectively the Progress Clause and 17 USC 102(a).  We have embodied this requirement in section 313 of our Compendium Third of Copyright Office Practices.

Accordingly, we have closed this file as a refusal-to-register.

Tamara Pester                          - 2 -                          1-5IVDL1X

Sincerely,

Examiner Mander
U.S. Copyright Office
Office of Registration Policy and Practice
Visual Arts Division

Enclosures:
  Reply Sheet



**United States Copyright Office**

Library of Congress · 101 Independence Avenue SE · Washington DC 20559-6000 · www.copyright.gov



*1-5IVDL1X*

# Use this sheet <u>if</u> you request reconsideration

## How to request reconsideration:

- Send your written explanation *of why the claim should be registered or why it was* improperly refused.
- Be sure to include the Correspondence ID Number (listed under the bar code above) on the first page of your Request.
- Indicate whether you are requesting a "First Reconsideration" or "Second Reconsideration."
- **Submit your request ONLINE:** We strongly recommend sending all requests for reconsideration via email following these steps:

  **EMAIL YOUR REQUEST (BUT NOT THE REQUIRED FEE) to:**
  reconsideration@copyright.gov.
  o The subject line should say "First Reconsideration" or "Second Reconsideration"
  o Once your email request is received, you will be contacted with instructions on how to submit the required fee.
  o Failure to send your request for reconsideration to the above email address will result in a delayed response.

  **IMPORTANT NOTE**: Your request and the required fee must be received no later than three months after a refusal is issued.

- **Alternatively, you may submit your request VIA MAIL**:

  o **IMPORTANT NOTE**: Your request must be postmarked (via the U.S. Postal Service) or dispatched (via commercial carrier, courier, or messenger) no later than three months after a refusal is issued.
  o Enclose the required fee.
  o Address your request to**:**

    **FIRST RECONSIDERATION *or* SECOND RECONSIDERATION**
    **U.S. Copyright Office**
    **MCA Division**
    **P.O. Box 71380**
    **Washington, DC 20024-1380**

Tamara Pester                            - 4 -                            1-5IVDL1X

**First Request for Reconsideration ($350.00 per application):** The Registration Program Office considers the first request. If it upholds the refusal, you may submit a second request.

**Second Request for Reconsideration ($700.00 per application):** The Copyright Office Review Board considers the second request. The Board consists of the Register of Copyrights and the General Counsel (or their respective designees), and a third member appointed by the Register. The Board's decision constitutes final agency action.

**Notification of decision**: The Copyright Office will send all notifications of its decisions by email to the email address provided in the record and/or in the request for reconsideration. If no email address is provided, the Office will send its decision via mail.

**RECONSIDERATION FEES:**

**First Request**        $350 per application

**Second Request**      $700 per application

READ MORE:

- U.S. Copyright Office Administrative Appeals:
  https://copyright.gov/comp3/chap1700/ch1700-administrative-appeals.pdf

- U.S. Copyright Office Fees:
  https://copyright.gov/circs/circ04.pdf

- Copyright Basics:
  https://copyright.gov/circs/circ01.pdf

- Copyright Registration:
  https://copyright.gov/circs/circ02.pdf

# EXHIBIT 5

First Request for Reconsideration

Service Request Number: 1-11743923581
Correspondence ID: 1-5IVDL1X
Name of Claimant: Jason Allen
Title of Work: Théâtre D'opéra Spatial

On behalf of claimant Jason Allen ("**Mr. Allen**"), we respectfully request that the U.S. Copyright Office (the "**Copyright Office**") reconsider its refusal to register the copyright claim in the work Théâtre D'opéra Spatial (the "**Work**"). The reasons cited by Examiner Mander in the letter dated December 13, 2022, Correspondence ID: 1-5IVDLIX (the "**Refusal Letter**"), reflect a misunderstanding of how the Work was authored, and what we believe is a misapplication of the Copyright Act of 1976 (the "**Copyright Act**") and the Compendium Third of Copyright Office Practices (the "**Compendium**," and together with the Copyright Act, the Progress Clause of the U.S. Constitution, and other sources of U.S. copyright law, collectively, "**Copyright Law**"). Mr. Allen's process of creating the work is fundamentally consistent with the process of creation for other visual works that receive the protection of registration with the Copyright Office, and, likewise, deserves to be registered and protected.

The novelty and uncertainty of artificial intelligence ("**AI**") technology and tools is undoubtedly a significant challenge facing the Copyright Office, and a modicum of sympathy is certainly due for those attempting to apply existing law accurately and uniformly to works made using any form of AI. Further, if, as it appears from recent decisions, the Copyright Office has taken the position that the use of AI tools renders a work ineligible for copyright protection, then we must accept that position and look forward to new legislation to protect creators using AI tools. However, we think there is room to distinguish works authored with the use of AI as "merely an assisting instrument," as the Compendium framework provides, versus those where the AI stands in place of the traditional human role of creation, and feel strongly that the Work fits comfortably in the former category.

## I.    MISAPPLICATION OF THE HUMAN AUTHORSHIP REQUIREMENT

The main reason for denial in the Refusal Letter was that the Work did not meet the human authorship requirement under the Copyright Act. The Refusal Letter begins by stating bluntly that "the deposit does not contain any human authorship; instead the deposit contains only material that your client solicited from an artificial intelligence art-generator."

Sections 306 and 313.2 of the Compendium set forth the human authorship requirement and provide examples of works that do not meet the requirement. Authorship by nature, non-human animals or plants is not relevant here. The inquiry focuses instead on the second part of Section 313.2, which reads:

> "Similarly, the Office will not register works produced by a machine or mere mechanical process that operates randomly or automatically without any creative input or intervention from a human author. The crucial question is 'whether the 'work' is basically one of human authorship, with the computer [or other device] merely being an assisting instrument, or whether the traditional elements of authorship in the work (literary, artistic, or musical expression or elements of selection, arrangement, etc.) were actually conceived and executed not by man but by a machine.' U.S. COPYRIGHT OFFICE, REPORT TO THE LIBRARIAN OF CONGRESS BY THE REGISTER OF COPYRIGHTS 5 (1966)."

This paragraph is followed by a list of examples, presumably meant to illustrate the principal. Unfortunately there appear to be several issues with this paragraph and the examples that follow.

(a)  **The two sentences are inconsistent with each other.**

Read alone, the first sentence sets a low bar for human authorship; the work simply needs "*any* creative input or intervention from a human author" (emphasis added). If the second sentence didn't exist, the examination of a deposit would take only so long as required to identify "any" human input or intervention in each part of the work that is otherwise copyrightable.

The second sentence offers a "crucial question" that seems both unrelated to the guidance provided in the first sentence, and adds considerable confusion to the analysis of human authorship. If the second sentence alone set the standard, then even a very high level of human authorship could still not qualify if the "traditional elements of authorship in the work" were attributable to machine assistance.

Presumably we cannot simply ignore one sentence or the other, which leads to an impossible task of reconciling contradictory standards, and wondering which will actually be applied in a given instance.

(b)  **The guidance in this paragraph is not found in the cited Report to the Librarian of Congress**.

It is unclear why the authoritative support for this paragraph is a reference to the Annual Report of the Register of Copyrights for the Fiscal Year Ending June 30, 1966. Neither the language in the Compendium nor the concept of human versus machine authorship are discussed in this report. Regardless of whether this reference is made in error, or a piece of the report has been taken out of context, it offers no additional guidance on the issue of human authorship. There is a paragraph identifying the problem of "aleatory music," but this is hardly a discussion of the human authorship issue or a statement that offers any guidance.

(c)  **The first five examples are not relevant to the question of human versus machine authorship**.

The first five examples offer little help because they don't depend on the role of a machine. The first example, reducing or enlarging the size of a preexisting work of authorship, would not be copyrightable regardless of whether the reduction or enlargement were carried out by a machine, since the re-sized version would fail the originality requirement. The same is true of the second, third, fourth and fifth examples, with the second example also being more relevant to the issue of useful articles.

(d)  **The sixth and seventh example show that the human authorship standard has been used out of context with respect to the Work.**

The sixth example, if illustrative of the distinction between human authorship and machine authorship, shows that the human authorship requirement has been misapplied in this context. The purpose of medical imaging is for diagnosing injuries, not for creative expression. The human technicians working in the medical lab are not attempting to express some creative idea they've come up with; they are simply trying accurately image the patient in order to provide effective diagnosis. It goes without saying that this is not the type of work that the Copyright Laws are meant to protect (though its illustrative of the confusing nature of the guidance paragraph because the medical imaging machine is literally an "assisting instrument," and also does not conceive or execute "the traditional elements of authorship in the work (literary, artistic, or musical expression or elements of selection, arrangement, etc.)"). The AI tool Mr. Allen used in creating the work was used for the purpose of expressing Mr. Allen's creative idea. The result is not meant for any useful purpose, like diagnosing a patient's injury or illness.

Finally, the seventh example is perhaps the most helpful in highlighting the difference between human and machine authorship. The mechanical weaving process produces irregular shapes at random, with no discernible pattern. It shows that the reason such resulting weave would not be copyrightable is because there could not have been a creative human idea as the origin of the design. The machine is programed to randomize the shape and the pattern, so it's not possible to say that the design that happened to occur randomly was in fact the expression of an idea that originated in the mind of the human operating the machine. Here, the Work is clearly not a random pattern of irregular shapes. The imagine is obviously one that expresses an idea that originated in a human mind, not one that was randomly spit out by a machine.

## II.    COPYRIGHT LAW FOCUSES ON THE ORIGIN OF THE IDEA EXPRESSED

The inquiry with respect to human authorship focuses on whether the work at issue is an expression of a human idea, not what tools were used in the process of creation.

The discussion above of the sixth and seventh examples is consistent with the case law dealing with this issue. The core element of copyright seems to be an artistic or creative thought that originates in the mind of a human that is then expressed in some tangible medium. The term "author" identifies the human in which the thought originated and who goes about bringing the thought into the world by expressing it in some medium.

With this understanding, it becomes clear that it is a nonsensical statement to say that the AI tool is the author; the AI tool does not have or originate thoughts, and does not go about attempting to express its own ideas.

This is why natural phenomena, facts, and medical imaging are not proper for copyright protection; the pattern of tree rings did not originate in the mind of a human, nor did the force gravity exerts on objects, and medical images are not taken with an eye towards creativity or artistic expression – they are taken for functional purposes.

The example of a monkey taking a picture is interesting to explore. Handing a monkey a camera then seeing what pictures it takes does not lead to photographs that are protectable under Copyright Law. However, if the artist goes about "selecting and arranging the costume, draperies, and other various accessories in said photograph, arranging the subject so as to present graceful outlines, arranging and disposing the light and shade, suggesting and evoking the desired expression" (*Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53 (1884)), but has simply trained the monkey to press the button on the camera to take the picture when the artist gives the monkey a signal the monkey has been trained to follow, then surely the physical act of pressing the button does change the copyrightability of the photograph.

How could such a strict requirement be applied, for example, to a quadriplegic? If such a person originated the idea for the photograph and went about the same process identified in Burrow-Giles, but required an assistant or a voice recognizing machine to actually press the button on the camera, would there be any argument over who the author of the resulting photograph was?

This underscores that the human authorship requirement is not an arbitrary rule against animals or trees, but simply a way to identify the intent of copyright protection – to protect the expression of creative ideas, which creative ideas, by definition, can only come from humans given what we know (or don't know) about non-human cognition, whether animal or machine.

Further, it is consistent with the "*sin qua non* of copyright": originality (*Feist Publications, Inc. v. Rural Telephone Service Co., Inc.*, 499 U.S. 340, 345 (1991)). Originality works as dividing line between

protectable and non-protectable works because the idea did not originate in the mind of the person copying another artist's work.

## III.   AI ASSISTED ART IS ANALOGOUS TO PHOTOGRAPHY

The arguments against protecting works created with AI tools seems analogous to the issue addressed in *Burrow-Giles*, where the copyrightability of photographs was challenged.

Examiner Mander states in the Refusal Letter that Mr. Allen "did not paint, sketch, color, or otherwise fix any of the deposit." This seems identical to the argument that the *Burrow-Giles* court rejected (emphasis added):

> "[I]t is said that an engraving, a painting, a print, does embody the intellectual conception of its author, in which there is novelty, invention, originality, and therefore comes within the purpose of the constitution in securing its exclusive use or sale to its author, while a photograph is the mere mechanical reproduction of the physical features or outlines of some object, animate or inanimate, and involves no originality of thought or any novelty in the intellectual operation connected with its visible reproduction in shape of a picture. That while the effect of light on the prepared plate may have been a discovery in the production of these pictures, and patents could properly be obtained for the combination of the chemicals, for their application to the paper or other surface, for all the machinery by which the light reflected from the object was thrown on the prepared plate, and for all the improvements in this machinery, and in the materials, the remainder of the process is merely mechanical, with no place for novelty, invention, or originality. It is simply the manual operation, by the use of these instruments and preparations, of transferring to the plate the visible representation of some existing object, the accuracy of this representation being its highest merit. This may be true in regard to the ordinary production of a photograph, and that in such case a copyright is no protection. On the question as thus stated we decide nothing.

*Burrow-Giles* at 58–59.

In other words, the Court is drawing a distinction between photographs taken with no artistic intent (i.e., the result of someone pointing a camera in a random direction and clicking the button), versus those that have been composed and reflect the artistic ideas of the photographer. This is consistent with the notion we have argued that the proper focus of examination is whether the work reflects a physical expression of an idea that originated in the mind of the human author. The court dismisses a narrow reading of the word "author," and identifies the common characteristic of "writings" that fall within the scope of copyright protection as those forms "by which the ideas in the mind of the author are given visible expression." (*Burrow-Giles* at 58).

Like photography, which rests on scientific principles and "the chemicals and machinery by which it is operated" (*Id.*), the AI tool simply rests on computer programming principles and the machinery on which such computer programs are operated. The Burrow-Giles court succinctly concludes that it "entertains no doubt that the constitution is broad enough to cover an act authorizing copyright of photographs, *so far as they are representatives of original intellectual conceptsion of the author*." (emphasis added) (*Id.*).

Like photographs, there may be pieces of artwork generated using AI tools that do not qualify for copyright protection. For example, if a website simply had a "Click Here for Art" button that generated a random picture each time a user clicked the button, this would not fall within the scope of copyrightable works. The reason, however, is not because the AI tool was used. Instead, it's because the user clicking the button has

not originated the idea, and has not given instructions to the tool in an effort to express and fix the idea, that is reflected in the work. As noted above, it is without question that the Work expresses the ideas of Mr. Allen, as the AI tool is not capable of its own ideas, much less an agent attempting to express its own ideas.

The court also identified the factors that lead it to conclude that the photograph at issue was properly in the category of photographs protectable by Copyright Law. Specifically, "posing the said Oscar Wilde in front of the camera, selecting and arranging the costume, draperies, and other various accessories in said photograph, arranging the subject so as to present graceful outlines, arranging and disposing the light and shade, suggesting and evoking the desired expression, and from such disposition, arrangement, or representation, made entirely by plaintiff, he produced the picture in suit." (*Burrow-Giles* at 60).

The Work at issue here was similarly composed by Mr. Allen. Instead of posing the subjects and physically moving objects to arrange them for a photograph, Mr. Allen used written prompts to instruct the AI tool with respect to lighting, arrangement of the objects, and selecting and arranging accessories and details displayed in the Work, and thereby produce the Work as an expression of the idea in Mr. Allen's head.

Notably, the court made no mention of the need to distinguish between the elements of the photograph attributable to the photographer versus the elements that unintentionally appeared in the photograph. Surely the court was aware that the photographer did not literally determine where each band of light might fall on the subject, or how other elements may appear in the photograph in a way that was accidental or even contrary to the intent of the photographer. Similarly, it seems beyond the proper scope of examination to delve into such details in the Work.

## IV.    IMPROPER FACTORS IN EXAMINATION

The reasons cited in the Refusal Letter suggest the consideration of factors during the examination of the Work in contradiction of section 310 of the Compendium. It seems that there is a tension between the intuition about skill required to create the Work, and requirement to not judge the artistic merit, effort, or skill required to create the work.

Excerpts from the relevant sections of the Compendium are reproduced here for convenience:

Section 310.2: "In determining whether a work contains a sufficient amount of original authorship, the U.S. Copyright Office does not consider the aesthetic value, artistic merit, or intrinsic quality of a work."

Section 310.5: "Evaluating the author's inspiration or intent would require the Office "to consider evidence of the creator's design methods, purposes, and reasons." Star Athletica, 137 S. Ct. at 1015. The Supreme Court has made it clear that copyrightability should be based on how a work is perceived, not how or why it was designed."

Section 310.6: "When examining a work for original authorship, the U.S. Copyright Office will focus on the appearance or sound of the work that the author created *but will not consider the amount of time, effort, or expense required to create the work*. These issues have no bearing on whether a work possesses the minimum creative spark required by the Copyright Act and the Constitution. See, e.g., Feist, 499 U.S. at 352-354, 364 (rejecting the so-called "sweat of the brow" doctrine that provided copyright protection solely as a "reward for the hard work" of creating a work); Star Athletica, 137 S. Ct. at 1015 ("our inquiry is limited to how the [work is] perceived," not how it was designed). As Justice O'Connor observed, "copyright rewards originality, not effort" and "[w]ithout a doubt, the 'sweat of the brow' doctrine flouted basic copyright principles." Feist, 499 U.S. at 352, 354, 364."

Each of these standards seem to have been violated during the examination of the Work, which is likely what has caused such confusion with respect to the use of AI tools. Because the work appears to be complex, detailed and display a certain aesthetic grandeur, it seems to challenge the viewer's preconceived notion of the type of skills the artist should possess in order to create the work.

However, there is no requirement that a photographer prove that he could draw or paint the subject of the photograph, nor that a painter be able to prove the textures created by his brushstroke were intentional. As the court succinctly states in *Mazer v. Stein*, 347 U.S. 201 (1954), "[i]t is clear Congress intened the scope of the copyright statute to include more than the traditional fine arts."

It seems that the examiner is requiring Mr. Allen to prove that he could have created the work using other tools or mediums. It difficult to see how this is not the result of a value judgment as to the aesthetic value or artistic merit of the work, and the subsequent request for proof that the author demonstrate certain arbitrary artistic abilities that have no bearing on the creative idea being expressed in the Work.

## V.    ADDRESSING CONCERNS WITH "AI ART"

The human authorship complaint seems to disguise the real objection many people have to the use of an AI tool, which can be summed up as "it's not fair." It doesn't seem fair that for centuries an artist was required to develop and hone certain skills in order to be able to express their creative ideas. However, there are several reasons we should think further and reject this instinctual reaction.

### (a)    More artists will be able to express their ideas.

The Copyright Office's position in the Refusal Letter would seem to impose certain physical requirements that would render it nearly impossible for humans without access to traditional means of creative expression, for example an artist with ALS who has become paralyzed, to ever receive the credit and protection of authorship. This would be particularly unfortunate at this moment in human history when the creative ideas locked inside the minds of those without a means of expression to finally be able to share those ideas with the world. While it is without question that great artists spend years honing their skills in order to create their works, it is also unquestionable that humans are born with varying innate abilities, and those who are not born with innate artistic abilities have always been at a disadvantage. AI tools threaten to let more people into the creative space because they even the playing field for those with the same creative ideas but who were not blessed with innate traditional artistic abilities.

### (b)    The Copyright Laws have a built-in protective mechanism of limiting the scope of protection in works.

The scope of protection being sought by Mr. Allen for the work is no greater than any other author; he simply wants to protect that "something unique" and "irreducible" that even "a very modest grade of art has in it." (*Mazer* at 205, footnote citing *Bleistein v. Donaldson Lithographing Co.*, 188 U.S. 239, 249-250). The discussion in *Feist* with respect to the scope of protection for original compilations is instructive here. Justice O'Conner clarifies that the restriction on copyrighting the underlying facts in a compilation "inevitably means that the copyright in a factual compilation is thin. Notwithstanding a valid copyright, a subsequent compiler remains free to use the facts contained in another's publication to aid in preparing a competing work, so long as the competing work does not feature the same selection and arrangement." (*Feist* at 349). A similar situation exists here. Other artists are free to use the same AI tool that Mr. Allen used, and depending on what ideas they wish to express may create works that are very similar to the Work. The fact that another artist's work looks similar to Mr. Allen's work in certain ways as a result of using the same AI tool is not more concerning than similarities resulting from two painters using the same type of paint, brushes and canvas, or two photographers using the same camera and lens. However, Mr. Allen's

protection would prevent others from circumventing the creative or creation process completely, and simply using the Work, for example on t-shirts, for their own financial gain. This is no different than the desire of all other artists and creators, and why copyright protection is seen as such a valuable social development.

(c) **The market will determine the difference in value between a work creating using a paint brush versus an AI tool.**

It requires little discussion to make this point other than to restate the old saying that "beauty is in the eye of the beholder." The value placed on art is and has always been completely arbitrary. If it is the case that Mr. Allen's work is devalued over time as a result of societal views on the use of the AI tool, then so be it. That should have no bearing, however, on whether the Work has met the requirements for copyright protection.

## VI.  OTHER ARGUMENTS

1.  Requesting the prompts Mr. Allen used feels like somewhat of a trap. First, if no standard has been set for what prompts would satisfy the examiner, then the examiner can use the prompts to set a higher standard if the intent was always to reject the Work. Second, the prompts presumably would be viewed as the "idea" instead of the "expression." We want to be clear that Mr. Allen is not attempting to gain copyright protection of the prompts. Third, showing the prompts could have the effect of explaining a magic trick; i.e. that once it becomes known, it seems far less impressive. The Work should be examined without this bias. Fourth, this seems like a skills test. Presumably painters are not required to submit a video of themselves painting to prove they created the painting. The same should be true for the use of other tools.

2.  Copyright law exists to encourage creativity and innovation by providing legal protection for creative works. AI-assisted artwork is a new and innovative form of creative expression, and it should be eligible for the same protections as other forms of creative expression, such as traditional painting or sculpture.

3.  Registering AI-assisted artwork with the copyright office will help to clarify the legal rights and responsibilities of the various parties involved in the creation of such works. It is important to determine who owns the copyright to the resulting work and how any potential profits should be divided.

4.  The Copyright Office's position is inconsistent with the myriad approaches to artistic expression and creation, and would unnecessarily restrict the processes artists may use, or be willing to disclose, to create their works.

5.  Requiring the string of prompts would improperly focus the inquiry on whether the prompts seem extensive or complex enough to meet an arbitrary bar for authorship. Further, it could be like explaining a magic trick; pulling a rabbit out of a hat seems much less impressive when the hidden compartment is exposed. However, the skill of the magician is in making the trick *seem* like magic, regardless of the underlying perceived complexity. Similarly, the perception of the complexity of the prompts does not indicate the skill of the artist using the AI tool to create.

6.  The language of the Progress Clause in the U.S. Constitution advises a more accepting and forward looking approach of accepting the use of new technology in the process of creation and the expression of creativity.

7. The ideas and creativity expressed in the Work are and always were human-authored, as there is no reason to believe the AI tool is able to have ideas, consider different ways an idea could be expressed, or determine whether the idea is being expressed as it executes its programming.

8. The AI tool does not replace the human requirement of intelligence and discernment in accomplishing the task at hand, namely, creating a tangible expression of an artistic idea.

9. It would only be appropriate to reference the AI tool used in creating the Work as an author if it is appropriate to reference the camera used by a photographer, the effect pedal used by the guitarist, the synthesizer used by the producer, or any other tool that allows for an author to express an idea that would not be possible without the use of a machine.

10. Critiques of the use of AI in artistic expression suggest a fundamental misunderstanding of the origin of ideas. For social and intuitive reasons, we credit the artist with originating the ideas expressed in a work. However, one of the most profound and unanswered mysteries is how and why idea come to be in our minds in the first place. The unsettling reality is that humans do not know why ideas pop into their head (both in terms of content and timing), what inputs their brain stored and reprocessed to form inspiration for creative works, or why certain forms and mediums of expression appeal to some artists and not others.

# EXHIBIT 6



**United States Copyright Office**

Library of Congress · 101 Independence Avenue SE · Washington DC 20559-6000 · www.copyright.gov

June 06, 2023

Tamara S. Pester, LLC
Attn: Tamara Pester Schklar
PO Box 6601
Denver, CO 80206
United States

Correspondence ID:   1-5T5320R
Original Corresp. ID:  1-5IVDL1X

**RE:**    *Théâtre D'opéra Spatial*; SR 1-11743923581

Dear Tamara Pester Schklar:

This is in response to your January 24, 2023 correspondence requesting reconsideration of the U.S. Copyright Office's (the "Office") refusal to register a copyright claim in the work titled *Théâtre D'opéra Spatial* (the "Work"). You made this request on behalf of the copyright claimant, Jason M. Allen.

As you explained in your correspondence, the Work was created using written prompts that were provided to the artificial intelligence ("AI") technology Midjourney. *Request for Reconsideration* at 6. Mr. Allen made some modifications to this image through the use of the photo and design program Photoshop. Then the modified image was upscaled through the use of the artificial intelligence technology Gigapixel AI.

We reviewed the Work in light of the points raised in your correspondence. We agree that the modifications Mr. Allen made with Photoshop constitute human authorship, and that these modifications contain a sufficient amount of derivative human authorship to qualify for copyright protection. However, the initial image generated by Midjourney and the upscaling performed by Gigapixel AI lack the human authorship that is essential for copyright protection.

As the examiner explained, the Office could register this work if Mr. Allen limited the claim to the derivative authorship that he created with Photoshop and excluded the non-human authorship that was produced by Midjourney and Gigapixel AI. Because Mr. Allen asserted a claim to copyright in the entire work and declined to exclude this non-human authorship, the Office must affirm the refusal.

## I.    Administrative Record

On September 21, 2022, the Office received an application from you on behalf of your client, Jason M. Allen, to register a "2-D artwork" titled *Théâtre D'opéra Spatial*.

Tamara Pester Schklar — 2 — 1-5T5320R



*The Work Submitted for Registration*

The application identified Jason M. Allen as sole author of the Work and made no mention of the artificial intelligence program Midjourney or Gigapixel AI. The application's New Material Included and Material Excluded fields were left blank, meaning the claim in 2-D artwork was unlimited and extended to the entire Work that was submitted for registration.

Shortly after receiving the application, the Office became aware that *Théâtre D'opéra Spatial* was created using Midjourney based on media reporting about the work. *See, e.g.*, Sara Kuta, *Art Made with Artificial Intelligence Wins at State Fair*, SMITHSONIAN MAGAZINE, *available at* https://www.smithsonianmag.com/smart-news/artificial-intelligence-art-wins-colorado-state-fair-180980703/ (cited in *Correspondence from U.S. Copyright Office to Tamara Pester* (Sept. 28, 2022)). The Copyright Office may take administrative notice of facts or matters that are known by the Office or the general public, and may use that knowledge to question an application that appears to contain or be based upon inaccurate or erroneous information. *U.S. Copyright Office, Compendium of U.S. Copyright Office Practices* § 602.4(C) (3d ed. 2021).

On September 28, 2022, the examiner assigned to the case asked you to provide details about how the named author used Midjourney during the course of creating the Work. On September 30, you replied to this email and described Mr. Allen's creative process, which included entering a series of prompts into Midjourney to produce a two-dimensional graphical output. You explained that, after Midjourney produced several drafts in response to these prompts, Mr. Allen decided to "upscale" one of these images using one or more of the Midjourney program's upscaling tools.[1] He then used Adobe's Photoshop program to "edit" the upscaled image. Finally, you explained that Mr. Allen used another photo program to further enhance the image and render it into the version submitted for registration.

---

[1] *Upscalers*, MIDJOURNEY, https://docs.midjourney.com/docs/upscalers. Unless stated otherwise, all websites were last visited on June 6, 2023.

Tamara Pester Schklar                    - 3 -                    1-5T5320R

On October 4, the examiner wrote to you and asked that you submit a copy of the AI output generated by Midjourney prior to any editing that Mr. Allen may have done with any other image editing program. The examiner then asked you to describe the changes made to the AI output in Photoshop and to identify the program used to generate the final image that was submitted for registration.

On October 6, you uploaded a copy of the AI output generated by Midjourney in a file designated "original panel from Midjourney.png."



*Midjourney Output*

You also described the changes Mr. Allen made to this AI output with the Adobe Photoshop program. For example, you explained that Mr. Allen removed what he considered to be "noticeable flaws" in the work (such as a crack on the floor next to the central subject's feet or a dark blemish in the background's sky) by erasing them with Photoshop. Mr. Allen then used Photoshop to recreate content in the empty spaces using "content aware tools, then using healing tools, blur and sharpening tools, as well as other brush tools and blending techniques." *Correspondence from Tamara Pester to U.S. Copyright Office* (Oct. 6, 2022). Finally, Mr. Allen further upscaled the image using Gigapixel AI.

On October 14, 2022, the examiner explained that the graphical output generated by Midjourney and the upscaling performed by Gigapixel AI was not copyrightable, because the images did not contain sufficient human-created authorship. The examiner went on to explain that, after comparing the initial output generated by Midjourney to the final version of the Work submitted for registration, the Office determined that Mr. Allen added a sufficient amount of new creative authorship to the Midjourney-generated image to merit registration. The examiner explained that the submitted Work was derivative of the AI output, and that the copyright claim must be limited to the new, human-created, authorship.

Tamara Pester Schklar                          - 4 -                          1-5T5320R

The examiner explained that the AI output would need to be excluded from the copyright claim and
asked the applicant to describe the new, non-AI, authorship present in the final version of the Work.

On October 25, 2022, you "decline[d] to limit Mr. Allen's claim to augmentations to the image
and exclude the entirety of the image which the author used Midjourney and Gigapixel A.I. to generate."
*Correspondence from Tamara Pester to U.S. Copyright Office* (Oct. 25, 2022). The examiner
subsequently refused registration for the Work on December 13, 2022 because it did not contain a
sufficient amount of human authorship to justify an unlimited registration in the entire work.

In correspondence received by the Copyright Office on January 24, 2023, you submitted a timely
First Request for Reconsideration.

## II.      Legal Standards

A work may be registered if it qualifies as an "original work[] of authorship fixed in any tangible
medium of expression." 17 U.S.C. § 102(a). The Supreme Court has explained that the term "original"
in this context consists of two components: Independent creation and sufficient creativity. *See Feist
Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345 (1991). First, the work must have been
independently created by the author. *Id*. Second, the work must possess sufficient creativity. *Id*. Only a
modicum of creativity is necessary, but the Supreme Court has ruled that some works—such as the
alphabetized telephone directory at issue in *Feist*—fail to meet even this low threshold. *Id*. The Court
observed that "[a]s a constitutional matter, copyright protects only those constituent elements of a work
that possess more than a de minimis quantum of creativity." *Id*. at 363. It found that there can be no
copyright in a work in which "the creative spark is utterly lacking or so trivial as to be virtually
nonexistent." *Id*. at 359.

The Office will register a derivative work if the new authorship that the author contributed to the
work contains a sufficient amount of original expression. Specifically, the derivative work must be
independently created and the derivative authorship must possess more than a modicum of creativity.
*See Waldman Publishing Corp. v. Landoll, Inc.*, 43 F.3d 775, 782 (2d Cir. 1994); *see also Compendium
(Third)* §§ 311.2, 507.1. In other words, the amount of creativity required for a derivative work is the
same as that required for a copyright in any other work. *Schrock v. Learning Curve Int'l, Inc.*, 586 F.3d
513 (7th Cir. 2009). "All that is needed to satisfy both the Constitution and the statute is that the 'author'
contributed something more than a 'merely trivial' variation, something recognizably 'his own.'" *Alfred
Bell & Co. v. Catalda Fine Arts, Inc.*, 191 F.2d 99, 102-03 (2d Cir. 1951).

The Office will register an original work of authorship or a derivative work only if the work was
created by a human being. Courts interpreting the phrase "works of authorship" have uniformly limited
it to the creations of human authors. In *Burrow-Giles Lithographic Co. v. Sarony* the Supreme Court
interpreted the scope of Congress's constitutional power to provide "authors" with the exclusive right to
their "writings." 111 U.S. 53, 56 (1884). In that case, the defendant was accused of creating
unauthorized copies of a photograph; in response, the defendant argued that expanding copyright
protection to photographs was unconstitutional because the camera – rather than the photographer –
created the work. *Id*. The Court disagreed and held that the Constitution's Copyright Clause granted
copyright protection to photographs "so far as they are representatives of original intellectual
conceptions of the author." *Id*. at 58. The Court went on to describe "authors" as human beings,

Tamara Pester Schklar           - 5 -           1-5T5320R

identifying them as a class of "persons" and a copyright as "the exclusive right of a man to the production of his own genius or intellect." *Id.*[2]

The Office's registration practices follow and reflect these court decisions. The Office collects its understanding of the law in the *Compendium of U.S. Copyright Office Practices (Third Edition)*, which provides standards for examining and registering copyrightable works. Following the cases described above, the Office has provided clear registration guidance requiring that works be the product of human authorship for at least half a century. *See, e.g., U.S. Copyright Office*, *Compendium of U.S. Copyright Office Practices* § 2.8.3(I)(a)(1)(b) (1st ed. 1973) (stating that only works that "owe their origin to a human agent" are eligible for registration). The current edition of the *Compendium* explains that "to qualify as a work of 'authorship' a work must be created by a human being," and that the Office "will refuse to register a claim if it determines that a human being did not create the work." *Compendium (Third)* § 313.2.

## III.   Discussion

The Office must consider the impact of Mr. Allen's use of artificial intelligence technology in its copyrightability analysis. The Office's understanding of Midjourney and Gigapixel AI – the artificial intelligence services Mr. Allen used to create the Work – is based on the applicant's correspondence with the Office and the Office's own knowledge and the services' public documentation, of which the Office takes administrative notice.

### A.   Midjourney

Midjourney is an artificial intelligence technology capable of generating images in response to text provided by a user. Users operate Midjourney through "prompts," which are text commands entered into the system. As Midjourney explains, prompts must start with the text "/imagine" and contain text describing what Midjourney should generate.[3] Users also have the option to include (1) a URL of one or more images to influence the generated output, or (2) parameters directing Midjourney to generate an image in a particular aspect ratio or providing other functional directions.[4]

After a user provides Midjourney with a prompt, the technology will generate four images that are displayed in a grid. If the user selects the buttons underneath the grid, Midjourney will "upscale" or provide a higher-resolution version of an image, create new variations of an image, or generate four new images.

---

[2] Similarly, appellate courts have found that copyright does not extend to works that are the product of divine spiritual beings or monkeys. *See Urantia Found. v. Kristen Maaherra*, 114 F.3d 955, 957–59 (9th Cir. 1997) (holding that "some element of human creativity must have occurred in order for the Book to be copyrightable" because "it is not creations of divine beings that the copyright laws were intended to protect"); *see also Naruto v. Slater*, 888 F.3d 418, 426 (9th Cir. 2018), *decided on other grounds* (explaining that a monkey cannot register a copyright in photographs it captured with a camera because the Copyright Act refers to an author's "children," "widow," "grandchildren," and "widower," – terms that "all imply humanity and necessarily exclude animals.").

[3] *See Quick Start*, MIDJOURNEY, https://docs.midjourney.com/docs/quick-start; *see also* Prompts, MIDJOURNEY, https://docs.midjourney.com/docs/prompts.

[4] For a list of parameters, *see Parameter List*, MIDJOURNEY, https://docs.midjourney.com/docs/parameter-list.

Tamara Pester Schklar                           - 6 -                                    1-5T5320R

Midjourney, by its own description, does not interpret prompts as specific instructions to create a particular expressive result. Because Midjourney "does not understand grammar, sentence structure, or words like humans," it instead converts words and phrases "into smaller pieces, called tokens, that can be compared to its training data and then used to generate an image." *Prompts*, MIDJOURNEY, https://docs.midjourney.com/docs/prompts. Generation involves Midjourney starting with "a field of visual noise, like television static, [used] as a starting point to generate the initial image grids" and then using an algorithm to refine that static into human-recognizable images. *Seeds*, MIDJOURNEY, https://docs.midjourney.com/docs/seeds.

B.  Application of Copyright Law to the Midjourney Output

Based on the record before it, the Office concludes that the image generated by Midjourney that formed the initial basis for this Work is not an original work of authorship protected by copyright. *See Compendium (Third)* § 313.2 (explaining that "the Office will not register works produced by a machine or mere mechanical process that operates randomly or automatically without any creative input or intervention from a human author"). Though Mr. Allen claims to have guided or directed the structure and content of the image, the process described in the Request for Reconsideration and in earlier correspondence with the Office makes clear that it was Midjourney—not Mr. Allen—that produced this image.

Your Request for Reconsideration does not explain Mr. Allen's creative process in detail, but you contend that he "used written prompts to instruct the AI tool with respect to lighting, arrangement of the objects, and selecting and arranging accessories and details displayed in the Work, and thereby produce the Work as an expression of the idea in Mr. Allen's head." *Request for Reconsideration* at 6.

While corresponding with the examiner assigned to the case, you provided a more detailed explanation of how Mr. Allen used Midjourney. You said he entered text prompts that specified "the overall subject of the piece" and "the type of scene" he wanted to produce. *Correspondence from Tamara Pester to U.S. Copyright Office* (Sept. 30, 2022). "At this point, the main bulk of the image's concept [was] established." *Id.* He then entered prompts that described the "genre and category" for the image, "the tone of the piece," "a description of how lifelike [Mr. Allen] wanted the piece to appear," "how colors were used," and "what style/era the artwork should depict." *Id.* You said this phase of the process involved "numerous revisions and text prompts **at least 624 times** to arrive at the initial version of the image" produced by Midjourney. *Id.* (emphasis in original).

The process by which Midjourney produces an image is not the same as that of a human artist. As noted above, the initial prompt from a user generates different images based on Midjourney's training data. Mr. Allen's prompts provided general directions to elicit output from the AI technology. The prompts described the general subject, genre, category, style, and tone of the image, specified the colors he wanted to see, and how realistic he wanted the image to be. But Mr. Allen had no control over how the artificial intelligence tool analyzed, interpreted, or responded to these prompts. Nor did he exercise any control over the actual creation, development, or execution of the image that Midjourney rendered on his screen. Simply put, the resulting image was the output of the artificial intelligence technology, and your correspondence does not identify any specific creative authorship in this image that can be attributed to Mr. Allen.

Tamara Pester Schklar                                  - 7 -                                  1-5T5320R

As the Supreme Court has explained, the "author" of a copyrighted work is the person "who has actually formed the picture," *Sarony*, 111 U.S. at 61. A person who provides text prompts to Midjourney does not "actually form" the images that are generated by the machine. Instead, Midjourney begins the image generation process with a field of visual "noise," which is refined based on tokens created from user prompts that relate to Midjourney's training database. The information that is included in the user's prompts may influence the generated image, but the prompt text does not dictate a specific result. *See Prompts*, MIDJOURNEY, https://docs.midjourney.com/docs/prompts (explaining that short text prompts cause "each word [to have] a more powerful influence" and that images included in a prompt may "influence the style and content of the finished result"). Because of the significant distance between what a user may ask Midjourney to create and the visual material Midjourney actually produces, Midjourney users do not have sufficient control over the resulting images to be considered the author of the AI's output.

This lack of control makes Midjourney different for copyright purposes than other tools used by artists. *See Request for Reconsideration* at 6 (arguing that the process of using Midjourney is equivalent to using other tools such as the photographer's camera). When a photographer uses a camera, they take specific steps to control the image, such as selecting the specific subjects that will be included in the frame; choosing the lens, focus, filter, and other settings that will be used to capture the image; deciding how to stage the image in terms of framing, angle, lighting, among other factors; and potentially making additional changes and adding derivative authorship during the editing process. As a result, the resulting image reflects the artist's "own original mental conception, to which [they] gave visible form." *Sarony*, 111 U.S. at 60 (explaining that the photographer's creative choices made the photograph "the product of [his] intellectual invention"). While users of Midjourney may offer directional text prompts that can be translated by the AI into visual art, they do not have a comparable degree of control over the creation of the initial images or any final images that the technology may generate in response to those prompts.

The Office does not question the fact that Mr. Allen expended significant time and effort sifting through hundreds of images that were produced by Midjourney. But that effort does not make him the "author" of those images under copyright law. The Supreme Court has rejected the argument that "sweat of the brow" can be a basis for copyright protection in otherwise unprotectable material. *Feist*, 499 U.S. at 352-54 (noting that "originality, not 'sweat of the brow,' is the touchstone of copyright protection.") The Office "will not consider the amount of time, effort, or expense required to create the work" because they "have no bearing on whether a work possesses the minimum creative spark required by the Copyright Act and the Constitution." *Compendium (Third)* § 310.7.

C.  Adobe Photoshop

During the initial examination of the work, you indicated that Mr. Allen used Adobe Photoshop to edit the image that was produced by Midjourney, such as erasing certain elements of the AI-produced image and recreating content in its place. *Correspondence from Tamara Pester to U.S. Copyright Office* (Oct. 6, 2022). A copy of the AI output generated by Midjourney is reproduced below alongside the copy submitted for registration:

Tamara Pester Schklar                          - 8 -                          1-5T5320R





*Midjourney AI Output*                                    *Work Submitted for Registration*

### D.  Application of Copyright Law to the Adobe Photoshop Modifications

A work containing AI-generated material may contain sufficient human authorship to support a copyright claim. For example, a children's book author may write a story and then select and arrange distinct AI-generated images to go along with the text. If the combination of human-authored text and machine-generated images is sufficiently creative, then the resulting compilation may constitute "an original work of authorship." 17 U.S.C. § 101 (definition of "compilation"). Or an artist may modify material generated by AI technology to such a degree that the modifications meet the standard for copyright protection. In these cases, copyright will only protect the human-authored aspects of the work, which are "independent of and do not affect" the copyright status of the AI-generated material itself. *Compendium (Third)* § 507.1; 17 U.S.C. § 101 (definition of "derivative work").

The Office agrees that the modifications Mr. Allen made with Adobe Photoshop were the result of human authorship and they contain a sufficient amount of original authorship to be registered as a derivative work. Because this work contains an appreciable amount of AI-generated material, the applicant must comply with the requirements of Section 409(9) of the Copyright Act. Specifically, the statute states that the "application for copyright registration . . . shall include . . . in the case of a compilation or derivative work, an identification of any preexisting work or works that it is based on or incorporates, and a brief, general statement of the additional material covered by the copyright claim being registered." 17 U.S.C. § 409(9). Identifying the new or revised material the author has contributed to a work and any material that cannot be claimed "is essential to defining the claim that is being registered" and "ensures that the public record will be accurate." *Compendium (Third)* § 621.1.

By their very nature, derivative works contain two distinct forms of authorship: (i) "The authorship in the preexisting work(s) that has been recast, transformed, or adapted within the derivative work," and (ii) "[t]he new authorship involved in recasting, transforming, or adapting the preexisting work(s)." *Compendium* § 507.1. The statute expressly states that the copyright in a derivative work "extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work." 17 U.S.C. §103(b). "[T]he material contributed by the author of such work" plainly refers to the new authorship that the derivative author contributed to the new work. *Id.* Thus, an application to register a derivative work must be limited to the new authorship that the derivative author contributed to that work – rather than the authorship from the preexisting work that may have been incorporated into the derivative work. *See id.; see also Compendium* § 311.2.

Tamara Pester Schklar                                   - 9 -                                   1-5T5320R

As noted above, the Office offered to amend your application to limit the claim to the human-authored elements shown in the deposit and to exclude the AI-generated components of the Work. You declined that offer, stating that "the correct scope of copyrightable authorship that Mr. Allen [created] is the entire image submitted to the Copyright Office." *Correspondence from Tamara Pester to U.S. Copyright Office* (Oct. 25, 2022). Likewise, your Request for Reconsideration does not distinguish between the human-authored and AI-generated elements of the Work.

By attempting to register the entire work, the application asserts a claim to copyright in non-human authorship that does not constitute copyrightable subject matter. The Office also finds that the application was not submitted in proper form, because it does not limit the claim to Mr. Allen's derivative human authorship or exclude the preexisting AI-generated material from the claim as required by 17 U.S.C. § 409(9). For these reasons, the Office cannot register the claim as submitted. 17 U.S.C. § 410(b) ("In any case in which the Register of Copyrights determines that, in accordance with the provisions of this title, the material deposited does not constitute copyrightable subject matter or that the claim is invalid for any other reason, the Register shall refuse registration and shall notify the applicant in writing of the reasons for such refusal.")

E.  Gigapixel AI

Gigapixel AI is an image upscaling tool that uses artificial intelligence to increase image resolution and size. Upscaling programs generally assess the existing pixels and other information present in the image being upscaled and then use an algorithm to sharpen or enhance that data. Gigapixel AI uses artificial intelligence to fill in missing data or detail in order to create a higher resolution image. It is "trained" on sample images to "learn" how to imitate photorealistic detail, and it fills in any gaps or imperfections in the image based on what it has learned from viewing thousands of other images.[5]

Users of Gigapixel AI may select the size of the image they want to produce based on pixels per centimeter or inch, or by magnification level of the original image, such as "4x" or "6x." The program also allows users to choose one of several preset options for the "AI Model" used to process the image. The AI Models are each intended for different types of images such as artwork, photographs, very low-resolution images, or images such as cityscapes or landscapes. The user is able to make additional refinements to the overall image in a few additional categories, such as noise suppression, removing blurriness, or fixing compression.

F.  Application of Copyright Law to the Gigapixel AI Enhancements

You stated that Mr. Allen used Gigapixel AI "to enhance the details and the resolution" of the image "in order to make the file suitable for reproduction on physical media." *Correspondence from Tamara Pester to U.S. Copyright Office* (Oct. 6, 2022). The process described in your Request for Reconsideration and prior correspondence does not exhibit the requisite human creativity needed to support a claim to copyright.

You said Mr. Allen accomplished this result by selecting "a sequence of settings to adjust the upscaling process." *Id*. On the administrative record before the Office, we do not find the upscaling

---

[5] *See* TOPAZ LABS – GIGAPIXEL AI, https://www.topazlabs.com/gigapixel-ai.

Tamara Pester Schklar                           - 10 -                                    1-5T5320R

changes to be sufficiently creative to support a claim in copyright. Merely adjusting the available settings within Gigapixel AI to automatically enhance the resolution of the AI-generated image does not result in copyrightable authorship.

While digital editing claims are considered on a case-by-case basis, the Office generally will refuse all claims where the author merely improved the source work's quality or resolution without adding appreciable new authorship that was not present in the original. *Compendium (Third)* § 909.3(A). Even if the changes made by Gigapixel AI were human-authored, the Office finds that these types of changes – such as noise suppression, removing blurriness, or fixing compression – to be minimal image editing that is not copyrightable.

G.  Policy Arguments

In your Request for Reconsideration, you make a number of policy arguments in support of registration. You argue that allowing registration of AI-generated output would promote the underlying purposes of copyright law by allowing "more people into the creative space . . . with the same creative ideas but who were not blessed with innate traditional artistic abilities." *Request for Reconsideration* at 9.

The Office's registration decision does not mean that technological tools – including AI and other tools – cannot be used as part of the creative process. Authors have long used computerized tools to create new works of authorship or to recast, transform, or adapt preexisting works into new forms of derivative authorship. In this case, Mr. Allen used Adobe Photoshop to adapt the preexisting AI-generated image. Specifically, it appears that the details of objects around and through the portal that have been added to the Midjourney-generated image are sufficient to be registered as a derivative work (assuming these details were the result of human authorship). However, you previously declined to limit the claim to such human authorship. We must therefore affirm the refusal of the entire claim.

In support of registration, you argue that the examiner's determination that Mr. Allen is not the author of the Midjourney image was "the result of a value judgment as to the aesthetic value or artistic merit of the work." *Request for Reconsideration* at 8. You additionally argue that the examiner improperly considered factors specifically precluded by the *Compendium*, such as the author's inspiration, intent, or design process; or the expense to the author, or time and effort expended to create the work. *Id.* at 6-8 (citing *Compendium (Third)* §§ 310.2, 310.5, and 310.6).

By inquiring about the use of artificial intelligence during the examination process and requiring AI-generated output to be excluded from the application, the Office is not making any judgment – aesthetic or otherwise – about AI, the users of AI, or the output generated by AI. The Office is responsible for determining if "the material deposited constitutes copyrightable subject matter" and if "the other legal and formal requirements of [the Copyright Act] have been met." 17 U.S.C. § 410. In making this determination, the Office may consider the author's creative process to determine the extent to which a human being exercised creative control over the work's expression and "actually formed" the traditional elements of authorship. *Sarony*, 111 U.S. at 61. In this case, the Office finds that the image produced by Midjourney and the enhancements made by Gigapixel AI do not satisfy this requirement.

Tamara Pester Schklar                      - 11 -                           1-5T5320R

## IV.     Conclusion

For the foregoing reasons, the Office affirms the examiner's decision to refuse registration for *Théâtre D'opéra Spatial*.

This letter is for your information only; no response is necessary.

Sincerely,



**Frank Muller**
Attorney-Advisor for Registration Policy & Practice
Office of Registration Policy & Practice | U.S. Copyright Office
101 Independence Ave, SE, Washington, DC 20559-6222

Enclosures:
  Reply Sheet



**United States Copyright Office**

Library of Congress · 101 Independence Avenue SE · Washington DC 20559-6000 · www.copyright.gov



**\*1−5T5320R\***

# Use this sheet <u>if</u> you request reconsideration

## How to request reconsideration:

- Send your written explanation *of why the claim should be registered or why it was* improperly refused.
- Be sure to include the Correspondence ID Number (listed under the bar code above) on the first page of your Request.
- Indicate whether you are requesting a "First Reconsideration" or "Second Reconsideration."
- **Submit your request ONLINE:** We strongly recommend sending all requests for reconsideration via email following these steps:

    **EMAIL YOUR REQUEST (BUT NOT THE REQUIRED FEE) to:**
    reconsideration@copyright.gov.
    - o The subject line should say "First Reconsideration" or "Second Reconsideration"
    - o Once your email request is received, you will be contacted with instructions on how to submit the required fee.
    - o Failure to send your request for reconsideration to the above email address will result in a delayed response.

    **IMPORTANT NOTE**: Your request and the required fee must be received no later than three months after a refusal is issued.

- **Alternatively, you may submit your request VIA MAIL**:

    - o **IMPORTANT NOTE**: Your request must be postmarked (via the U.S. Postal Service) or dispatched (via commercial carrier, courier, or messenger) no later than three months after a refusal is issued.
    - o Enclose the required fee.
    - o Address your request to**:**

        **FIRST RECONSIDERATION *or* SECOND RECONSIDERATION**
        **U.S. Copyright Office**
        **MCA Division**
        **P.O. Box 71380**
        **Washington, DC 20024-1380**

Tamara Pester Schklar                    - 13 -                    1-5T5320R

**First Request for Reconsideration ($350.00 per application):** The Registration Program Office considers the first request. If it upholds the refusal, you may submit a second request.

**Second Request for Reconsideration ($700.00 per application):** The Copyright Office Review Board considers the second request. The Board consists of the Register of Copyrights and the General Counsel (or their respective designees), and a third member appointed by the Register. The Board's decision constitutes final agency action.

**Notification of decision**: The Copyright Office will send all notifications of its decisions by email to the email address provided in the record and/or in the request for reconsideration. If no email address is provided, the Office will send its decision via mail.

**RECONSIDERATION FEES:**

**First Request**          $350 per application

**Second Request**          $700 per application


READ MORE:

- U.S. Copyright Office Administrative Appeals:
  https://copyright.gov/comp3/chap1700/ch1700-administrative-appeals.pdf

- U.S. Copyright Office Fees:
  https://copyright.gov/circs/circ04.pdf

- Copyright Basics:
  https://copyright.gov/circs/circ01.pdf

- Copyright Registration:
  https://copyright.gov/circs/circ02.pdf

# EXHIBIT 7

Second Request for Reconsideration

Service Request Number: 1-11743923581

Correspondence ID: 1-5T5320R

Name of Claimant: Jason Allen

Title of Work: Théâtre D'opéra Spatial

*Via email: reconsideration@copyright.gov*

On behalf of claimant Jason Allen, we respectfully request that the U.S. Copyright Office reconsider its denial to grant registration of the copyright claim in the work Théâtre D'opéra Spatial (the "**Work**"). The reasons cited by Attorney-Advisor Muller in the letter dated June 6, 2023, Correspondence ID: 1-5T5320R (the "**Denial of Reconsideration**" or "**Refusal**") discount the extent, nature, and character of any human authorship involved in creation of the Work; incorrectly characterizes Midjourney's role in the creation of the Work; improperly and prejudicially requires the author to list tools used the creation of his Work; and, if the Denial's rationale were applied to all creators who use non-human tools to assist in the creation of their work, it would result in broad uncertainty with respect to ownership.  Additionally, Fair Use doctrine would allow for registration of the work, and the Copyright Office's refusal to register the entire Work would lead to dangerous precedent, stifling creativity and discouraging artists to use new and emerging tools to concoct complex and unique works that challenge assumptions.

## 1.  <u>Human Authorship</u>

The Copyright Office found that the "initial image generated by Midjourney and the upscaling performed by Gigapixel AI lack the human authorship that is essential for copyright protection."  In doing so, the Office ignores the essential element of human creativity required to create a work using the Midjourney program.

The Copyright Office cites <u>Burrow-Giles Lithographic Co. v. Sarony</u>, 111 U.S. 53, 56 (1884) as supporting its denial of registration; however, a close reading of that case would

cause the opposite result.  As mentioned in the First Request for Reconsideration, the goal of the Supreme Court in Burrow-Giles was to provide "authors" with the exclusive right to their "writings," regardless of whether the tool used to create same was novel or widely used.  The Court in that case found that the photographer had created a "useful, new, harmonious, characteristic, and graceful picture. . . . entirely from his own original mental conception, to which he gave visible form by posing the [subject] in front of the camera, selecting and arranging the costume, draperies, and other various accessories in said photograph, arranging the subject so as to present graceful outlines, arranging and disposing the light and shade, suggesting and evoking the desired expression, and from such disposition, arrangement, or representation, made entirely by plaintiff, he produced the picture."  Id, 111 U.S. 53 at 60.

The Copyright Office cites another part of the Burrow-Giles decision as requiring human authorship of a work, disregarding the immediately preceding sentence which clearly expresses the desire of the Supreme Court to include new and useful technologies amongst the tools with which works subject of copyright protection may be created:  "the only reason why photographs were not included in the extended list in the act of 1802 is, probably, that they did not exist, as photography, as an art, was then unknown, and the scientific principle on which it rests, and the chemicals and machinery by which it is operated, have all been discovered long since that statute was enacted."  Id. at 58.  Substitute "AI programs" for "photography," and you may arrive at the proper conclusion that AI tools can help create original works of authorship.  Our courts consistently interpret the Copyright Act and Copyright Law in light of technological evolution.

Similarly, the Office's citation to Waldman Pub. Corp. v. Landoll, Inc., 43 F.3d 775, 782 (2d Cir. 1994) fails to consider the entire case and decision in context.  In Waldman, the Court concluded that a publisher who created books following the same format as another line of popular children's books was indeed capable of copyright protection: "a derivative work is copyrightable if it is sufficiently original. . . the test of originality is concededly a low threshold. By this definition, the Waldman books are original works. The *selection* of which episodes in the classics to include in the books, the *redrafting of the text* to tailor

the books to young readers and *the illustrations* add more than a quantum of originality to the original works." Waldman Pub. Corp. v. Landoll, Inc., 43 F.3d 775, 782 (2d Cir. 1994) (emphasis added).  Additionally, Schrock v. Learning Curve Int'l, Inc., 586 F.3d 513, 516 (7th Cir. 2009) involves requiring a heightened standard of originality for copyright in a derivative work, and not a judgment about the quantity or quality of human authorship.  Id.

The "ambivalence and occasional antagonism" towards AI technologies should not color the Office's consideration of the Work's eligibility for registration.  Similar attitudes previously existed towards photography and spilled into the debate over whether to extend copyright protection to photographs.  SHL Imaging, Inc. v. Artisan House, Inc., 117 F. Supp. 2d 301, 307 (S.D.N.Y. 2000).  Ultimately, an author of any creative work is "someone who creates the work himself, *i.e.,* does not copy it from someone else.  Second, an author must imbue the work with a visible form that results from creative choices."  Id at 308.

The Supreme Court renounced the distinction between the artistic and the ordinary in Bleistein v. Donaldson Lithographing Co., 188 U.S. 239 (1903). In describing the circumstances when the requisite creativity may be satisfied, Justice Holmes notes that "the [work] is always the personal reaction of an individual upon nature. Personality always contains something unique. It expresses its singularity even in handwriting, and a very modest grade of art has in it something irreducible, which is one man's alone. That something he may copyright unless there is a restriction in the words of the act."  Id.  The totality of this body of case law strongly suggests that human authorship is present even in works that use newer technologies, because it is human creativity that caused such a work to exist at all.  Without a human conceiving of an idea and manipulating tools – whether paintbrushes or computer programs – to visually manifest that idea, no creative work could materialize.  As the court succinctly states in *Mazer v. Stein*, 347 U.S. 201 (1954), "[i]t is clear Congress intended the scope of the copyright statute to include more than the traditional fine arts."

2.   **Role and Mechanics of Midjourney and Gigapixel AI**

The Copyright Office's statement that it is "clear that it was Midjourney—not Mr. Allen—that produced this image" (Refusal at 6) is a false assertion at worst or an unsubstantiated argument at best. The Office states that Allen did not "exercise any control over the actual creation, development, or execution of the image that Midjourney rendered on his screen. Simply put, the resulting image was the output of the artificial intelligence technology, and your correspondence does not identify any specific creative authorship in this image that can be attributed to Mr. Allen."  At the same time, the Office acknowledges the long and tedious process by which Mr. Allen created the Work, recognizing indeed that creative authorship can be attributed to Mr. Allen.  He entered a series of prompts, adjusted the scene, selected portions to focus on, and dictated the tone of the image.  Such creative input is surely on par with that expressed by other types of artists and capable of Copyright protection.  See, e.g., Friedman v. Guetta, No. CV 10-00014 DDP JCX, 2011 WL 3510890, at *3 (C.D. Cal. May 27, 2011) ("plaintiff made related decisions about light and shadow, image clarity, depth of field, spatial relationships, and graininess that were all represented" in the copyrighted work); Waldman Pub. Corp. v. Landoll, Inc., 43 F.3d 775, 782 (2d Cir. 1994); Burrow-Giles Lithographic Co. v. Sarony, 111 U.S. 53, 60 (1884).

Under the Office's decision, the camera itself in Burrow-Giles Lithographic Co. v. Sarony would own the image that was generated. Claiming that Allen did not have "sufficient control over the resulting images to be considered the author of the AI's output" is not supported by factual, concrete evidence and relies on ignoring the actual evidence of Midjourney being a multi-modal interaction system which by definition *requires human interaction and input*.  Computers and their systems do not exist naturally in the world like plants, animals, humans, or other forms of life, without effort by humans, hence the word "artificial" which literally means "man-made." The Copyright Office has not matched the submitted evidence describing the creative process with anything which demonstrates beyond doubt that the Work produced lacks human authorship.

4

The National Commission on New Technological Uses of Copyrighted Works ("CONTU") in 1981 recommended that "continued availability of copyright protection for computer programs is desirable" and "in keeping with nearly two centuries' development of American copyright doctrine, during which the universe of works protectible by statutory copyright has expanded along with the imagination, communications media, and technical capabilities of society." Final Report on the National Commission on New Technological Uses of Copyrighted Works, 3 Computer L.J. 53 (1981) at *11, available at https://repository.law.uic.edu/cgi/viewcontent.cgi?article=1573&context=jitpl.    CONTU indicated that eligibility for copyright registration does not depend on the use of devices in its creation, but rather on the presence of at least minimal human creative effort at the time it was produced.  The Commission additionally warned of making value judgments regarding the legitimacy of a work:

> Courts have assiduously avoided adopting the critic's role in evaluating the aesthetic merits of works of authorship. To attempt to deny copyrightability to a writing because it is capable of use in conjunction with a computer would contravene this sound policy. Where could a meaningful line of demarcation be drawn? Between flow chart and [sic] source code? Between source code and object code? At the moment of input into a computer or microprocessor? The Commission believes that none of these is appropriate. The line which must be drawn is between the expression and the idea, between the writing and the process which is described. This proposal acknowledges the propriety of keeping cultural value judgments out of copyright. The only legitimate question regarding copyrightability is: Is the object an original work of authorship?

Id. at *25.


The Copyright Office also misinterprets the use of Gigapixel AI as the author of the upscaled image. The Office wrongly concludes that the use of Gigapixel AI "was not a 'simple' mechanical process," (Refusal at 8) yet provides no sound reasoning to support this assertion. The Office appears to misunderstand the technical process involved. Gigapixel AI uses machine learning algorithms to upscale the image – it doesn't introduce new artistic elements. It performs the function it was programmed to perform by a human, in this case Mr. Allen, just like a paintbrush does not add new strokes to a painting on its own.

Gigapixel AI doesn't introduce new, original elements into the image – rather, it simply enhances the resolution based on the given input. This is akin to a painter using a finer brush to enhance the details of a painting, or a photographer using a filter to sharpen the image quality. These actions do not create a separate authorship – they merely serve to enhance the work of the original author.   The enlargement process undertaken by Gigapixel AI does not equate to authorship. It is merely a function of the software. The same way a magnifying glass can enlarge an image for clarity, Gigapixel AI enlarges the digital image, refining its clarity but not altering the original artistic composition. It's a process of refinement, not creation. Therefore, the role of Gigapixel AI is not that of an author, but rather a tool used by the human author.

**3.   Improper Distinguishing of Human and alleged AI-generated components of the Work**

The Office's continued refusal to grant Copyright protection to the entire Work, but only to portions that were altered with Photoshop, is troubling and suggests that the Office is placing a value judgment on the utility of various tools.  The most recent Refusal notes that "the Office agrees that the modifications Mr. Allen made with Adobe Photoshop were the result of human authorship and they contain a sufficient amount of original authorship to be registered as a derivative work," but that "because this work contains an appreciable amount of AI-generated material," it must therefore limit the claim to the "human-authored elements shown in the deposit and to exclude the AI-generated components of the Work." Once again, this illustrates the conundrum the Copyright Office has created: while a non-human cannot be the author of a creative work, there is also no alternative to human ownership of a work that used AI tools to assist in the creation.  Furthermore, there is no specific guidance as to what constitutes an "appreciable amount" of AI-assisted portions of a work, and therefore leaves the Copyright Office in the role of judge and jury – a result certainly never intended by our courts or legislators.

The Office tries to distinguish between the Photoshop tool and Midjourney or Gigapixel AI, noting that "even if the changes made by Gigapixel AI were human-authored, the Office finds that these types of changes – such as noise suppression, removing blurriness, or fixing compression – to be minimal image editing that is not copyrightable." It makes one wonder if the Office, when presented with Jackson Pollock's work, would have deemed it not capable of copyright protection because the artist had no control over where the splattered paint landed on a canvas.

### 4. Requirement to List Tools

Although the Copyright Office has recently enacted legislation which requires authors to indicate whether their material has been created with the assistance of AI tools (37 CFR § 202), Claimant asserts that this is an improper application of law.  The Act affords protection to "original works of authorship," a phrase which Congress left purposely undefined and for interpretation by the courts. 17 U.S.C. § 102(a).  Contrary to the Office's argument, the Office does not typically test, or have a means to test, to see if a registration is being submitted for an AI-Generated Work, or whether the portion of content created with the assistance of artificial tools is "appreciable"; the presumption until recently is that since humans are the only beings capable of creative expression, they must, by default, be credited with ownership of works whose existence they caused.

It seems that the Office is requiring Mr. Allen to prove that he could have created the Work using other tools or mediums. It difficult to see how this is not the result of a value judgment as to the aesthetic value or artistic merit of the work, and the subsequent request for proof that the author demonstrate certain arbitrary artistic abilities that have no bearing on the creative idea being expressed in the Work.  In contrast, the bar for originality is low. "To qualify for copyright protection, a work must be original to the author." Feist Publications, Inc. v. Rural Telephone Service Company, Inc., 499 U.S. 340, 345 (1991) (citation omitted). "Original, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works),

7

and that it possesses at least some minimal degree of creativity." Id. at 345 (citation omitted).

A person who produces a short new work or makes a small improvement in a few hours gets a copyright for that contribution fully as effective as that on a novel written as a life's work.  The input of time is irrelevant. A photograph may be copyrighted, although it is the work of an instant and its significance may be accidental.  Rockford Map Publishers, Inc. v. Directory Serv. Co. of Colorado, 768 F.2d 145, 148 (7th Cir. 1985).

Similarly, the Office should not examine "the designer's artistic judgment exercised independently of functional influence" because that "would require the decision maker to consider evidence of the creator's design methods, purposes, and reasons," whereas the Copyright Act's text "makes clear, however, that [a court or reviewing agency's] inquiry is limited to how the article and feature are perceived, not how or why they were designed." Star Athletica, L.L.C. v. Varsity Brands, Inc., 580 U.S. 405, 422–23 (2017).  Each of these standards seem to have been violated during the examination of the Work, which is likely what has caused such confusion with respect to the use of AI tools. Because the work appears to be complex, detailed and display a certain aesthetic grandeur, it seems to challenge the viewer's preconceived notion of the type of skills the artist should possess in order to create the work.

Requiring creators to list each tool and the proportion of the work created with the tool would have a burdensome effect if enforced uniformly.  Would painters need to intend for each brush stroke and striation to have a particular impact?  What about the instance where an artist merely splatters paint on a canvas?  Is the human responsible for the work, or the paintbrush?  Do novelists now need to disclose snippets of conversation that they overheard and incorporated into their book's scenes, or specify the humans on whom characters are based?  The disclosure requirement could be the beginning of a slippery slope that would never end if applied universally to all inspiration and tools which artists use, and cannot possibly be enforced in a fair manner.

## 5.  Denial of Copyright Protection would result in a void of ownership

An Artificial Intelligence program is not a legal person and does not have rights. It is therefore not possible for an AI to "own" intellectual property. AI-tools used to assist in the creation of an "AI-Generated Work" are not considered as a legal "employee" per se. It functions, at least in the present case, in its capacity as personal property.  We agree with the Copyright Office's decisions (i.e., *A Recent Entrance to Paradise*) that an AI program cannot, itself, own intellectual property, since it is neither a human nor a corporation capable of ownership, but, per its definition, an artificial/man-created machine. The Office has, through its Refusal, ascribed human characteristics to non-human machines, while also acknowledging the machines' contributions.  Given the lack of AI's ability to own a Work, and the Office's decision denying ownership to the human who used the tool to create the Work, we are therefore left with a void of ownership troubling to creators.

We believe there is room to distinguish works authored with the use of AI as "merely an assisting instrument," as the Compendium framework provides, versus those where the AI stands in place of the traditional human role of creation, and feel strongly that the Work fits comfortably in the former category.   Allen did not merely press a button to generate the Work; he used Midjourney as a tool and constantly input direction as to how he wanted the image to appear, just as a director of a photo shoot or video does.  By attributing the Work to a random mechanical process, the Office disregards the importance of human user prompts in shaping the totality of the Work.

## 6.  Fair Use

In copyright law, the doctrine of fair use allows for transformative uses of copyrighted material in certain circumstances. Section 107 of the Copyright Act of 1976 offers four considerations for courts to evaluate in determining fair.

First: The purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

Second: The nature of the copyrighted work;

Third: The amount and substantiality of the portion of the copyrighted material used in relation to the copyrighted material as a whole; and

Fourth: The effect of the use upon the potential market for or value of the copyrighted material.

17 U.S.C.A. § 107 (West).  Ultimately, the doctrine of transformative use is particularly useful as a tool for distinguishing fair use from infringement.   Transformative use considers whether a new work merely supersedes an original creation or adds elements that create a further purpose or different character.

The 2013 case Cariou v. Prince, 714 F.3d 694 (2nd Cir. 2013) is of particular relevance in this instance. In that case, appropriation artist, Richard Prince, altered 30 photographs from Patrick Cariou's book, "Yes Rasta", in order to create a series of collages for sale at an exhibition. The alterations made to Cariou's photographs by Prince ranged from minor to extensive, including painting over parts of the images, using portions of the images in new collages, and modifying colors and backgrounds.

Cariou filed a copyright infringement lawsuit against Prince, alleging unauthorized use of his photographs. The District Court granted summary judgment to Cariou, holding that, because Prince did not comment on Cariou's work or the culture it depicted, his works were not transformative. On appeal, however, the Second Circuit overturned the District Court's decision, holding that 25 of the 30 artworks created by Prince were transformative despite relatively insignificant changes, even where Cariou's works were "readily apparent" because defendant's "composition, presentation, scale, color palette, and media are fundamentally different and new compared to the photographs, as is the expressive nature of [defendant's] work." Cariou, 714 F.3d 694, 707 (2d Cir. 2013)

10

The holding explained that that the law imposes no requirement for a new work comment on the original or its author in order be considered transformative. Instead, new works can be transformative so long as they alter the original work with some "new expression." Id at 707.

Ultimately, the court stated that…

> "if [the original work] is used as raw material, transformed in the creation of new information, new aesthetics, new insights and understandings—this is the very type of activity that the fair use doctrine intends to protect for the enrichment of society."

Cariou v. Prince, 714 F.3d 694, 706 (2d Cir. 2013), (citing Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc., 150 F.3d 132, 137 (2d Cir.1998) at 142); holding modified by Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith, 992 F.3d 99 (2d Cir. 2021), and holding modified by Andy Warhol Found. for Visual Arts, Inc. v. Goldsmith, 11 F.4th 26 (2d Cir. 2021)

In this case, the underlying AI-generated work merely constitutes *raw material* which Mr. Allen has transformed through his artistic contributions, as discussed herein.  Further, by the copyright Office's own admission, the generative AI itself has no rights that can be enforced in court. It also cannot be said that the AI-generated work has been "published" for copyright purposes, as the court has not recognized any non-human entities capacity to publish original work of authorship. To be an author, under the Copyright Act, one must be capable of intent, of making creative choices, of possessing a creative spark. Machines and AI, while capable of following instructions and executing algorithms, do not possess these qualities.

Finally, there will be no effect upon the commercial market for the new work's underlying AI-generated material, as the commercial market for that work was and is completely limited to my client.   For these reasons, regardless of whether the underlying AI-generated work is eligible for copyright registration, the entire Work in the form submitted to the copyright office should be accepted for registration.

Furthermore, the Office's interpretation would lead to dangerous precedent and a drastic reshaping of copyright law, which can adversely affect creators and stifle creativity. It is not only impractical but also fundamentally against the principles of copyright law to require authors to distinguish between their creative input and the role of the tools they used in creating their works. It can also lead to absurd results. For example, should we consider the camera the author of a photograph because it captures the image, or the brush and the paint the authors of a painting because they were used to apply the colors on the canvas? The answer is, of course, "no".

The Office has correctly identified the human authorship involved in the creation of the Work through the use of Adobe Photoshop. However, it fails to properly acknowledge the same when it comes to the use of Midjourney and Gigapixel. Mr. Allen did not merely press a button and let these tools create the Work on their own. He made creative choices at every step of the process, from selecting the input for Midjourney, tweaking its settings, choosing the enhancements in Gigapixel, to the final editing in Adobe Photoshop. These are not mechanical or mundane tasks but creative decisions made by Mr. Allen, reflecting his creative vision and transforming the underlying work into a new and original work of human authorship.

Mr. Allen's work is a product of his creative ingenuity, expressed and materialized with the help of advanced tools. His involvement in designing the initial conditions, manipulating parameters, selecting and refining the final generative outputs, all show a substantial exercise of human intellect, skill, and judgment. Therefore, the work should qualify as an "original work of authorship," as required under 17 U.S.C. § 102(a), and the Copyright Office should grant full copyright protection to the Work.  Under the totality of the circumstances, we therefore request that the Copyright Office reconsider its refusal and grant registration to the entire Work.

Respectfully submitted,

/Tamara Pester/
Attorney for applicant

12

# EXHIBIT 8



**Copyright Review Board**
United States Copyright Office · 101 Independence Avenue SE · Washington, DC 20559-6000

September 5, 2023

Tamara Pester, Esq.
Tamara S. Pester, LLC
PO Box 6601
Denver, CO 80206

**Re:    Second Request for Reconsideration for Refusal to Register Théâtre D'opéra Spatial (SR # 1-11743923581; Correspondence ID: 1-5T5320R)**

Dear Ms. Pester:

The Review Board of the United States Copyright Office ("Board") has considered Jason M. Allen's ("Mr. Allen") second request for reconsideration of the Office's refusal to register a two-dimensional artwork claim in the work titled "Théâtre D'opéra Spatial" ("Work"). After reviewing the application, deposit copy, and relevant correspondence, along with the arguments in the second request for reconsideration, the Board affirms the Registration Program's denial of registration. The Board finds that the Work contains more than a *de minimis* amount of content generated by artificial intelligence ("AI"), and this content must therefore be disclaimed in an application for registration. Because Mr. Allen is unwilling to disclaim the AI-generated material, the Work cannot be registered as submitted.

## I.    DESCRIPTION OF THE WORK

The Work is a two-dimensional artwork, reproduced below:



Tamara Pester, Esq.                                                                 September 5, 2023
Tamara S. Pester, LLC

## II.    ADMINISTRATIVE RECORD

On September 21, 2022, Mr. Allen filed an application to register a two-dimensional artwork claim in the Work.  While Mr. Allen did not disclose in his application that the Work was created using an AI system, the Office was aware of the Work because it had garnered national attention for being the first AI-generated image to win the 2022 Colorado State Fair's annual fine art competition.[1]  Because it was known to the Office that AI-generated material contributed to the Work, the examiner assigned to the application requested additional information about Mr. Allen's use of Midjourney, a text-to-picture artificial intelligence service, in the creation of the Work.  Email from U.S. Copyright Office to Tamara Pester (Sept. 28, 2022).  In response, Mr. Allen provided an explanation of his process, stating that he "input numerous revisions and text prompts at least 624 times to arrive at the initial version of the image."  Email from Tamara Pester to U.S. Copyright Office (Sept. 30, 2022) ("Allen Sept. Creation Explanation").  He further explained that, after Midjourney produced the initial version of the Work, he used Adobe Photoshop to remove flaws and create new visual content and used Gigapixel AI to "upscale" the image, increasing its resolution and size.  *Id.*[2]  As a result of these disclosures, the examiner requested that the features of the Work generated by Midjourney be excluded from the copyright claim.  Email from U.S. Copyright Office to Tamara Pester (Oct. 14, 2022).  Mr. Allen declined the examiner's request and reasserted his claim to copyright in the features of the Work produced by an AI system.  Email from Tamara Pester to U.S. Copyright Office (Oct. 25, 2022).  The Office refused to register the claim because the deposit for the Work did not "fix only [Mr. Allen's] alleged authorship" but instead included "inextricably merged, inseparable contributions" from both Mr. Allen and Midjourney.  Initial Letter Refusing Registration from U.S. Copyright Office to Tamara Pester at 1 (Dec. 13, 2022).

On January 24, 2023, Mr. Allen requested that the Office reconsider its initial refusal to register the Work, arguing that the examiner had misapplied the human authorship requirement and that public policy favored registration.  Letter from Tamara Pester to U.S. Copyright Office at 2, 4–8 (Jan. 24, 2023) ("First Request").  After reviewing the Work in light of the points raised in the First Request, the Office reevaluated the claims and again concluded that the Work could not be registered without limiting the claim to only the copyrightable authorship Mr. Allen himself contributed to the Work.  Refusal of First Request for Reconsideration from U.S. Copyright Office to Tamara Pester (June 6, 2023).  The Office explained that "the image generated by Midjourney that formed the initial basis for th[e] Work is not an original work of authorship protected by copyright."  *Id.* at 6.  The Office accepted Mr. Allen's claim that human-authored "visual edits" made with Adobe Photoshop contained a sufficient amount of original authorship to be registered.  *Id.* at 8.  However, the Office explained that the features generated by Midjourney and Gigapixel AI must be excluded as non-human authorship.  *Id.* at 6–7, 9.  Because Mr. Allen sought to register the entire work and refused to disclaim the portions attributable to AI, the Office could not register the claim.  *Id.* at 9.

In a letter submitted July 12, 2023, Mr. Allen requested that, pursuant to 37 C.F.R. § 202.5(c), the Office reconsider for a second time its refusal to register the Work.  Letter from

---

[1] Sarah Kuta, *Art Made with Artificial Intelligence Wins at State Fair*, SMITHSONIAN MAGAZINE (Sept. 6, 2022), https://www.smithsonianmag.com/smart-news/artificial-intelligence-art-wins-colorado-state-fair-180980703/.
[2] Mr. Allen provided additional details about this process in further correspondence on October 6, 2023.  *See* Email from Tamara Pester to U.S. Copyright Office (Oct. 6, 2022) ("Allen Oct. Creation Explanation").

Tamara Pester, Esq.                                                    September 5, 2023
Tamara S. Pester, LLC

Tamara Pester to U.S. Copyright Office (July 12, 2023) ("Second Request").  The Second
Request presented several arguments.  First, Mr. Allen argued that, in finding that the image
generated by Midjourney lacks the human authorship essential for copyright protection, "the
Office ignore[d] the essential element of human creativity required to create a work using the
Midjourney program."  *Id.* at 1.  Mr. Allen argued that his "creative input" into Midjourney,
which included "enter[ing] a series of prompts, adjust[ing] the scene, select[ing] portions to
focus on, and dictat[ing] the tone of the image," is "on par with that expressed by other types of
artists and capable of Copyright protection."  *Id.* at 4.  He further contended that the fair use
doctrine "would allow for registration of the work" because it "allows for transformative uses of
copyrighted material."  *Id.* at 1, 9.  Mr. Allen argued that, "[i]n this case, the underlying AI-
generated work merely constitutes *raw material* which Mr. Allen has transformed through his
artistic contributions."  *Id.* at 11 (emphasis in original).  Therefore, "regardless of whether the
underlying AI-generated work is eligible for copyright registration, the entire Work in the form
submitted to the copyright office should be accepted for registration."  *Id.* at 1, 9–11.

        Next, he asserted that, by refusing to register content generated via Midjourney and other
generative AI platforms, "the Office is placing a value judgment on the utility of various tools,"
and that denial of copyright protection for the output of such tools would result in a void of
ownership.  *Id.* at 6, 9.  Finally, he objected to the Office's registration requirements for works
containing AI-generated content, stating that "[r]equiring creators to list each tool and the
proportion of the work created with the tool would have a burdensome effect if enforced
uniformly."  *Id.* at 7–8.

## III.    DISCUSSION

        After carefully examining the Work and considering the arguments made in the First and
Second Requests, the Board finds that the Work contains more than a *de minimis* amount of AI-
generated content, which must be disclaimed in an application for registration.  Because
Mr. Allen has refused to disclaim the material produced by AI, the Work cannot be registered as
submitted.

### A.  Originality and the Human Authorship Requirement

        The Copyright Act protects, and the Office registers, "original works of authorship fixed
in any tangible medium of expression."  17 U.S.C. § 102(a).  Courts have interpreted the
statutory phrase "works of authorship" to require human creation of the work.  *See Thaler v.
Perlmutter*, No. 22-cv-1564, 2023 WL 5333236, at *4 (D.D.C. Aug. 18, 2023) (stating that
"human authorship is a bedrock requirement of copyright" in affirming the Office's refusal to
register a work "autonomously" created by AI).  For this reason, courts have uniformly rejected
attempts to protect the creations of non-humans through copyright.  For example, the Ninth
Circuit held that a book containing words "'authored' by non-human spiritual beings" can only
gain copyright protection if there is "human selection and arrangement of the revelations."
*Urantia Found. v. Kristen Maaherra*, 114 F.3d 955, 957–59 (9th Cir. 1997) (holding that "some
element of human creativity must have occurred in order for the Book to be copyrightable"
because "it is not creations of divine beings that the copyright laws were intended to protect").
Similarly, a monkey cannot register a copyright in photos it captures with a camera because the
Copyright Act refers to an author's "children," "'widow,'" "grandchildren," and "widower,"—

Tamara Pester, Esq.                                                    September 5, 2023
Tamara S. Pester, LLC

terms that "all imply humanity and necessarily exclude animals." *Naruto v. Slater*, 888 F.3d 418, 426 (9th Cir. 2018), *decided on other grounds*. Most recently, in *Thaler v. Perlmutter*, the U.S. District Court for the District of Columbia explained:

> By its plain text, the 1976 Act . . . requires a copyrightable work to have an originator with the capacity for intellectual, creative, or artistic labor. Must that originator be a human being to claim copyright protection? The answer is "yes."

2023 WL 5333236 at *4 (footnote omitted). Because copyright protection is only available for the creations of human authors, "the Office will refuse to register a [copyright] claim if it determines that a human being did not create the work." U.S. COPYRIGHT OFFICE, COMPENDIUM OF U.S. COPYRIGHT OFFICE PRACTICES § 306 (3d ed. 2021) ("COMPENDIUM (THIRD)").

When analyzing AI-generated material, the Office must determine when a human user can be considered the "creator" of AI-generated output. In March 2023, the Office provided public guidance on registration of works created by a generative-AI system. The guidance explained that, in considering an application for registration, the Office will ask "whether the 'work' is basically one of human authorship, with the computer [or other device] merely being an assisting instrument, or whether the traditional elements of authorship in the work (literary, artistic, or musical expression or elements of selection, arrangement, etc.) were actually conceived and executed not by man but by a machine." *Copyright Registration Guidance: Works Containing Material Generated by Artificial Intelligence*, 88 Fed. Reg. 16,190, 16,192 (Mar. 16, 2023) ("AI Registration Guidance") (quoting U.S. COPYRIGHT OFFICE, SIXTY-EIGHTH ANNUAL REPORT OF THE REGISTER OF COPYRIGHTS FOR THE FISCAL YEAR ENDING JUNE 30, 1965, 5 (1966)); *see also* AI Registration Guidance, 88 Fed. Reg. at 16,192 (asking "whether the AI contributions are the result of 'mechanical reproduction' or instead of an author's 'own original mental conception, to which [the author] gave visible form.'") (quoting *Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53, 60 (1884)). This analysis will be "necessarily case-by-case" because it will "depend on the circumstances, particularly how the AI tool operates and how it was used to create the final work." AI Registration Guidance, 88 Fed. Reg. at 16,192.

If all of a work's "traditional elements of authorship" were produced by a machine, the work lacks human authorship, and the Office will not register it. *Id.* If, however, a work containing AI-generated material also contains sufficient human authorship to support a claim to copyright, then the Office will register the human's contributions. *Id.* at 16,192–93. In such cases, the applicant must disclose AI-generated content that is "more than *de minimis*." *Id.* at 16,193. Applicants may disclose and exclude such material by placing a brief description of the AI-generated content in the "Limitation of Claim" section on the registration application. The description may be as brief and generic as "[description of content] generated by artificial intelligence." *Id.* Applicants may provide additional information in the "Note to CO" field in the online application. *Id.* Applicants are not required to list the AI tools used in the creation of the work.

Before turning to its analysis of the Work, the Board notes the Office has previously considered the scope of copyright protection of images generated through the use of the tool used by Mr. Allen, *i.e.*, the generative AI system Midjourney. Last year, the Office of Registration Policy and Practice initiated cancellation proceedings for a graphic novel containing images

-4-

Tamara Pester, Esq.                                                                September 5, 2023
Tamara S. Pester, LLC

generated by Midjourney.[3]  In its final decision reissuing the registration certificate with
exclusions, the Office explained its understanding of how the Midjourney service functions and
the relevant analysis under copyright law.[4]  In examining the Work here, the Board applies its
knowledge of Midjourney and Midjourney's description of its own service, of which the Office
takes administrative notice.  *See* COMPENDIUM (THIRD) § 1704.2 ("[T]he Board . . . may take
administrative notice of matters of general knowledge or matters known to the Office or the
Review Board.").

### B.  Analysis

Because the Work here contains AI-generated material, the Board starts with an analysis
of the circumstances of the Work's creation, including Mr. Allen's use of an AI tool.  According
to Mr. Allen, the Work was created by 1) initially generating an image using Midjourney (the
"Midjourney Image"), 2) using Adobe Photoshop to "beautify and adjust various cosmetic
details/flaws/artifacts, etc." in the Midjourney Image, and 3) upscaling the image using
Gigapixel AI.  After considering the application, the deposit, and Mr. Allen's correspondence,
the Board concludes that the Work contains an amount of AI-generated material that is more
than *de minimis* and thus must be disclaimed.[5]  Specifically, the Board concludes that the
Midjourney Image, which remains in substantial form in the final Work, is not the product of
human authorship.  In reaching this conclusion, the Board does not decide whether Mr. Allen's
adjustments made in Adobe Photoshop would be copyrightable on their own because the Board
lacks sufficient information to make that determination.[6]  The Board also does not consider
Mr. Allen's use of Gigapixel AI because he concedes that Gigapixel AI "doesn't introduce new,
original elements into the image" and that "the enlargement process undertaken by Gigapixel AI
does not equate to authorship."  Second Request at 5–6.

---

[3] *See* Letter from U.S. Copyright Office to Kris Kashtanova at 14 (Oct. 28, 2022), https://www.copyright.gov/docs
/zarya-of-the-dawn.pdf.
[4] U.S. Copyright Office, *Cancellation Decision re: Zarya of the Dawn (VAu001480196)* at 6–8 (Feb. 21, 2023),
https://copyright.gov/docs/zarya-of-the-dawn.pdf.
[5] The Board notes that there may be cases in the future where the application of the *de minimis* standard is a closer
call.  Here, however, the significance of the AI-generated material to the final work is apparent.
[6] Mr. Allen used Photoshop to erase "[u]ndesired visual elements" from the image generated by Midjourney, such as
"a crack on the floor next to the central subjects' feet, a deformed looking tower structure in the landscape's
background, a dark scar in the cityscape, and a dark blemish in the sky of the background."  Allen Oct. Creation
Explanation.  He then "used Photoshop to paint in those [deleted] areas with content aware tools," before using other
Photoshop features such as brush tools, and blur and sharpening tools.  *Id.*  According to Adobe, Photoshop's
content fill feature fills empty spaces in with little or no input from a user, which suggests a lack of human
authorship of filled material.  *See* Meredith Alexander Kunz, *Leveraging Deep Learning to Fix Images*, ADOBE
RESEARCH (Feb. 8, 2018), https://research.adobe.com/news/leveraging-deep-learning-to-fix-images/ (explaining that
an older version of content fill "pick[ed] patches in the surrounding area to copy in" and a newer version employs
machine learning techniques "to actually create new content for an image").  And the Board would need more
information to know whether Mr. Allen's use of Photoshop rose to the level of copyrightability.  *See* COMPENDIUM
(THIRD) § 909.3(A) ("Typical technical alterations that do not warrant registration include . . . repairing faded print
and visual content; and sharpening and balancing colors, tint, tone, and the like.").  Were Mr. Allen willing to
disclaim AI-generated material in the Work, he would be able to file a new application and explain why his
modifications to the image rise to the level of copyrightable authorship.

Tamara Pester, Esq.                                                    September 5, 2023
Tamara S. Pester, LLC




**Midjourney Image**                          **The Work**

In his Second Request, Mr. Allen asserts a number of arguments in support of his claim. He argues that his use of Midjourney allows him to claim authorship of the image generated by the service because he provided "creative input" when he "entered a series of prompts, adjusted the scene, selected portions to focus on, and dictated the tone of the image." *Id.* at 4. As explained in his correspondence, Mr. Allen created a text prompt that began with a "big picture description" that "focuse[d] on the overall subject of the piece." Allen Sept. Creation Explanation. He then added a second "big picture description" to the prompt text "as a way of instructing the software that Mr. Allen is combining two ideas." *Id.* Next, he added "the overall image's genre and category," "certain professional artistic terms which direct the tone of the piece," "how lifelike [Mr. Allen] wanted the piece to appear," a description of "how colors [should be] used," a description "to further define the composition," "terms about what style/era the artwork should depict," and "a writing technique that Mr. Allen has established from extensive testing" that would make the image "pop." *Id.* He then "append[ed the prompt] with various parameters which further instruct[ed] the software how to develop the image,"[7] resulting in a final text prompt that was "executed . . . into Midjourney to complete the process" and resulted in the creation of the Midjourney Image above. *Id.*[8]

In the Board's view, Mr. Allen's actions as described do not make him the author of the Midjourney Image because his sole contribution to the Midjourney Image was inputting the text prompt that produced it. Although Mr. Allen describes "input[ing] numerous revisions and text prompts at least 624 times" before producing the Midjourney Image, Allen Sept. Creation Explanation, the steps in that process were ultimately dependent on how the Midjourney system processed Mr. Allen's prompts. According to Midjourney's documentation, prompts "influence" what the system generates and are "interpret[ed]" by Midjourney and "compared to its training data."[9] As the Office has explained, "Midjourney does not interpret prompts as specific instructions to create a particular expressive result," because "Midjourney does not understand

---

[7] Midjourney permits users to add "parameters" to a text prompt to control aspects of what is generated, such as an image's aspect ratio or how much computing time is spent to generate the image. *See* MIDJOURNEY, *Parameter List*, https://docs.midjourney.com/docs/parameter-list (last visited Sept. 5, 2023).

[8] Mr. Allen declined to disclose any specific prompt on the grounds that "specific string of prompts and inputs are confidential." Allen Sept. Creation Explanation. Mr. Allen has not sought copyright protection for his prompts and inputs. Nor could the Board consider whether the prompts themselves were sufficiently creative to be independently protected by copyright since Mr. Allen has not disclosed them.

[9] *See* MIDJOURNEY, *Prompts*, https://docs.midjourney.com/docs/prompts (last visited Sept. 5, 2023).

Case No. 1:24-cv-02665-SKC-KAS   Document 1-1   filed 09/26/24   USDC Colorado   pg 76 of 78

Tamara Pester, Esq.                                                    September 5, 2023
Tamara S. Pester, LLC

grammar, sentence structure, or words like humans."[10]  It is the Office's understanding that, because Midjourney does not treat text prompts as direct instructions, users may need to attempt hundreds of iterations before landing upon an image they find satisfactory.  This appears to be the the case for Mr. Allen, who experimented with over 600 prompts before he "select[ed] and crop[ped] out one 'acceptable' panel out of four potential images … (after hundreds were previously generated)."  Allen Sept. Creation Explanation.  As the Office described in its March guidance, "when an AI technology receives solely a prompt from a human and produces complex written, visual, or musical works in response, the 'traditional elements of authorship' are determined and executed by the technology—not the human user."  AI Registration Guidance, 88 Fed. Reg. at 16,192.  And because the authorship in the Midjourney Image is more than *de minimis*, Mr. Allen must exclude it from his claim.  *See id.* at 16,193.  Because Mr. Allen has refused to limit his claim to exclude its non-human authorship elements, the Office cannot register the Work as submitted.

The Board finds that Mr. Allen's remaining arguments regarding elements of authorship in the Work are unpersuasive.  First, he argues that the Office's position "ignores the essential element of human creativity required to create a work using the Midjourney program," and that his creative choices in operating Midjourney make him the author of resulting output.  Second Request at 1, 4 (citing *SHL Imaging Inc. v. Artisan House, Inc.*, 117 F. Supp. 2d 301, 308 (S.D.N.Y. 2000) (holding human authorship requires that "an author must imbue the work with a visible form that results from creative choices")).  The Board acknowledges that the process of prompting can involve creativity—after all, "some prompts may be sufficiently creative to be protected by copyright" as literary works.  AI Registration Guidance, 88 Fed. Reg. at 16,192 n.27.  But that does not mean that providing text prompts to Midjourney "actually form[s]" the generated images.  *See Sarony*, 111 U.S. at 61; *see also Thaler*, 2023 WL 5333236, at *3 (the "key" to copyright protection is "[h]uman involvement in, and ultimate creative control over, the work at issue").  Instead, Mr. Allen is closer to the plaintiff in *Kelley v. Chicago Park District* who sought to claim copyright in a "living garden."  635 F.3d 290 (7th Cir. 2011).  In that case, the court rejected the authorship claim because, as is true here, the plaintiff's actions did not amount to creative control of the claimed elements of the work.[11]  As the Seventh Circuit further explained, while "copyright's prerequisites of authorship and fixation are broadly defined, … the law must have some limits."  *Id.* at 304.

Second, the Board rejects Mr. Allen's policy argument that denying copyright protection to AI-generated material leaves a "void of ownership troubling to creators."  Second Request at 9.  The Constitution and the Copyright Act define the works that are entitled to copyright

---

[10] U.S. Copyright Office, *Cancellation Decision re: Zarya of the Dawn (VAu001480196)* at 1 (Feb. 21, 2023), https://www.copyright.gov/docs/zarya-of-the-dawn.pdf (quoting MIDJOURNEY, *Prompts*, https://docs.midjourney.com/docs/prompts).

[11] In the case of gardens, "a garden owes most of its form and appearance to natural forces, though the gardener who plants and tends it obviously assists," such as by "determin[ing] the initial arrangement of the plants in a garden." *Kelley*, 635 F.3d at 304.  And in the case of images generated by Midjourney, most of the form of the image will be determined by outside forces such as Midjourney's training data and the initial "noise" that serves as a starting point for the diffusion process that generates a final image.  *See* MIDJOURNEY, *Prompts*, https://docs.midjourney.com/docs/prompts  (explaining that prompts are converted to tokens that are then "compared to [Midjourney's] training data") (last visited Sept. 5, 2023); MIDJOURNEY, *Seeds*, https://docs.midjourney.com/docs/seeds (explaining that Midjourney creates "a field of visual noise, like television static, as a starting point to generate the initial image grids") (last visited Sept. 5, 2023).

Tamara Pester, Esq.                                                          September 5, 2023
Tamara S. Pester, LLC

protection, and expressly exclude certain subject matter.  To be copyrightable, a work must qualify as an "original work of authorship," which excludes works produced by non-humans.  The fact that not all works will satisfy this standard does not create a "troubling" void of ownership.  The Office administers the copyright laws as enacted by Congress and cannot exceed the bounds set by Congress and the Constitution.

Third, the Board rejects Mr. Allen's argument that requiring AI-generated material to be excluded from the application for the Work improperly "plac[es] a value judgment on the utility of various tools."  Second Request at 6–7.  The disclosure of AI-generated material is "information regarded by the Register of Copyrights as bearing upon the preparation or identification of the work or the existence, ownership, or duration of the copyright."  17 U.S.C. § 409(10).  As the Office's guidance on works containing AI-generated material explained, the Copyright Act permits the Register to identify such information and require its disclosure in copyright applications.  AI Registration Guidance, 88 Fed. Reg. at 16,191.  This requirement is not a value judgment; it is a recognition of the fact that "[h]uman authorship is a bedrock requirement of copyright."  *Thaler*, 2023 WL 5333236, at *4.

Fourth, the Board rejects Mr. Allen's suggestion that the doctrine of "fair use" is relevant to the determination of whether a work is copyrightable.  *See* Second Request at 1, 9–11 (arguing that AI-generated material "merely constitutes raw material which Mr. Allen has transformed") (citing *Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013)).  Fair use is a legal doctrine that permits the unauthorized use of copyright-protected works in certain circumstances; it does not address copyrightability, but rather use.  To the extent Mr. Allen argues by analogy that his visual edits are "transformative," and thus, copyrightable, the Board agrees that human-authored modifications of AI-generated material may protected by copyright.  *See* AI Registration Guidance, 88 Fed. Reg. at 16,192–93 (explaining that in many cases, "a work containing AI-generated material will also contain sufficient human authorship to support a copyright claim" because a human author may select, arrange, or modify AI-generated material in a sufficiently creative way).  But the Office cannot register Mr. Allen's human contributions if he does not limit his claim with respect to the AI-generated material.

Finally, the Board dismisses Mr. Allen's argument that "[r]equiring creators to list each tool and the proportion of the work created with the tool would have a burdensome effect."  Second Request at 8.  The Office does not require a detailed disclosure of the specific identity and creative process behind the AI-generated material in a work.  The Office's guidance merely requires applicants to provide a "brief statement" in the application, such as that the text was "generated by artificial intelligence."  *See* AI Registration Guidance, 88 Fed. Reg. at 16,193.  The Office does not intend this requirement to be burdensome, and it does not call for a detailed list of the tools used or the precise proportions of the work that were created by each one.[12]

---

[12] The Office illustrated the simplicity of this requirement in a webinar designed to assist applicants whose works contain material generated by artificial intelligence.  *See* U.S. Copyright Office, *Webinar: Registration Guidance for Works Containing AI-Generated Content* (June 28, 2023), https://copyright.gov/events/ai-application-process/; *see id.*, Tr. at 11.

Tamara Pester, Esq.                                                                September 5, 2023
Tamara S. Pester, LLC

## IV.      CONCLUSION

For the reasons stated herein, the Review Board of the United States Copyright Office affirms the refusal to register the copyright claim in the Work.  Pursuant to 37 C.F.R. § 202.5(g), this decision constitutes final agency action regarding Mr. Allen's September 2022 application.[13]

**U.S. Copyright Office Review Board**
Suzanne V. Wilson, General Counsel and
    Associate Register of Copyrights
Maria Strong, Associate Register of Copyrights and
    Director of Policy and International Affairs
Jordana Rubel, Assistant General Counsel

---

[13] This decision does not foreclose Mr. Allen's ability to file a new application for registration of the Work in which he disclaims the Work's AI-generated material.  In such a case, the Office could consider whether the human-authored elements of the Work can sustain a claim for copyright, an issue we have not decided here.