# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 1:24-cv-02665-WJM

**JASON ALLEN, an individual**,

    Petitioner,

v.

**SHIRA PERLMUTTER, in her official capacity as Register of Copyrights and Director of the United States Copyright Office, and THE United States Copyright Office**,

    Defendants.

---

## PETITIONER'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT THEREOF

---

## TABLE OF CONTENTS

I.      INTRODUCTION........................................................................................4

II.     JURISDICTIONAL STATEMENT.............................................................5

III.    PETITIONER'S STATEMENT OF MATERIAL FACTS AND PROCEDURAL

        HISTORY ..................................................................................................6

IV.     LEGAL STANDARD .................................................................................15

V.      ARGUMENT ...............................................................................................17

        A.   Allen Is the Author of the Original Work He Created Under Both the Copyright
             Act's Text and the Supreme Court and Federal Circuit Precedent..........................17

             1.   Allen More Than Meets the Requirements for Authorship That Was Defined
                  and Refined in the Supreme Court and the Federal Courts ...............................17

                  a.   The Supreme Court Held That a Work Is Copyrightable if It Reflects Any
                       Creative Choices, No Matter How Small ....................................................17

                  b.   In the Sarony Case, The Supreme Court Already Determined Machine
                       Intervention Does Not Heighten or Otherwise Change the Low Bar of
                       Originality Necessary for Authorship and Copyright...................................19

                  c.   The Supreme and Federal Court's Definition of Author Includes Allen Who
                       Should Be Owner of the Copyright in the Work ..........................................22

             2.   The Work Meets the Few Requirements of a Copyrightable Work in the Act's
                  Text As Evidenced by Its Purpose.....................................................................25

        B.   The Copyright Office's Proffered Test Defies Established Law..............................29

             1. The Copyright Office's Test Applies Restrictions Based on Methods of Creation,
                Which Has Been Explicitly Rejected by the Supreme Court ............................30

                  a.   Copyright Office Is Asking this Court to Police a Creator's Methods, When
                       The Supreme Court Has Already Rejected this Approach...............................30

b. Unintentional and Unforeseen Results Are a Cornerstone of Copyrightable Works and the Creative Process .......................................................................32

2. The Copyright Office's Policy Penalizes Artists Who Use AI instead of other Tools, and If Applied Uniformly Would Deny Copyright to Numerous Registered Works..................................................................................................33

C. Fairly Applying the Copyright Office's Own Criteria, the Work Should be Copyrightable Because the Copyright Office's Description of Allen's Creative Process Meets Its Original Stated Requirements of Authorship ..............................36

D. The Copyright Office's Test Sets Unconstitutional Limits on Authorship .............41

VI. CONCLUSION ...............................................................................................................43

## I.    <u>INTRODUCTION</u>

Petitioner Jason M. Allen ("Allen") is an artist who exercised a very high degree of direct creative involvement in the generation of an award-winning image he titled "Théâtre D'opéra Spatial" (the "Work").  He created his image, in part, by providing hundreds of iterative text prompts to an artificial intelligence ("AI")-based system called Midjourney to help express his intellectual vision. Yet, the Defendant United States Copyright Office ("Copyright Office") denied his copyright registration proclaiming it ran afoul of its policy that a human being must execute the "traditional elements of authorship." In Allen's case, the Copyright Office decided that when an AI system produces an output based on a text prompt, the "'traditional elements of authorship' are determined and executed by the technology—not the human user."

This outcome is wrong for numerous reasons. The entire policy is inconsistent with the text and purpose of the Copyright Act (the "Act"). Leaving aside that the Act has explicitly permitted non-human authorship for more than a century, the Copyright Office's references to human authorship requirements are inapt because this Work *has* a clear human author—Mr. Allen. The Copyright Office's policy is extra-statutory, applied in an arbitrary and capricious manner, and it is contrary to well established federal and Supreme Court jurisprudence.

Even if the Act did require that a person execute the traditional elements of human authorship, elements which the Copyright Office has never defined, Mr. Allen meets that standard. Federal law has been clear that all that is required for a person to be an author is that that the work reflect just a small spark of creativity. Mr. Allen contributed far, far more than that. That is obvious from the copyright jurisprudence related to photography, for which the Act has been interpreted to allow protection in cases that are highly similar to the present case. More

4

broadly, federal courts, including the Supreme Court, have consistently interpreted the Act to encourage the use of machine and computer technologies to promote the generation and dissemination of creative works.

In practice, the Copyright Office now applies its policy to selectively prevent the registration of certain works created using AI, even when AI is merely used as a tool. But authors have long used similar tools, including cameras, cell phones, and even AI, uncontroversially to generate and register countless works. Moreover, randomness and unexpected outcomes are often an integral part of the creative process—regardless of the use of technology. For good reasons, the Act does not limit the tools or methods an author can use to make a work. If Allen cannot copyright the Work, it is unclear who, if anyone, could copyright a work they created using AI. That is an outcome dramatically at odds with the Act.

The Work is copyrightable, and it belongs to its human author, Allen. Petitioner moves for summary judgment as to the legal issue alone—whether a work generated by human creativity using AI as a tool is copyrightable.

## II.    JURISDICTIONAL STATEMENT

As this is an action brought pursuant to the Administrative Procedure Act (APA), this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331. Jurisdiction is proper under the judicial review provisions of the Administrative Procedure Act, 5 U.S.C. § 702, which provides for the right to judicial review of agency actions. The court may grant declaratory relief, injunctive relief, and other relief pursuant to 28 U.S.C. § 2201-2202 and 5 U.S.C. § 705-706.

Venue is proper in the District of Colorado under 28 U.S.C. §§ 1391(b)(2) and (e)(1). The Petitioner, is, and was at all times relevant to this action, domiciled in Colorado. As this is an APA action, the Petitioner's domicile is a proper venue. 28 U.S.C. § 1391(e).

## III.    PETITIONER'S STATEMENT OF MATERIAL FACTS AND PROCEDURAL HISTORY

Pursuant to Fed. R. Civ. P. 56, Mr. Allen submits this statement of material facts as to which there is no genuine issue, which includes the entire administrative record provided by the Copyright Office. Dkt. 22.

1.      Petitioner is a user of the AI tool, Midjourney, and using this tool he created the two-dimensional award-winning artwork (the "Work") titled "Théâtre D'opéra Spatial" (French for Space Opera Theatre) reproduced below:



Dkt. 22-2, USCO_AR_("AR")002, 022.

2.      Allen produced this artwork using "hundreds of iterations" of prompts, and after he "experimented with over 600 prompts," he cropped and completed the final Work, touching it up manually and upscaling using additional software. AR_069.

3.  On September 21, 2022, Petitioner filed an application to register the Work with the Copyright Office. AR_001-003.

4.  In the application, Petitioner identified himself as the author of the Work. AR._002.

5.  On September 28, 2022, the Copyright Office emailed Allen's attorney, and indicated it was aware that Midjourney was involved in the creation of the Work and that it needed to know "whether the uploaded work is the result of Mr. Allen's intellectual labor, with Midjourney serving as a mere assisting instrument. Or, whether Midjourney conceived and executed the uploaded work." AR_004.  The Copyright Office therefore asked that Allen "Please provide the text prompts/command inputs that Mr. Allen typed into the Midjourney to achieve the final version of the work that he is seeking to register. Tell us about Jason Allen's interaction with Midjourney. Were there revision cycles to get Midjourney to create an artwork that Mr. Allen wanted? How many revisions were needed? If Mr. Allen did input some preexisting art/text into Midjourney to create the work, please attach a copy of it to your reply." *Id*.

6.  On September 30, 2022, Allen's attorney responded to this email. In her response, she provided affirmative answers to the questions posed by the Copyright Office that Allen did not generate a work at random, and that this, instead, represented the clear, intended product of a great deal of iteration and precision in language to get the output from the AI tool that existed in his mind. AR_005-08. She organized the response to include text beneath each specific question posed by the Copyright Office in its prior missive. *Id*.

7.  In response to the Copyright Office's request to provide the text/prompt commands, Allen's attorney explained first that the exact prompt is confidential, but that his process was extensive:

> Mr. Allen used artistic, dramatic, and sophisticated language, terminology, adjectives, and keywords to develop this prompt. The beginning of the

prompt focuses on the overall subject of the piece. This is a "big picture description." Next, another "big picture description" was given, as a way of instructing the software that Mr. Allen is combining two ideas. Then, similar to a film director, Mr. Allen informs what "type of scene" is being expressed, which also has an intended effect on the composition. At this point, the main bulk of the image's concept is established, and Mr. Allen can begin describing in detail more information to further develop the piece. For this, he begins to describe quite literally how the image is presented, that is to say, what the overall image's genre and category is. Then certain professional artistic terms which direct the tone of the piece are input. From here, a description of how lifelike the artist wanted the piece to appear was added. Next, a description for what Mr. Allen desired to occur in terms of how colors were used. Then a description to further define the composition was included. After that, words that describe how to 'finish' the piece are input. Then, some final terms about what style/era the artwork should depict. Finally, a writing technique that Mr. Allen has established from extensive testing is input at the end to give the image the final emotional impact that makes the image "pop." Once the prompt is finished, Mr. Allen appends it with various parameters which further instruct the software how to develop the image. The entirety of this prompt and parameters is called a "command." Once he had researched, tested, and developed the command, Mr. Allen executed the command into Midjourney to complete the process.

AR_007.

8.      In response to the Copyright Office's request that Allen explain his "interaction with Midjourney," his attorney responded that:

> The work was a result of Mr. Allen's intellectual labor in that it was conceived using his creative imagination, knowledge, and experience to realize a vision which he translated into a series of descriptive, creative instructions using his skills as a creative writer and art director. These creative instructions are known as a "prompt" which he inputs into a text-to-image multimodal artificial intelligence software called Midjourney. In addition to the prompt, there are initialization texts called "parameters" which are similar to code scripts, which Mr. Allen appended into the prompt when input to the software. Parameters instruct the software to behave in ways specific to the user's vision for the content's output, and there are many. Midjourney did not conceive any creative form of input for this work, and is not capable of executing operation independently of the user, thus further demonstrating the software is a digital tool and assisting instrument Mr. Allen took numerous actions and steps to create the work including writing, editing, making textual creative decisions, making visual creative decisions, curating, upscaling, executing variants, executing a large number of iterations, making cosmetic adjustments and edits manually to the image, and digital preparation for the work to be suitable for print/distribution.

AR_007.

9.      In response to the Copyright Office's request to describe Mr. Allen's process, his attorney provided the following explanation of his methodology and how many revisions were needed:

Allen input[ed] numerous revisions and text prompts at least 624 times to arrive at the initial version of the image. Once Mr. Allen had this initial version, he made several variations of it. Finally, a variation that was desired to be completed was chosen by Mr. Allen to "upscale." To upscale in Midjourney means to make the image larger, with more detail, and continued expansion upon the prompts instructions. Mr. Allen calls this upscaled version of the image a "completion." Mr. Allen takes this completion and brings it into photoshop, where further visual edits are made to beautify and adjust various cosmetic details/flaws/artifacts etc. This is called a "pass", and Mr. Allen made 2 passes for this image. Once the final image was complete, Mr. Allen proceeded to upscale it again, this time using another photo program, to make the image high enough resolution to be suitable for reproduction via print... Mr. Allen did not input any preexisting art or text into Midjourney.

AR_008.

10.    On October 4, 2022, the Copyright Office contacted Allen's attorney for more information, namely, to provide details as to how Allen altered the image with the manual digital editing tool Adobe Photoshop, asking for "before and after" photos, with a detailed explanation of the changes, as well as the name of the program used to upscale the image. AR_009-010.

11.    On October 6, 2022, Mr. Allen's attorney responded. She uploaded the requested before and after images. AR_011, 022. Before providing details of how Allen changed the image Midjourney produced, she noted that, "[t]he Midjourney machine cannot independently make creative decisions and has no ability to replicate an individual creator's particular sensibilities without very specific and repeated prompts." AR_012. Thus, Allen obtained an image through these prompts, then he added numerous details to the image as detailed by his attorney. *Id*. In short, he removed parts of the image he did not want and then replaced them using alterations in

Photoshop. *Id*. He then upscaled by "determining a sequence of settings" to upscale how he wanted using a program called Gigapixel A.I. that was successful in "bringing in new details, creating more clarity, and sharpening the image." AR_013. Finally, Allen's attorney explained that, "We consider the entire image to be a new creative work, as it involves the process of coming up with numerous descriptive prompts, selecting, generating, editing, and re-inputting additional prompts, and creating the final image using a combination of Midjourney, Photoshop, and Gigapixel A.I. The final artistic work is solely dependent on human creativity." *Id*.

12.    On October 14, 2022, the Copyright Office responded that "[t]he artwork generated through the use of Midjourney and Gigapixel A.I. is not copyrightable. While Mr. Allen created the text prompts, Midjourney generated and delivered an image for Mr. Allen's approval. As a result, the Midjourney generated image does not contain direct human-created authorship." AR_015. The Copyright Office then cited to its compendium that "A work must be created by a human being in order to be registered with the U.S. Copyright Office, Compendium (Third) § 313.2." *Id*. The Copyright Office, however, never explained what made the careful use of prompts eliminate the "original, creative authorship" that it requires. *See id*.

13.    In response, on October 25, 2022, Mr. Allen's lawyer stated Mr. Allen's position that, "[y]ou have suggested that the bulk of Mr. Allen's work was 'created by' Midjourney or Gigapixel; however, these programs were merely used as tools, with Mr. Allen, a human, controlling the tools and creating the desired output. The Copyright Office itself has said that only humans can be creators . . . . By suggesting that Midjourney and Gigapixel are the creators of Mr. Allen's work, the Copyright Office would be contradicting itself, as well as straying from well-established precedent which allows humans who have used novel tools to create a work, to own the copyright in that work." AR_ 016. Importantly, she stated that the software systems used in the creation of the work did not, "actually make any decisions involved in the creative process

or generation of images without human intervention and therefore can not be the creators of such images." *Id*.

14.     On December 13, 2022, the Copyright Office provided Mr. Allen's attorney notice of a final decision denying the registration of the copyright. The letter stated that the denial was because "your client did not paint, sketch, color, or otherwise fix any of the deposit." AR_023.

15.     Afterward, Allen sent in a detailed request for reconsideration. The request identified six main areas where the Copyright Office erred.

  a. First, the application of the human authorship requirement is misplaced. The Copyright Office's policy is that it "will not register works produced by a machine or mere mechanical process that operates randomly or automatically without any creative input or intervention from a human author." Even under the Copyright Office's own policy, the situation described in the registration involved significant human input.

  b. Second, that copyright law looks at the origin of the idea that becomes expressed by the author.  The idea that the AI would be the author of the Work is misplaced given that the idea and ultimate expression came from Allen.

  c. Third, Allen did more than provide the minimal amount of creativity required.

  d. Fourth, that AI assisted art is analogous to photography.

  e. Fifth, that the Copyright Office improperly looked at the methodology, bringing in a "sweat of the brow" requirement that has long been rejected.

  f. Sixth, that public policy considerations justify registration.

AR_025-037.

16.     On June 6, 2023, the Copyright Office responded to the first request for reconsideration, rejecting it on the basis that, "The prompts described the general subject, genre, category, style, and tone of the image, specified the colors he wanted to see, and how realistic he wanted the image to be. But Mr. Allen had no control over how the artificial intelligence tool analyzed, interpreted, or responded to these prompts. Nor did he exercise any control over the actual creation, development, or execution of the image that Midjourney rendered on his screen. Simply put, the resulting image was the output of the artificial intelligence technology, and your correspondence does not identify any specific creative authorship in this image that can be attributed to Mr. Allen." AR_043. The Copyright Office cited to *Burrow-Giles Lithographic Co. v. Sarony*, arguing that "author" of a copyrighted work is the person "who has actually formed the picture," *Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53, 61 (1884). AR_044. The Copyright Office argued Midjourney users lacked "sufficient control" for copyright. *Id.* The Copyright Office also stated its understanding of Midjourney was that it functioned by "convert[ing] words and phrases 'into smaller pieces, called tokens, that can be compared to its training data and then used to generate an image.'" *Id.* (Citing *Prompts*, Midjourney, https://docs.midjourney.com/docs/prompts.[1])

17.     In response, Mr. Allen sent a Second Request for Reconsideration. Mr. Allen clarified several points of law but also corrected the Copyright Office's factual misunderstanding as to Gigapixel AI, noting that "[t]he Office appears to misunderstand the

---

[1] This URL is now outdated. Going to the time period at issue, in the Wayback Machine, which archives websites as snapshots in time, the following link should coincide with the Prompts URL for the period at issue:
https://web.archive.org/web/20230902071032/https://docs.midjourney.com/docs/prompts.

technical process involved. Gigapixel AI uses machine learning algorithms to upscale the image – it doesn't introduce new artistic elements. It performs the function it was programmed to perform by a human…" AR_055. More broadly, the Second Request raised the issue of the Copyright Office's vague reasoning, and that "there is no specific guidance as to what constitutes an 'appreciable amount' of AI-assisted portions of a work, and therefore leaves the Copyright Office in the role of judge and jury – a result certainly never intended by our courts or legislators." AR_056.

18.    On September 5, 2023, the Copyright Office sent a letter rejecting the Second Request for Reconsideration. The Copyright Office reiterated what it called the "Human Authorship Requirement," but further explained as really being a lack of the "traditional elements of authorship," as the basis for not copyrighting the work. *See* AR_063-071. The Copyright Office's simply stated that "works of authorship . . . require human creation of the work." AR_065. Its explanation was essentially circular because it predicated such human creation on an undefined term, the "traditional elements of authorship." AR_066. Providing some further detail on the decision, the Copyright Office further explained that "[i]t is the Office's understanding that, because Midjourney does not treat text prompts as direct instructions It is the Office's understanding that, because Midjourney does not treat text prompts as direct instructions." AR_069. Thus, regardless of contends that the AI, regardless of Allen's numerous contributions, was the originator of the Work. AR_065-70.

19.    In summation, Allen told the Copyright Office that he wrote and then used at least text prompts to create the image on Midjourney, then "used Adobe Photoshop to remove flaws and create new visual content and used Gigapixel AI to 'upscale' the image, increasing its

resolution and size." AR_064. In applying its nebulous traditional elements test, the Copyright

Office ruled that "Allen's claim that human authored 'visual edits' made with Adobe Photoshop

contained a sufficient amount of original authorship to be registered," but that the initial image

Allen created on Midjourney and his refinements on Gigapixel AI were authored by AI, not a

human. *Id.* Because Allen refused to disclaim the latter elements from his registration

application, the Office denied the entire registration. *Id.*

20.     Following this second and final denial,[2] Jason Allen filed a timely complaint

pursuant to the APA on September 26, 2024. Dkt. 1.

21.     Afterward, the Court set a briefing schedule for summary judgment per the

Parties' agreement on March 10, 2025. Dkt. 23.

## IV.    <u>LEGAL STANDARD</u>

Under the APA, "the statute provides that [the Federal Courts] 'decide all relevant

questions of law' and "interpret . . . statutory provisions.'" *Am. Bankers Ass'n v. Nat'l Credit

Union Admin.*, 934 F.3d 649, 662 (D.C. Cir. 2019) (quoting 5 U.S.C. § 706.). The Court "shall . .

. hold unlawful and set aside agency action, findings, and conclusions found to be—(A)

arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B)

contrary to constitutional right, power, privilege, or immunity; [or] (C) in excess of statutory

---

[2] The Copyright Office must take all the information provided in the requests for reconsideration into account.  USCO Circular 20 (available at: https://www.copyright.gov/circs/circ20.pdf) ( "[a] first request for reconsideration will be reviewed by a Registration Program staff attorney who did not participate in the initial examination of your claim. The Office will base its decision on your submission and the administrative record." "A second request for reconsideration will be reviewed de novo by the Review Board, which consists of the Register of Copyrights, the general counsel of the U.S. Copyright Office (or their respective designees), and a third individual designated by the Register. The Office will base its decision on your written submission and the administrative record.")

jurisdiction, authority, or limitations, or short of statutory right . . ." 5 U.S.C. § 706(2). The court must judge the propriety of the agency's action based "solely [on] the grounds invoked by the agency" when it made the challenged decision. *Sec. & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194, 196 (1947).

In *Loper Bright*, the Supreme Court cited 5 U.S.C. § 706 to conclude that "courts decide legal questions by applying their own judgment." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 371 (2024). When reviewing questions of law under the APA, courts review the agency's decision de novo. See *Sunnyside Coal Co. v. Dir., Off. of Workers' Comp. Programs, United States Dep't of Lab.*, 112 F.4th 902, 910 (10th Cir. 2024) (citing *Antelope Coal Co./Rio Tinto Energy Am. v. Goodin*, 743 F.3d 1331, 1341 (10th Cir. 2014)). The Court gives no deference to the agency's interpretation of the statute. See *Sunnyside Coal Company*, 112 F.4th at 910. (citing *Loper Bright Enterprises*, 603 U.S. at 371). As such, the definition of an author, and more relevantly, the "traditional elements of authorship," arise entirely from the Copyright Office's own creation and is given no deference in interpretation.

Defendants are not entitled to *Skidmore* deference either as described in *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), which limited as "an agency's interpretation of a statute merits deference under *Skidmore* only in 'proportion[ ] to its 'power to persuade.'" *Hydro Res., Inc. v. U.S. E.P.A.*, 608 F.3d 1131, 1146 n. 10 (10th Cir. 2010) (quoting *United States v. Mead Corp.*, 533 U.S. 218, 235 (2001).) In effect, "for challenges to agency action under the APA, the court 'acts as an appellate court' and 'employs summary judgment to decid[e], as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review.'" *Oklahoma v. United States Dep't of the Interior*, 640 F.

Supp. 3d 1130, 1139 (W.D. Okla. 2022) (quoting *New Mexico Health Connections v. United States Dep't of Health & Hum. Servs.*, 946 F.3d 1138, 1161 (10th Cir. 2019)).

## V.    <u>ARGUMENT</u>

### A.    <u>Allen Is the Author of the Original Work He Created Under Both the Copyright Act's Text and the Supreme Court and Federal Circuit Precedent</u>

Copyright requires only two basic components: "Copyright protection 'subsists ... in original works of authorship fixed in any tangible medium of expression.'" *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 432 (1984) (quoting 17 U.S.C. § 102(a).) Thus, all that is required is originality and a fixed medium of expression. In this case, the fixed medium is not at issue, so the Copyright Office denied the registration based on the "originality" requirement given what they described as the lack of "traditional elements of authorship." *See* AR_065-66, 069. Inventing a new standard that defies the Act as interpreted by the Supreme Court and other federal authorities clearly justifies reversing the Copyright Office's decision, as defying established precedent is not persuasive. See *Hydro Resources, Inc.*, 608 F.3d at 1146.

### 1.    **Allen More Than Meets the Requirements for Authorship That Was Defined and Refined in the Supreme Court and the Federal Courts**

#### a.    <u>The Supreme Court Held That a Work Is Copyrightable if It Reflects Any Creative Choices, No Matter How Small</u>

For over one hundred years, the "originality" requirement has been discussed and refined by the Supreme Court and numerous federal courts, and they have always set an extremely low bar for the creative contribution a person must make to own the copyright in a work as its author. The modern test for copyrightability was set forth in *Feist*, which stated that copyright exists in

any work with a spark of creativity such that it reveals 'the existence of ... intellectual production, of thought, and conception.'" *Feist Publications, Inc. v. Rural Telephone Service Co., Inc.* (*Feist*)*, 499 U.S. 340, 362 (1991). (quoting *Burrow–Giles Lithographic Co. v. Sarony* (*Sarony*)*, 111 U.S. 53, 59–60 (1884)).

The *Feist* Court stressed that originality is "the touchstone of copyright protection" and the "bedrock principle of copyright." *Id.* at 347. Citing its discussion of "Writings" of "Authors" in The *Trade-Mark Cases* and *Sarony*, the Court described originality as follows:

> The sine qua non of copyright is originality. To qualify for copyright protection, a work must be original to the author. Original, as the term is used in copyright, means only [1] that the work was independently created by the author (as opposed to copied from other works), and [2] that it possesses at least some minimal degree of creativity.

*Id.* at 345.

As the Court explained, a telephone book, as a compilation of uncopyrightable facts, can qualify for copyright as a writing of authors if the telephone book "features an original selection or arrangement of facts . . . ." *Id.* at 350. The *Feist* Court stressed that "the requisite level of creativity is extremely low; even a slight amount will suffice. The vast majority of works make the grade quite easily, as they possess some creative spark, 'no matter how crude, humble or obvious' it might be." *Id.* at 345. Thus, even a compiler of uncopyrightable elements can be an author simply by selecting or arranging the elements in a minimally creative way. *Feist* also illustrates the extreme standard required to fail to contribute even a "minimal level of creativity" in either the selection of listings (names, towns, and telephone numbers) or their arrangement

(alphabetical by last name). The telephone book's selection and arrangement followed the industry standard—"a garden-variety white pages directory, devoid of even the slightest trace of creativity." *Id.* at 362.

> b.    In the Sarony Case, The Supreme Court Already Determined Machine Intervention Does Not Heighten or Otherwise Change the Low Bar of Originality Necessary for Authorship and Copyright

Almost a century and a half ago, the Supreme Court was faced with deciding whether and how copyright should apply to the use of another revolutionary creative tool, the camera, in *Sarony*. The work at issue was a photograph of Oscar Wilde produced by Napoleon Sarony. Sarony did not physically fix the work himself—the photograph was the output of a machine. In fact, he did not even operate the camera. Rather, he used human assistants to take the photograph and to stage the scene, but still, the photograph came about because he made creative decisions and communicated instructions to human assistants who in turn provided instructions to the machine. Christine Haight Farley, *The Lingering Effects of Copyright's Response to the Invention of Photography*, 65 Univ. Pittsburgh L. Rev. 385, 434-35 (2004); *Studio, Sarony*, SC.EDU, https://broadway.library.sc.edu/content/studio- sarony.html; *compare* AR at 63.

The relevant question presented was whether Congress had the constitutional right to protect photographs by copyright. The Constitution authorizes Congress, "to promote the progress of science and useful arts, by securing, for limited times to authors and inventors the exclusive right to their respective writings and discoveries." *Sarony*, 111 U.S. at 56 (quoting US Const. Art. I  § 8, cl. 8). Burrow-Giles Lithographic Company argued a photograph is literally not the author's writing because he did not produce it himself. *Id.* ("that a photograph being a

reproduction, on paper, of the exact features of some natural object, or of some person, is not a writing of which the producer is the author."). As they noted, it is in fact, a mechanical reproduction of a natural phenomenon—it is the output of a machine. *Id.*, 59. ("[A] photograph is the mere mechanical reproduction of the physical features or outlines of some object, animate or inanimate, and involves no originality of thought or any novelty in the intellectual operation connected with its visible reproduction in shape of a picture."). Burrow-Giles Lithographic Company thus argued that photographs were not protectable subject matter, and that producing a photograph did not make a person an author. *Id.*

The Supreme Court rejected these arguments, deciding instead to purposively interpret the terms "author" and "writings." An author, in this context, is a person "to whom anything owes its origin; originator; maker; one who completes a work..." *Sarony*, 111 U.S. at 58. Similarly, "writings" in this context means "all forms… by which the ideas in the mind of the author are given visible expression." *Id.*[3] Expanding the definition of writing necessarily expands the definition of authors, and vice versa, as an author is plainly defined by their creations. *See* 17 U.S.C. § 102(a).

In the case of Sarony, he qualified as an author given that he created a  "useful, new, harmonious, characteristic, and graceful picture, and … made the same . . . entirely from his own original mental conception, to which he gave visible form by posing the said Oscar Wilde in

---

[3] Similarly, in *In re Trade-Mark Cases*, 100 U.S. 82 (1879), the Supreme Court determined that "the word writings may be *liberally construed* . . . to include original designs for engravings, prints, etc." *Id.* at 94 (emphasis added). The further refinement of this definition was that the key was the output reflecting the creator's mental conception, such that copyrightable subject matter includes "only such as are original, and are founded in the creative powers of the mind. The writings which are to be protected are the fruits of intellectual labor, embodied in the form of books, prints, engravings, and the like." *Id.*

front of the camera, selecting and arranging the costume, draperies, and other various accessories in said photograph, arranging the subject so as to present graceful outlines, arranging and disposing the light and shade, suggesting and evoking the desired expression, and from such disposition, arrangement, or representation, made entirely by Petitioner, he produced the picture in suit." *Sarony*, 111 U.S. at 60. In other words, the Court looked at whether creative choices had been made by the author related to machine output, rather than simply denying protection based on the technology used to make a work. Another way to conceive of it is that a Court should look *for* the creative elements an author controlled to grant copyright, not reasons not to.

The Supreme Court's analysis focused entirely on the conception of the photograph, not the physical creation or taking thereof. As another court has summarized, "to the extent a photograph reflects the photographer's decisions regarding pose, positioning, background, lighting, shading, and the like, those elements can be said to 'owe their origins' to the photographer, making the photograph copyrightable, at least to that extent." *Meshwerks, Inc. v. Toyota Motor Sales U.S.A., Inc.*, 528 F.3d 1258, 1264 (10th Cir. 2008)[4] (Analyzing *Sarony*).[5] Thus, if someone makes creative choices using Midjourney, there is no reason the resulting image should not be protected simply because of the manner in which the work was made.

---

[4] While the Court in *Meshworks* ultimately did not find copyright in the mesh wireframes, that was because it was an exact copy from medium to another which is not relevant in this case. *See Id.* at 1267. If the principle espoused in *Meshworks*, however, is applied to the purely fictitious work of imagination Allen created, it clearly supports a finding that he is the author of a copyrighted work.

[5] The Tenth Circuit also noted that Mr. Wilde's visit, and by extension Mr. Sarony's photograph and the refinement of the law arising from it, are a part of Colorado's history. "The tour brought Wilde within what is now our territorial jurisdiction in 1882, including to the bustling silver mining town of Leadville, Colorado, where Wilde descended into Horace Tabor's Matchless Mine…" *Id.* at 1264.

     c.        <u>The Supreme and Federal Court's Definition of Author Includes</u>

                  <u>Allen Who Should Be Owner of the Copyright in the Work</u>

The instant dispute is, in all relevant respects, an exact mirror of the one in *Sarony*. Neither Allen nor Sarony had complete control over their finished work, but both made creative choices that influenced their works. The Copyright Office, however, would now deny protection to Sarony based on its policy that the author performs what it calls the "traditional elements of authorship." *See* AR_047, 066, 069. The Copyright Office never defines what these traditional elements are, nor does the term arise outside of the Copyright Office's own invention, and, for this reason, the Copyright Office engages in erroneous, arbitrary, and capricious analysis when it relies on *Sarony* for its determination that Allen did not himself perform any "traditional elements of authorship." *See* AR_047; 5 U.S.C. § 706(2).

The Supreme Court has, since *Sarony*, in every copyright case before it, only ever further expanded, rather than contracted, the universe of copyright protection. *See Bleistein v. Donaldson Lithographing Co.*, 188 U.S. 239, 249–51 (1903) ("Personality always contains something unique. It expresses its singularity even in handwriting, and a very modest grade of art has in it something irreducible, which is one man's alone. That something he may copyright unless there is a restriction in the words of the act."); *Eldred v. Ashcroft*, 537 U.S. 186, 218-22 (2003) (inter alia, rejecting the argument that extending the term of existing copyrights violated the Act's originality requirement and First Amendment.) *Golan v. Holder*, 565 U.S. 302, 332-36 (2012) (declining to recognize a constitutional bar against granting copyrights to works in the public domain and affirming the Tenth Circuit's decision).

Since *Sarony*, courts have determined that "it is now settled beyond question that practically anything novel can be copyrighted," even if there is only a "faint trace of originality." *See Dan Kasoff, Inc. v. Novelty Jewelry Co.*, 309 F.2d 745, 746 (2d Cir. 1962). "All that is needed to satisfy both the Constitution and the statute is that the 'author' contributed something more than a 'merely trivial' variation, something recognizably 'his own. . . . No matter how poor artistically the 'author's addition, it is enough if it be his own." *Alfred Bell & Co. v. Catalda Fine Arts*, 191 F.2d 99, 102–03 (2d Cir. 1951) (finding that Petitioner's mezzotints consisting of reproductions of works in the public domain subject to Copyright protection because the Copyright Act "explicitly provides for the copyrighting of 'translations, or other versions of works in the public domain.' The mezzotints were such 'versions'").

As the Tenth Circuit recognized, the "Court explained through Justice Holmes, even 'a very modest grade of art has in it *something* irreducible, which is one man's alone. That something he may copyright....'". *Meshwerks, Inc. v. Toyota Motor Sales U.S.A., Inc.*, 528 F.3d 1258, 1263 (10th Cir. 2008) (emphasis added) (quoting *Bleistein v. Donaldson Lithographing Co.*, 188 U.S. 239, 250 (1903) and citing *Feist Publications, Inc.*, 499 U.S. at 345 (all that is needed is *some* creative spark, "no matter how crude, humble, or obvious").

Mr. Allen clearly explained why the Work was a product of his own creativity, and he has done more than enough to show that at least some of Work reflects his creative decisions. Even the Copyright Office accepts that "[h]e [] entered prompts that described the 'genre and category' for the image, 'the tone of the piece,' 'a description of how lifelike [Mr. Allen] wanted the piece to appear,' 'how colors were used,' and 'what style/era the artwork should depict.'" AR_043. Further, the Copyright Office admits that "the process involved 'numerous revisions and text prompts **at**

**least 624 times** to arrive at the initial version of the image' produced by Midjourney." *Id.*
Critically, what the Copyright Office ignores is that Mr. Allen chose this many prompts because he
wanted something specific from Midjourney to match his mental conception. There was clear
intentionality with over 600 prompts. What this shows is that Mr. Allen had the "original mental
conception, to which he gave visible form . . . arranging and disposing the light and shade,
suggesting and evoking the desired expression, and from such disposition, arrangement, or
representation …." that the Supreme Court connected as the copyrightable element of a work made
through machinery. *See Sarony*, 111 U.S. at 55. He "contributed something more than a 'merely
trivial' variation, something recognizably 'his own". *See Feist Publications, Inc.*, 499 U.S. at 362
and *Alfred Bell & Co. v. Catalda Fine Arts*, 191 F.2d 99, 102–03 (2d Cir. 1951). This necessary
creativity exists irrespective of whether he affixed the eventual artwork himself or relied on some
novel form of technology to bring this vision to life. *See Sarony*, 111 U.S. at 60.  The Copyright
Office itself noted five important elements that Mr. Allen contributed all through his own
creativity, which is reflected in the final Work, so to the extent the threshold for authorship is
low, Mr. Allen easily surpasses it.

 Thus, applying *Feist*, *Sarony*, and the other authorities that set a low bar and do not make
technological innovation or utilization a bar to authorship when it is used to realize one's
creative vision, Allen is the author of a protectable work. There is no argument by the Copyright
Office that the Work is copied from another work, and it would be impossible to describe the
Work as "garden variety"—the Work literally won a state art competition. Further, the Work is
the result of many detailed choices Allen made directly in the context of the Work's generation.
Allen explained to the Copyright Office that he made creative decisions and that he did not copy

preexisting work into the AI. Instead, he generated a new image with his sophisticated use of prompts. AR_007. The Copyright Office contradicts itself by stating that a photographer chooses "subjects," the "lens, focus, filter and other settings," then "framing, angle, lighting," which qualifies them to be an author, but then ignoring Mr. Allen's statements that he made similar choices in his prompts. *See* AR_043-044. The Copyright Office instead misstates that his contribution boils down to "sifting through hundreds of images." *Id.* In fact, Mr. Allen made the Work from nothing and provided far more creative input than most photographers. Thus, the Copyright Office's denial is contrary to law and internally inconsistent, requiring reversal. *See* 5 U.S.C. § 706(2).

        2.        **The Work Meets the Few Requirements of a Copyrightable Work in the Act's Text As Evidenced by Its Purpose**

In the Act, "author" has no definition except by its effect, which is that "Copyright in a work protected under this title vests initially in the author or authors of the work," and "[c]opyright protection subsists, in accordance with this title, in original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." 17 U.S.C. § 102, 201.  Notably, the medium of expression was broadly defined to be expansive and inclusive of future technological advancement. To the extent that this is ambiguous, the Courts and Congress have charged courts to read it expansively.

The Act does not limit the tools that an author can use to express their creativity. To the contrary, the Act is designed to encourage the use of novel technologies in the creative industry. The Copyright Office cannot thus read a limitation into the Act that does not exist, and a

limitation at odds with the Act's text and purpose. As the Supreme Court has cautioned, "[a] court does not get to delete inconvenient language and insert convenient language to yield the court's preferred meaning." *Borden v. United States*, 593 U.S. 420, 436 (2021); *see, e.g.*, *Eldred*, 537 U.S. at 213 ("We have also stressed, however, that it is generally for Congress, not the courts, to decide how best to pursue the Copyright Clause's objectives."); *Stewart v. Abend*, 495 U.S. 207, 209 (1990) ("Absent an explicit statement of congressional intent that the rights in the renewal term of an owner of a pre-existing work are extinguished upon incorporation of his work into another work, it is not our role to alter the delicate balance Congress has labored to achieve."); *Sony Corp. of America*, 464 U.S. at 429  ("[I]t is Congress that has been assigned the task of defining the scope of the limited monopoly that should be granted to authors ... in order to give the public appropriate access to their work product."); *In re Trade-Mark Cases*, 100 U.S. at 94 ("And while the word writings may be liberally construed, as it has been, to include original designs for engravings, prints, etc., it is only such as are original, and are founded in the creative powers of the mind.").

Congress has been equally consistent in finding that the purpose of Copyright is to promote the generation and dissemination of works. Congress passed its first Copyright Act in 1790, which inherited numerous provisions from the Statute of Anne. The Act stated it was "for the encouragement of learning, by securing copies of the maps, charts, and books, to the authors and proprietors of such copies, during the times therein mentioned."  Jane C. Ginsburg, *A Tale of Two Copyrights: Literary Property in Revolutionary France and America*, 64 Tul. L. Rev. 991, 1001 (1990). ("Congress adopted a rather pragmatic view of the kinds of works that achieved that objective: the first copyright law protected maps, charts, and books-in that order. The great

majority of works for which authors or publishers sought copyright protection under that first statute were highly useful productions."). Authors and proprietors are mentioned, but the public remained the law's primary beneficiaries. *See id.*

The legislative history of the more recent copyright acts shows this is still the purpose Congress hoped to achieve. The House of Representatives committee most responsible for the 1909 Copyright Act noted the following:

> The enactment of copyright legislation by Congress under the terms of the Constitution is not based upon any natural right that the author has in his writings, for the Supreme Court has held that such rights as he has are purely statutory rights, but upon the ground that the welfare of the public will be served and progress of science and useful arts will promoted by securing to authors for limited periods the exclusive rights to their writings. The Constitution does not establish copyrights, but provides that Congress shall have the power to grant such rights if it thinks best. Not primarily for the benefit of the author, but primarily for the benefit of the public, such rights are given. Not that any particular class of citizens, however worthy, may benefit, but because the policy is believed to be for the benefit of the great body of people, in that it will stimulate writing and invention, to give some bonus to authors and inventors.

H.R. REP. No. 2222, 60th Cong., 2d Sess. (1909) at 5.

The House of Representatives made a similar note when preparing and finalizing the current iteration of the Copyright Act:

> The history of copyright law has been one of gradual expansion in the types of works accorded protection, and the subject matter affected by this expansion has fallen into two general categories. In the first, scientific discoveries and technological developments have made possible new forms of creative expression that never existed before. In some of these cases the new expressive forms-- electronic music, filmstrips, and computer programs, for example-- could be regarded as an extension of copyrightable subject matter Congress had already intended to protect, and were thus considered copyrightable from the outset without the need of new legislation. In other cases, such as photographs, sound recordings,

and motion pictures, statutory enactment was deemed necessary to give them full recognition as copyrightable works.

*See* H.R. REP. 94-1476, 51, 1976 U.S.C.C.A.N. 5659, 5664.

The *only* exception to this clear policy directive, from both the Congress and the Courts, has been the Copyright Office's traditional elements of authorship policy. In 2021, the Copyright Office revised the Compendium's third edition to include language referring to, for the first time, the so-called "traditional elements of authorship." U.S. COPYRIGHT OFFICE, COMPENDIUM OF U.S. COPYRIGHT OFFICE PRACTICES (THIRD) (Rev. 3d ed. 2021), §§ 306, § 313.2, https://www.copyright.gov/comp3/docs/compendium.pdf [hereinafter 2021 COMPENDIUM]. [6]

This term, in fact, originated in the Copyright Office's REPORT TO THE LIBRARIAN OF CONGRESS BY THE REGISTER OF COPYRIGHTS 5 (1966). The Copyright Office, therefore, is not applying a legal test articulated by a federal court or required by the Act but rather elevating the thoughts of a Register of Copyright to constitutional authority, further justifying reversal as capricious.

---

[6] The Copyright Office ignores the intentionally broad language of the Act. Per the Committee Report of the Act, "Authors are continually finding new ways of expressing themselves, but it is impossible to foresee the forms that these new expressive methods will take. The committee does not intend either to freeze the scope of copyrightable subject matter at the present stage of communications technology or to allow unlimited expansion into areas completely outside the present congressional intent. The committee's statement of the subject matter of copyright protection in § 102 implies neither that that subject matter is unlimited nor that new forms of expression within that general area of subject matter would necessarily be unprotected." Legislative History of the General Revision of the Copyright Law, Title 17 of the United States Code, and for Other Purposes: PL 94–553 (S 22), PL 94–553, OCTOBER 19, 1976, 90 Stat 2541, at 43.  The "very broad" subject matter of copyright was meant to encompass works that fall within a listed type under Section 102, its "general area of subject matter," but also ones involving future technologies that provide authors "new ways of expressing themselves," or "new expressive methods." Id.  Likewise, "bird calls" were included as the kind of contribution music producers can make to copyrightable musical compositions. Id. at 43. Such calls would be selected but chosen from ultimately random natural processes for which one has minimal control.

**B.**       **The Copyright Office's Proffered Test Defies Established Law**

The Copyright Office's position with respect to works created through the use of text

prompts to engineer art can be summarized as follows: (1) a creator using AI text-to-image

generators will not satisfy the traditional elements of authorship if the final work was generated

through a process incorporating random data or elements so that the exact specific result is not

precisely dictated by the creator, but (2) a creator can satisfy the traditional elements of

authorship by editing the work with sufficient human contribution.[7] *See* AR_068. The Copyright

Office explained that it viewed Mr. Allen's prompts as insufficiently creative because

Midjourney did not "create a particular expressive result" and such particularized results are

what the Copyright Office requires to satisfy the "traditional elements of authorship." *Id.*

Holding Mr. Allen to a different standard than everyone else is the very definition of

"arbitrary and capricious," and a review of the case law establishes just that. *See* 5 U.S.C. §

706(2).  In fact, no court has ever held there is a requirement that an author must exercise the

"traditional elements of authorship."  Instead, the Office has translated musings by the Register

of Copyrights in 1965 into a legal requirement that the "traditional elements of authorship in the

work (literary, artistic, or musical expression or elements of selection, arrangement, etc.)" must

be "actually conceived and executed not by man but by a machine." U.S. Copyright Office,

Sixty-Eighth Annual Report of the Register of Copyrights for the Fiscal Year Ending Jun. 30,

1965, at 5. However, beyond the statement above and a list of seven examples, the Copyright

---

[7] Throughout the record the term "human authorship requirement" appears. The Act contains no
such requirement, but this case has a human author. The issue here is not whether AI working
autonomously can create a copyrightable work, but whether a human artist using AI as a tool can
own the resulting output. To the extent the Copyright Office tries to elide the concepts, they are
inapt.

Office's 2021 Compendium still does not explain what it believes the traditional elements of authorship to be. 2021 COMPENDIUM, § 313.2.

In effect, the Copyright Office penalizes certain creators if it believes the ultimate work product does not perfectly match the original conception of the work. The Copyright Office is therefore enforcing, in a very particular technological context, a static, linear, unidirectional, and deterministic view of authorship and creation itself that should more broadly eliminate copyrightability from any work that incorporates random chance. The methods that the Copyright Office determined disqualifies works from copyrightability would also disqualify countless registrations because an element of randomness or chance is common even in the most traditional creative processes. This approach is also fatally flawed because it measures copyrightability by methods, which defies precedent.

      1.      **The Copyright Office's Test Applies Restrictions Based on Methods of Creation, Which Has Been Explicitly Rejected by the Supreme Court**

      a.      <u>Copyright Office Is Asking this Court to Police a Creator's Methods, When The Supreme Court Has Already Rejected this Approach</u>

The Supreme Court has explained that copyright must not require the court or Copyright Office "to consider evidence of the creator's design methods, purposes, and reasons." *Star Athletica, L.L.C. v. Varsity Brands, Inc.*, 580 U.S. 405, 422 (2017). While the Supreme Court in *Star Athletica* was interpreting specific language as to what elements to consider in the copyrightability of the decorative portions of useful articles, the case's holding has broad applicability to the copyrightability of any artwork. *Id.* at 422–23 (Discussing 17 U.S.C. § 101.) Given consideration of the design in a useful article is literally carving out those portions that are otherwise graphical art as if

it were "separated . . and applied in another medium" which "would qualify as two-dimensional works of art," as in this case, the Supreme Court's determination applies equally that one is not supposed to consider design methods. *See id*. Likewise, the Supreme Court's determination is also applicable in this case because no requirement to consider methods exists in the Act regarding authorship at all. *See id*. Nothing in the Act makes decorative portions of a useful article subject to *less* scrutiny than any other artwork, rather, the test is purely designed to add further elements to be considered when there are artful elements of useful articles. *See id*; 17 U.S.C. § 101.

As such, deeming too little effort went into the physical creation defies the same principle and attempts to recreate the sweat of the brow doctrine. *See id.* at 408 ("our inquiry is limited to how the [work is] perceived," not how it was designed). As Justice O'Connor observed, "copyright rewards originality, not effort" and "[w]ithout a doubt, the 'sweat of the brow' doctrine flouted basic copyright principles." *Feist Publications, Inc.*, 499 U.S. at 352, 354, 364.

Justice Holmes explained that:

> It would be a dangerous undertaking for persons trained only to the law to constitute themselves final judges of the worth of pictorial illustrations, outside of the narrowest and most obvious limits. *At the one extreme, some works of genius would be sure to miss appreciation. Their very novelty would make them repulsive until the public had learned the new language in which their author spoke.* It may be more than doubted, for instance, whether the etchings of Goya or the paintings of Manet would have been sure of protection when seen for the first time. At the other end, copyright would be denied to pictures which appealed to a public less educated than

31

the judge. Yet if they command the interest of any public, they have a

commercial value—it would be bold to say that they have not an aesthetic

and educational value—and the taste of any public is not to be treated with

contempt. It is an ultimate fact for the moment, whatever may be our

hopes for a change."

*Bleistein*, 188 U.S. at 251–252 (emphasis added).

Indeed, Justice Holmes's opinion anticipated the permissive approach to photographs by recognizing "[t]he least pretentious picture has more originality in it than directories and the like, which may be copyrighted." *Bleistein*, 188 U.S. at 250. Yet, the Copyright Office is now telling Mr. Allen that his work has less originality embodied in it than a directory and denying him copyright despite far less expressive works historically receiving protection.

> b.    <u>Unintentional and Unforeseen Results Are a Cornerstone of Copyrightable Works and the Creative Process</u>

Accidental, luck-based creation has a long history of protectability that the Copyright Office seeks to arbitrarily unravel in certain AI contexts. In *Chamberlin v. Uris Sales Corp.*, 150 F.2d 512 (2d Cir. 1945) the Court made it clear that copyright cannot unravel the intentional from the unintentional, as it requires too much uncertainty for courts to engage in such metaphysical pursuits in the creative process. *Id.* at 513 ("It is not easy to ascertain what is intended and what inadvertent in the work of genius: That a man is color-blind may make him a master of black and white art; a painter's unique distortions, hailed as a sign of his genius, may be due to defective muscles. Consider the great scientific discoveries- such as the X-ray and the galvanic circuit- which resulted from accidents.") Such accidents are therefore not less protected. *Id.*

The Second Circuit further refined this understanding of the value of randomness when Judge Frank observed that "even if their substantial departures from the paintings were inadvertent, the copyrights would be valid. A copyist's bad eyesight or defective musculature, or a shock caused by a clap of thunder, may yield sufficiently distinguishable variations. Having hit upon such a variation unintentionally, the 'author' may adopt it as his and copyright it." *Alfred Bell & Co. v. Catalda Fine Arts*, 191 F.2d 99, 105 (2d Cir. 1951). Despite being able to embrace random chance and select and "adopt" outcomes entirely out of his control as his own, the Copyright Office refuses to register Mr. Allen's copyright "because Midjourney does not treat text prompts as direct instructions, users may need to attempt hundreds of iterations before landing upon an image they find satisfactory." AR_069. This is even though Allen had to create the text prompt used to make images, iterate that prompt based on output, then filter through and choose and selectively adopt certain output as his own. *See* AR_069. Nonetheless, the Copyright Office is refusing registration based on this element of randomness that still occurs when using an AI tool. This is notwithstanding the creative elements and choices that Mr. Allen had to make that reflect classic elements of authorship and have led to successful registration when randomness is associated with capturing nature, real world events, or anything that is not AI-related.

2. **The Copyright Office's Policy Penalizes Artists Who Use AI instead of other Tools, and If Applied Uniformly Would Deny Copyright to Numerous Registered Works**

Nothing illustrates the arbitrary and capricious nature of the Copyright Office's policy more than copyright jurisprudence related to photography. Here, the Copyright Office denied

protection to a highly involved professional artist and creator with a clear vision and the perseverance to iterate works using AI until he made a conscious choice to select his desired result. The existence of some amount of randomness in the creation of a work, or the presence of some element not intended ab initio by the artist, cannot bar protection because photography has always embraced randomness as part of the process of creation.

As discussed in the prior section, Courts do not search for randomness or police methods to prohibit copyright in a work, rather, they determine whether a spark of creativity exists that allows for protection. For example, the First Circuit did not determine that there was too much random chance to allow a lucky photograph copyright protection, instead, they identified the creative choice of "timing," which includes complete chance, and "being at the right place at the right time." *See Harney v. Sony Pictures Television, Inc.*, 704 F.3d 173, 181–82 (1st Cir. 2013).

Courts have never denied photographers copyrights by claiming they have not exercised "sufficient control" to dictate specific results of their photographs, so it is arbitrary for the Copyright Office to require Allen to do so. *Cf,* AR_044. A photographer's luck at being in the right place at the right time, even when capturing newsworthy events that are, essentially, purely factual moments, does not preclude copyright. *Mannion v. Coors Brewing Co.*, 377 F. Supp. 2d 444, 452–53 (S.D.N.Y. 2005) ("[A] person may create a worthwhile photograph by being at the right place at the right time. I will refer to this type of originality as originality in timing.") (Citation and internal quotation marks omitted); *Cruz v. Cox Media Grp., LLC*, 444 F. Supp. 3d 457, 465 (E.D.N.Y. 2020) (Photograph taken by amateur photographer of terror suspect arrest was sufficiently original to qualify for protection, though media outlet asserted that photographer did not make a creative choice in taking the photograph; photograph reflected creative choices,

including photographer's timing of when he took the photograph, which occurred after photographer recognized "big commotion"); *see also Ets-Hokin v. Skyy Spirits, Inc.*, 225 F.3d 1068, 1076 (9th Cir. 2000) (quoting Judge Learned Hand's opinion in *Jewelers' Circular Pub. Co. v. Keystone Pub. Co.*, 274 F. 932, 934 (S.D.N.Y. 1921) that "no photograph, however simple, can be unaffected by the personal influence of the author.") "This approach, according to a leading treatise in the copyright area, 'has become the prevailing view,' and as a result, 'almost any[ ] photograph may claim the necessary originality to support a copyright merely by virtue of the photographers' [sic] personal choice of subject matter, angle of photograph, lighting, and determination of the precise time when the photograph is to be taken.'" *Ets-Hokin*, 225 F.3d at 1076 (quoting 1 Melvin B. Nimmer & David Nimmer, NIMMER ON COPYRIGHT § 2.08[E][1], at 2–130 (1999).)

As previously discussed, *Sarony* charged that if creative elements originating with an author exist in a final product, a work can be copyrighted. *See supra,* Section V.A.1.b. The Copyright Office is therefore asking the wrong questions and now focusing on all the things it claims Allen did not control, and ignoring, both factually and legally, what he did control. What he controlled fundamentally resulted in a unique piece of art that reflects the individual spark that Justice Holmes looked for when determining copyrightability. As these various cases show, photography is a work made by a machine that includes elements which are out of the author's control, but it also includes other creative contributions that still allow a person to copyright a photograph.

Allen controlled significantly more than a news journalist whose sole creative decision is the timing of the shot. Allen selected the scene, the elements, the tone, and refined this idea over 600 times to engineer the prompt to get the output he wanted, at which point he selected the arrangement he considered most in line with his intellectual conception. *See* AR_069. Unlike the

photographer in *Cruz v. Cox Media Group* or *Mannion*, Mr. Allen had to consciously decide what he wanted to create, and he used the AI software to help bring his expression to life.

> **C.**    **Fairly Applying the Copyright Office's Own Criteria, the Work Should be Copyrightable Because the Copyright Office's Description of Allen's Creative Process Meets Its Original Stated Requirements of Authorship**

In addition to holding Allen to an extra-legal standard that does not follow its own behavior, or court precedent interpreting the Act, the Copyright Office is not fairly applying its own stated standard in rejecting Allen's Copyright, warranting reversal for being arbitrary and capricious. The Copyright Office will grant copyright even when randomness influences the final result, as discussed in the previous Section. In addition, it stated its goal, initially, in registering the work was simply to determine if, "the uploaded work is the result of Mr. Allen's intellectual labor, with Midjourney serving as a mere assisting instrument. Or, whether Midjourney conceived and executed the uploaded work." AR_004. Despite setting a low bar, the Copyright Office refused to grant copyright despite its own rendition of the facts showing the Work was a result of Allen's intellectual labor.

As the Copyright Office itself described, "[u]sers operate Midjourney through 'prompts,' which are text commands entered into the system. As Midjourney explains, prompts must start with the text "/imagine" and contain text describing what Midjourney should generate." AR_042. Users also have the option to include (1) a URL of one or more images to influence the generated output, or (2) parameters directing Midjourney to generate an image in a particular aspect ratio or providing other functional directions." *Id.* The Copyright Office relied on Midjourney's prompt

FAQ. *Id.* Looking at the same FAQ,[8] it further describes how users have variable levels of control in which specific word choice has a clear impact. Prompts, https://web.archive.org/web/20230902071032/https://docs.midjourney.com/docs/prompts ("Word choice also matters. More specific synonyms work better in many circumstances. Instead of big, try gigantic, enormous, or immense. Remove words when possible.")

Midjourney also explains that there is a clear difference between default results, and that users can have the necessary influence to make a "unique" work. *Id.* ("Very short prompts will rely heavily on Midjourney's default style, so a more descriptive prompt is better for a unique look.".) Midjourney concludes that "details matter," and that "[b]eing vague is a great way to get variety, but you may not get the specific details you want." *Id.* They suggest, for instance, you can specify "subject, medium, environment, lighting, color, mood, and composition." *Id.* Ultimately, this shows that there are ways for users to linguistically engineer the output from Midjourney as their main method for interacting with and operating the software. The most common way people are used to interacting with software would likely be clicking on symbols that get certain results, like selecting a pre-determined option like color in Microsoft Paint, but Midjourney allows language to be used instead.

Looking at the portions that the Copyright Office quoted, "Midjourney 'does not interpret prompts as specific instructions to create a particular expressive result. Because Midjourney 'does not understand grammar, sentence structure, or words like humans,' it instead converts

---

[8] The Prompts FAQ is accessed using the Wayback Machine set to a day before the Copyright Office's last response, so that it clearly captures the information/technology at the time the Copyright Office considered Allen's registration of the Work.

words and phrases 'into smaller pieces, called tokens, that can be compared to its training data and then used to generate an image.'" AR_043. [9]

In fact, the Copyright Office admitted that "information that is included in the user's prompts may influence the generated image."  AR_044 (citing that Prompts, MIDJOURNEY, https://docs.midjourney.com/docs/prompts (explaining that short text prompts cause "each word [to have] a more powerful influence" and that images included in a prompt may "influence the style and content of the finished result"). So, what the Copyright Office says it requires is that "prompt text does [] dictate a specific result." *See* AR_044.

The Copyright Office further admitted that it took as true Allen's statements that:

> [Allen] provided "creative input" when he "entered a series of prompts, adjusted the scene, selected portions to focus on, and dictated the tone of the image." As explained in his correspondence, Mr. Allen created a text prompt that began with a "big picture description" that "focuse[d] on the overall subject of the piece." Allen Sept. Creation Explanation. He then added a second "big picture description" to the prompt text "as a way of instructing the software that Mr. Allen is combining two ideas." Id. Next,

---

[9] Given that these "tokens" are essentially portions of images in that they are "used to generate an image," the ultimate image can be seen, in the alternative, as a copyrightable arrangement of elements as well. AR_043. Midjourney starts with "a field of visual noise . . . used as a starting point to generate the initial image grids . . . using an algorithm to refine that static into human-recognizable images." *Id.* Based on its own description on what is copyrightable, this work could also, in the alternative, be seen as a compilation or arrangement of AI-generated elements even if the Copyright Office considered them uncopyrightable.  *See* 17 U.S.C. § 101. For example, one's selection of one shell at the beach may not make one the owner of that individual shell, but arranging them all, even largely at random, on a canvas would make that arrangement copyrightable. Surely arranging and selecting the arrangement of such "tokens" would also qualify.

> he added "the overall image's genre and category," "certain professional
> artistic terms which direct the tone of the piece," "how lifelike [Mr. Allen]
> wanted the piece to appear," a description of "how colors [should be]
> used," a description "to further define the composition," "terms about
> what style/era the artwork should depict," and "a writing technique that
> Mr. Allen has established from extensive testing" that would make the
> image "pop." He then "append[ed the prompt] with various parameters
> which further instruct[ed] the software how to develop the image,"
> resulting in a final text prompt that was "executed . . . into Midjourney to
> complete the process" and resulted in the creation of the Midjourney
> Image above.

AR_068 (citations omitted.)

Despite describing the many ways the Work ultimately reflected Allen's conception and not a completely random process, the Copyright Office refused registration solely because "[i]n the Board's view, Mr. Allen's actions as described do not make him the author of the Midjourney Image because his sole contribution to the Midjourney Image was inputting the text prompt that produced it." AR_068. In other words, the Copyright Office moved the goalpost. Despite setting out that its test would require determining if the AI came up with and expressed the idea, after Allen showed he expressed his own idea, the Copyright Office required him to exercise significantly more control than it originally set out. *Compare* AR_004 and AR_068. In this circumstance, the Copyright Office, in not applying its own standard, has not "articulated a rational connection between the facts found and the choice made." *Friends of the Floridas v.*

*United States Bureau of Land Mgmt.*, 746 F. Supp. 3d 1039, 1163–64 (D.N.M. 2024) (quoting *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983)). Having found Allen's prompts had creative influence over the ultimate image, the Copyright Office should have registered the copyright.

This is even more clear because, despite admitting that Allen had at least *some* control, such that his work should be copyrightable based on its own policy, the Copyright Office contradicts itself by then claiming that "Mr. Allen had *no control*" over the ultimate Work. *See* AR_043 (Emphasis added.) It focused again on output, not creative input, to deny copyright based on its focus on factors it never identified as being deciding. *See id*. ("Simply put, the resulting image was the output of the artificial intelligence technology, and your correspondence does not identify any specific creative authorship in this image that can be attributed to Mr. Allen.") The Copyright Office is therefore requiring too much, because neither the Copyright Office itself nor the Act require an author perfectly express a thought in a tangible medium. In effect, the Copyright Office is not enforcing human authorship, it is selectively requiring authorial precognition and eliminating the natural force of randomness that artists rely on and utilize, but only in the case of AI, not photography (despite often utilizing AI) or other art forms. On its face, this requirement defies the "minimal degree of creativity" standard espoused by the Supreme Court, and the Copyright Office's decisions as to other "writings." Even if the Copyright Office's policy was not at odds with the Act and case law, the Copyright Office has admitted in its own rendition of facts that the Work should obtain protection.

///

///

**D.**       **The Copyright Office's Test Sets Unconstitutional Limits on Authorship**

The Copyright Clause of the U.S. Constitution expressly designates its overall objective ("[t]o promote the Progress of Science" in the United States), and the method for doing so ("by securing for limited times to authors … the exclusive right to their respective writings"). Art. I, § 8, cl. 8. Notably, this language is intentionally general. The historical record shows, for instance, James Madison proposed a more limited clause that would refer to "literary authors." Edward C. Walterscheid, *To Promote the Progress of Science and Useful Arts: The Background and Origin of the Intellectual Property Clause of the United States Constitution*, 2 J. INTELL. PROP. L. 1, 46 (1994). As part of this broad-based purpose, the Supreme Court has not read new restrictions into the Act that were not explicitly placed there by Congress.

The Copyright Office, however, has now sought to change the constitutional definition of authors to be much smaller and more restrictive. Clearly, the Copyright Office intends to make such a constitutional finding, as it relied on constitutional authority as one basis for its refusal. *See* AR_041 (citing *Feist Publications, Inc.*, 499 U.S. at 359 to argue that, "[a]s a constitutional matter, copyright protects only those constituent elements of a work that possess more than a de minimis quantum of creativity.") Resting its decision on the constitutional minimum for authorship, and the creativity shown in a work necessary to be an author, it is fair to say the Copyright Office is denying Allen a constitutional right to own the Work.

This refusal defies the basic constitutional principles underlying copyright. In furtherance of these objectives, the Supreme Court has been consistent that, other than originality and the requirement of a finite term of copyright, which derive from the Copyright Clause, and the First Amendment safeguards of fair use and idea-expression dichotomy, one should defer to Congress

to impose any other limits on copyright. *See supra*, Section V.A. As the Court made clear in *Eldred v. Ashcroft*, "[a]s we read the Framers' instruction, the Copyright Clause empowers Congress to determine the intellectual property regimes that, overall, in that body's judgment, will serve the ends of the Clause." *Eldred*, 537 U.S. at 222 (citation omitted).

The Supreme Court has likewise repeatedly instructed courts to flexibly read the Act to accommodate technological growth. "We have understood the provision to set forth general principles, the application of which requires judicial balancing, depending upon relevant circumstances, including 'significant changes in technology.'" *Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 19 (2021) (quoting *Sony Corp. of America*, 464 U.S. at 430).

As such, in denying Allen's registration, the Copyright Office has contracted the definition of author far above its low floor set by the Constitution as articulated repeatedly by the Supreme Court and Congress. The Supreme Court and the federal courts have consistently rejected (1) *every* instance where a party argued for contraction of copyright ownership or authorship and their writings in and general,[10] and (2) interpreting the general text of the Copyright Clause to imply a constitutional restriction that curbs Congress's discretion in deciding copyright law. Ultimately, this Court should reject any argument that Mr. Allen is not the Work's author to avoid unconstitutionally contracting the definition of author.

///

///

---

[10] In fact, in every case in which the Supreme Court was asked to recognize a constitutional restriction under the Copyright Clause, the Court declined to do so. *Supra*, Section V.A.1.c

## VI.    <u>CONCLUSION</u>

For the foregoing reasons, the Petitioner Jason Allen respectfully asks that the Court reverse the Copyright Office's decision to allow Allen the chance to own the copyright in a work that reflects his personal creativity.

Respectfully Submitted,

DATED at Los Angeles, California this Tuesday, August 25, 2025.

*/s/ Ryan B. Abbott*
Ryan B. Abbott (CA State Bar No. 281641)
Timothy G. Lamoureux (CA State Bar No. 294048)

<u>Brown, Neri, Smith & Khan, LLP</u>
Firm Name
<u>11601 Wilshire Blvd., Suite 2080</u>
Office Address
<u>Los Angeles, CA 90025</u>
City, State, ZIP Code
<u>(310) 593-9890</u>
Telephone Number
<u>ryan@bnsklaw.com; tim@bnsklaw.com</u>
Primary CM/ECF E-mail Addresses

*Attorneys for Petitioner, Jason Allen*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on Monday, August 25, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following email addresses:

U.S. Dept. of Justice:
JENNA MUNNELLY
SUZANNE JOHNSON
Via Email: jenna.e.munnelly@usdoj.gov
Suzanne.M.Johnson@usdoj.gov
YAAKOV M. ROTH, Acting Assistant Attorney General
SCOTT BOLDEN, Director


*s/ Kaitlyn Alexander*