# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| JASON ALLEN,<br><br>Plaintiff,<br><br>v.<br><br>SHIRA PERLMUTTER; and<br>THE UNITED STATES COPYRIGHT OFFICE,<br><br>Defendants. | Civil Action No.  1:24-cv-02665-WJM<br><br>**JURY TRIAL DEMANDED** |

**BRIEF OF *AMICUS CURIAE* PROFESSOR EDWARD LEE IN SUPPORT OF
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

This case asks whether human creators are authors of the works they generated by writing prompts—or "prompt engineering"—on AI generators. The artist Jason Allen created a pictorial work that won an award at the Colorado State Fair. The Copyright Office Review Board ("Office") later rejected Allen's authorship in the work by dissecting it into two: an image Allen created using a series of prompts on the AI generator Midjourney and edits he made using Photoshop. The Office held that Allen might be the author of his Photoshop edits, but he was not the author of *everything* he created on Midjourney. Allen's prompt-engineered image failed to satisfy the Office's extra-statutory requirement of "traditional elements of authorship."

The Office erred. No federal court has discussed "traditional elements of authorship," much less adopted them. The Office's test is contrary to the Copyright Clause and the Supreme Court's broad interpretation of "authors"—and the whole goal of promoting progress by incentivizing people's creative activities to produce new works. *Mazer v. Stein*, 347 U.S. 201, 219 (1954).

In 1787, the Framers chose "authors" in the Copyright Clause, rejecting a proposal for

1

"literary authors" that followed copyright law's traditional focus on books. In 1884, the Supreme Court rejected the argument that "authors" was confined to book authors and adopted a "more enlarged definition" that included photographers as "authors" based on their selection and arrangement of elements in a photograph. *Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53, 57-58 (1884). This broad definition of "authors" has accommodated new technologies for creating a vast array of photographs, films, sound recordings, synthesized music, and computer programs. Under *Burrow-Giles*, Allen and others who use prompt engineering are authors if they made, at least, an original selection and arrangement in the work, including through their *prompts alone*. A simple prompt of a few words will not satisfy this test. But a person's detailed prompt(s) specifying greater features can make an original selection and arrangement in what is composed. Like a photographer's choices in taking a photograph captured by a camera, a person's detailed prompt engineering with AI gives "visible expression" to the "ideas in the mind of the author." *Id.* at 58.

## ARGUMENT

### I. THE FRAMERS AND THE SUPREME COURT ADOPTED A BROAD VIEW OF AUTHORS TO ACCOMMODATE NEW TECHNOLOGIES

The Office denied Jason Allen was an author under its "traditional elements of authorship," a limit the Office attributed to the Copyright Clause. AR 66, 69-70; *see* AR 195. This Court reviews the Office's interpretation of "authors" independently, with no deference to the agency. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 392 (2024). The Office's restrictive view is contrary to the Supreme Court's broad interpretation of "authors" of "writings."

#### A. The Framing of the Copyright Clause and Its Broad View of "Authors"

Article I, Section 8, Clause 8 of the Constitution sets forth the power granted to Congress to enact copyright and patent laws. U.S. CONST. art. I, § 8, cl. 8. In 1787, the Framers considered

2

two proposals for the copyright aspects of this Clause. Both proposed to give Congress the power to grant copyrights but differed in a key respect. One envisioned copyrights for "authors"; the other was limited to "literary authors." The Framers chose "authors." *See* Karl Fenning, *The Origin of the Patent and Copyright Clause of the Constitution*, 17 GEO. L. J. 109, 112-14 (1929).

The Framers' choice of "authors" of "writings," along with "exclusive right," is significant. The general terms were consistent with the view of Edmund Randolph, a member of the Committee on Detail that drafted the final version of the Copyright Clause. Randolph believed the Constitution should "insert essential principles only, lest the operations of government should be clogged by rendering those provisions permanent and unalterable, which ought to be accommodated to times and events." 2 THE RECORDS OF THE FEDERAL CONVENTION OF 1787, at 137 (Max Farrand ed., 1911). This approach to accommodate future times in the Constitution—here future "authors" and "writings"—suited well the Copyright Clause's goal to "promote the Progress of Science." At the Framing, "promote" meant to "advance"; "progress" meant "intellectual improvement"; and "science" meant "knowledge." THOMAS SHERIDAN, A GENERAL DICTIONARY OF THE ENGLISH LANGUAGE 733-34, 811 (1780). The Copyright Clause seeks *future* advancements in this country.

Compare what the Framers did not follow. The Statute of Anne, England's first copyright act, focused on the "authors" of "books" and granted them "the sole right and liberty of printing such book[s]." 8 Ann. c. 19, § II (1710) (Eng.).[1] Similarly, before the Framing, all twelve state copyright acts granted authors rights for printing books, other literary works, and, in three states, also maps and charts. *See* Francine Crawford, *Pre-Constitutional Copyright Statutes*, 23 BULL.

---

[1] Later acts protected engravings, starting in 1735. *See* English Engraving Copyright Act 1735, 8 Geo. 2 c. 13 (Eng.); ISABELLA ALEXANDER, COPYRIGHT AND CARTOGRAPHY 59-70 (2023).

3

COPYRIGHT SOC'Y 11, 13, 18-21 (1975). Most of these state laws responded to the Continental Congress's resolution in 1783 that "recommended to the several states, to secure to the authors or publishers of any new books not hitherto printed … [the] exclusive right of printing." *Id.* at 13. Early copyright's framing as a right tied to the printing press was understandable. "[C]opyright … is … the creature of the printing press…." MARK ROSE, AUTHORS AND OWNERS 3 (1993).

Against this history, the Copyright Clause is unique. Instead of limiting the Clause to "literary authors" or confining copyright to works and rights tied to the printing press as the Statute of Anne and state copyright laws did, the Framers opted for general terms tied to no particular technology, type of work, or type of author. The Copyright Clause thus allowed copyright law to accommodate new technologies—and new methods for people to create—in the name of progress.

### B. The Supreme Court Broadly Construes "Authors" of "Writings"

In 1884, the Supreme Court interpreted "authors" in a case involving the then-new technology of cameras. Like the Framers, the Court had two choices: one interpreted "authors" broadly to include photographers versus the other that would exclude them because photographs were "merely mechanical." *Burrow-Giles*, 111 U.S. at 59. Rejecting the narrow interpretation of "authors" as limited to book authors, the Supreme Court held that "authors" of "writings" "are susceptible of a *more enlarged definition* than this." *Id.* at 57-58 (emphasis added). The Court defined "author" broadly: "he to whom anything owes its origin; originator; maker; one who completes a work of science or literature." *Id.* (quoting JOSEPH E. WORCESTER, A DICTIONARY OF THE ENGLISH LANGUAGE 99 (1860)). The Court provided its own broad definition for "writings": "the literary productions of those authors, and Congress very properly has declared these to include *all forms of writing*, printing, engravings, etchings, [etc.], *by which the ideas in the mind of the*

4

*author are given visible expression.*" *Id.* (emphasis added). Napoleon Sarony's photograph of Oscar Wilde thus qualified as a work of authorship based on Sarony's "posing the said Oscar Wilde …, *selecting and arranging* the costume, draperies, and other various accessories …, *arranging* the subject …, *arranging* … the light and shade." *Id.* at 60 (emphasis added). Subsequent courts recognize most photographs are works of authorship. *See Jewelers' Circular Pub. Co. v. Keystone Pub. Co.*, 274 F. 932, 934 (S.D.N.Y. 1921) (L. Hand, J.), *aff'd*, 281 F. 83 (2d Cir. 1922).

The Supreme Court's broad interpretation of "authors" serves the Copyright Clause's goal: "The economic philosophy behind the clause empowering Congress to grant patents and copyrights is the conviction that *encouragement of individual effort* by personal gain is the best way to advance public welfare through the talents of authors and inventors in 'Science and useful Arts.'" *Mazer*, 347 U.S. at 219 (emphasis added). "Rewarding authors for their creative labor and 'promot[ing] Progress' are complementary; as James Madison observed, in copyright '[t]he public good fully coincides ... with the claims of individuals.'" *Eldred v. Ashcroft*, 537 U.S. 186, 212 n.18 (2003) (quoting THE FEDERALIST No. 43, at 272 (C. Rossiter ed. 1961)).

In 1991, the Supreme Court reaffirmed its broad approach to "authors" in *Feist Publications, Inc. v. Rural Telephone Service Co.*, 499 U.S. 340, 346-47 (1991). It explained the constitutional requirement of originality. *Id.* at 347-48. Originality requires that (1) "the work was independently created by the author (as opposed to copied from other works)," and (2) that "it possesses at least some minimal degree of creativity." *Id.* at 345 (internal citations omitted). The latter is an "extremely low" standard: "The vast majority of works make the grade quite easily, as they possess some creative spark, 'no matter how crude, humble or obvious' it might be." *Id.* Selection and arrangement can be based even on facts and unprotected elements. "[T]he

5

compilation author typically chooses which facts to include, in what order to place them, and how to arrange the collected data so that they may be used effectively by readers." *Id.* at 348. For compilations of facts, the copyright is thin, limited to near identical copies. *Id.* at 349.

**II.    THE OFFICE'S RESTRICTIVE VIEW OF "AUTHORS" IS LEGAL ERROR**

The Office committed legal error by ignoring the Supreme Court's test for authorship and applying its own greater restrictions of the "traditional elements of authorship," a term no federal court has adopted. The Office's requirement that Allen disclaim his image based on this incorrect test is also legal error (AR 65), as is the Office's rejection of authorship in works people create through "prompts alone," which was also based on its erroneous traditional elements (AR 69).

**A.    The Office's "Traditional Elements of Authorship" Conflict with Supreme Court Precedent and the Framers' Broad View of "Authors"**

The Office denied Allen was an author based on the "traditional elements of authorship." AR 66, 69; AR 196-97 (*Copyright Registration Guidance: Works Containing Material Generated by Artificial Intelligence*, 88 Fed. Reg. 16,190, 16,192-93 (Mar. 16, 2023) ("AI Guidance")). This term was first used in the 1965 annual report by Register of Copyrights Kaminstein, who tentatively and tersely suggested how to analyze computer-generated works:

> The crucial question appears to be whether the "work" is basically one of human authorship, with the computer merely being an assisting instrument, or whether the traditional elements of authorship in the work (literary, artistic, or musical expression or elements of selection, arrangement, etc.) were actually conceived and executed not by man but by a machine.

AR 133 (U.S. COPYRIGHT OFF., SIXTY-EIGHTH ANN. REP. OF REG. OF COPYRIGHTS FOR FISCAL YEAR ENDING JUN. 30, 1965, at 5 (1966)). The Office elevated this tentative remark into rigid but shifting requirements for authors of prompt-engineered works. *See* Edward Lee, *Prompting Progress: Authorship in the Age of AI*, 76 FLA. L. REV. 1445, 1466-77 (2024) ("*Prompting*").

6

The Office's extra-statutory "traditional elements" are hard to pin down. They were not subject to notice and comment,[2] much less rulemaking. In a prior decision in 2023, the Office held that Kris Kashtanova, a creator who used Midjourney to create images for a graphic novel, did not qualify as an author of the images on the ground "the process is not controlled by the user because it is not possible to predict what Midjourney will create ahead of time." AR 172. Because Midjourney used random noise, "the prompt may 'influence' generated image, but prompt text does not dictate a specific result." AR 173. "Midjourney generates images in an unpredictable way," the Office concluded. *Id.* The Office likened a person's prompt engineering to hiring another visual artist who "actually formed" the work. *Id.* (citing *Burrow-Giles*, 111 U.S. at 61).

But, in Allen's case, the Office shifted its explanation. AR 65-70. The Office did not mention a requirement of prediction or a disqualification based on randomness. *Id.* Instead, it cited its AI Guidance issued in March 2023. AR 69. The Office held Allen was not an author because "'when an AI technology receives solely a prompt from a human and produces complex written, visual, or musical works in response, the 'traditional elements of authorship' are determined and executed by the technology—not the human user.'" *Id.* (quoting AI Guidance, 88 Fed. Reg. at 16,192 (AR 196-97)). This ruling was later echoed in a 2025 Report: "given current generally available technology, prompts alone do not provide sufficient human control to make users of an AI system the authors of the output." U.S. COPYRIGHT OFF., COPYRIGHT AND ARTIFICIAL INTELLIGENCE: PART 2 COPYRIGHTABILITY 18 (Jan. 2025) ("Part 2 Report"),

---

[2] *See* Edward Lee, *The Code Red for Copyright Law*, 76 FLA. L. REV. F. 1, 7-15 (2024); *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 95 (D.C. Cir. 1997) (agency's "guidance" for new technology, especially one presenting "unique" factual considerations, is "exactly the sort[] of change [] in fact and circumstance which notice and comment rulemaking is meant to inform").

7

https://www.copyright.gov/ai/Copyright-and-Artificial-Intelligence-Part-2-Copyrightability-Report.pdf. Prompts are just "'re-rolling' the dice," the Office's Report asserted. *Id.* at 20. But this metaphor confuses more than it illuminates. It implies randomness, yet the Office's own Report disclaimed that "predictability of the outcome" was even the relevant inquiry. *Id.* at 21.

The Office has no authority to impose "traditional elements of authorship" that restrict the Supreme Court's definition of authors. As then-Judge Ruth Bader Ginsburg wrote in a case in which the Office denied registration to an early video game: "It is not the Register's task to shape the protection threshold or ratchet it up beyond the 'minimal creative spark required by the Copyright Act and the Constitution.'" *Atari Games Corp. v. Oman,* 979 F.2d 242, 247 (D.C. Cir. 1992) (quoting *Feist*, 499 U.S. at 363). Atari's *selection* and *arrangement* of unprotected shapes and colors could qualify as a work of authorship—and the Office erred in dissecting the work into individual screens instead of examining the entire work. *Id.* at 245-47; *cf. Ent. Mgmt. Ltd, Inc. v. Warrick*, 717 F.3d 1112, 1119 (10th Cir. 2013) (warning not to over-dissect work because "[a]ny copyrightable work can be sliced into elements unworthy of copyright protection").

The Office's suggestion that *Burrow-Giles* supports "traditional elements" is mistaken. The passage the Office quoted to support its view a person using prompts does not "'actually form[]' the generated images" (AR 69) is not the Supreme Court's own words. The words "actually form" are from one judge's opinion in the English case, *Nottage v. Jackson*. *See Burrow-Giles*, 111 U.S. at 60 (discussing *Nottage*, 11 Q.B.D. 627 (1883) (Eng.)). *Nottage* involved a choice between two potential authors—not whether a photograph was too mechanical. *Nottage* ruled it was the employee who shot the photograph, not his employer. *Burrow-Giles*, 111 U.S. at 61. *Burrow-Giles* never held that "actually form" is a requirement of authorship. *Id.* at 58 (defining

8

"author"). The Supreme Court has not used or cited *Nottage*'s "actually form" ever again. "Actually form" was not the crucial concept—selecting and arranging was. As *Burrow-Giles* explained, one opinion in *Nottage* stated the photographer was the author because he "actually formed the picture by putting the persons in position, and arranging" their positions. *Id.* at 61.

The Office erred in suggesting the *Thaler* district court's passing reference to "ultimate creative control" is an independent test. AR 69; *Thaler v. Perlmutter,* 687 F. Supp. 3d 140, 146 (D.D.C. 2023). This dictum explained *Burrow-Giles* and did not supplant its definition of author. *Id. Thaler* only considered an AI output "absent any guiding human hand." *Id.* On appeal, the D.C. Circuit did not mention "ultimate creative control" but *did* note how the Motion Picture Association and copyright experts disagreed with the Office's approach to prompts. 130 F.4th 1039, 1043, 1049-50 (D.C. Cir. 2025). The Office's reliance (AR 69) on *Kelley v. Chicago Park Dist.*, 635 F.3d 290 (7th Cir. 2011), is also misplaced. Unlike living plants, non-living visual works do not owe their origin to nature. *Kelley* recognized an artist's *plans* are copyrightable. *Id.* at 304.

In addition to using an erroneous legal standard, the Office's vague, shifting explanations of "traditional elements of authorship" are arbitrary and capricious and violate the requirement of reasoned decision making. As the Federal Circuit held in analogous situation, the Trademark Office's denial of trademark registration due to "failure to function" as a trademark did not state "a coherent standard" but instead sounded like the Trademark Office took an "I know it when I see it" approach. *In re Brunetti*, -- F. 4th --, 2025 WL 24466503, *8 (Fed. Cir. Aug. 26, 2025). The same is true here. The "traditional elements of authorship" are incoherent, shifting from dictating a specific result, predicting it ahead of time, to satisfying an unspecified level of control and "actual form[ation]." But in the 2025 Report, the Office conceded that random and uncontrolled elements,

9

such as in wildlife photography, do *not* disqualify creators from authorship: "The issue is the degree of human control, rather than the predictability of the outcome." Part 2 Report at 21 & n. 112. And the Office's unspecified level of "control" is a "I know it when I see it" approach. *See In re Brunetti*, 2025 WL 2446503, at *8. "Control" is not even the correct test of authorship. Photographers of wildlife, such as birds, are authors even though the birds are living and beyond human control. *See Herrick v. Shutterstock*, Inc., 2024 WL 1348754, at *1-*2 (S.D.N.Y. 2024) (photographs of plover and egret). The House Report to the Copyright Act recognizes a person's recording of birdcalls is copyrightable. H.R. REP. No. 94-1476, at 56 (1976). Authors do not have to "actually form" or "control" the birds or their chirps to qualify as authors. Instead, they must *select* or *arrange* these uncontrolled elements by deciding what and how to photograph or record.

### B.     The Copyright Clause Does Not Restrict Authors' Process of Creating

The Constitution does not restrict authors or inventors in the processes in which they create. The Copyright Clause speaks to only their end products, "their respective writings and discoveries," and says nothing about the processes they used. U.S. CONST. art. I, § 8, cl. 8; Lee, *Prompting*, at 1501-05. This accommodates spontaneity in authorship. *Id.* at 1549-57.

The Second Circuit recognized that authorship exists in *unintended* elements. *See Alfred Bell & Co. Ltd. v. Catalda Fine Arts*, 191 F.2d 99, 105 & nn. 23-24 (2d Cir. 1951). Drawing on Plutarch's tale, the court discussed the example of a painting whose depiction of horse's foam resulted from an irate painter's throwing of a sponge at the canvas, even though the painter did not intend it as an element of the painting. "Having hit upon such a variation unintentionally, the 'author' may adopt it as his and copyright it," the court concluded. *Id.* at 105. The court cited patent cases that recognize accidental inventions are patentable. *Id.* at 104 n.25 (citing *Radiator Specialty*

10

*Co. v. Buhot*, 39 F.2d 373, 376 (3d Cir. 1930) ("It is with the inventive concept, the thing achieved, not with the manner of its achievement or the quality of the mind which gave it birth, that the patent law concerns itself.")); *see* Lee, *Prompting*, at 1502 (discussing Federal Circuit case law).

Examples of spontaneous elements in copyrighted works abound. *See* Lee, *Prompting*, at 1553-57 (discussing examples). Jackson Pollock's paintings depended on the spontaneous flow of paint spattering. *See* Richard H. Chused, *Randomness, AI Art, and Copyright*, 40 CARD. ARTS & ENT. L. J. 621, 629 (2020). Photographers capture nature, wildlife, and spontaneous elements they do not "actually form" or "control." *Cf.* Lee, *Prompting*, at 1553 (my photograph of Perito Moreno Glacier). The Office's attempt to distinguish Pollock and photographers on the ground that they are "principally responsible for the execution of the idea" is conclusory—and evades the very issue whether copyright law restricts authors from incorporating elements they do not control. Part 2 Report at 20. It does not. The key issue is, not control, but a person's selection and arrangement.

### C. The Office's Rule Against "Prompts Alone" Is Legal Error

The Office compounded its legal error by adopting the legal position that people's prompts alone on AI cannot result in a work of authorship. AR 69 ("traditional elements" not satisfied "solely" by prompts as with Allen's image) (quoting AI Guidance, 88 Fed. Reg. at 16,192 (AR 196)). The Office's position on prompts is legal error because it is premised on its erroneous requirement of "traditional elements of authorship." *Id.* The Office's position is also internally inconsistent, inadequately explained, and therefore arbitrary and capricious. *See General Chemical Corp. v. U.S.*, 817 F.2d 844, 846 (D.C. Cir. 1987). The AI Guidance purported to give creators the chance to show authorship by a selection and arrangement of AI material (AR 196-97), but then it categorically taketh it away by ruling out a person's doing so "solely" by prompts (AR 196). The

AI Guidance also said the Office uses a "case-by-case inquiry" but then ruled out a person's prompts alone resulting in authorship. AR 196. For Allen and others who use prompts alone, an application to register their works is *not* a case-by-case inquiry given the Office's categorical view on prompts alone. Indeed, the Office relied on its prior views of Midjourney and prompts alone, citing administrative notice, to deny Allen was an author, while again stating its inquiry was "case-by-case." AR 66-69. *See ANR Storage Co. v. FERC*, 904 F.3d 1020, 1024 (D.C. Cir. 2018).

The Office's positions are inconsistent with parts of its Compendium. It states: "the Office will not register works produced by a machine or mere mechanical process that operates randomly or automatically *without any creative input or intervention by a human author*." U.S. COPYRIGHT OFF., COMPENDIUM OF U.S. COPYRIGHT OFF. PRACTICES § 313.2 (rev. 3d ed. 2021) (emphasis added) (AR 95). In 2021, the Compendium added "traditional elements of authorship" after the above sentence. *Id.* But these two standards are inconsistent. The first focuses on randomly and automatically produced works *without any creative input or intervention by a human author.* AR 96 (7 failed examples); AR 28 (Allen's challenge). The second focuses on *traditional elements of authorship*. The Office did not examine whether Allen had "any creative input or intervention" in the generative process but ruled his prompts did not satisfy "traditional elements of authorship." AR 68-69 ("Board acknowledges that the process of prompting can involve creativity ….").

The Office's 2025 report further exposed the inconsistency of its positions. The Office recognized that certain functions offered by AI generators enable people to make a selection and arrangement to qualify as authorship. Part 2 Report at 26-27. One example the Office discussed is Midjourney's inpainting function, which Midjourney called "Vary Region and Remix Prompting." *Id.* Even as the name "remix *prompting*" indicates, inpainting involves a person's *prompts*. *Id.* The

12

only difference between inpainting and "prompts alone" is that inpainting allows a person to use one's cursor to select a specific area within an image and alter it using another prompt. *Id.* The Office failed to explain why inpainting prompts *can* effectuate a person's selection or arrangement, but "prompts alone" cannot. *Id.* It is a distinction without a difference—they both depend on prompts. Just as inpainting prompts can effectuate a person's selection or arrangement, so can prompts alone, especially using specific parameters as Allen did. AR 7, 68; AR 531 (parameters on Midjourney). In either case, the proof is in the pudding—what the creator selected or arranged.

Prompt engineering enables people to select and arrange elements for an image, especially using an iterative process, creating multiple versions and altering aspects of the initial version. *Cf.* 2 PATRY ON COPYRIGHT § 3.60.51 (2025) (criticizing Office's rule because "the desired output is ultimately not a random design, but rather a specific one, often painstakingly achieved through a long iterative process"). Using Midjourney, I selected and arranged elements using prompts to make a fanciful image (of a "tall giraffe standing behind one man in his thirties with red hair and a beard, wearing a black suit and sunglasses sitting all alone on a bench in Central Park"), starting with initial versions of the scene I staged by a prompt, then rearranging elements (giraffe to the left of man but behind) by a prompt, and changing the style by a prompt. *See* Lee, *Prompting*, at 1535-43. It strains credulity to conclude that I did not select or arrange any elements. And, like Allen, artists craft far more detailed prompts than I did. *See infra* p. 14 (detailed prompt example).

### D.   The Supreme Court's Broad Approach to Authorship Governs

The Supreme Court established the legal test for authorship of an original work that applies: (1) whether Allen independently created—"originated" or "made"—the work, including by his selection or arrangement of elements, and (2) whether it contains a minimal level of creativity

added by Allen. *See Feist*, 499 U.S. at 345-46; *Ent. Mgmt. Ltd.*, 717 F.3d at 1119 (court "must focus on whether [the author] has 'selected, coordinated, and arranged' the elements of her [work] in an original way"). The focus is on whether Allen made an original selection or arrangement via his prompts in producing the work. In my article, I recommended how various prompt-engineered works should be analyzed if the authorship is based solely on a selection and arrangement with a minimal level of creativity. Lee, *Prompting*, at 1508-09 (table 4). A simple prompt (e.g., "dog") will not be sufficient. *Id.* at 1512. But detailed prompt(s) likely will. The more detail a person specifies in prompts to stage a scene or arrange elements, the more the person used "the creative powers of the mind" to make "choices as to selection and arrangement" in the image produced. *Feist*, 499 U.S. at 345-46 (internal citation omitted); *see, e.g.*, @iamemily205, X (Aug. 19, 2025), https://x.com/IamEmily2050/status/1958011844439994788 (detailed prompt example for Grok).

Just as a photographer's selection and arrangement is embodied in the photograph's subject and rendition (how it looks), so too a prompt-engineer's selection and arrangement is embodied in the image's subject and rendition. *Cf. Mannion v. Coors Brewing Co.*, 377 F. Supp. 2d 444, 452-55 (S.D.N.Y. 2005) (photographs); Lee, *Prompting*, at 1531-32 (table 3). Courts can decide the scope of copyright of a work in cases as they arise. *Cf. Civility Experts Worldwide v. Molly Manners, LLC,* 167 F. Supp. 3d 1179, 1190-91 (D. Colo. 2016). By contrast, for literary works, the idea-expression dichotomy requires original expression, which is unlikely satisfied by prompts to "write an essay on Justice Holmes[]," for example. Lee*, Prompting*, at 1513-15.

E. **The Office's Restrictive Approach to Authors Impedes Progress**

Under the Supreme Court's broad definition of "authors," copyright law accommodates creations with new technologies. *Id.* at 1485-86. This approach advances the Copyright Clause's

14

goal of progress by spurring the creation of new works. *See id.* Unlike the Office, the Patent Office issued AI guidance that *accommodates* the use of AI by inventors. *See* USPTO, INVENTORSHIP GUIDANCE FOR AI-ASSISTED INVENTIONS, 89 Fed. Reg. 10043, 10046 (Feb. 13, 2024). The Patent Office's guidance focuses on *contributions* humans make, not on whether prompts lack "control." *Id.* at 10048. A prompt alone might qualify a human as an inventor. *Id.* ("a significant contribution could be shown by the way the person constructs the prompt in view of a specific problem to elicit a particular solution from the AI system").

Individuals and industries now face a Hobson's choice under the Office's approach: do not use AI or risk losing copyright protection. As Motion Picture Association (MPA) stated in its comment to the Office's study: "MPA is troubled that the Office is moving toward an inflexible rule that will deny registration if human users are not able to predict and control the particular outputs that follow from prompts provided to the AI system, despite extensive human involvement in the creative process." MPA, *Comments of MPA in Response to Notice of Inquiry, Inc.*, at 43 (Oct. 30, 2023), https://perma.cc/9W9X-3EZE ("MPA"). In 2025, the Office stuck to its view: although the film as a whole is copyrightable, the AI-generated parts "are not." Part 2 Report at 27. But, as MPA had explained, "[s]uch a result would be untenable." *See* MPA 51.

It is untenable not only for the movie industry, but also for all creators in the United States who wish to create using AI. Progress is impeded by the Office's traditional rules disqualifying industries and individuals from authorship in works they create using "prompts alone."

## CONCLUSION

For the foregoing reasons, the Court should reverse the Office's decision to deny Allen's registration and remand the matter to the Office to reconsider under the correct legal standard.

15

Dated: September 2, 2025                              Respectfully submitted,

                                                      /s/ Scott M. Kelly

Scott M. Kelly (admitted in D. Colo.)                 Victoria R. M. Webb (admitted in D. Colo.)
Virginia Bar No. 80548                                Illinois Bar No. 6307279
*skelly@bannerwitcoff.com*                            *vwebb@bannerwitcoff.com*
Sydney L. Huppert (admitted in D. Colo.)              BANNER & WITCOFF, LTD.
District of Columbia Bar No. 90017904                 71 South Wacker Drive, Suite 3600
*shuppert@bannerwitcoff.com*                          Chicago, IL 60606
BANNER & WITCOFF, LTD.                                Telephone: (312) 463-5000
1100 13th St., NW, Suite 1200
Washington, DC 20005
Telephone: (202) 824-3000

***Counsel Filing for Amicus Curiae Edward Lee***

## CERTIFICATE OF SERVICE

I hereby certify that on September 2, 2025, I caused the foregoing document to be electronically filed with the Clerk of the Court using the Court's CM/ECF filing system which will send notification of such filing to all registered counsel of record for the parties.

/s/ Scott M. Kelly
Scott M. Kelly