**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 24-cv-02665-WJM

JASON ALLEN, an individual,

      Plaintiff,

v.

SHIRA PERLMUTTER, in her official capacity as Register of Copyrights and Director of the United States Copyright Office, and THE COPYRIGHT OFFICE,

      Defendants.

---

**DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT AND MEMORANDUM IN SUPPORT THEREOF AND
CROSS-MOTION FOR SUMMARY JUDGMENT**

---

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

I.      MATERIAL FACTS AND PROCEDURAL HISTORY ................................................. 4

II.     STANDARD OF REVIEW .............................................................................................. 6

III.    LEGAL STANDARD ....................................................................................................... 9

        A.      The Human Authorship Requirement ................................................................. 10

        B.      Original Authorship ............................................................................................ 11

        C.      The Disclaimer Requirement .............................................................................. 13

IV.     FACTUAL BACKGROUND ......................................................................................... 16

V.      ARGUMENT .................................................................................................................. 19

        A.      The Office Could Not Register the Work as a Whole ......................................... 19

                i.      The Work Contained an AI-Generated Image that Mr. Allen Did
                        Not Author ............................................................................................... 20

                        a.      Human Authorship Is Required for Copyright Protection ........... 20

                        b.      The Midjourney Output Was Not Authored by Mr. Allen ........... 22

                ii.     Midjourney's Documentation Shows That Prompts Could Not
                        Control Expression .................................................................................. 28

                iii.    Examples In the Record Show that Prompts Could Not Control
                        Expression ............................................................................................... 29

                iv.     Mr. Allen Cannot Adopt Expression He Did Not Author ......................... 32

        B.      The Office Could Not Register Mr. Allen's Contributions Because He
                Declined to Limit His Claim ............................................................................... 36

VI.     THE REQUESTED RELIEF IS OUTSIDE THE APA'S SCOPE ................................. 41

CONCLUSION .................................................................................................................... 42

Defendants[1] (the Office or Defendants) respectfully request that the Court deny Plaintiff Jason Allen's Motion for Summary Judgment, grant the Office's Cross-Motion for Summary Judgment, and dismiss the case with prejudice.

## INTRODUCTION

Each year, the U.S. Copyright Office examines approximately half a million applications for copyright registration. *See* U.S. COPYRIGHT OFFICE, UNITED STATES COPYRIGHT OFFICE ANNUAL REPORT FY 2022 at 8 (Apr. 2024), https://www.copyright.gov/reports/annual/2022/ar2022.pdf. In accordance with the Copyright Act the Office registers claims and issues certificates of registration only if it "determines that . . . the material deposited constitutes copyrightable subject matter and that the other legal and formal requirements of [the statute] have been met." § 410(a). The Act prohibits the Office from issuing registration certificates if the material deposited does not constitute copyrightable subject matter or the claim is invalid for any other reason. *See* § 410(b). The Office relies on the information submitted with the application and any communication with the applicant to determine if what the applicant seeks to register satisfies these requirements. Granting Mr. Allen's registration application would have required the Office to contravene the requirements of § 410 because Mr. Allen's application claimed material that he did not author and which is not copyrightable.

In 2022, Mr. Allen asked a text-to-language artificial intelligence ("AI") platform to generate an array of two-dimensional images, and he selected his favorite among the results (the

---

[1] Shira Perlmutter currently serves as Register of Copyrights and Director of the United States Copyright Office. *See Perlmutter v. Blanche*, No. 25-5285, 2025 WL 2627965, at *1 (D.C. Cir. Sept. 10, 2025). An application for a stay of the D.C. Circuit's decision remains pending before the Supreme Court. *See Blanche v. Perlmutter*, No. 25A478 (Oct. 27, 2025), Order (Nov. 26, 2025).

"Midjourney Output"). This machine-made image is not copyrightable, and Mr. Allen did not submit it for registration. Rather, Mr. Allen modestly revised the Midjourney Output using Photoshop and upscaling software, and sought to register the resulting image (the "Work") in its entirety. But even after these alterations, the Midjourney Output indisputably remained a part of the Work:





*The Midjourney Output*                    *The Work*

The Office became aware that the Work was created using AI and sought clarification and further information from Mr. Allen. After substantial correspondence with Mr. Allen, the Office determined that he did not author the underlying Midjourney Output and that the expression in the Midjourney Output was produced not by a human, but by AI.

The Copyright Act and the U.S. Constitution have long required human authorship for copyright protection. Courts have uniformly upheld this requirement in cases involving non-human creators—ranging from material generated by AI to animals, nature, and divine beings—and the Office was correct not to manufacture an exception to this rule. That Mr. Allen provided ideas (via text prompting) and chose among a resulting assortment of AI-generated outputs does not make him the author of the Midjourney Output, regardless of the amount of effort he put into

2

devising the prompts and picking his preferred output. Mr. Allen's own description of his prompting, Midjourney's description of its technology, and the Office's experience evaluating authorship and considering applications to register AI-generated materials, all support the finding that Mr. Allen did not control the expressive visual elements generated by Midjourney.

Mr. Allen likely could have successfully registered the Work had he simply agreed to limit his claim by disclaiming the underlying material that he did not author. The Office requires that claimants identify and disclaim material that they cannot register, consistent with the Copyright Act and its regulations. For the Office to properly administer the registration system, registration applications must identify the author of the work and provide "information regarded by the Register of Copyrights as bearing upon the preparation or identification of the work or the existence, ownership, or duration of the copyright." 17 U.S.C. § 409(10). Because "copyright protection may extend only to those components of a work that are original to the author," *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 348 (1991), the Office reasonably requires applicants to include a brief, high-level disclaimer if the work contains more than a *de minimis* amount of material that was not created by the author. Examples include material that is in the public domain, created by a different author, or created by a non-human. This requirement ensures that registered claims are a meaningful, accurate record of the author's contributions, and that courts, litigants, and the general public may rely on them. *See* § 410(c).

The Office asked Mr. Allen to adhere to this requirement. Had he complied, the Office would have issued a certificate of registration covering all aspects of the work that Mr. Allen did author. Such a registration would cover Mr. Allen's human-authored contributions, while properly putting the public on notice of the Work's unprotectible elements and preventing

confusion over the extent of his rights.  When Mr. Allen declined to comply, however, the Office correctly refused to register the Work as a whole, without any limitation.  This decision was a reasonable application of existing, technology-neutral legal principles to the facts in the record.

What Mr. Allen tries to frame as a penalty for relying on AI technology is really a problem of his own making.  The Office has repeatedly recognized that human authors can make creative contributions using AI, and those contributions can be protected by copyright.  The Office has granted thousands of copyright registrations for works created using AI.  *See, e.g.*, U.S. COPYRIGHT OFFICE, COPYRIGHT AND ARTIFICIAL INTELLIGENCE PART 2: COPYRIGHTABILITY at 3, (Jan. 2025), https://www.copyright.gov/ai/Copyright-and-Artificial-Intelligence-Part-2-Copyrightability-Report.pdf (hereinafter "AI COPYRIGHTABILITY REPORT") (as of January 2025, "the Office has registered hundreds of works that incorporate AI-generated material").  As reflected in the written policy guidance cited in the Office's correspondence with Mr. Allen, the Office's AI COPYRIGHTABILITY REPORT (a lengthy report on the copyrightability of AI-generated material), litigation statements, and written materials on registration practices, the Office's consideration of works generated using this technology applies longstanding legal principles that apply across mediums.  In analyzing Mr. Allen's registration application, the Office appropriately applied the legal and formal requirements necessary for registration.

## I.    MATERIAL FACTS AND PROCEDURAL HISTORY

Below, Defendants respond to each numbered paragraph in Plaintiff's Statement of Material Facts and Procedural History.  *See* Dkt. 41 at 6-15.  For purposes of this Motion only, Defendants do not dispute Paragraphs 1-9, 13-14, 20-21.  Even if accepted as true, Plaintiff's facts do not preclude summary judgment in Defendants' favor.

Paragraph 10 is argumentative and does not accurately reflect the record. The Office requested, *inter alia*, "the initial version of the image that Mr. Allen accepted from Midjourney and the version of the image after Mr. Allen completed his visual edits." Dkt. 22-2 at USCO_AR_009 ("AR").

Paragraph 11 is argumentative and does not accurately reflect the record. Mr. Allen's attorney uploaded "the first image generated by Midjourney that Mr. Allen 'accepted' in the sense that he was aesthetically attracted to it, it was similar to what he intended to create with the string of prompts, and wanted to further develop it." AR_011. This "'original panel'" was "one of a set of several possible images that Midjourney generated." AR_012.

Paragraph 12 is argumentative and does not accurately reflect the record. The Office said, "the final artwork does show that Mr. Allen added new creative authorship to the Midjourney-generated image," but that registration would require a limitation to "clarify that the registration will extend only to Mr. Allen's direct creative authorship in the image." AR_015.

Paragraph 15 is argumentative and does not accurately reflect the record. An assertion that the Office "erred" is a legal conclusion and not an undisputed fact.

Paragraph 16 is argumentative and does not accurately reflect the record. It purports to summarize the Office's decision on the first request for reconsideration but omits that it was premised on Mr. Allen's attempt to register the "entire work," and failure to limit the claim to "human authorship or exclude the preexisting AI-generated material." AR_046. The Office's more detailed factual findings and legal arguments speak for themselves. *See* AR_038-50.

Paragraph 17 is argumentative and does not accurately reflect the record. The Office admits that Mr. Allen made these statements in his second request for reconsideration but denies

that he "corrected the Copyright Office's factual misunderstanding as to Gigapixel AI" and that the Office's reasoning was "vague."

Paragraph 18 is argumentative and does not accurately reflect the record. It purports to summarize the Office's decision on the second request for reconsideration but omits that it was premised on the "Work contain[ing] more than a *de minimis* amount of AI generated content, which must be disclaimed in an application for registration. Specifically . . . the Midjourney Image, which remains in substantial form in the final Work, is not the product of human authorship." AR_063. The Office's more detailed factual findings and legal arguments speak for themselves. *See* AR_063-71.

Paragraph 19 is argumentative and does not accurately reflect the record. It purports to summarize the Office's decision on the second request for reconsideration but mischaracterizes it as requiring disclaimer of Gigapixel AI "refinements." But the Office was explicit that its decision did "not consider Mr. Allen's use of Gigapixel AI." AR_067. The Office's more detailed factual findings and legal arguments speak for themselves. *See* AR_063-71.

## II.    STANDARD OF REVIEW

The standard of review for a challenge to the denial of an application for copyright registration under the Administrative Procedure Act (APA) is whether the denial was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Review under the APA is limited to a consideration of the administrative record. *See id.*; *see also Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1579-80 (10th Cir. 1994) ("the 'arbitrary or capricious' standard requires an agency's action to be supported by the facts in the record"); *CTS Corp. v. EPA*, 759 F.3d 52, 64 (D.C. Cir. 2014) ("[i]t is black-letter

administrative law that in an [APA] case, a reviewing court should have before it neither more

nor less information than did the agency when it made its decision") (internal quotation marks

and citation omitted).  An agency decision is only found to be arbitrary or capricious if it,

> (1) entirely failed to consider an important aspect of the problem, (2) offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise, (3) failed to base its decision on consideration of the relevant factors, or (4) made a clear error of judgment.

*S. Utah Wilderness All. v. United States Dep't of Interior*, 44 F.4th 1264, 1272–73 (10th Cir.

2022).

The Tenth Circuit has described this standard as "very deferential to the agency."  *Id.* at

1272.  This "deference is most pronounced in cases where . . . the challenged decision

involves 'technical or scientific matters within the agency's area of expertise.'"  *W. Watersheds*

*Project v. Bureau of Land Mgmt.*, 721 F.3d 1264, 1273 (10th Cir. 2013) (quoting *Utah Env't*

*Congress v. Bosworth,* 443 F.3d 732, 739 (10th Cir. 2006)).  Additionally, a court may not

substitute its judgment for that of the agency and must "presume that an agency action is valid

unless the party challenging the action proves otherwise."  *Defs. of Wildlife v. Everson*, 984 F.3d

918, 934 (10th Cir. 2020) (internal quotations omitted).

In *Loper Bright Enters. v. Raimondo*, the Supreme Court focused on the degree of

deference given to an agency's interpretation of statutes under the *Chevron* doctrine.  *See* 603

U.S. 369, 396 (2024).  The Tenth Circuit has since applied *Loper Bright* to require courts to

"exercise independent judgment in determining the meaning of statutory provisions."  *Ctr. for*

*Biological Diversity v. United States Env't Prot. Agency*, 129 F.4th 1266, 1270 (10th Cir. 2025);

*see also 3484, Inc. v. Nat'l Lab. Rels. Bd.*, 137 F.4th 1093, 1104–04 (10th Cir. 2025).  But

agency actions that are challenged under the APA are still reviewed under the arbitrary and capricious standard of review, as required by § 706 of that statute. *See, e.g.*, *Ctr. for Biological Diversity*, 129 F.4th at 1270, 1273. While *Loper Bright* reaffirmed that the reviewing court must "independently interpret" a statute that delegates discretionary authority to an agency, the application of a settled legal standard to the facts of an administrative record does not implicate *Loper Bright*. *Loper Bright*, 603 U.S. at 395; *see also Sunnyside Coal Co. v. Dir., Off. of Workers' Comp. Programs, United States Dep't of Lab.*, 112 F.4th 902, 910 (10th Cir. 2024) ("For questions of fact, . . . we focus our analysis on the factual findings . . . 'we do not reweigh the evidence' [and a]s such, our judicial review is 'limited' to whether, based on the record as a whole, 'substantial evidence supports the factual findings'") (quoting *Spring Creek Coal Co. v. McLean o/b/o McLean*,  881 F.3d 1211, 1217 (10th Cir. 2018)). As such, the "deferential" standard of review under § 706 of the APA continues to apply to challenged agency actions. *See Ctr. for Biological Diversity*, 129 F.4th at 1270 (citing *Loper Bright*, 603 U.S. at 394).

The agency's factual findings are set aside "'only if they are unsupported by substantial evidence.'" *S. Utah Wilderness All.*, 44 F.4th at 1272 (quoting *OXY USA Inc. v. U.S. Dep't of the Interior*, 32 F.4th 1032, 1044 (10th Cir. 2022)). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal quotations omitted); *see also Sunnyside Coal Co.*, 112 F.4th at 910. "The substantial evidence standard does not allow [courts] to displace the agency's choice 'between two fairly conflicting views, even though [the court] would justifiably have made a different choice had the matter been before [the court] *de novo*.'" *OXY USA Inc.*, 32 F.4th at 1044–45 (quoting *Wyo. Farm Bureau Fed'n v. Babbitt*, 199 F.3d 1224, 1231 (10th Cir. 2000)).

Courts have recognized that the Copyright Act "establishes a wide range of selection within which discretion must be exercised by the Register in determining what he has no power to accept." *Esquire, Inc. v. Ringer*, 591 F.2d 796, 805–06 (D.C. Cir. 1978) (*quoting Bouve v. Twentieth Century-Fox Film Corp.*, 122 F.2d 51, 53 (D.C. Cir. 1941)). Courts defer to the Register's expertise in determining the copyrightability of works, including "in the interpretation of the law and its application to the facts presented by the copyright application." *Norris Indus., Inc. v. Int'l Tel. & Tel. Corp.*, 696 F.2d 918, 922 (11th Cir. 1983), *cert. denied*, 464 U.S. 818 (1983) (collecting cases); *see also Varsity Brands, Inc. v. Star Athletica, LLC*, 799 F.3d 468, 478-80 (6th Cir. 2015) (collecting cases and holding that the "district court erred by failing to give greater deference to the Copyright Office's registration determinations"), *aff'd sub nom. Star Athletica, L.L.C. v. Varsity Brands, Inc.*, 580 U.S. 405 (2017). As one court explained, "the Register, in part due to having to make such determinations on a daily basis, is generally recognized to possess considerable expertise over such matters." *Homer Laughlin China Co. v. Oman*, No. CIV. A. 90-3160, 1991 WL 154540, at *1 (D.D.C. July 30, 1991) (*citing Norris Indus.*, 696 F.2d at 922).

## III.    LEGAL STANDARD

The Office's decision to refuse registration of the Work was based on established legal standards, including the Constitution, the text of the Copyright Act, judicial interpretations of the Act, and the Office's own public guidance and practices. The legal inquiry into whether a particular work can be registered begins with the text of the statute. The Copyright Act of 1976, 17 U.S.C. § 101 et seq. ("the Copyright Act" or the "Act"), grants copyright protection to "original works of authorship fixed in any tangible medium of expression." 17 U.S.C. § 102(a).

9

Copyright protection confers certain exclusive rights, including the rights to copy and distribute the work. *Id.* § 106. Because these rights attach at the moment a work is created, registration with the Copyright Office is not necessary for a work to be protected.

### A.    The Human Authorship Requirement

The Constitution gives Congress the authority "[t]o promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." U.S. Const. art. I, § 8, cl. 8. Throughout the nation's history, Congress has exercised this authority to provide copyright protection to the "author" or "authors" of certain works. *See* Act of May 31, 1790, ch. 15, § 1, 1 Stat. 124 (the "Copyright Act of 1790"); Act of Mar. 4, 1909, ch. 320, § 4, 35 Stat. 1075 (the "Copyright Act of 1909"). In this context, "author" has always referred to a human author. *See, e.g.,* Copyright Act of 1790 § 1 (making protection contingent on the U.S. citizenship or residency of the author); Copyright Act of 1909 § 9 (stating that "any person" may secure copyright for "his" work by publication with the required notice). Today, the Copyright Act of 1976 states that protection subsists "in original works of authorship fixed in any tangible medium of expression." 17 U.S.C. § 102(a). Consistent with the Constitution and prior statutes, "authorship" requires that a work be created by a human being. *See generally* AI COPYRIGHTABILITY REPORT.

Courts that have considered the human authorship requirement have uniformly concluded that copyright is limited to *human* creations. *See, e.g.*, *Thaler v. Perlmutter*, 130 F.4th 1039, 1041 (D.C. Cir. 2025) ("the Copyright Act of 1976 requires all eligible work to be authored in the first instance by a human being"). Federal appellate courts have consistently refused to extend copyright protection to non-human authors, including animals, nature, and divine spirits.

*See, e.g.*, *Kelley v. Chicago Park Dist.*, 635 F.3d 290, 304 (7th Cir. 2011); *Urantia Found. v. Maaherra*, 114 F.3d 955, 958 (9th Cir. 1997); *Naruto v. Slater*, 888 F.3d 418, 426 (9th Cir. 2018). As the D.C. Circuit recently confirmed, these same principles apply to material generated by AI. *See Thaler*, 130 F.4th at 1041 (affirming the Office's refusal to register a work where the claimant attributed authorship to generative AI).

### B.    Original Authorship

To be eligible for protection, a work must also be "original to the author." *Feist*, 499 U.S. at 346. Original means that "the work was independently created by the author" and the author's contribution "possesses at least some minimal degree of creativity." *Id.* While this standard is "low," it is axiomatic that protection only extends "to those components of a work that are original *to the author*." *Id.* at 349 (emphasis added). Further, facts and ideas are not copyrightable. *See, e.g.*, *id.* at 350. Rather, "copyright is limited to those aspects of the work— termed 'expression'—that display the stamp of the author's originality." *Harper & Row Publishers, Inc. v. Nation Enters.,* 471 U.S. 539, 547.

"As a general rule, the author is the party who actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to copyright protection." *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 737 (1989) (hereinafter "*CCNV*"); *see also Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53, 58 (1884) (an author is "he to whom anything owes its origin; originator; maker; one who completes a work of science or literature," while writings includes "all forms of writing, printing, engravings, etchings, etc., by which the ideas in the mind of the author are given visible expression") (internal quotes omitted).

Cases expounding on authorship often arise where more than one party is involved in the creation of the work.  *See, e.g.*, *CCNV*, 490 U.S. at 732-37.  Courts have repeatedly rejected claims of authorship where a commissioning party provides mere ideas or suggestions to another.  For example, in *S.O.S., Inc. v. Payday, Inc*, the Ninth Circuit held that a person who described her company's needs to computer programmers, but did not participate in the actual coding process, was not an author.  *See* 886 F.2d 1081, 1083-87 (9th Cir. 1989).  Someone "who merely describes to an author what the commissioned work should do or look like is not a joint author for purposes of the Copyright Act."  *Id.* at 1087.  Likewise, in *M.G.B. Homes, Inc. v. Ameron Homes, Inc.*, the Eleventh Circuit held that a home builder was not an author of an architectural floorplan and drawings, where his "contribution to the final drawings produced by [an independent contractor] was a thumbnail sketch of the floor plan he desired" and where he approved the finished product thereafter.  903 F.2d 1486, 1493 (11th Cir. 1990).  The "[builder's] ideas, conveyed to the author of the copyrighted work . . . were not copyrightable."  *Id.*

While the provision of mere ideas is not enough, a person need not physically create a work to be considered an author.  For instance, in *Andrien v. Southern Ocean County Chamber of Commerce*, the Third Circuit concluded that a plaintiff who "assembled a series of maps and turned them over to a printing firm to prepare a composite" could be an author for copyright purposes.  927 F.2d 132, 133 (3d Cir. 1991).  The Court relied on testimony that he "expressly directed the copy's preparation in specific detail," the "compilation needed only simple transcription to achieve final tangible form," and the printer did not change the "substance" of his "original expression."  *Id.* at 135.  Thus "[p]oets, essayists, novelists, and the like may have

copyrights even if they do not run the printing presses or process the photographic plates necessary to fix the writings into book form." *Id.* However, when "one authorizes embodiment, that process must be rote or mechanical transcription that does not require intellectual modification or highly technical enhancement." *Id.*

### C.    The Disclaimer Requirement

The Register of Copyrights is directed by statute to determine if a work submitted for registration constitutes copyrightable subject matter and if the other legal and formal requirements for registration have been met. *See* 17 U.S.C. § 410(a). If so, the Office will register the claim to copyright and will issue a certificate of registration. *See id.* The Register must refuse registration if the work does not constitute copyrightable subject matter or if the claim is invalid for any other reason. *See* § 410(b).

Pursuant to 17 U.S.C. § 409, an "application for copyright registration" must include specific information "on a form prescribed by the Register of Copyrights." This provision gives the Office the "authority to elicit all of the information needed to examine the application and to make a meaningful record of registration." H.R. REP. NO. 94-1476, at 155-56 (1976). It includes, *inter alia*, the name(s) of the claimant and author or authors, *see* § 409(1), (2), and "any other information regarded by the Register of Copyrights as bearing upon the preparation or identification of the work or the existence, ownership, or duration of the copyright," § 409(10).

Because "copyright protection may extend only to those components of a work that are original to the author," *Feist*, 499 U.S. at 348, § 409 gives the Register the authority to request additional information if the work contains material that cannot be claimed by the author and/or

claimant named in the application.[2]  Specifically, an applicant may be required to identify the new material that the author contributed to the work, to distinguish the author's contribution from elements that may have come from other sources, and to exclude those elements from the claim.  *See* § 409(10).

Section 409(10) was intended to be a "catch-all clause at the end of the section [that] will enable the Register to obtain more specialized information," such as whether the work contains material that is ineligible for copyright protection.  H.R. REP. NO. 94-1476, at 156; *see also* § 409(9) (requiring, for compilations and derivative works, identification of any preexisting work(s) and a brief statement of additional material covered by the claim.).  Among other things, it gives the Register the authority to request additional information if a work contains material that was not created by the author, material that is not owned by the copyright claimant, or material that is not eligible for copyright protection.  *See* § 409(10).

The Register requires applicants to notify the Office if a work contains an "appreciable" or more than *de minimis* amount of "unclaimable material."  *See, e.g.*, COMPENDIUM OF U.S. COPYRIGHT OFFICE PRACTICES § 621.1 (3d ed. 2021) (hereinafter "COMPENDIUM") (AR_116-17).  Material that is in the public domain, for instance, cannot be claimed in a registration application because it is not owned by the copyright claimant.  Likewise, applicants submitting

---

[2] When Congress enacted § 409, it codified the Office's longstanding practice for identifying and excluding certain material from the claim to copyright.  Application forms in use as early as 1909 provided spaces where applicants were required to identify the "New Matter in This Version" of the work and "[i]f any substantial part of this work has been previously published anywhere, give a brief, general, statement of the nature of the new matter published for the first time in this version."  *See* U.S. COPYRIGHT OFFICE, FORM A: APPLICATION FOR REGISTRATION OF A CLAIM TO COPYRIGHT IN A PUBLISHED BOOK MANUFACTURED IN THE UNITED STATES OF AMERICA, COMPENDIUM § 2100, App'x H, at 1, https://copyright.gov/comp3/chap2100/doc/appendixH-original.pdf.

derivative works for registration—such as a translation, a sound recording that samples from an existing track, or a motion picture based on a literary work or play—must disclaim any preexisting material that is incorporated in their new work.  *See* 17 U.S.C. § 101 (defining derivative work as "a work based upon one or more preexisting works"); *see also* COMPENDIUM § 311.  The disclaimer requirement is not burdensome.  It can be satisfied by providing brief descriptions of the new material authored by the claimant and the unclaimable material that is excluded, such as "new artwork" and "some preexisting material."  *See* COMPENDIUM § 311.1.

"In any case in which the Register of Copyrights determines that . . . the material deposited does not constitute copyrightable subject matter or that the claim is invalid for any other reason, the Register shall refuse registration and shall notify the applicant of the reasons for such refusal."  § 410(b).  An application is not in proper form if an applicant refuses to provide information required by § 409.  *See, e.g.*, *Proulx v. Hennepin Tech. Centers Dist. No. 287*, No. 4-79-637, 1981 WL 1397, at *5 (D. Minn. Dec. 7, 1981) ("The Register has authority to insist that applications and registration certificates show clearly and unequivocally the facts determinative of the scope, validity and ownership of the copyright in order to prevent public deception or confusion") (citing 2 NIMMER ON COPYRIGHT § 7.21[A] at p. 7-150 n. 2).  This includes cases where the applicant refuses to disclaim material that is not protectable or material that was not created by or is not owned by the author/claimant named in the registration application.  *See, e.g.*, *Ashton v. United States Copyright Off.*, 310 F. Supp. 3d 149, 152–53 (D.D.C. 2018) (upholding the Office's decision to deny an application where the claimant "had 'refused to have the [unprotectable] claim in text' removed"); *cf. Oliver v. Meow Wolf, Inc.*, No. CV 20-237

KK/SCY, 2023 WL 4353541, at *2-3, 8-9 (D.N.M. July 5, 2023) (invalidating registration where claimant knowingly failed to exclude material created by an another).

Creating a meaningful, accurate record of the author's contributions to the work has many benefits. Notifying the Office that a work contains material that the author did not create or cannot claim copyright protection for helps the Office determine if the work contains a sufficient amount of new material to support a registration. Excluding material from a claim also creates a clear record so that courts, litigants, and the general public may rely on the legal presumptions provided by the certificate of registration. *See* § 410(c). If a claim is approved, the certificate creates a presumption that the deposit contains copyrightable authorship and that the copyright in that material is valid. *See id.* It also creates a presumption that the facts stated in the certificate are correct, for instance, that the copyrightable material was created by the author named in the certificate and that the claimant owns all of the exclusive rights in that material. In addition, identifying and excluding material that cannot be claimed by the author/claimant can streamline legal disputes and limit the potential for a challenge to the validity of the registration under § 411(b).

## IV.   FACTUAL BACKGROUND

Mr. Allen filed an application to register the Work on September 21, 2022. *See* AR_001-03. The application stated that the Work was created in 2022 and identified Mr. Allen as the sole author. *Id.* It did not disclaim any material or otherwise acknowledge the use of AI in the Work's creation. *Id.* However, the Work garnered national media attention, and the Office became aware that Mr. Allen had used Midjourney. *See* AR_004-05. In correspondence, the examiner asked for a description of Mr. Allen's interaction with Midjourney, including the

specific text prompts used, *see* AR_004-05, and later requested a copy of the image generated by the platform and a description of edits made thereafter, *see* AR_009-10.

Mr. Allen refused to disclose his prompts but provided the examiner with "a generalization and description of the type of prompts used."  AR_007.  Mr. Allen said his prompts included, *inter alia*, text describing the "overall subject of the piece," the "big picture," the "type of scene," "the overall image's genre and category," "the tone," "how lifelike" the image should be, "how colors were [to be] used," "the composition," "how to 'finish' the piece," and the "style/era."  *Id*.  He also stated that he had used optional Midjourney settings to set "various parameters which further instruct the software how to develop the image," but did not specify what those parameters were or the qualities he aimed to adjust.  *Id*.; *see also* AR_545-47 (documenting basic parameters, such as aspect ratio and rendering quality).

Mr. Allen described the creation of the Work as follows:  He entered text prompts "at least 624 times."  AR_008.  Each time, Midjourney generated a 2x2 grid of "potential images."  AR_012; *see also* AR_542.  He then chose one with Midjourney's "variations" feature, which generates four new images "similar to the chosen image's overall style and composition."  AR_008; *see also* AR_542.  Finally, he selected one, the Midjourney Output, AR_022 (bottom), as "acceptable."  AR_011-12.  Mr. Allen made certain edits to the Midjourney Output: increasing its resolution with Midjourney's "Upscaler" feature, using Photoshop to "beautify and adjust various cosmetic details/flaws/artifacts etc.," and upscaling it a second time with Gigapixel AI.  AR_008; AR_012-13.  Mr. Allen submitted the resulting Work for registration. *See* AR_022 (top).

In light of Mr. Allen's description, the examiner informed Mr. Allen that the content generated by AI was not copyrightable.  *See* AR_015.  The examiner further informed Mr. Allen that the Work showed that he had "added new creative authorship," and the Office would consider registration if Mr. Allen "complet[ed ] the limitation of claim to clarify that the registration will extend only to [his] direct creative authorship in the image."  AR_015.  When Mr. Allen declined, s*ee* AR_016-18, the Office refused to register the claim, *see* AR_023-24.

Mr. Allen requested reconsideration pursuant to 37 C.F.R. § 202.5(b) and, upon review, the Office reached the same conclusion.  *See* AR_028-48.  The Office found that "[b]y attempting to register the entire work, the application asserts a claim to copyright in nonhuman authorship that does not constitute copyrightable subject matter," and that "the application was not submitted in proper form, because it does not limit the claim to Mr. Allen's derivative human authorship or exclude the preexisting AI-generated material from the claim."  AR_046.

Mr. Allen made a second request for reconsideration pursuant to 37 C.F.R. § 202.5(c), and the Office again affirmed.  *See* AR_051-71.  The Office analyzed the circumstances of the Work's creation, taking into consideration Mr. Allen's description and the Office's "knowledge of Midjourney and Midjourney's description of its own service."  AR_067.  The Office found that Mr. Allen was not the author of the Midjourney Output because his sole contribution "was inputting the text prompt that produced it."  AR_068.  "Midjourney does not treat text prompts as direct instructions, and users may need to attempt hundreds of iterations before landing upon an image they find satisfactory."  AR_069.  That appeared to be the case for Mr. Allen, "who experimented with over 600 prompts" before selecting an "acceptable" image.  *Id.*  Although prompting may involve creativity, the Office found that text prompting does not actually form

the image or exercise creative control over the expressive elements, which are mostly "determined by outside forces such as Midjourney's training data and the initial 'noise' that serves as a starting point for the diffusion process that generates a final image." AR_069 n.11 (citing AR_548-50 (MIDJOURNEY, *Prompts*)).

The Office concluded that "the Work contains more than a *de minimis* amount of content generated by artificial intelligence ('AI'), and this content must therefore be disclaimed in an application for registration. Because Mr. Allen is unwilling to disclaim the AI-generated material, the Work cannot be registered as submitted." AR_063. This decision is a final agency action. *See* 37 C.F.R. § 202.5(g) (2020).

## V.    ARGUMENT

After significant correspondence, two requests for reconsideration, and a thorough review of the record, the Office found that the Work submitted for registration contained more than a *de minimis* amount of content that was generated by AI, not authored by Mr. Allen. The Office refused registration because Mr. Allen declined to disclaim this uncopyrightable content. *See* AR_067. Mr. Allen was not penalized because AI was used in the creation of the Work. Rather, the Office's decision to refuse registration applied existing legal standards regarding authorship and rules requiring registration applicants to disclaim unclaimable material. That decision was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

### A.    The Office Could Not Register the Work as a Whole

Mr. Allen attempted to register a work that contained, but did not disclaim, material that is uncopyrightable and that he did not author. As the responsible custodian of the registration system, the Office was correct in preventing him from doing so. *See* 17 U.S.C. § 410.

### i.    The Work Contained an AI-Generated Image that Mr. Allen Did Not Author

Mr. Allen concedes that the Work he submitted for registration includes the Midjourney Output, and that the Midjourney Output was created using text-to-image generative AI technology. *See* AR_006-09. The Midjourney Output "remains in substantial form in the final Work," AR_067, and is uncopyrightable and unattributable to Mr. Allen's creative expression.

### a.    Human Authorship Is Required for Copyright Protection

The Copyright Act states that protection subsists "in original works of authorship fixed in any tangible medium of expression." 17 U.S.C. § 102(a). To the extent that Mr. Allen believes that the Act does not require human authorship, *see, e.g.*, Dkt. 41 at 29 n.7 (asserting that "[t]he Act contains no such requirement . . ."), Mr. Allen is mistaken.[3] Consistent with the Constitution, prior copyright statutes, and every court that has considered the issue, "authorship" requires that a work be created by a human being. *See supra*, Section III.A.

Courts that have considered the human authorship requirement have uniformly concluded that copyright is limited to *human* creations. In fact, the D.C. Circuit recently confirmed that this principle applies in the context of AI. *See Thaler*, 130 F.4th at 1051 ("the Copyright Act itself requires human authorship"). In *Thaler*, the D.C. Circuit affirmed the Office's refusal to register a work where the claimant attributed authorship to generative AI software called the "Creativity Machine." *Id.* at 1041. It held that "[t]he Creativity Machine cannot be the recognized author of

---

[3] Mr. Allen also argues that the Office applied a new standard, "the so-called 'traditional elements of authorship,'" that is discussed in the COMPENDIUM. Dkt. 41 at 28 (citing COMPENDIUM § 306, § 313.2). Sections 306 and 313.2 of the COMPENDIUM discuss the human authorship requirement which is not a "new standard." *See also infra*, Section V.A.iv.

a copyrighted work because the Copyright Act of 1976 requires all eligible work to be authored in the first instance by a human being." *Id.*

As the D.C. Circuit recognized, "the text of multiple provisions of the statute," indicate that "authors must be humans, not machines." *Id.* at 1045. For example, the Act provides that copyright protection generally "endures for a term consisting of the life of the author and 70 years after the author's death." § 302(a); *see also Thaler*, 130 F.4th at 1046. Similarly, when an author dies, certain rights may be exercised by their "widow," "widower," "children," or "grandchildren." § 203(a)(2)(A)-(D); *see also* § 409(2)-(3) (applications must include "nationality or domicile of the author or authors," and "the date of their death" if any are deceased); *Thaler*, 130 F.4th at 1046. Non-human authorship is incompatible with these Act provisions, and others that require the authors to be a person capable of exercising legal rights. *See, e.g.*, §§ 201(a), 203(a).

While the technology in *Thaler* may have been novel, the legal principles were not. *See Thaler*, 130 F.4th at 1045 ("many of the Copyright Act's provisions make sense only if an author is a human being"). Other appellate courts considering non-human creations have all reached the same conclusion. In *Kelley v. Chicago Park Dist.*, the Seventh Circuit held that a wildflower garden was not copyrightable because "[a]uthors of copyrightable works must be human; works owing their form to the forces of nature cannot be copyrighted." 635 F.3d at 304. In *Urantia Found. v. Maaherra*, the Ninth Circuit explained that copyright was not intended to protect the "creations of divine beings" and that "some element of human creativity must have occurred in order for the [work at issue] to be copyrightable." 114 F.3d at 958. And in *Naruto v. Slater*, the Ninth Circuit rejected a monkey's ability to sue under the Copyright Act, citing statutory terms

that "imply humanity and necessarily exclude animals that do not marry and do not have heirs entitled to property by law."  888 F.3d at 426.

These principles have persisted, and the Office has explicitly recognized them for decades.  *See, e.g.*, *Thaler*, 130 F.4th at 1047 (*citing* U.S. COPYRIGHT OFFICE, SIXTY-EIGHTH ANNUAL REPORT OF THE REGISTER OF COPYRIGHTS at 5 (1966) (hereinafter "SIXTY-EIGHTH ANNUAL REPORT") (AR_125-54); COMPENDIUM FIRST § 2.8.3(I), (I)(a)(1)(b)); *see also* AI COPYRIGHTABILITY REPORT at 7-11.  They are equally applicable here.

### b.    The Midjourney Output Was Not Authored by Mr. Allen

Mr. Allen's contributions to the Midjourney Output do not make him its author.  His principal interaction with Midjourney was inputting text prompts.  *See* AR_008.  While these prompts, which Mr. Allen did not provide to the Office, are not part of the record, based on the description he provided, the prompts related to the "overall subject," the "big picture," the "type of scene," the "genre and category," the "tone," how "lifelike" the image should be, how "colors were [to be] used," the "composition," how to "'finish' the piece," and the "style/era."  AR_007.  These prompts amount to ideas, not to authorship.[4]

Conceiving and communicating general ideas—no matter the level of effort involved—does not constitute authorship of an expressive work.  *See, e.g.*, *Feist*, 499 U.S. at 344-45 ("[t]he most fundamental axiom of copyright law is that 'no author may copyright his ideas or the facts he narrates'") (quoting *Harper & Row*, 471 U.S. at 556).  After all, only the expressive elements, not the underlying idea itself, are eligible for copyright protection.  *See* 17 U.S.C. § 102(b).

---

[4] Perhaps unintentionally, Mr. Allen acknowledges that his prompting reflected an idea, explaining that he "selected the scene, the elements, the tone, and refined this *idea* over 600 times to engineer the prompt."  Dkt. 41 at 35 (emphasis added).

Thus, to be an author, a person must "translate[] an idea into a fixed, tangible expression entitled to copyright protection." *CCNV*, 490 U.S. at 737; *see also Baker v. Selden*, 101 U.S. 99, 105 (1879); 17 U.S.C. § 102(b); H.R. Rᴇᴘ. No. 94-1476, at 57.  As the Supreme Court has explained, the author is generally the person who "actually creates the work." *CCNV*, 490 U.S. at 737; *Sarony*, 111 U.S. at 58 (referring to an author as a "maker; one who completes a work of science or literature").[5]

Mr. Allen emphasizes that he revised and entered text prompts "at least 624 times."  Dkt. 41 at 23-24 (citing AR_043).  But repeatedly revising prompts does not amount to authorship. The time and effort involved in creating a work is irrelevant in analyzing what aspects are eligible for copyright.  *See, e.g.*, *Feist*, 499 U.S. at 352 (rejecting "sweat of the brow" doctrine).[6] For example, an art collector commissioning a work from an artist could not claim to be the author of the resulting painting simply because the collector gave general directions to the artist

---

[5] Even detailed suggestions and directions are insufficient to make a person an author. For instance, the court in *S.O.S.* found that a "liaison" to a programming team, who "told the programmers what tasks the software was to perform and how it was to sort data," was not an author because she "did nothing more than describe the sort of programs [her employer] wanted," and "did none of the coding and [did] not understand any computer language."  886 F.2d at 1086-87.  Likewise, the court in *M.G.B. Homes* found that even where an idea for architectural plans and drawings were provided in a thumbnail sketch, that sketch was insufficient to support a claim of joint authorship in the final product.  *See* 903 F.2d at 1493.

[6] Mr. Allen's Motion also devotes considerable discussion to originality, arguing that the standard is low and the Work more than meets it.  *See* Dkt. 41 at 17-19, 22-25, 30-32.  Mr. Allen argues it "would be impossible to describe the Work as 'garden variety'—the Work literally won a state art competition," and contends the Office erred in finding it "has less originality embodied in it than a directory."  *Id.* at 24, 32.  But the Office never found that the Work, or even the Midjourney Output, was "garden variety" or insufficiently creative.  *See, e.g.*, AR_067 (reviewing the "circumstances of the Work's creation" not its originality).  As the Cᴏᴍᴘᴇɴᴅɪᴜᴍ states, the Office does not consider whether a work is "novel, distinctive, innovate, or even unique," or its "aesthetic value, artistic merit, or intrinsic quality."  AR_088-89 (Cᴏᴍᴘᴇɴᴅɪᴜᴍ § 310.1, § 310.2).

and reviewed several attempts before accepting one.  In much the same way, Mr. Allen supplied

ideas and approved the result; Midjourney translated his instructions into expressive elements.

*See* AR_069.  Updating the instructions did not provide actual control over the resulting

expression.[7]  *See, e.g.*, *S.O.S.*, 886 F.2d at 1083.

Mr. Allen quotes the Office's recitation of his prompting technique, claiming it

"describe[s] the many ways the Work ultimately reflected [his] conception."  Dkt. 41 at 38-39

(quoting AR_068).  For example, the prompts included "certain professional artistic terms which

direct the tone of the piece" and "terms about what style/era the artwork should depict."

AR_007.  Mr. Allen argues that this shows "he expressed his own idea."  Dkt. 41 at 39.

However, Mr. Allen conflates the *idea* of a particular tone or style (e.g., "Renaissance art") with

the *expression* of that tone or style; overstates the degree of control afforded by text prompting,

*see infra*, Section V.A.ii-iii; and ignores that all or most of the expression in Midjourney-

generated outputs is attributable to random noise and the Midjourney model, *see infra*, Section

V.A.iii-iv.

The effort Mr. Allen expended in prompting is irrelevant.  Even the cases cited by Mr.

Allen, *see* Dkt. 41 at 34-36, make clear that the copyrightability analysis should focus on the

work or the "output," not the labor or skill involved in its creation.  In *Mannion v. Coors

Brewing Co.*, the court observed that "[p]rotection derives from the features of the work itself,

---

[7] This case does not concern newer generation AI models, released in early 2025, which offer some ability to iteratively edit images in plain English.  *See, e.g.,* Ethan Mollick, *No elephants: Breakthroughs in image generation*, ONE USEFUL THING (Mar. 30, 2025), https://www.oneusefulthing.org/p/no-elephants-breakthroughs-in-image.  There is no indication in the record that Mr. Allen's first 623 prompts had any influence on how Midjourney processed the 624th.  At each stage, Mr. Allen could only accept the entire image generated by Midjourney or reject it and try again.

not the effort that goes into it."  377 F. Supp. 2d 444, 451 (S.D.N.Y. 2005).  Even when a "great deal of effort and expertise may have been poured into the production" of a work, it is not necessarily protectable.  *Id.* (citing *Bridgeman Art Libr., Ltd. v. Corel Corp.*, 36 F. Supp. 2d 191 (S.D.N.Y. 1999)). Similarly, in *Meshwerks, Inc. v. Toyota Motor Sales U.S.A., Inc.*, the court explained that "in assessing the originality of a work for which copyright protection is sought, we look only at the final product, not the process, and the fact that intensive, skillful, and even creative labor is invested in the process of creating a product does not guarantee its copyrightability."  528 F.3d 1258, 1268 (10th Cir. 2008) (Gorsuch, J.); *see also Feist*, 499 U.S. at 359-60.

Far from downplaying Mr. Allen's efforts, the Office openly acknowledged that he entered prompts "at least 624 times."  AR_068.  However, the Office explained that this was consistent with its understanding of how Midjourney's technology functions and the limited degree of control it affords.  *See* AR_69.  The Office observed that "users may need to attempt hundreds of iterations before landing upon an image they find satisfactory." *Id.*  While repeated prompting may demonstrate substantial effort, it also shows that prompters do not determine the expression generated by an AI system like Midjourney and—like Mr. Allen—must keep trying until it produces an image they deem "acceptable."  *See id.*  That is not authorship.

Mr. Allen points to *Sarony,* and *Meshwerks,* arguing that "machine intervention" does not change the standard for authorship and that "physical creation" is not required.  *See* Dkt. 41 at 19-21.  The Office agrees.  But Mr. Allen is wrong that this observation helps his case. Regardless of the technology used, authorship turns on human contribution.  *See Sarony*, 111 U.S. at 58-60.

In *Sarony*, a case involving the then-new technology of the camera, the Supreme Court explained that an author is "he to whom anything owes its origin; originator; maker; one who completes a work of science or literature," while writings includes "all forms of writing, printing, engravings, etchings, etc., by which the ideas in the mind of the author are given visible expression." *Id.* at 57-58 (internal quotes omitted). The Court thus had "no doubt that the Constitution is broad enough to cover an act authorizing copyright of photographs, *so far as* they are representatives of original intellectual conceptions of the author." *Id.* at 58 (emphasis added). But this did not end the inquiry. The Court went on to consider whether the photograph at issue was a "mere mechanical reproduction" or whether there was evidence "of originality, of intellectual production, of thought, and conception on the part of the author." *Id.* at 59-60. The lower court found that the photographer "gave visible form" to the picture by "posing the [subject] in front of the camera, selecting and arranging the costume, draperies, and other various accessories," "arranging the subject so as to present graceful outlines," "arranging and disposing the light and shade," and "suggesting and evoking the desired expression." *Id.* at 60. This demonstrated the photographer's control over the selection and arrangement of elements and was sufficient to "show [the] photograph to be an original work of art, the product of [his] intellectual invention, of which [he] is the author." *Id.*

As then-Judge Gorsuch explained, *Sarony* did not establish a *per se* rule of copyrightability for photographs. *See Meshwerks*, 528 F.3d at 1264. Rather, it established that a photograph can be copyrightable "to the extent [it] reflects the photographer's decisions regarding pose, positioning, background, lighting, shading, and the like, those elements can be said to 'owe their origins' to the photographer." *Id.* The Office correctly applied these

principles in refusing Mr. Allen's registration application.[8]  Nothing in Mr. Allen's description of his prompting suggests that it was equivalent to "posing [subjects] in front of [a] camera," "selecting and arranging the costume, draperies, and other various accessories," or similar creative contributions that have been found to support a claim of photographic authorship. *Sarony*, 111 U.S. at 55; *see also Meshwerks*, 528 F.3d at 1264.[9]

The technology Mr. Allen used did not allow users to "exercise ultimate creative control over how such systems interpret prompts and generate material.  Instead . . . prompts function more like instructions to a commissioned artist—they identify what the prompter wishes to have depicted, but the machine determines how those instructions are implemented in its output." AR_196; *see also* AR_044 (explained that Mr. Allen lacked sufficient creative control over the creative elements of the Midjourney Output); AR_069.  For example, the prompt, "write a poem about copyright law in the style of William Shakespeare," might result in "text that is recognizable as a poem, mentions copyright, and resembles Shakespeare's style.  But the technology will decide the rhyming pattern, the words in each line, and the structure of the text." AR_196.

---

[8] As the Office explained in its AI COPYRIGHTABILITY REPORT, works created using generative AI can be copyrightable to the extent that AI is used as a tool.  *See* AI COPYRIGHTABILITY REPORT at 11-12.  Mr. Allen claims his use of Midjourney is akin to using a tool, *see* Dkt. 41 at 5, 6, 11, 33-35; AR_016, but he is incorrect.  *See, e.g.*, AR_043 (Mr. Allen did not "exercise any control over the actual creation, development, or execution of the image that Midjourney rendered on his screen.").

[9] Mr. Allen's citation to a law review article claiming that *Sarony* relied on assistants for staging the scene and operating the camera is irrelevant, as any such contributions were not part of the Court's consideration of the case.  *See* Dkt. 41 at 19 (*citing* Christine Haight Farley, *The Lingering Effects of Copyright's Response to the Invention of Photography*, 65 Univ. Pittsburgh L. Rev. 385, 434-35 (2004)).

ii.     **Midjourney's Documentation Shows That Prompts Could Not Control Expression**

Midjourney's own descriptions of its technology support the finding that Mr. Allen's prompts did not control the expressive visual elements generated by Midjourney.  The Office appropriately considered the technical capabilities of Midjourney based on public documentation available at the time, which was cited by the Office and included in the administrative record. *See* AR_39, AR_042, AR_068-69, AR_527-50.  This documentation demonstrates that text prompting could only loosely influence the generation of visual images; it did not function like instructions followed by an amanuensis or assistant.  *See* AR_527-50.  For example, under the heading "Prompting Notes," the documentation directs users to "[c]oncentrate on the main concepts."  AR_528.  In encouraging users to "Think About What Details Matter," simple categories of ideas are listed: the subject ("person," "animal"), medium ("photo," "painting"), environment ("indoors," "outdoors"), lighting ("soft," "ambient"), color ("vibrant," "muted"), mood ("sedate," "calm"), and composition ("portrait," "headshot").  AR_529.  Even when combined (e.g., "soft" lighting, "muted" color, and a "sedate" mood), these "details" represent an idea capable of being translated into numerous and widely different expression.

Midjourney's documentation does not provide any examples of complex prompts detailing expressive elements.  But even the most complex examples are still highly conceptual and could result in a range of widely varied outputs.  *See, e.g.*, AR_537 ("Bright orange California poppies drawn with colored pencils"); AR_545 ("adorable rubber duck medieval knight").  In fact, Midjourney explicitly discourages more complex uses.  *See, e.g.*, AR_548-49.  The documentation warns that "super-long prompts aren't always better," and the system "works best with simple, short sentences . . . [a]void long lists."  *Id.*  Midjourney "does not understand

grammar, sentence structure, or words like humans," and users should focus on what "[they]

want instead of what [they] don't want."  AR_549.  Midjourney further warns that attempts at

controlling outputs can even have paradoxical effects, explaining that "[i]f you ask for a party

with 'no cake,' your image will probably include a cake."  *Id.*  In some cases, even specific

instructions may not be followed and "anything you leave out will be randomized."  AR_550.

Midjourney fills the gaps for any detail not specified in a prompt, informing the user that that

anything "left unsaid may surprise you."  AR_529.

### iii.    Examples In the Record Show that Prompts Could Not Control Expression

The record is replete with examples of Midjourney prompts paired with resulting images,

which illustrate the technological limitations described in the Midjourney documentation.  *See*

AR_170-71, AR_185, AR_188, AR_534, and AR-537.[10]  These examples show that the prompts

functioned as ideas, but Midjourney determined the expression, filled in gaps, and often

disregarded specific instructions.  *See id.*

For example, in response to the prompt "white bunny with low ears, rainbow background,

love, cute, happy," Midjourney generated the following four images:

---

[10] Some of these examples appear in the Midjourney documentation discussed above;
others appear in the Office's correspondence regarding "Zarya of the Dawn," a work created
using AI and submitted for registration, which was cited in the Office's decision on Mr. Allen's
second request for reconsideration.  *See* AR_066-67 (citing AR_165-77).



AR_170. Although the images share the same general concept—something not protected by copyright—each image is unique. *See id.* The specific bunny, angle, distance, pose, flooring, lighting, and rainbow pattern are all different. *See id.* The "low ears" and "happy" part of the prompt appears to have had little effect on the outputs; several bunnies have high ears, one is missing an ear, and at least one looks distinctly unhappy. *Id.*

Another example shows one prompt ("celadon owl pitcher") producing twelve completely different images. *See* AR_534. Each image features a green ceramic owl-shaped pitcher, but the expression varies wildly—the shape of the pitcher, the shade of green, the color of the owl's eyes, and so on. *See id.* Even if copyright covered the idea of a "celadon owl pitcher"—and it does not—every other element of expression would be attributable to Midjourney, rather than the prompt.

More complex prompts in the record result in similar issues. The following Midjourney image was generated from a prompt including the text "a holographic elderly white woman name

Raya, Raya is having curly hair and she is inside a spaceship :: Star Trek spaceship :: Raya is a hologram . . .":



AR_188.  Despite additional specificity, the prompt did not actually determine how the idea was expressed.  *See id.*  The generated image reflects a generic sci-fi setting but does not include the inside of an actual Star Trek spaceship or an "elderly" woman.  *See id.*  Where the prompt was silent or ambiguous (such as whether to include a Star Trek-style viewscreen, how to depict that viewscreen, and what content would be displayed), Midjourney filled in the gaps.  Midjourney's translation of the prompt into the fixed, tangible *expression* of a particular scene featuring a viewscreen cannot be attributed to the prompter.

The Office was not able to examine the gaps between Mr. Allen's final prompt and the resulting output because Mr. Allen would not disclose the language he used.  *See* AR_034 (claiming that disclosure of the prompts "could have the effect of explaining a magic trick; i.e. That once it becomes known, it seems far less impressive").  But a written description of a complex image like the Midjourney Output will inevitably fail to describe important elements, and—in Midjourney's words—the rest will be "randomized."  AR_550.  Thus, no matter how detailed Mr. Allen's undisclosed prompt was, there would still be many major elements left out of his description that Midjourney would randomize.  *See id.*  Mr. Allen did not claim, for

instance, to have specified the number of people, types or colors of specific dresses, the content of the background, the placement or intensity of light sources, or other details about visual elements that appear in the Midjourney Output.  *See* AR_007.  Like with the owl pitcher, every element not described had to be generated by Midjourney.[11]  Thus, the Midjourney Output contained elements, including randomized elements, that were not authored by Mr. Allen, and the Office was correct not to grant a registration application that represented otherwise.

### iv.   Mr. Allen Cannot Adopt Expression He Did Not Author

Mr. Allen does not claim that his prompts specified all of the visual elements in the Midjourney Output.  *See, e.g.*, Dkt. 41 at 23 ("at least some of [the] Work reflects [Mr. Allen's] creative decisions").  Instead, he counters that randomness does not preclude copyrightability and that "[a]ccidental, luck-based creation has a long history of protectability."  *Id.* at 32.  In particular, he cites photography jurisprudence and argues that "[t]he existence of some amount of randomness in the creation of a work, or the presence of some element not intended ab initio by the artist, cannot bar protection."  *Id.* at 33-35.  He claims that courts "do not search for randomness or police methods to prohibit copyright in a work, rather, they determine whether a spark of creativity exists that allows for protection."  *Id.* at 34.

But this argument misstates the Office's position in two respects.  First, the randomness in Midjourney-generated images is not itself a bar to registration.  It simply illustrates how much expression is attributable to Midjourney rather than the user.  The randomness is not confined to a few individual or *de minimis* elements—the same prompt produces images with completely

---

[11] It should also be noted that the output from an AI system, including Midjourney, is at least somewhat dependent on the material that is used to train the AI system.  *See, e.g.*, AI COPYRIGHTABILITY REPORT at 36-37.

different expression, from the subject and composition to the lighting and colors. *See, e.g.*, AR_534. If the same prompt results in such vastly differing expression, the prompter cannot be the one who translated the idea into expression, nor can the expression be said to reflect their decisions as an author.

Second, the Office did not refuse to register the Work because it lacked originality or a "spark of creativity." It refused because it contains more than a *de minimis* amount of material that Mr. Allen did not author, which he failed to disclaim. *See* AR_038-48; *see also* AR_063, AR_065-67, AR_069. The photography jurisprudence cited by Mr. Allen supports this approach, rejecting the idea that a photographer is entitled to protection in every visual element captured by their camera.

For example, Mr. Allen cites *Harney v. Sony Pictures Television, Inc.* for the proposition that there is not "too much random chance" to prevent a lucky photograph from obtaining copyright protection. Dkt. 41 at 34 (citing 704 F.3d 173, 181-82 (1st Cir. 2013)). Mr. Allen further uses *Harney* to argue that a photographer makes the creative choice of the timing, which "includes complete chance." *Id.* [12] But the holding in *Harney* did not address the timing of the photograph. *See* 704 F.3d at 180–81. In fact, the Court stated the case "does not involve a unique or unusual moment fortuitously captured by a photographer." *Id.* at 186 n.10. And the Court's decision explicitly rested on a finding that there *were* unprotectable elements in the photograph. *Id.* at 180–81. In reaching its decision, the First Circuit found that many elements in the original photograph were *not* covered by the copyright: "the piggyback pose of [the father]

---

[12] The language from *Harney* quoted in Mr. Allen's Motion appears in Footnote 10 of *Harney*. *See Harney*, 704 F.3d at 186 n.10.

and [daughter], their clothing, the items they carried, [and] the Church of the Advent shown with bright blue sky behind it." *Id.* at 186; *see also Mannion*, 377 F. Supp. 2d at 450 (observing that a photographer could not claim originality in the "face, torso, and hands" of his subject). Thus, Mr. Allen's arguments are not supported by *Harney*.

Mr. Allen also argues that an author can still claim accidental, unintended, or random expression because he can "select and 'adopt' outcomes entirely out of his control as his own." Dkt. 41 at 33 (quoting *Alfred Bell & Co. v. Catalda Fine Arts*, 191 F.2d 99, 105 (2d Cir. 1951) (hereinafter "*Bell*")). This, however, misstates the holding in *Bell*, which concerned the copyrightability of mezzotint prints based on paintings in the public domain. *See Bell*, 191 F.2d at 104. Likening the metal engraving technique to translation, the court held that mezzotints could be copyrighted as distinct "versions," which "originated" with those who made them. *Id.* In particular, there was evidence that the prints were "not intended to, and did not, imitate the paintings they reproduced." *Id.* at 105.

In language that has been recognized as "dictum," *Godinger Silver Art Co. v. Int'l Silver Co.*, No. 95 CIV. 9199 (LMM), 1995 WL 702357, at *5 n.5 (S.D.N.Y. Nov. 28, 1995), the *Bell* court suggested that even if the changes in the mezzotints were "inadvertent," their copyrights would still be valid: "a copyist's bad eyesight or defective musculature, or a shock caused by a clap of thunder, may yield sufficiently distinguishable variations. Having hit upon such a variation unintentionally, the 'author' may adopt it as his and copyright it," 191 F.2d at 105 (citations omitted). But *Bell* does not stand for the proposition that someone can become an author of another's expression that they did not create by formally adopting it as their own. Rather, it suggests that one's own expression, inadvertent or deliberate, is original to the author.

34

Whether intentionality is required for originality is not at issue in this case.  *Cf. Chamberlin v. Uris Sales Corp.*, 150 F.2d 512, 513 (2d Cir. 1945) (leaving open the question of "whether originality is precluded by lack of intention," but suggesting it would be difficult to ascertain "what is intended and what inadvertent in the work of genius").  Here, Midjourney generates *entire images*, in which all or nearly all the expression is created based on random visual noise and a machine learning model.  *See, e.g.*, AR_527-30.  Indeed, Mr. Allen had to continually feed Midjourney prompts until the AI system happened toproduce an image that he desired.  Mr. Allen cannot "adopt" that expression, any more than one who approves the work of another, *see M.G.B. Homes*, 903 F.2d at 1493, or cultivates natural beauty, *see Kelley*, 635 F.3d at 304, could adopt those expressions.  And Mr. Allen appears to recognize this principle, acknowledging that "one's selection of one shell at the beach may not make one the owner of that individual shell."  Dkt. 41 at 38 n.9.

The Office's final decision, and the Office's AI Registration Guidance cited therein, did not create a new standard for authorship.  *See* AR_ 065-68 (citing AR_195-96).  The Office has continuously articulated the existing standard that has developed over decades, citing cases like *Sarony* (1884), *Urantia Found* (1997), and *Kelley* (2011); the 1973, 1984, and 2021 editions of the COMPENDIUM; and the SIXTY-EIGHTH ANNUAL REPORT (1965).  *See* AR_065-68, AR_125-54, AR_195-96.  In the SIXTY-EIGHTH ANNUAL REPORT issued in 1965, the Register made the following observation on works created with computers:

> The crucial question appears to be whether the "work" is basically one of human authorship, with the computer merely being an assisting instrument, or whether the traditional elements of authorship in the work (literary, artistic, or musical expression or elements of selection, arrangement, etc.) were actually conceived and executed not by man but by a machine.

AR_133.  This language was later incorporated into the current version of the COMPENDIUM, *see* AR_095-96, and the Office's AI Registration Guidance, *see* AR_196.

Mr. Allen argues that the Office "invent[ed] a new standard that defies the Act" and "translated musings by the Register of Copyrights in 1965 into a legal requirement."  Dkt. 41 at 17, 28-29.  To the contrary, the Register simply restated the well-established standard for authorship in accessible terms.  Whether one uses the formulation from *Sarony* ("he to whom anything owes its origin") or *CCNV* ("person who translates an idea into a fixed, tangible expression"), or the principles outlined by the circuit courts in *Kelley*, *S.O.S.,* and *M.G.B. Homes*, the result is the same.  An author must conceive and execute the expressive elements of a work; providing ideas, delegating creation to another or a machine, and approving the result is not enough.

### B.    The Office Could Not Register Mr. Allen's Contributions Because He Declined to Limit His Claim

Mr. Allen was not left without recourse even though he did not author every aspect of the Work.  As the Office's AI Registration Guidance observes, determining authorship is "necessarily a case-by-case inquiry."  AR_196.  It is also not a binary inquiry.  The Office could have registered material authored by Mr. Allen had he agreed to limit his claim and disclaim the material that he did author.  *See* AR_015 (informing Mr. Allen that he will need to "complet[e ] the limitation of claim to clarify that the registration will extend only to Mr. Allen's direct creative authorship in the image.").  Mr. Allen chose not to.

Authors routinely incorporate preexisting or unprotectable expression in their works, and this does not preclude protection for their own original contributions.  However, protection is limited to "those components of a work that are original to the author."  *Feist*, 499 U.S. at 348;

*see also Mannion*, 377 F. Supp. 2d at 451 ("the nature and extent of a photograph's protection differs depending on what makes that photograph original"). The Office regularly registers works that include material from other sources, including material created with the assistance of AI, provided that the claim is limited to the author's new contributions. *See, e.g.*, AI COPYRIGHTABILITY REPORT at 3, 24-27.

Consistent with this practice, the Office informed Mr. Allen that it was willing to consider registration of his contributions to the Work, provided he disclaimed the AI-generated material that he did not author. *See* AR_015. The examiner acknowledged that Mr. Allen added "new creative authorship" to the Work and suggested it could be registered subject to "completion of the limitation of claim" space with a brief statement disclaiming the AI-generated elements that appear in the Work. *Id.* In the final decision, the Office again observed that "[w]ere Mr. Allen willing to disclaim AI-generated material in the Work, he would be able to file a new application and explain why his modifications to the image rise to the level of copyrightable authorship." AR_067.

Mr. Allen's Motion makes no effort to grapple with the Office's disclaimer requirement or its refusal of his claim on that basis. *See generally* Dkt. 41. He only mentions it once and repeatedly mischaracterizes the Office's decision as applying to the entire Work.[13] *See, e.g.*, Dkt. 41 at 4 ("the Copyright Office's references to human authorship requirements are inapt

---

[13] Mr. Allen additionally claims that by refusing the registration application, "the Copyright Office is denying Allen a constitutional right to own the Work." Dkt. 41 at 41. While Mr. Allen fails to provide support for this assertion, *see id.*, neither copyrightability nor "ownership" is contingent on registration. *See, e.g.*, 17 U.S.C. § 408(a) ("registration is not a condition of copyright protection"). Further, the Copyright Clause confers authority on Congress but does not independently create rights for copyright claimants. *See* Art. I, § 8 cl. 8.

because this Work *has* a clear human author") (emphasis in original).  Assuming Mr. Allen is not challenging the basic principle that copyright protection extends "only to those components of a work that are original to the author," *Feist*, 499 U.S. at 348, his omission on this point should be treated as a concession:  If the Work contains more than a *de minimis* amount of expression that was not authored by Mr. Allen, then it was appropriate for the Office to require a claim limitation disclaiming those aspects of the Work.

It was certainly not arbitrary, capricious, or an abuse of discretion.  As explained in Section III.C, *supra*, the Office has the authority to require applicants to include a high-level disclaimer if a work contains more than a *de minimis* amount of unclaimable material.  *See* 17 U.S.C. § 409(9), (10).  Such information bears upon the "the existence, ownership, or duration of the copyright," § 409(10), and informs courts, litigants, and the public about the scope of the copyright in the registered work.  *See, e.g.*, *Express, LLC v. Fetish Group, Inc.*, 424 F. Supp. 2d 1211, 1219 (C.D. Cal. 2006) ("the scope of the registered copyright is determined by the actual registration application").  The Office regularly exercises its discretion to require this information, with the COMPENDIUM providing several examples of unclaimable material that should be disclaimed (such as material that is in the public domain or copyrightable material that was previously published, previously registered, or owned by a third party) as well as examples of *de minimis* or obvious material that need not be disclaimed (facts, ideas, or direct quotes).  *See* AR_116-19.

Here, there is no question that the Midjourney Output comprises more than a *de minimis* part of the Work, and therefore should have been disclaimed.  *See supra*, Introduction (*compare* Midjourney Output *with* the Work).  The Midjourney Output "remains in substantial form in the

final Work." AR_067.  The subjects, poses, composition, lighting, and other elements in the

Midjourney Output are nearly identical to those the Work.  *Compare* AR_22 (bottom) *with*

AR_22 (top).  As the Office explained, there "may be cases in the future where the application of

the *de minimis* standard is a closer call.  Here, however, the significance of the AI-generated

material to the final work is apparent."  AR_067.  This material was not claimable because it was

not authored by Mr. Allen.  The Office reasonably required a disclaimer because the Work

contained more than a *de minimis* amount of unclaimable material that was not obvious from an

inspection of the deposit, or anything stated in the application.  *See* AR_002-03

Similar to a person who makes a mezzotint engraving based on a public domain painting,

*see Bell*, 191 F.2d at 104, Mr. Allen gains no rights in the underlying Midjourney Output even

though he made some edits to it.  And just as a public domain novel would need to be disclaimed

from an application to register a new edition with added introductory material and illustrations,

so too must Mr. Allen disclaim the material in the Work that he did not author.  *See, e.g.*, *id.*; *see*

*also Darden v. Peters*, 488 F.3d 277, 286 (4th Cir. 2007) (explaining that copyright protection in

a derivative work only extends to elements that the author has added).  This requirement is not

burdensome, and it "does not call for a detailed list of the tools used or the precise proportions of

the work that were created by each one."  AR_070.  Only a "brief statement" is required.  *Id.*

(citing AI Registration Guidance, 88 Fed. Reg. at 16,193).

Mr. Allen attempts to frame the Office's decision as part of a broader policy to "prevent

the registration of certain works created using AI."  Dkt. 41 at 5.  But the disclaimer policy is not

about AI.  It applies the same general legal standards, which were developed well before the

advent of sophisticated generative AI systems, to all works.  *See, e.g.*, § 409(9), (10) ("any other

information regarded by the Register of Copyrights as bearing upon the preparation or

identification of the work or the existence, ownership, or duration of the copyright").  Under

these standards, human-authored contributions made with AI may be protectable, just like any

other work.  The Office reaffirmed this position in the second part of its report on copyright and

artificial intelligence, released in January 2025.  *See* AI COPYRIGHTABILITY REPORT.  It explained

that the "use of AI tools to assist rather than stand in for human creativity does not affect the

availability of copyright protection for the output" and that copyright "protects the original

expression in a work created by a human author, even if the work also includes AI-generated

material."  *Id.* at iii.  It also noted that the Office has "registered hundreds of works that

incorporate AI-generated material, with the registration covering the human author's

contribution to the work."  *Id.* at 3.

For example, the record in this case includes a copy of the Office's decision in a

cancellation proceeding involving a work titled "Zarya of the Dawn," a comic book claimed by

Kristina Kashtanova.  *See* AR_162-93. The Office initiated cancellation when it discovered that

Kashtanova failed to disclose that they used Midjourney to generate the images for the work

through a "process of trial-and-error, in which [they] provided 'hundreds or thousands of

descriptive prompts."  AR_162, AR_172.  Although the Office concluded that Kashtanova did

not author these images, it found that they did author the book's text and issued a new

registration covering "the expressive material that [they] created."  AR_165.  Specifically,

Kashtanova could claim the text and the selection and arrangement of the AI-generated images

with that text in the various panels shown on each page.  *See* AR_168-69.  The Office also

acknowledged that Kashtanova's edits to individual images "could provide human authorship and would not be excluded from the new registration certificate." AR_176.

Here, the Office could have registered Mr. Allen's claim if he had excluded the material that he did not author. But Mr. Allen found the disclaimer requirement "troubling," AR_056, and continued to seek copyright in the entire Work—including uncopyrightable elements he did not author—and for that reason the Office properly refused his claim. *See* AR_069-71.

## VI.    THE REQUESTED RELIEF IS OUTSIDE THE APA'S SCOPE

The Complaint requests that the Court "[o]rder the United States Copyright Office to register 'Theatre D'Opera Spatial' as a copyright-protected work." Dkt. 1 at 39. Although Mr. Allen's Motion for Summary Judgment does not appear to seek that relief, such relief is outside the scope of the APA in any event. *See, e.g.*, *Nova Stylings, Inc. v. Ladd*, 695 F.2d 1179, 1180, 1182 (9th Cir. 1983) (affirming the district court's determination that it lacked "jurisdiction under 28 U.S.C. § 1361 to compel the Copyright Office to register" a work and "review through the Administrative Procedure Act . . . is an adequate remedy"); *see also Coach, Inc. v. Peters*, 386 F. Supp. 2d 495, 498 (S.D.N.Y. 2005) ("plaintiffs have cited no authority, and the Court is aware of none, that would allow this Court, on a review under the APA, to order [the Copyright Office] to register the works") (citing *Atari Games Corp. v. Oman*, 979 F.2d 242, 247 (D.C. Cir. 1992) (remanding to "the district court with instructions to again return the matter of Atari's application to the Register for renewed consideration")). As detailed above, the refusal to register the Work, the final agency action at issue, is a discretionary act and was lawfully done in accordance with the Office's policies and procedures. Even if the Court were to find that the Office abused its discretion, which it did not, the remedy would not be an order compelling

registration, but rather "renewed consideration" of the copyrightability of the Work. *Atari Games Corp.*, 979 F.2d at 247.

## CONCLUSION

The Administrative Record shows that the Office's refusal to register the Work was sound, rationally based on settled law, and not arbitrary or capricious, an abuse of discretion, or otherwise not in accordance with law. For the reasons stated above, Defendants respectfully request that the Court deny Plaintiff's Motion for Summary Judgment and grant Defendants' Cross-Motion for Summary Judgment.

Respectfully Submitted,

BRETT A. SHUMATE
Assistant Attorney General

SCOTT BOLDEN
Director

Of Counsel:

/s/ Jenna Munnelly

SUZANNE JOHNSON
U.S. Dept. of Justice

JENNA MUNNELLY
Trial Attorney
Commercial Litigation Branch
Civil Division

EMILY L. CHAPUIS
General Counsel and
Associate Register of Copyrights
JOHN R. RILEY
Acting Deputy General Counsel
BRANDY KARL
Associate General Counsel
MICHAEL DRUCKMAN
Attorney-Advisor
U.S. Copyright Office

Department of Justice
Washington, DC 20530
Telephone: (202) 616-1061
Email: jenna.e.munnelly@usdoj.gov

*Attorneys for Defendants*

Dated: January 16, 2026