# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLORADO

**Civil Action No. 1:24-cv-02665-WJM**

**JASON ALLEN, an individual**,

      Petitioner,

v.

**SHIRA PERLMUTTER, in her official capacity as Register of Copyrights and Director of the United States Copyright Office, and THE United States Copyright Office**,

      Defendants.

---

## PETITIONER'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

---

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................................................1

II.    ARGUMENT................................................................................................................3

    A.  This Court Reviews the Copyright Office's Legal Determination De Novo Under Loper Bright .......................................................................................................................3

    B.  The "Traditional Elements of Authorship" Test Is Undefined and Has No Basis in the Act.............................................................................................................................6

        1.  Thaler Is Inapposite Because It Was Wrongly Decided And This Case Has a  Human Author ..................................................................................................................7

        2.  Applying the Register's 1965 Musings, Arguendo, Allen Is the Author....................9

    C.  The Office Improperly Conflates Idea and Expression By Discounting the Use of the AI Tool to Demand a Degree of Physical Precision The Act Does Not Require ...............10

    D.  The Office Imposes an Impossible "Sufficient Control" Standard and Selectively Penalizes Randomness Only in AI-Assisted Works ........................................................13

    E.  The Office's "Disclaimer" Requirement Assumes the Dispositive Question At Issue ..20

    F.  The Copyright Act's Text and Purpose Foreclose the Office's Restrictive Interpretation ....................................................................................................................................23

    G.  The Requested Relief Is Within the APA's Scope ..........................................................24

III.   CONCLUSION.........................................................................................................25

i

## I.    **INTRODUCTION**

The United States Copyright Office's ("Copyright Office" or "Office") denial of Mr. Allen's registration rests on an interpretive framework that exists entirely outside the statutory text of the Copyright Act and therefore must be corrected. Congress defined the requirements for copyright protection in 17 U.S.C. § 102(a) [1]: "original works of authorship fixed in any tangible medium of expression." The Supreme Court has interpreted these requirements consistently for over 140 years—from *Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53 (1884), which established that authorship lies in creative conception rather than physical execution, to *Feist Publications, Inc. v. Rural Telephone Service Co.*, 499 U.S. 340, 345 (1991), which confirmed that originality requires only "independent creation plus a modicum of creativity"—an "extremely low" threshold. The Office's denial does not apply these settled requirements. Instead, it rests on a series of extra-statutory tests and standards the Office has constructed on its own—none of which appear in the Copyright Act, none of which the Office can trace to any binding authority, and several of which directly contradict Supreme Court precedent. In effect, the Office muddies the issue instead of clarifying it in its opposition.

The Office's errors in statutory interpretation are both numerous and fundamental. It relies on an undefined "traditional elements of authorship" test that appears nowhere in the statute, the Constitution, or any judicial decision. It conflates the idea/expression dichotomy of Section 102(b)—which limits *what* is protectable—with the distinct authorship inquiry of *who* created the

---

[1] All subsequent references to statutory sections without title and code refer to the Copyright Act.

protectable expression, treating Mr. Allen's specific expressive choices as mere "ideas" simply because they were implemented through prompt engineering rather than a brush or camera. It reads a physical-execution requirement into "authorship" that *Sarony* rejected in 1884. It replaces *Feist*'s "extremely low" originality threshold with a "sufficient control" standard demanding near-deterministic command over every element of expression—a standard that would wipe out protection from numerous creative mediums. The Office ignores Section 102(a)'s "now known or later developed" language and the legislative history confirming Congress's intent to accommodate future creative technologies without new legislation.

The Office acknowledged that Allen's prompts described subject, genre, tone, color, composition, style, and lifelikeness — then concluded he exercised "no control" over the creative output. It admitted his prompts "influenced" the generated image — then said that influence was legally irrelevant. It set the initial standard as whether "the uploaded work is the result of Mr. Allen's intellectual labor, with Midjourney serving as a mere assisting instrument"—then moved the goalposts to require that Allen dictate "a particular expressive result."[2]

The bottom line is that the Copyright Office built a doctrinal house of cards: an undefined standard, sourced from a 60-year-old aside, applied through a process-based inquiry that existing precedent forbids, yielding results that contradict the Office''s own factual admissions.

---

[2] The Office never acknowledged or explained this shift in its standard across the administrative correspondence. Petitioner's opening brief identified this goalpost-moving as evidence of arbitrary and capricious action—the Office initially asked whether the Work was "the result of Mr. Allen's intellectual labor, with Midjourney serving as a mere assisting instrument," AR_004, but ultimately required that prompts "dictate a specific result," AR_044. Dkt. 41 at 36–40. The Office's opposition does not address this inconsistency.

## II.    ARGUMENT

### A.   This Court Reviews the Copyright Office's Legal Determination De Novo Under *Loper Bright*

The Copyright Office asks this Court to defer to its legal conclusion that Mr. Allen is not an author under 17 U.S.C. § 102(a). Dkt. 57 at 6-9. The Office argues that while *Loper Bright Enterprises v. Raimondo ("Loper Bright")*, 603 U.S. 369 (2024), requires courts to "independently interpret" statutes, this case involves merely "the application of a settled legal standard to the facts of an administrative record" and therefore warrants deferential "arbitrary and capricious" review. Dkt. 57 at 7-8. This characterization is incorrect. The dispositive question here is a pure question of law that this Court must decide de novo: what constitutes "authorship" under the Copyright Act when creative work is produced using AI tools?

The Court did not merely refine the standard of review—it rejected the foundational premise that agency expertise on legal questions can substitute for independent judicial analysis. As the Court stated, "[p]erhaps most fundamentally, *Chevron*'s presumption is misguided because agencies have no special competence in resolving statutory ambiguities. Courts do." *Loper Bright,* 603 U.S. at 400-401 (citations omitted). This holding applies with full force to the Copyright Office's interpretation of what constitutes "authorship" under the Copyright Act—a question of statutory construction, not a question of technical or scientific fact committed to agency expertise.

This is not a factual dispute about what Mr. Allen did as the administrative record establishes the facts. AR_002-021, 069. Nor is this a dispute about applying settled law to particular facts. It is a foundational legal question implicating the scope of statutory terms,

constitutional boundaries, and Supreme Court precedent. These are quintessential legal questions requiring *de novo* review.

Moreover, even if some aspect of the Copyright Office's decision involved factual determinations or mixed questions, the dispositive issues here are legal. The issues are not technical and certainly not technical in an area that the Copyright Office can claim any expertise in. Its authority to justify deference on fact findings involved specialized agencies with scientific expertise making scientific determinations. *See W. Watersheds Project v. Bureau of Land Mgmt.*, 721 F.3d 1264, 1273 (10th Cir. 2013) (Applying deference given the Bureau of Land Management's "technical or scientific expertise.") The Copyright Office has no expertise in scientific or technical fields and does not claim special knowledge as to AI.  The Office's brief only claims authority in interpreting the Copyright Act, to which this Circuit grants no deference. *See Sunnyside Coal Co. v. Dir., Off. of Workers' Comp. Programs, United States Dep't of Lab.*, 112 F.4th 902, 910 (10th Cir. 2024).

The Office does not dispute that Mr. Allen specified creative parameters (genre, tone, composition, style, lighting, color), performed 624 iterations, selected results matching his vision, and edited the final work. AR_006-007, 068-069. The Office concedes the Work is creative and original. Dkt. 57 at 23 n.6. The sole question is whether these undisputed facts satisfy the legal definition of authorship. That question—whether particular conduct meets a statutory standard— is a legal question reviewed *de novo*. *See Ornelas v. United States*, 517 U.S. 690, 696-97 (1996) (explaining that legal questions defining statutory terms reviewed *de novo* even when applied to specific facts).

The Copyright Office's sole authority predates *Chevron* entirely and articulated a *sui generis* expertise-based standard that effectively granted the Register a presumption of correctness on mixed questions of law and fact.[3] To the extent these cases stand for mandatory judicial deference to the Register's *legal conclusions* about what the Copyright Act requires for copyrightability, that rationale is squarely incompatible with *Loper Bright*'s command that courts exercise "independent judgment" on questions of statutory meaning. 603 U.S. at 394.

The Copyright Office's position would effectively insulate its policy judgments about emerging technologies from meaningful judicial review, because whenever it declares that works created with new tools lack "authorship," courts would defer even when the Office's position contradicts statutory text and Supreme Court precedent. *Loper Bright* forecloses this approach. Courts, not agencies, must "say what the law is." 603 U.S. at 385 (citation omitted).

*Loper Bright* preserved the principle from *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), that agency interpretations may constitute "a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Loper Bright*, 603 U.S. at 394 (quoting *Skidmore*, 323 U.S. at 140). But *Skidmore* respect is not true deference. Under *Skidmore*, the weight accorded to an agency's position depends on "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade." *Skidmore*, 323 U.S. at 140.

---

[3] *Esquire, Inc. v. Ringer*, 591 F.2d 796, 805–06 (D.C. Cir. 1978), *Norris Industries, Inc. v. International Telephone & Telegraph Corp.* 696 F.2d at 922, *Varsity Brands, Inc. v. Star Athletica, LLC*, 799 F.3d at 478, *Homer Laughlin China Co. v. Oman*, No. CIV. A. 90-3160, 1991 WL 154540, at *1 (D.D.C. July 30, 1991) all discuss antiquated deference to the Copyright Office's frequency of interpretation that, as to the legal question of statutory interpretation, was plainly overruled.

The Copyright Office's position on AI-assisted authorship fails to satisfy even this modest standard of persuasiveness. The Register's analysis suffers from several deficiencies that deprive it of *Skidmore* weight, as discussed at length in this reply.

B. **The "Traditional Elements of Authorship" Test Is Undefined and Has No Basis in the Act**

The Copyright Office's entire framework rests on whether Mr. Allen "conceived and executed" the "traditional elements of authorship." AR_066, 069; Dkt. 57 at 35–36. Yet neither the opposition brief nor any Office guidance defines this term with any precision. The phrase appears nowhere in the Copyright Act, nowhere in the Constitution's Copyright Clause, and nowhere in any Supreme Court or circuit court decision. Instead, it originates in a single sentence of the Register's Sixty-Eighth Annual Report, issued in 1965, which posed the following question about the use of computers in the creative process:

> "The crucial question appears to be whether the 'work' is basically one of human authorship, with the computer merely being an assisting instrument, or whether the traditional elements of authorship in the work (literary, artistic, or musical expression or elements of selection, arrangement, etc.) were actually conceived and executed not by man but by a machine."

AR_133.

This was an observation in an annual report—not a rulemaking, not a regulation, not an adjudicatory precedent. The Office later incorporated this language into "current version of the Compendium." Dkt. 57 at 35–36. But the Compendium is not a statute; it is an internal practice manual that carries no force of law. The Office cannot bootstrap informal commentary from nearly six decades ago—commentary written before the internet, before digital photography, before modern AI existed—into a binding legal standard governing modern creative tools.

6

The Office insists this is not a "new standard" but merely a restatement of existing law. Dkt. 57 at 35–36. If so, the Office should be able to explain what the test requires and why Mr. Allen fails it. It cannot. The opposition cycles through formulations from *Sarony* ("he to whom anything owes its origin"), *CCNV* ("person who translates an idea into a fixed, tangible expression"), *Kelley*, *S.O.S.*, and *M.G.B. Homes*, Dkt. 57 at 36, asserting that these cases all say the same thing. But these cases exist as part of a continuum that sets a very *low* threshold for authorship that is met by a "creative spark," *Feist*, 499 U.S. at 345, and the Office never explains how that low threshold excludes Mr. Allen while including photographers, digital artists, and electronic musicians who exercise lower levels of creative control through comparable technological intermediaries. The Opening Brief cited extensive authority establishing this low threshold—including *Feist*'s characterization of the creativity requirement as "extremely low," 499 U.S. at 345 and *Bleistein*'s warning against judges constituting themselves "final judges of the worth of pictorial illustrations," *Bleistein v. Donaldson Lithographing Co.*, 188 U.S. 239, 251–52. Dkt. 41 at 17–24. The Office's opposition does not engage with any of this authority or explain how Mr. Allen's creative choices—which the Office concedes produced a creative and original work, Dkt. 57 at 23 n.6—fall below *Feist*'s "extremely low" bar.

### 1.    *Thaler Is Inapposite Because It Was Wrongly Decided And This Case Has a Human Author*

The Office places great weight on *Thaler v. Perlmutter*, 130 F.4th 1039 (D.C. Cir. 2025), arguing it establishes that "the Copyright Act of 1976 requires all eligible work to be authored in the first instance by a human being." Dkt. 57 at 20–21. Thaler is an out-of-circuit case that was wrongly decided.

The "human authorship requirement" that the Copyright Office argues necessitates no copyright in works generated by AI relies on the Copyright Office impermissibly importing "absent word[s] into the statute." *Lamie v. United States Trustee*, 540 U.S. 526, 538 (2004). To understand how mistaken the very concept of a human authorship requirement is, this Court need look no further than the fact that nonhuman authors such as corporations and other nonhuman "persons" have been authors without controversy for over a century. *See*, *e.g.*, *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 143 (2d Cir. 2013); *Warren v. Fox Fam. Worldwide, Inc.*, 328 F.3d 1136, 1140–41 (9th Cir. 2003). Indeed, when registering such works, there is no requirement to disclose any involvement by a natural person, much less the sort of traditional authorial contributions the Copyright Office now demands. In short, the Copyright Office *never* defined what the traditional elements of authorship are to find "human authorship," and still has not in its opposition, nor has it consistently enforced the test in a manner from which any principles can be gleaned, which is clearly "arbitrary" and "capricious." 5 U.S.C. § 706(2); *see* Edward Lee, *Prompting Progress: Authorship in the Age of AI*, 76 Fla. L. Rev. 1445, 1466 (2024).

But even if this Court finds the Human Authorship Requirement exists, this case has a clear human author. Mr. Allen has consistently identified himself as the Work's author. AR_002. The entire premise of his copyright application is that he authored the Work by using AI as a tool to express his creative vision. The Office attempts to blur this critical distinction by asserting that "the expression in the Midjourney Output was produced not by a human, but by AI." Dkt. 57 at 2. But this assumes the conclusion to the very question at issue. The Office's reasoning is therefore circular: AI produced the output, therefore AI is the author; AI is the author, therefore a human

cannot be. As demonstrated below, that logic would disqualify every photograph ever taken, because in every case a machine, not the photographer, "generated" the image.

### 2. Applying the Register's 1965 Musings, Arguendo, Allen Is the Author

Even accepting the 1965 formulation *arguendo*, Mr. Allen's work satisfies it. The Register asked whether the work is "basically one of human authorship, with the computer merely being an assisting instrument." AR_133. That is precisely what Mr. Allen has consistently maintained: the Work is fundamentally his creative conception, with Midjourney serving as the instrument through which he expressed that vision.

The Office's own AI Registration Guidance, recognizes that human authors can make creative contributions using AI and that those contributions can be protected by copyright if the AI material is "of an author's own original mental conception to which the author gave visible form." AR_195–96 (internal citations and brackets omitted). Mr. Allen did precisely that. He provided complex, detailed prompts specifying subject, genre, composition, tone, lighting, color, and style, and refined over 624 iterations to obtain his original mental conception. AR_006-007, 068-069. Under the Office's own published guidance, this should constitute copyrightable authorship. The Opening Brief specifically identified the Office's inconsistency between its published Guidance and its treatment of Mr. Allen's application—noting that the Office shifted from initially asking whether "the uploaded work is the result of Mr. Allen's intellectual labor, with Midjourney serving as a mere assisting instrument" (AR_004) to ultimately requiring that Allen dictate "a particular expressive result." (AR_068) Dkt. 41 at 7, 29, 36-38. The Office's opposition never acknowledges or justifies this shift in standard. The Office's refusal to apply its own standard meets the gold standard of arbitrary and capricious agency action.

**C.  The Office Improperly Conflates Idea and Expression By Discounting the Use of the AI Tool to Demand a Degree of Physical Precision The Act Does Not Require**

The Copyright Office repeatedly argues that Mr. Allen only "provided ideas" via prompts and did not create the Work because "[t]hese prompts amount to ideas, not authorship." Dkt. 57 at 2, 11-12, 22-23. The Copyright Office, in doing so, is transparently holding Allen to a higher standard just because he used AI instead of other technology by conflating two distinct concepts: (1) the idea/expression dichotomy, which holds that copyright protects expression but not ideas, and (2) the separate question of who authored the expression.

Mr. Allen's prompts were not unprotectable ideas—they were the means by which he controlled the technology to effect specific expressive choices reflected in the Work. When Mr. Allen specified "genre and category," "tone," color usage, composition, and "style/era," AR_007, he was inputting commands that shaped the final visual expression, determining what the image would depict, how it would be composed, what emotional tone it would convey, and what artistic style it would embody.

The Copyright Office's assertion that Mr. Allen's involvement is too minimal, analogous to one who orders software from someone else when they "did none of the coding" and "did not understand any computer language," Dkt. 57 at 23 n.5 (*citing S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1086-87 (9th Cir. 1989)) is a red herring based on this same false construct.[4] Photographers

---

[4] The cases the Office cites are also readily distinguishable, as ordering a specific outcome from a person who makes all the creative decisions on how to get that outcome is very different from the methods of prompt engineering Mr. Allen described to the Copyright Office. *S.O.S., Inc. v. Payday, Inc.* and *M.G.B. Homes, Inc. v. Ameron Homes, Inc.*, 903 F.2d 1486, 1493 (11th Cir. 1990), involved someone not being found to own a copyright when they just described the practical uses they wanted for a copyrightable work, *not* creative decisions or expression; the end

need not understand the physics of light propagation, the chemistry of silver halide reactions in film development, or the complex algorithms governing digital sensor operation, noise reduction, color interpolation, and JPEG compression. *See Sarony*, 111 U.S. at 60 (holding that a photographer is author based on artistic choices not other requirements). Writers need not understand printing press mechanics, paper manufacturing, or how to affix words to a fixed medium to author books. *See Andrien v. Southern Ocean Cnty. Chamber of Commerce*, 927 F.2d 132, 135 (3d Cir. 1991) (poet has copyright "even if they do not run the printing presses" and "are entitled to copyright protection even if they do not perform with their own hands the mechanical tasks of putting the material into the form distributed to the public.") What Mr. Allen described through his iterative process was making the software work how he wanted even if how Midjourney operates is somewhat mystifying. *See* AR_007 ("Once he had researched, tested, and developed the command, Mr. Allen executed the command into Midjourney to complete the process." Per Mr. Allen, he *did* refine and develop the command to manipulate Midjourney to produce his desired result.

More than a century ago in *Sarony*, the Supreme Court rejected the formalistic, hands-on approach to authorship the Office attempts to resurrect. Thus, when the Copyright Office claims that it "never found that the Work, or even the Midjourney Output, was 'garden variety' or insufficiently creative." Dkt. 57 at 23 n.6, this admission is fatal to its position. The Office

---

result of a program, for instance, has no relation to the coding itself. *See S.O.S., Inc.*, 886 F.2d at 1086–87. It is not the case that Mr. Allen simply said he wanted some painting. He made numerous creative decisions expressed in the final work using the AI tool. This illustrates why Allen explained how many iterations he used to refine his process, because he did not simply say what he wanted to have the AI make the creative decisions; instead, he engaged in iterative logic to better manipulate Midjourney to reflect the creative choices *he* made. *See* AR_069.

concedes the Work is creative and original—the two elements required for copyright protection under *Feist*. Its sole objection is the method by which that original, creative work came into being. But this is precisely what *Star Athletica* forbids: courts cannot determine copyrightability by examining "the creator's design methods, purposes, and reasons." 580 U.S. at 422-423. The Court's inquiry must focus on the work itself and whether it reflects creative choices, not the exact degree to which the execution matched the conception, which in any other context would be far outside the scope of the Court's or Copyright Office's purview.

Notably, the Copyright Office's opposition never once addresses *Star Athletica*'s holding that author's methods should not be policed, despite the Opening Brief devoting a full subsection to this controlling Supreme Court authority. Dkt. 41 at 30–32. The Office's silence on a 2017 Supreme Court case that directly prohibits the methods-based inquiry on which its entire framework depends is telling—it reveals that the only distinction driving the Office's position is the technology used, not the author's involvement. *Star Athletica* is not the only Opening Brief authority the Office leaves unanswered. The Office's opposition also fails to engage with: (1) Petitioner's argument that the Office's restrictive interpretation unconstitutionally narrows the Copyright Clause's definition of "Authors" under Art. I, § 8, cl. 8, Dkt. 41 at 41-42; (2) Justice Holmes's admonition in *Bleistein* that it would be a "dangerous undertaking for persons trained only to the law to constitute themselves final judges of the worth of pictorial illustrations," 188 U.S. at 251-252, Dkt. 41 at 22-23, 32; and (3) the Supreme Court's instruction in *Google LLC v. Oracle America, Inc.*, 593 U.S. 1, 19 (2021), that copyright law must be read flexibly to accommodate technological growth. Dkt. 41 at 42. These are not peripheral authorities. This is

constitutional law that directly undermines the Office's framework, and the Office's failure to confront them is telling.

The Copyright Office attempts to distinguish this case by asserting that Midjourney does not "treat text prompts as direct instructions." AR_069; Dkt. 57 at 18. But the Office's own Guidance does not require deterministic command execution; it focuses on the author's conception. AR_195-196. That is what happened here: Midjourney translated Mr. Allen's detailed creative specifications from textual form into visual form reflecting his creative vision.

### D.  The Office Imposes an Impossible "Sufficient Control" Standard and Selectively Penalizes Randomness Only in AI-Assisted Works

The Office argues that because the same prompt can produce different images, the prompter cannot be "the one who translated the idea into expression." Dkt. 57 at 32–33. It insists that "the randomness in Midjourney-generated images is not itself a bar to registration," but rather "illustrates how much expression is attributable to Midjourney rather than the user." *Id.* at 32. This purported distinction collapses upon inspection, and if taken seriously, the Office's test would invalidate copyright protection for vast categories of currently registered and/or protected works.

Courts have consistently held that randomness, unpredictability, and lack of deterministic control do not defeat copyright. In *Alfred Bell & Co. v. Catalda Fine Arts*, the Second Circuit held that even if "substantial departures" in mezzotint prints "were inadvertent, the copyrights would be valid," explaining that "[a] copyist's bad eyesight or defective musculature, or a shock caused by a clap of thunder, may yield sufficiently distinguishable variations. Having hit upon such a variation unintentionally, the 'author' may adopt it as his and copyright it." 191 F.2d 99, 105 (2d

Cir. 1951). In *Chamberlin v. Uris Sales Corp.*, the same court recognized the impossibility of disentangling "what is intended and what inadvertent in the work of genius." 150 F.2d 512, 513 n. 4 (2d Cir. 1945).

The Office attempts to distinguish *Bell* by arguing that it "does not stand for the proposition that someone can become an author of another's expression that they did not create by formally adopting it as their own," but rather "suggests that one's own expression, inadvertent or deliberate, is original to the author." Dkt. 57 at 34–35. This distinction, however, assumes the conclusion. The mezzotint engraver in *Bell* did not "create" the variations caused by defective musculature or a clap of thunder any more than Mr. Allen "created" the specific pixel arrangements generated by Midjourney's diffusion process. The engraver's "bad eyesight" and "defective musculature" were not independent sources of authorship. In addition, the example of a thrown sponge clearly shows variations from the sponge flying through the air in which a great deal of the randomness at that point is entirely out of the artist's control. *See Alfred Bell & Co. v. Catalda Fine Arts*, 191 F.2d at 105 n. 23.

The Office's attempt to characterize Midjourney's variations as the product of an "independent system" assumes the very conclusion at issue: that Midjourney is an independent creative agent rather than a tool whose manipulation by a particular person will naturally have some level of control and randomness. But the Office has argued that AI systems are not authors and cannot now have it both ways.

Likewise, the *Andrien* court explained that when "one authorizes embodiment, that process must be rote or mechanical transcription that does not require intellectual modification or highly technical enhancement…" *Andrien v. Southern Ocean County Chamber of Commerce*, 927 F.2d

132, 135 (3d Cir. 1991). The Office cites this case to argue that because Midjourney's processing involved complex computational operations rather than simple transcription, Mr. Allen cannot claim authorship. Dkt. 57 at 12-13. But this reads *Andrien* backwards. The "rote or mechanical transcription" limitation in *Andrien* addresses a specific concern: when a human delegates creation to another entity *capable of independent authorship*, the question arises whether the intermediary's creative contributions are so substantial that authorship should be attributed to the intermediary rather than the person who gave the instructions. *See Andrien*, 927 F.2d at 135-136 (Discussing joint authorship, not natural deviations or randomness in an author's creative process). Given the Office's position that Midjourney is not capable of independent authorship, once again the Office cannot have it both ways. *See Andrien*, 927 F.2d at 135.

Photography cases make this point even more clearly. In *Mannion v. Coors Brewing Co.*, the court recognized "originality in timing"—the creative choice of when to press the shutter, capturing a spontaneous moment the photographer could not predict or control. 377 F. Supp. 2d 444, 452–53 (S.D.N.Y. 2005). In *Cruz v. Cox Media Group, LLC*, an amateur photograph of a terror suspect's arrest was sufficiently original despite the photographer exercising virtually no control over the subject, lighting, or composition. 444 F. Supp. 3d 457, 465 (E.D.N.Y. 2020).

Mr. Allen exercised far more deliberate creative control than these photographers. He specified subject matter, genre, composition, tone, lighting quality, color palette, artistic style, and era. AR_006-007. He refined those specifications, the Office admits, over 624 iterations, each time adjusting his instructions based on previous results, learning how the tool responded to different specifications, and systematically building toward his artistic vision. AR_006-007, 068-069. The process Mr. Allen described to the Office was not random guessing, it was deliberate artistic

development. The Office's selective treatment of randomness as fatal to authorship in AI works, while accepting far greater randomness in photography, is the definition of arbitrary and capricious agency action. *See Devon Energy Production Company, L.P. v. Gould*, 421 F.Supp.3d 1213, 1234 (2019) ("[A]n agency may not treat like cases differently.") (Citations omitted).

The Opening Brief devoted significant analysis to these photography comparisons—demonstrating that spontaneous photographers like those in *Harney v. Sony Pictures Television, Inc.*, 704 F.3d 173 (1st Cir. 2013), *Cruz v. Cox Media Group, LLC*, 444 F. Supp. 3d 457 (E.D.N.Y. 2020), and *Mannion v. Coors Brewing Co.*, 377 F. Supp. 2d 444 (S.D.N.Y. 2005), exercised far less deliberate creative control than Mr. Allen, yet have never been denied copyright or required to disclaim elements attributable to camera processing. Dkt. 41 at 33–35. The Office's opposition does not meaningfully distinguish any of these cases, without explaining why being at the right place at the right time is sufficient authorship but conceiving a specific artistic vision and refining it over 624 iterations is not.

The Copyright Office relies heavily on Midjourney's own documentation to argue that text prompts provide insufficient control over the generated output. Dkt. 57 at 28-29. But the Office's selective quotation of this documentation undermines rather than supports its position. When read in full context, Midjourney's documentation describes exactly the kind of tool-user relationship that has always been sufficient for copyright: a sophisticated tool that responds to detailed creative input with varying degrees of predictability, requiring user skill and judgment to achieve desired results.

///

///

The documentation the Copyright Office cites includes the following guidance to users:

• "Word choice also matters. More specific synonyms work better in many circumstances." AR_549.

• "Details matter." AR_529.

• "Very short prompts will rely heavily on Midjourney's default style, so a more descriptive prompt is better for a unique look." AR_528.

• "Being vague is a great way to get variety, but you may not get the specific details you want." AR_550.

This is the language of a creative tool that responds meaningfully to user input—one whose documentation explicitly tells users that their choices about word selection, level of detail, and specificity will affect the output in foreseeable ways. The Copyright Office focuses instead on Midjourney's warnings that the tool "does not understand grammar, sentence structure, or words like humans" and that results can be unpredictable. Dkt. 57 at 28-29; AR_527-550. Even in its example the Copyright Office misconstrues the advice provided by Midjourney's creators, which is especially clear when looking at paradoxical results. The admonition that telling Midjourney not to include means it will likely include a cake, means that a user can learn how to avoid including the cake, just by other means than how one would communicate to a human with independent creative capabilities. Dkt. 57 at 28-29; AR_527-550. That illustrates that prompt engineering is a creative exercise on the part of the human author.

When Mr. Allen entered "over 600 prompts," AR_069, generating numerous different results and selecting among them, he was not engaged in mechanical trial-and-error or randomly "sifting through hundreds of images" hoping to get lucky. *See* AR_006-007, 044. The Copyright

Office therefore misconstrues Mr. Allen's creative process as a series of disconnected, independent attempts bearing no relation to one another. In footnote 7, the government asserts that "[t]here is no indication in the record that Mr. Allen's first 623 prompts had any influence on how Midjourney processed the 624th." Dkt. 57 at 24 n.7. But this framing misses the point entirely. The relevant question is not whether the machine retained information from prior prompts, but whether Mr. Allen's own creative process was iterative and cumulative. In other words, the human *author* retained information and learned. Mr. Allen described constructing his prompt in deliberate layers—subject, scene type, genre, tone, lifelikeness, color, composition, style, and parameters—over 624 revisions. AR_006-007, 043, 068. He was not blindly repeating the same exercise; he was learning how to manipulate the software to realize his creative vision until he created an image he deemed acceptable. AR_007, 043. That convergence toward a specific creative objective is itself evidence of purposeful authorship, not random chance.

The Office's reduction of this process to a binary of either accepting the entire image\ or rejecting it and trying again like an artistic casino Dkt. 57 at 24 n.7, ignores Mr. Allen's creative judgment exercised between those endpoints. The same binary choice describes the photographer's interaction with a camera — one can only accept or reject each exposure. Yet, the Court in *Sarony*, found authorship not in any single shutter click but in the cumulative creative decisions of "posing the [subject] in front of the camera, selecting and arranging the costume, draperies, and other various accessories," and "arranging and disposing the light and shade." 111 U.S. 53 at 60. Similarly, Mr. Allen exercised creative judgment at each stage — selecting which outputs to pursue further, identifying what to adjust in his prompt, and directing subsequent iterations toward his intended result. AR_006-007, 043, 068.

The Copyright Office inadvertently proves this in its own "celadon owl pitcher" and "rabbit" examples. Dkt. 57 at 29-31; AR_534. The Copyright Office argues that "every other element of expression would be attributable to Midjourney, rather than the prompt," suggesting lack of authorship. Dkt. 57 at 30. But the prompt is enough, because in any other context only a few creative elements can confer copyright, for example to an "entire" photograph. *Harney*, 704 F.3d at 185. (The Court explaining that while some elements in the photograph are not protected, the "photograph may not be reproduced in its entirety without his permission unless the copier is able to prove fair use.")

The Copyright Office claims its position is "technology-neutral" and applies "longstanding legal principles," Dkt. 57 at 4, but this claim is demonstrably false. The Office's human author requirement—requiring that the author must "control" and "determine" every aspect of the final expression, with minimal intervention by the tool—would invalidate copyright protection for numerous entire categories of currently registered works. Under the Office's reasoning, photographers cannot be authors because the "traditional elements of authorship"—the specific pixels, their colors, their arrangement, the lighting on faces, the background blur, the shadow detail—are "determined and executed by the technology" or just chance, "not the human user." *See* AR_069. Since the test cannot function properly, the Office's interpretation must be wrong.

The Opening Brief devoted an entire subsection to Section 102(a)'s "now known or later developed" language and the legislative history confirming Congress's intent that new creative technologies be "considered copyrightable from the outset without the need of new legislation." Dkt. 41 at 25–28. The Office's opposition does not engage with the statutory text or its legislative history—a remarkable omission given that the language directly forecloses the Office's attempt to

create a technology-specific exclusion for AI-assisted works while leaving functionally equivalent tool-assisted creation untouched. [5]

The Office also suggests in passing that AI output is "at least somewhat dependent on the material that is used to train the AI system," Dkt. 57 at 32 n.11, implying that the training data—not Allen—is the source of the expression. But this observation defies the minimal creative spark necessary for copyright explained in *Feist*. Copyright has never required that expression spring from a vacuum and be wholly original. What matters is whether the author made original creative choices reflected in the final work—not the provenance of the author's (or tool's) influences. [6]

### E. The Office's "Disclaimer" Requirement Assumes the Dispositive Question At Issue

The Copyright Office repeatedly asserts that it "could have registered Mr. Allen's claim if he had excluded the material that he did not author." Dkt. 57 at 37, 41. It characterizes Mr. Allen's refusal to disclaim the Midjourney Output as unreasonable, noting that disclaimer "is not burdensome" and requires only "a brief statement." *Id*. at 39. But this argument assumes the

---

[5] The Office's opposition does not address this systemic argument. It simply asserts its position is "technology-neutral," Dkt. 57 at 4, 39–41, without demonstrating how functionally equivalent technologies would survive its "traditional elements of authorship" requirements.

[6] Allen's opening brief also cited extensive authority on the low originality threshold that the Office's opposition does not address, including *Dan Kasoff, Inc. v. Novelty Jewelry Co.*, 309 F.2d 745, 746 (2d Cir. 1962) ("practically anything novel can be copyrighted" with only a "faint trace of originality"), and *Ets-Hokin v. Skyy Spirits, Inc.*, 225 F.3d 1068, 1076 (9th Cir. 2000) (quoting Judge Learned Hand's observation that "no photograph, however simple, can be unaffected by the personal influence of the author"). Dkt. 41 at 23, 35. The Office offers no explanation for why Mr. Allen's extensive creative influence over the Work falls below this well-established threshold that has been applied in the context of other technology-assisted works like photography.

conclusion the Office must prove. The Copyright Office demands that Mr. Allen disclaim material "he did not author," but the entire dispute is precisely whether he did author that material. *Id.*

The Copyright Office's analogy to derivative works based on preexisting material fails at a fundamental level. The Office assumes AI-generated content is equivalent to preexisting material like a public domain novel. Dkt. 57 at 39 (*citing Alfred Bell & Co. v. Catalda Fine Arts, Inc.*, 191 F.2d at 104). But this assumption is false. Nothing in the Work existed before Mr. Allen created it through his prompts. It was not sitting in the public domain waiting to be discovered and used as a foundation for some other creative endeavor, nor was it was not created or owned by a third party or like any of the examples of "unclaimable material" the Copyright Office identifies in its registration requirements. *See* AR_116-19. It came into existence solely and exclusively through Mr. Allen's creative process—his specification of subject matter, genre, composition, tone, lighting, color, and style, refined through hundreds of iterations. AR_006-007. The Office's reliance on *Oliver v. Meow Wolf, Inc.*, No. CV 20-237 KK/SCY, 2023 WL 4353541 (D.N.M. July 5, 2023), for the proposition that knowingly failing to exclude material "created by an [sic] another" can invalidate registration, Dkt. 57 at 15-16, thus begs the question: the Midjourney output was not "created by another" because the Office does not consider Midjourney an "other" capable of authorship. *See Thaler*, 130 F.4th at 1041.

The Office also points to Mr. Allen's acknowledgment that "one's selection of one shell at the beach may not make one the owner of that individual shell." Dkt. 57 at 35 (citing Dkt. 41 at 38 n.9). But Mr. Allen did not find a shell on a beach. Metaphorically, he specified, by learning how best to do so, what the shell should look like, directed the ocean to produce it, iterated his directions

over the course of hundreds and hundreds of shells being produced, selected the shell that matched his vision, and then hand-polished it. That is authorship, not mere discovery.

The Office's position also conflates what is unprotectable in an infringement analysis with what must be disclaimed at registration. The Office concedes that photographs contain unprotectable elements—the subject's face, clothing, real-world objects in the frame. *See, e.g.,* *Harney*, 704 F.3d at 185-186; *Mannion*, 377 F. Supp. 2d at 450-451 (noting that "almost any photograph" supports finding copyright). Nonetheless, the Court in *Harney* noted the author had the right to prevent reproduction of the "entirety" of the photograph. *Harney*, 704 F.3d at 185. The Office offers no principled basis for requiring AI-assisted artists to disclaim elements when photographers must only concern themselves with this issue in an infringement action. The Office's own reliance on *Harney* exposes this gap: in *Harney*, the First Circuit identified numerous unprotectable elements in the photograph—the "piggyback pose," the subjects' "clothing," the "Church of the Advent" in the background—yet the photograph was registered as a whole without any disclaimer of those uncontrolled elements (which can be inferred by the fact that the Court had to determine what was and was not copyrightable at the infringement stage). *See* 704 F.3d at 186. The Office has never explained why it demands at the registration stage what courts sort out only in infringement proceedings.

The Office also argues it could not evaluate the gap between Allen's prompts and the output because he declined to disclose his exact prompt language, characterizing disclosure as "explaining a magic trick." Dkt. 57 at 31 (citing AR_034). But the Office had Mr. Allen's detailed description of his prompting methodology, his attorney's extensive correspondence describing the creative process, and Midjourney's own documentation. AR_006–013. This showed enough creative

control. Furthermore, the argument also fails because the Office cannot simultaneously claim it lacked sufficient information to evaluate Allen's creative contribution while also concluding that his contribution was legally insufficient. Even if the record was inadequate for evaluation (it was not), the appropriate response was to further request additional information under § 409(10)—not to deny registration based on an incomplete record.

## F. The Copyright Act's Text and Purpose Foreclose the Office's Restrictive Interpretation

The Copyright Act protects "original works of authorship fixed in any tangible medium of expression, *now known or later developed*." Section 102(a) (emphasis added). Congress deliberately chose technologically neutral language to ensure that copyright protection would extend to works created using technologies the 1976 Congress could not anticipate. The House Report confirmed this intent, explaining that "scientific discoveries and technological developments have made possible new forms of creative expression" that should be "considered copyrightable from the outset without the need of new legislation." H.R. REP. 94-1476, at 51 (1976). The Office never addresses how its position defies the legislative mandate.

The Office's position contravenes this explicit statutory design. If Mr. Allen's creative process—conceiving a specific artistic vision, specifying its parameters in detail, iteratively refining those specifications over 624 attempts, selecting the result that best matched his vision, and editing the final work—does not constitute authorship, then it is unclear how any person using text-to-image AI could ever qualify as an author. That outcome would effectively create a

categorical exclusion for an entire class of creative tools—precisely the kind of technologically restrictive interpretation Congress sought to prevent.

The Supreme Court has consistently rejected attempts to contract the scope of copyright protection. *See Bleistein v. Donaldson Lithographing Co.*, 188 U.S. at 251–52 (warning against judges constituting themselves "final judges of the worth of pictorial illustrations"); *Eldred v. Ashcroft*, 537 U.S. 186, 222 (2003) ("the Copyright Clause empowers Congress to determine the intellectual property regimes"); *Google LLC v. Oracle Am., Inc.*, 593 U.S. at 19 (2021) (courts must "flexibly read the Act to accommodate technological growth"). The Office's attempt to restrict authorship based on technology choice runs counter to this consistent trajectory. The Opening Brief presented detailed arguments—grounded in the Copyright Clause's text, the Framers' deliberate choice of general language (rejecting proposals to limit the clause to "literary authors"), and *Eldred v. Ashcroft*, 537 U.S. 186, 218–22 (2003)—that the Office's restrictive interpretation is constitutionally suspect. Dkt. 41 at 41–42. The Office's opposition does not address these constitutional arguments. Nor does it address Petitioner's reliance on *Google LLC v. Oracle America, Inc.*, 593 U.S. 1, 19 (2021), for the proposition that the Act must be construed flexibly to "accommodate technological growth." Dkt. 41 at 42. This Court should construe the statute to avoid the constitutional difficulty the Office's interpretation creates.

## G.  The Requested Relief Is Within the APA's Scope

The Office argues that an order compelling registration is outside the APA's scope. Dkt. 57 at 41–42. Mr. Allen does not dispute that the typical APA remedy is remand for reconsideration consistent with the Court's legal holdings. *See Atari Games Corp. v. Oman*, 979 F.2d 242, 247

(D.C. Cir. 1992). But the Office's argument about remedy does not affect the merits, or the ultimate effect that this Court's intervention should have. The Office's legal conclusions about authorship are reviewable under the APA regardless of what remedy the Court ultimately fashions. If this Court holds that Mr. Allen's creative process constitutes authorship as a matter of law, the Office must apply that holding on remand. *See Atari Games Corp.*, 979 F.2d at 246–47 (remanding with instructions). The Office cannot insulate its legal errors from review by arguing about the form of relief.

### III.    CONCLUSION

For the foregoing reasons, and for the reasons stated in Petitioner's opening brief, the Court should grant Petitioner's Motion for Summary Judgment and deny Defendants' Cross-Motion for Summary Judgment.

Respectfully Submitted,

DATED at Los Angeles, California this Friday, February 27, 2026.

*/s/ Ryan B. Abbott*
Ryan B. Abbott (CA State Bar No. 281641)
Timothy G. Lamoureux (CA State Bar No. 294048)

Brown, Neri, Smith & Khan, LLP
Firm Name
11601 Wilshire Blvd., Suite 2080
Office Address
Los Angeles, CA 90025
City, State, ZIP Code
(310) 593-9890
Telephone Number
ryan@bnsklaw.com; tim@bnsklaw.com
Primary CM/ECF E-mail Addresses

*Attorneys for Petitioner, Jason Allen*

25

## **CERTIFICATE OF SERVICE**

I hereby certify that on February 27, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following email addresses:

U.S. Dept. of Justice:
JENNA MUNNELLY
SUZANNE JOHNSON
Via Email: jenna.e.munnelly@usdoj.gov
Suzanne.M.Johnson@usdoj.gov
YAAKOV M. ROTH, Acting Assistant Attorney General
SCOTT BOLDEN, Director

*s/ Kaitlyn Alexander*