# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLORADO

JASON M. ALLEN,
    *Plaintiff,*

                          v.

SHIRA PERLMUTTER, in her official capacity as
Register and Director of the U.S. Copyright Office; and
THE UNITED STATES COPYRIGHT OFFICE,
    *Defendants.*



**Rec'd**

UNITED STATES DISTRICT COURT
DENVER, COLORADO

**JUN - 4 2026**

JEFFREY P. COLWELL
CLERK

Civil Action No. 1:24-cv-02665-WJM

## BRIEF OF AMICUS CURIAE
## IN SUPPORT OF NEITHER PARTY

The amicus supports neither party and is in contact with neither. He places before the Court the scope and breadth the parties' narrow framing omits.

The parties litigate whether one applicant's work may be registered. They do not litigate — and may not acknowledge — what that refusal sets in motion beyond them.

A registration decision is not confined to the applicant who sought it. The standard applied to refuse him is applied to everyone who creates as he does: creators dependent on assistive technologies, collective and Indigenous traditions, whole categories of human expression that have no party in this case and no voice in its outcome, yet must live under whatever standard survives it.

This refusal sits at a technological and historical juncture the parties do not acknowledge, and the harm it works is neither isolated to them nor erased by their silence about it.

## THE BLACK BOX AND THE ARTIST

Artificial intelligence is a black box. Its user directs it toward a result and selects among what it

1

returns, but cannot trace the path from instruction to output. The Copyright Office treats that opacity as the fact that severs the human from the work — and treats it as novel, a problem unique to artificial intelligence. It is neither.

The "romantic authorship" doctrine presumes that protected creative work flows from a solitary "mastermind" author without technological mediation. *Feist Publications, Inc. v. Rural Telephone Service Co.*, 499 U.S. 340 (1991), codified this framework.

The premise is that an unexamined instrument standing between the artist's intent and the finished work defeats authorship. That premise, applied honestly, does not reach artificial intelligence alone. It reaches the camera, the synthesizer, the electric guitar and its effects, the sewing machine, the wood lathe, and the photo-editing suite. Each is a black box.

The opaque instrument standing between the maker's intent and the finished work is not new, and it is not unique to AI. It is the ordinary condition of art made through technology, and has been for over a century.

The photographer who chooses a Leica over a Nikon, or Adobe Lightroom over a darkroom, does not know what the engineers decided inside the housing. He knows only that one box yields the result he prefers. The engineers' choices color every output permanently, and the artist who relies on them cannot account for how.

Mediation through an instrument the maker does not understand is not the exception in the history of art. Since the late nineteenth century it has been the rule.

**The doctrine contradicts human experience.**

Beethoven did not perform his symphonies. The musicians who performed them did not thereby become authors of his work. Frank Lloyd Wright employed draftsmen at Taliesin; modern architects use CAD. No technological mediation has produced another Wright. The author remains the author. "Mediation" is an inadequate measure for art.

As the camera spread, critics held that photography was mechanical copying, not art — "art's most mortal enemy," in Baudelaire's phrase of 1859 — and that the photographer, having only pressed a button over a chemical process, was no author beside the oil painter. Humanity

answered these questions centuries before the doctrine was invented.

**The accusation lost. Photography is art.**

Ansel Adams is not a lesser artist than Matisse, who in his final years cut painted paper while his assistants applied the paint and fixed each form in place. Beethoven is not a lesser composer because others performed what he could no longer hear, or because he could not play the music he composed. The line the critics drew between legitimate and illegitimate mediation was their own preference, not a measure anyone else could apply, and that distinction is legally relevant.

***Théâtre D'opéra Spatial* drew the same objection.**

Complaints against Allen were raised against an unfamiliar form of mediation and not against the other entrants in the same competition that were produced through Photoshop, Lightroom, or comparable tools. The complaint identified what was new, not what was mediated.

The Copyright Office adopted that complaint uncritically, without supplying what the complaint lacked: a standard. It did not identify the property that places artificial intelligence on one side of authorship and the camera, the synthesizer, and the editing suite on the other. No such property has been named in this matter, and none is administrable across the instruments the Office already accepts. What remains is a line drawn where one observer's familiarity ended.

## WHAT PRECISELY IS "MEDIATED EXPRESSION"?

If the line cannot be drawn in principle, it is still drawn in practice — and it does not fall evenly. For most artists, mediation is a choice among instruments. For the disabled artist, mediation is the instrument. A standard that treats mediated expression as less than authorship therefore does not burden every creator alike. It burdens most heavily those who cannot create any other way.

The record on this is not speculative, and it is not new. It is the settled history:

- Henri Matisse, after the cancer surgery of 1941 left him unable to stand at an easel, made the gouaches découpées — works whose paint was applied by assistants and whose forms were fixed in place by other hands on his direction. The cut-outs are not regarded as a diminished coda. They are regarded as among his most important work,

and their authorship has never been in question.

- Evgen Bavcar, blind since childhood, composes his photographs in his mind, captures them through an automatic camera, and relies on sighted assistants to mediate between the exposure and the image he intends; his work is held in the collection of the Library of Congress.

In each case the expressive act was routed through a tool, a prosthesis, or another person, and in each case the human is named the author without hesitation by the law, the market, and the institutions of culture — including the institution that is the defendant's own custodian.

**"Mediated" or "Assistive"**

The lines being drawn are artificial, arbitrary and reveal more about the personal preferences of the person drawing them than they do about actual art, art history or legally cognizable standards.

Assistive technology is not a different thing from mediated expression. It is mediated expression under another name. No standard the Office has offered, and none available to it, distinguishes the tool that compensates for a disability from the tool that does not — because at the level of authorship there is nothing to distinguish. A line that cannot be drawn between them cannot be the basis for protecting one and refusing the other.

There is never a shortage of persons confusing their personal preferences as law. Adam Smith named the type: the man of system, "wise in his own conceit," who "seems to imagine that he can arrange the different members of a great society with as much ease as the hand arranges the different pieces upon a chess-board." - *The Theory of Moral Sentiments* VI.ii.2.17 (1759).

The court has held that confidence is not a qualification. It is the disqualification. The Supreme Court has held, and has not retreated from holding, that tribunals are not competent to sit in judgment of what qualifies as art. In *Bleistein v. Donaldson Lithographing Co.*, 188 U.S. 239 (1903), the Court warned that it would be a "dangerous undertaking" for persons trained only to the law to constitute themselves final judges of the worth of pictorial illustrations.

"Dangerous" is not a neutral characterization.

4

*Bleistein* does not hold that judging art is hard; it holds that it is not the law's office to do at all — a "dangerous undertaking" no matter how assured the hand that attempts it. The art critic certain of his own taste is free to publish his rankings. He is not thereby fit to administer a federal agency charged with respecting a fundamental right. The Office's certainty that it could distinguish the assistive instrument from the merely mediated one is precisely the certainty *Bleistein* identifies as the danger.

Applied honestly, the standard the Office used against Allen would strip authorship from the creators named above. The Office does not apply it to them. It applied it to Allen because his mediation was unfamiliar, not because it was greater.

**THE CONSTITUTIONAL TURN:**

**AUTHORITY, NOT AESTHETICS**

Allen's work may be nothing more than a commercial image. It may also be an expression of religious conviction, cultural inheritance, or familial meaning. It is certainly not devoid of spiritual content.

The Supreme Court has recognized that certain fundamental rights exist not as enumerated provisions but as penumbral guarantees derived from the structure of the Constitution. *Griswold v. Connecticut*, 381 U.S. 479 (1965).

The amicus does not know the artist's purpose, nor does that matter. What matters is that the category of thing the Office passed judgment on — a fixed creative expression — is the category the First Amendment protects, and includes the cultural, familial, spiritual, and religious expression through which communities transmit who they are.

Art is unequivocally a form of protected speech. When the Office decides which creative expressions the United States will recognize and which it will leave unrecorded, it is making a federal judgment about expressive activity. That judgment occupies a constitutionally sensitive field. A system that classifies authorship and excludes forms of expression from the federal record therefore requires a justification proportionate to the power exercised.

The Copyright Office lacks the authority to make that judgment at all. The arbitrary nature of the

5

"romantic authorship" standard is not merely an analytic gap. It is the signature of an act beyond the actor's authority — a judgment of artistic legitimacy, made by a body the Constitution never empowered to make it, against a standard that does not exist because no lawful body was ever permitted to construct it.

## THE UNPALATABLE ORIGINS OF THE STANDARD BEING APPLIED

The "romantic authorship" construct is being applied to Allen's work; sitting in judgement of whether the *Théâtre D'opéra Spatial* qualifies. The prosopographic history combined with citation Shepardizing will provide the record of where the "romantic authorship" and its complimentary framework, the "useful articles" construct, emerged from.

The intended effects of these constructs is known and documented by the Library of Congress and the Copyright Office. The notion of "romantic authorship" emerged from Victorian Era cultural and ethnic hierarchies, in an attempt to fabricate a rank-order between Europeans and non-European cultures. The accompanying Declaration evidences they emerged from the eugenics era, and from a "white man's burden" framework.

The Copyright Office's history with the cultural works of at-risk communities is not debated. It is not neutral. It is also instructive to our purposes. Apply the "useful articles" or "romantic authorship" tests to Indigenous cultural works — tribal chants, traditional dances, communal textile patterns — and the outcome is categorical exclusion. These works are collaborative. They are inherited. They are unified in form and function. They fail every test the two constructs impose.

The prosopographic and citation history contained in the accompanying Declaration evidences that the "useful articles" and "romantic authorship" constructs were grafted into American jurisprudence without Constitutional grounding. This is not the opinion of the Amicus. This is the opinion of the court:

> "An important constitutional question underlies this case — a question which was stirred on oral argument, but not treated in the briefs....Article I, § 8 of the Constitution grants Congress the power "To promote the Progress of Science and useful Arts, by securing for limited Times to Authors . . . the exclusive Right to their

> respective Writings. . . ." The power is thus circumscribed: it allows a monopoly to be granted only to "authors" for their "writings." Is a sculptor an "author," and is his statute a "writing," within the meaning of the Constitution? We have never decided the question… The interests involved in the category of "works of art," as used in the copyright law, are considerable.... Perhaps these are all "writings" in the constitutional sense. But, to me, at least, they are not obviously so. It is time that we came to the problem full face. I would accordingly put the case down for reargument." (Mazer v. Stein, 347 U.S. 201, 219–221 (1954) (Douglas, J., concurring, joined by Black, J.)

The "romantic authorship" construct entered American law via Reconstruction Era court opinions, sourced from British intellectual property case law by the Justices, who in the same years, delivered the now universally condemned opinions that forced the Native Nations into wardship. The proximate effect of these opinions was to systematically erase their cultural practices. That was their intent: to "kill the Indian, save the man".

**Exposing the Indecent:**

The prosopographic history will evidence that the "romantic authorship" standard presupposes that artful expression is a Victorian notion of what constitutes "inventive genius"; the creation of a singular identifiable mind. It explicitly denies protection to forms of art that are communal, or by extension, mediated in their creation.

Consider the incoherence that has been built up across the decades of enforcing such an arbitrary measure:

- Pornography receives copyright protection under 17 U.S.C. § 101 because the courts decided that editorial collaboration constitutes authorship.
- Indigenous sacred chants are denied protection because, under the logic of the "romantic authorship" construct, they are collaborative.
- PornHub's content receives federal protection. Navajo sacred chants do not.

The prosopographic history substantiates: the "useful articles" and "romantic authorship" legal frameworks were authored by the same Justices, the same courts, in the same years, as the now widely condemned *Civil Rights Cases* and the federal prohibition of Native American religious practices.

7

The harmed, at-risk, communities lost control as a consequence of the "wardship" decisions by these courts and these Justices. Their denial of ownership and protection produced predictable consequences: The originating community could not control commercialization. The culture was diminished. The imagery was trivialized. The sacred became a screen-print on a mass-produced t-shirt.

The discomfort the prosopographic citation history creates is not rhetoric. The discomfort is evidence.

This prosopographic evidence is also dispositive and directly relevant, as the "romantic authorship" is reviewable *de novo* under *Loper Bright*. The Copyright Office relies on the now obsolete notion that an agency can leverage standards that have no grounding in the Constitution. The "romantic authorship" standard is precisely that.

(See *Bleistein v. Donaldson Lithographing Co.*, 188 U.S. 239 (1903), *Roth v. United States*, 354 U.S. 476 (1957), *Miller v. California*, 413 U.S. 15 (1973), *Mitchell Bros. Film Group v. Cinema Adult Theater*, 604 F.2d 852 (5th Cir. 1979))

**THE SILENCED MAJORITY**

The proximate effects rippled across the subsequent century. Their deleterious effects are charted by the Copyright Office. Their publications evidence the exclusionary effects of the "romantic authorship" and "useful articles" constructs, and the damage is not contained within the at-risk communities.

The Geography of Copyright Registrations (U.S. Copyright Office, Office of the Chief Economist, Sept. 2024), names New York sixty times and Los Angeles fifty-seven times across thirty-six pages. New Orleans, San Antonio, El Paso, Albuquerque, Austin, Memphis, Houston, Corpus Christi, Tucson, Baton Rouge, and Birmingham are named not once.

The Copyright Office's own data establishes that registration is an island phenomenon—concentrated in a small number of coastal metropolitan centers. In The Geography of Copyright Registrations, the Office reports:

> "The majority of copyright registrations originate from a handful of large metropolitan areas. Ten metropolitan areas generate slightly more than half of the

8

country's copyright registrations."

The concentration is starkest by State and by coast. The same report states:

> "[R]egistrations from California and New York amount to nearly 2 million, accounting for about 37 percent of all registrations issued by the Copyright Office. Importantly, these two states account for over one-third of copyright registrations despite accounting for less than 15 percent of the U.S. population. Creators in other states registered far fewer works."

And further:

> "[R]egistrations tend to be most concentrated on the coasts, especially on the Northeast coast and in Southern California. In fact, 29 percent of all copyright registrations in the country come from the MSAs of Los Angeles or New York. As a point of comparison, those two MSAs, while quite populous, only comprise about 9.7 percent of the U.S. population, indicating that registration activity in New York and Los Angeles is about three times greater than their combined population size would suggest."

**The island has grown denser over time, the work concentrating in ever fewer hands.**

Reviewing Professor Robert Brauneis's 2015 Christopher A. Meyer Memorial Lecture on copyright-registration data from 1978 to 2012, the commentator records:

> "[T]he number of registrations by the top 1% (numerically) of registrants has been steadily rising, going from slightly above 30% to the mid-40s."

The report does not attribute concentration to originating creative communities. It attributes concentration to institutional intermediaries: Sony, Big Machine Music, Curb Music, Black River, Atlantic Records, Warner Brothers, Hal Leonard, Lynda.com, and similar entities. The report further acknowledges that registration activity is "even further skewed beyond what population differences alone would explain," and that many non-coastal concentrations reflect individual institutional filers rather than local creative ecosystems.

**A Failure to "Promote"**

The Copyright Office performed worst where a copyright system should perform best: in relation to the creative forms that originated in the United States itself. New Orleans jazz. Nashville

country music. Southwestern Americana. Collective, iterative, community-shaped forms of creation that emerged from practice rather than from the Victorian model of the solitary author producing a separable object.

A Copyright process where Nashville and New Orleans fall of the demographic radar has catastrophically failed to protect, promote and preserve American culture.

The result is consistent with the doctrines discussed throughout this record. The administrators who apply it today do not see the original premise of excluding art on the basis of Victorian cultural and racial hierarchies. They inherit the form and administer it as though it were neutral. Tocqueville warned that aristocratic structures often survive democratic transitions by becoming invisible to those who inherit them. The useful-articles doctrine presents precisely that danger, and the Office's publications evidence the Tocqueville effect:

> "Regardless of what other countries conclude, however, the United States is bound by our own Constitution and copyright principles." - U.S. Copyright Office, Copyright and Artificial Intelligence, Part 2:  Copyrightability 39 (2025) (Report of the Register of Copyrights, Shira Perlmutter).

**"The Constitutional Goals Envisioned by the Framers"**

The Copyright Office maintains that its doctrines reflect the Intellectual Property Clause as the Founders understood it.

> "The constitutional goals envisioned by the Framers, and the basic framework of rights and exceptions built over the years by Congress, were designed to be resilient and have continued their function of promoting creativity to the benefit of the public." — Shira Perlmutter, Copyright Then and Now: A Half-Century of Change, 50 AIPLA Q.J. 559, 560 (2022).

The proposition can be tested. The historical record suggests a different question. If the doctrines accurately capture the constitutional design, why do they fit so poorly against some of the most successful and influential forms of American creation?

The communities most analogous to the world of the Founding generation were not modern corporate rights-holders. The Shakers and Quakers produced furniture, tools, instruments, buildings, and other integrated forms of creation through communal and multi-generational

processes. They were collective maker cultures; the antithesis to the "useful articles" bifurcation of decoration and utility or the solitary genius of the "romantic authorship" construct.

The same pattern reaches Windsor chairmaking, Pennsylvania long-rifle production, Conestoga wagonbuilding, Appalachian luthiery, Mennonite craft, Amish craft, and other traditions that developed outside the metropolitan curatorial centers around which copyright doctrine evolved.

**The Defect is Structural Rather than Racial.**

The result is that some of the maker traditions closest to the Founding era become difficult to reconcile with the very doctrines claimed to reflect the Founders' design. Native American, Pacific Islander, Shaker, Quaker, Mennonite, Amish, and Appalachian traditions share neither ancestry nor politics. What they share is a mode of creation. They are communal, iterative, functional, and often intergenerational.

The racial consequences are among the most visible effects of the defect. They are not the defect itself. In Robert Brauneis & Dotan Oliar, Challenging Copyright's Race, Gender, and Age Blindness, 86 Geo. Wash. L. Rev. 101 (2018), the authors find that the access enjoyed by white authors has grown more disproportionate over time:

> "[A]s of 2010, white authors were producing 116% of the registrations they would be if they were producing at a rate equal to their proportion of the general population, which was the rate at which they were producing registrations in 1980, three decades earlier."

The mirror finding is the most severe underrepresentation in the dataset:

> "[A]s of 2010, Hispanic authors were producing only 44.6% of the registrations that they would be if they were producing at a rate equal to their proportion of the general U.S. population. That is by far the largest underrepresentation of any racial or ethnic group."

The authors state the conclusion plainly: "Increasing overrepresentation of white authors is a warning signal."

**A System for the Few**

The Office explains much of the observed concentration through agglomeration economics and

the presence of large institutional filers. Its own report repeatedly attributes registration activity not to originating creative communities but to publishers, labels, universities, legal publishers, print-music houses, and other intermediaries.

The Tennessee example is illustrative. The report attributes the state's registration activity to country music production in and around Nashville through publishers including Sony, Big Machine Music, Curb Music, and Black River. Elsewhere, apparent concentrations are explained by the presence of entities such as the University of Virginia, LexisNexis, Hal Leonard, or former textile manufacturers registering designs as artistic works.

The significance is not that these institutions file registrations. It is that the Office's own explanations repeatedly identify filing infrastructure rather than creative origination as the source of registration concentration. The report does not claim that registrations map creativity. It expressly acknowledges that the concentration is "even further skewed beyond what population differences alone would explain."

That admission matters. The Constitution charges the system with promoting creative production. The Office's own data suggest that registration activity is often a measure of institutional capacity to file, aggregate, and monetize creative works rather than a measure of where creativity originates.

The distinction is central to this case. A system that primarily observes intermediaries risks losing sight of the communities, traditions, and forms of creation from which the underlying culture emerged.

> "While the next fifty years may bring even greater changes, I am confident that the copyright system will remain a vital engine of creativity." — Shira Perlmutter, Copyright Then and Now: A Half-Century of Change, 50 AIPLA Q.J. 559, 579 (2022).

A regulator that defines its mission by the volume of what is filed, and never by who is missing, cannot see this. On the evidence of its own report, it does not. That blindness is not ministerial bookkeeping. It is the exercise of a judgment about whose creativity counts as authorship — the precise question of institutional character on which this case turns.

## SILENT TRIBUNALS

The Copyright Office does not merely record claims. It examines deposits. It applies originality, authorship, and useful-articles doctrines. It issues refusals under 17 U.S.C. § 410(b) when it determines that a work is not copyrightable subject matter.

That determination is not clerical. It treads upon First Amendment territory without providing the ordinary incidents of adjudication. There is no recognized court, no conventional administrative hearing, and no structurally independent tribunal. The applicant receives only an internal written reconsideration process administered by the same institution whose determination is under review.

The Office exercises adjudicatory power through procedures designed for ministerial recordation.

The problem is substantive gatekeeping exercised through procedures incapable of proportionate challenge. Applicants may communicate with the Office. What they lack is a mechanism proportionate to the power being exercised against them.

### Audi Alteram Partem

A body that judges must hear. The common-law maxim is *audi alteram partem,* hear the other side, is not decorative. It names the condition that distinguishes adjudication from command. A body that refuses to hear while judging is not a constitutionally adequate tribunal.

The maxim predates the Republic. A sovereign that both accuses and decides without a meaningful hearing ceases to operate as law and begins to operate as prerogative.

Three categories of federal entities can adjudicate substantive rights.

1. Article III courts — federal district courts, the circuit courts, the Supreme Court. These are exclusively judicial; they require Article III judges with life tenure and undiminished salary. The Copyright Office is not made up of federal judges.
2. Article I tribunals — the bankruptcy courts, the U.S. Tax Court, the Court of Federal Claims, military commissions in narrow circumstances, certain territorial courts. These

exist by specific congressional creation, are limited to particular subject-matter jurisdiction under the constraints of *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982), refined in *Stern v. Marshall*, 564 U.S. 462 (2011).

3. Agency adjudicators of public rights. Under *Crowell v. Benson*, 285 U.S. 22 (1932), and its progeny, Congress may assign "public rights" disputes — disputes between the government and individuals over government-created rights — to administrative agency adjudication. This is the quintessential agency function.

**There is no fourth box.**

The Solicitor General has effectively conceded the point. In the stay application in *Blanche v. Perlmutter*, No. 25A478 (S. Ct.), the government argued: "The Register, acting under the Librarian's supervision, wields executive power by exercising 'significant regulatory authority over copyrights,'... impacting a wide array of crucial intellectual-property issues." The quoted phrase is from *Imaging & Technology Alliance v. Library of Congress*, 103 F.4th 830, 833 (D.C. Cir. 2024). "Wields executive power" is the government's own characterization.

Federal copyright registration is an agency adjudicator of public rights where the government determines whether to grant a federal property right that did not exist at common law. Adjudicating registration eligibility on doctrinal grounds — applying Compendium § 310.7, the useful-articles separability test, the human-authorship requirement to AI-assisted works — is public-rights adjudication. That is the defining executive-agency function under *Crowell.*

The relevance is structural. If the Office functioned solely as a registry, its current procedural architecture might suffice. Registries record claims; they do not determine ultimate validity.

**Registry vs. Tribunal**

The Progress Clause empowers Congress to "secure" exclusive rights to authors and inventors. "Secure" implies protecting something that pre-exists. The Founders' word choice is dispositive: rights are secured, not granted. The Framers understood intellectual property rights as pre-constitutional in nature, rights the governmental system would recognize, register and protect.

Article I, Section 8, Clause 8 empowers Congress to promote "the Progress of Science and useful

14

Arts" by securing the work of authors and inventors via a "registrar". The "romantic authorship" and "useful articles" construct invite intrusion into the creative act far beyond the mere registration of property:

Justice Holmes warned against precisely the "dangerous" deviation from Constitutionality in *Bleistein*.  The USPTO and the Copyright Office have constituted themselves as exactly the tribunal Justice Holmes said persons trained only to the law should never become.

## LIBRARY OF CONGRESS - FAILURE AS TRUSTEE

The Copyright Office declares its commitment:

> "to helping fulfill copyright's Constitutional purpose and to promote creativity and free expression for the benefit of all." (https://www.copyright.gov/about)

The LOC's own Collections Policy Statement acknowledges that "copyright and publishing mechanisms" are insufficient "to preserve Indigenous histories."

The American Folklife Center's Ethnographic Collections guide states that its Native American holdings are "the intellectual property of the communities of origin." The Copyright Office's "romantic authorship" doctrine categorically denies such rights.

One institution. One Librarian. The left hand formally recognizes Indigenous intellectual property. The right hand administers doctrine that excludes it. The National Congress of American Indians has identified a potential explanation:

> "The United States Patent and Trademark Office has taken positions in negotiations at the World Intellectual Property Organization more aligned with corporations that want to access and use Indigenous Peoples' genetic resources, traditional knowledge, and cultural expressions than with the United States' role as trustee for Tribal Nations." — Native American Rights Fund, January 12, 2024

The LOC cannot claim clean hands. It holds the historical record. It authored the doctrine. It documented the harm. It continued administering the cause while cataloging the effects.

- Deliberate Indifference: Under *City of Canton v. Harris*, 489 U.S. 378, 388–89 (1989), institutional liability attaches where the need for corrective action is "so obvious" and

the failure to act "so likely to result in the violation of constitutional rights" that the institution's inaction amounts to a deliberate choice.

- Means available: The Library of Congress holds the founding-era evidence and decades of scholarship confirming the facts documented in the enclosed affidavit.

- Duty to acquire: The LOC's Congressional Research Service and Law Library employ staff tasked with analyzing this class of constitutional question. The Register of Copyrights is required by statute to advise Congress on copyright's constitutional dimensions.

- Discharge would have produced knowledge: The LOC employs approximately 3,000 staff. It operates fellowship programs — including the Kluge Center — designed to synthesize founding-era materials for contemporary policy. The scholarship on the disparate cultural impact of the "useful articles" doctrine has been cataloged in the LOC's own systems for decades. The institution cannot claim ignorance of work it commissioned.

The harm in this record follows one structure. It appears in the geography record and in the accessibility record.

- The first element is knowledge. The institution's own records document the harm. The geography study is the Office's own work. The accessibility deficiencies appear in its own files and correspondence.

- The second element is continuation. The procedures that produce the documented harm continue after the documentation exists.

- The third element is lack of sufficient justification. The examination function does not create the right, foreclose later challenge, or supply an enforcement judgment the courts cannot supply. What remains is a procedure that imposes documented harm without a corresponding institutional benefit sufficient to justify it.

The point is institutional, not rhetorical. A custodial body is not judged only by whether it keeps records and receives appropriations. It is judged by whether the system it administers serves those for whom the institution exists. On this record, the Office knew, continued, and preserved a procedure whose costs fall on the communities least able to absorb them. A trustee who declares

fidelity to a trust instrument, then administers the trust contrary to that instrument, has defined the breach.

The law recognizes that structure. *City of Canton v. Harris,* 489 U.S. 378 (1989), treats deliberate indifference as present where a pattern of violations puts an institution on notice that its response to a recurring situation is insufficient to protect the rights at stake. The institution's own documentation supplies notice. The question is not whether the policy was unconstitutional on its face. The question is whether the institution knew of the harm and continued the practice anyway.

That standard does not depend on wardship. Disabled applicants are not wards. They are members of the public seeking meaningful access to a federal rights-recording process. The constitutional access principles discussed in this brief reach them directly. *Tennessee v. Lane* and *Bolling v. Sharpe* supply the access floor without any analogy to guardianship.

## NOTICE IS THE HINGE

The historical record does not originate with the petitioner. It originates with the institution. Placed before a federal court, it is no longer an external historical argument. It is the agency's own record of knowledge of harm, in a federal proceeding. To contest it, the Office would have to contradict its own published findings. The consequence turns on what it knew, when, and what it did with that knowledge.

*Hencely v. Fluor Corp.,* 608 U.S. ___, No. 24-924 (Apr. 22, 2026) (Thomas, J.), changes the environment in which that structure is examined. The Court held that judicial doctrine cannot supply what statutory or constitutional text omits: the Fourth Circuit's battlefield-preemption rule had no foundation in the Constitution, federal statutes, or precedent, and *Boyle v. United Technologies Corp.,* 487 U.S. 500 (1988), was narrowed. The alignment was 6-3 — Sotomayor, Kagan, Gorsuch, Barrett, and Jackson joined; Alito dissented, joined by Roberts and Kavanaugh. The principle had appeared before only in solo positions — *Ziglar v. Abbasi,* 582 U.S. 120 (2017); *Baxter v. Bracey,* 140 S. Ct. 1862 (2020); *Hoggard v. Rhodes,* 141 S. Ct. 2421 (2021).

Qualified immunity is the doctrine that logic reaches. Section 1983 provides that every person

17

acting under color of law who deprives another of rights "shall be liable." No immunity appears in the text. The clearly-established-law test originates in *Harlow v. Fitzgerald*, 457 U.S. 800 (1982); the doctrine in *Pierson v. Ray*, 386 U.S. 547 (1967).

Alexander A. Reinert, Qualified Immunity's Flawed Foundation, 111 Cal. L. Rev. 201 (2023). Qualified immunity exists in vacuo. That is why the harm documented in this record was never answered for. The shield is not a defense raised by any party here; it is the structural reason a century of notice produced no correction.

> "Generally, ministerial acts are unshielded by qualified immunity, which protects only actions taken pursuant to discretionary functions. In other words, noncompliance with a ministerial duty bars qualified immunity."

Copyright registration is ministerial — the Office's own characterization in *Perlmutter v. Blanche*, No. 1:25-cv-01659 (D.D.C.). An institution that characterizes its registration function as ministerial in its own litigation cannot simultaneously rely on discretionary-function immunity to explain why it was never required to answer for the documented harm. On its own account, nothing shielded it — and yet a century passed. That gap is the point: the persistence this Court is asked to ratify by inaction was never inevitable. It was permitted.

Notice is the hinge. It is not an emotional fact; it is a legal one. Notice changes foreseeability. Notice changes duty. Notice changes the plausibility of good-faith ignorance. An official unknowingly participating in a defective structure occupies one posture; an institution continuing after documented notice that its doctrines produce constitutional injury occupies another.

For the first century after enactment, the Court recognized no good-faith immunity. *Hencely* moves it into majority language. After *Hencely*, a doctrine resting on no constitutional or statutory text — only on a compilation error later treated as intent — can no longer supply the unexamined backdrop against which inaction is mistaken for legitimacy.

## WHAT JUSTIFIES THE ARTIFICIAL BARRIERS & THE EXTENSIVE HARM?

The Copyright Office does not create the right. It cannot. The certificate does not create the copyright. It records a claim to a right that already exists. Copyright protection attaches when an original work of authorship is fixed in a tangible medium of expression. 17 U.S.C. § 102(a). The

Berne Convention likewise forbids conditioning protection on a formality.

The statute confirms the limited effect of registration. A certificate issued within five years of publication is only prima facie evidence of validity. 17 U.S.C. § 410(c). After five years, its evidentiary weight is left to the court. The House Report explains the point plainly: the presumption "does not deprive the defendant in an infringement suit of any rights, it merely orders the burdens of proof." The same legislative history states that, "unlike a patent claim, a claim to copyright is not examined for basic validity before a certificate is issued."

The certificate therefore decides little. It does not create the right. It does not foreclose later challenge. It does not bind the court on validity or infringement. Its principal legal effect is evidentiary: it orders who must prove what first.

If "validity" is not the measure, then what precisely is the "romantic authorship" standard?

That is the operative consequence of the system. A recording office could supply the public timestamp without judging the work. Other registries do. The component unique to the Copyright Office is the judgment: a silent administrative decision about which forms of artful expression the government will recognize.

The Court therefore need not begin with labels. It can begin with function. What does this examination do that registration alone cannot do? What public benefit has been purchased by 140 years of judging, classifying, and excluding creative forms under doctrines whose constitutional ancestry remains unresolved?

## THE STANDARD FAILS THE REHABILITATION ACT

Under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and ADA Title II, 42 U.S.C. § 12132, qualification standards that screen out disabled individuals must be necessary and job-related.

In denying Allen, the Office has taken a development that widened access to expression and used it to narrow protection. That is not a neutral authorship rule. It is a merit-judging rule applied without an empirical standard.

When the Copyright Office judges applications, it does so as a quasi-tribunal without adhering to the minimal standards the nation expects of its courts. A process already narrowed to internal written review becomes narrower still when administered through obsolete or inaccessible systems. For applicants without institutional resources, the refusal is not merely a decision. It is a practical endpoint. For disabled applicants, the burden is greater.

The "romantic authorship" doctrine penalizes mediated expression — the very accommodation disabled creators require. Selectively invoking the doctrine against creators who require assistive technologies constitutes differential treatment.

That burden becomes constitutionally significant when the refusal rests on constructs with no empirical standard.

**The Copyright registration interface compounds the problem.**

As of the writing of this pleading, the eCO Registration System remains a legacy form-based system reminiscent of Netscape Browser era interfaces. The Office publishes no Section 508 or WCAG compliance audit for eCO. It publishes no Voluntary Product Accessibility Template for eCO or for the new registration modules. The LOC's general statement asserts:

> "We believe that our web site is compliant with Section 508 and W3C accessibility design guidelines. Older, legacy pages are in the process of being upgraded for gcompliance."

The WCAG measure is not based on "belief". It is an empirical metric with ample tools for the LOC to make determinations. Arriving at a determination if an interface is WCAG compliant takes no effort whatsoever. It is automated. The various tools deliver instantaneous reports accompanied by action plans for corrective measures.

**INTEREST OF AMICUS CURIAE**

The Library of Congress and its Copyright Office are the initiating parties to injuries documented by the Declaration filed with this Amicus.

Amicus applied for copyright protection on three sculptural musical instrument body designs. The Copyright Office rejected each application under the "useful articles" doctrine. Amicus

20

pivoted and sought to register his property rights with the USPTO. The damages were compounded by the USPTO.

Amicus is an applicant with a sequencing impairment. Accommodation requests inadvertently resulted in the exposure of the USPTO as non-compliant with longstanding equal access laws meant for the less-able.

The agency reacted with increasingly hostile adverse acts. The concurrently filed Declaration documents what the Amicus exposed and the agencies reaction:

- The USPTO's public-facing systems lack rudimentary accessibility features required by Sections 504 and 508 of the Rehabilitation Act.
- Requesting accessibility accommodation demonstrably triggered escalating adverse action: record tampering, non-docketing of civil rights correspondence, unauthorized attorney appearance, retroactive reclassification, etc.

The USPTO maintains an $879 million reserve (2025 disclosure), projected to exceed $1.249 billion by 2026 per the agency's statements. Its budgets document allocations for travel, entertainment, and employee bonuses. They document zero dollars for public-facing Section 504/508 compliance so the less-able can have equal access to their systems.

None of five petitions filed requesting assistance have received substantive response.

Most of these petitions were reclassified and rerouted to departments with no authority to adjudicate Civil Rights complaints. These departments fabricated timelines, refused to provide on-the-record responses, refused to apply controlling case law or to consider sworn evidence containing expert testimony or controlling precedent contained within USPTO databases.

These facts are brought before this Court because the controlling laws and controlling precedents that went ignored pivoted upon the "romantic authorship" and "useful articles" doctrines, and/or their downstream legal frameworks. In the case of the USPTO, that agency attempted to dismiss Amicus's petitions for help under the Rehabilitation Act by claiming they were generated by AI.

## WHY THIS BRIEF IS DESIRABLE

The communities bearing the burden of these doctrines are not parties to this litigation. Peer-reviewed, education-controlled studies held by the Library of Congress document the disparate impact of the "useful articles" doctrine and the "romantic authorship" doctrines on identifiable, at-risk, communities: Native American, Pacific Islander, African-American, and disabled applicants.

Amicus is a member of multiple affected classes — Hispanic national origin, visual impairment requiring accommodation — with pending applications before both the Copyright Office and the USPTO. His prosopographic research documents that the judicial figures who authored the exclusionary IP frameworks also authored the now-condemned *Civil Rights Cases* of the Reconstruction era. No other party is positioned to present this perspective.

An amicus is most useful where it supplies what the parties cannot or do not. The matter set out above and in the accompanying Affidavits is, by the parties' own filings, absent from this litigation. None of the parties points to the technological and historical juncture at which this decision is made, or to the true scope and breadth of the consequences — the 140-year-overdue harm to the Tribal Nations, the ongoing exclusion the registration demographics evidence, and the exponential acceleration artificial intelligence is about to force.

## THE JUDICIARY'S ROLE AFTER NOTICE

*Loper Bright* and *Hencely* alter the posture in which this Court receives the record. Administrative inertia is no longer a substitute for constitutional analysis. Nor does age alone supply constitutional insulation to doctrine whose source has never been examined.

The consequence is not personal to any judge. It is institutional. Once the constitutional instability of a doctrine is placed before a court, continued application of that doctrine requires examination rather than assumption. The question is not whether the judiciary created every defect in the administrative system. The question is whether a court, after notice, may continue to apply the doctrine without testing the authority on which it rests.

*Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1 (1831) described the relation between tribal nations

and the United States as resembling that of "a ward to his guardian." Chief Justice Marshall was writing for the Supreme Court of the United States. He did not describe an executive-branch relationship alone. He described a relationship between tribal nations and the federal government.

The trust responsibility that developed from that relationship attaches to the sovereign whose protection was asserted. The judiciary is part of that sovereign. Federal courts have enforced the trust responsibility against the executive branch for generations on the premise that the obligation is constitutional in character.

That is the limited point. The Court is not asked to accept personal liability, institutional fault, or historical blame. It is asked to recognize that doctrines affecting protected communities cannot continue to operate by inherited assumption once their constitutional genealogy has been placed in issue.

The discomfort produced by that conclusion is not evidence against it. It follows from the structure the cases themselves created.

## JUDICIAL SUPREMACY: COURTS DECIDE WHAT THE LAW IS

In *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 177 (1803), Chief Justice Marshall declared: It is emphatically the province and duty of the judicial department to say what the law is." This holding established that written constitutions exist to limit governmental power, and that if those limits may be passed at any time by those intended to be restrained, the distinction between a government with limited and unlimited powers is abolished.

Nor can an agency within the Federal government be an instrument through which treaty obligations are arbitrarily violated. Berne Convention characterizes any conditioning of the right to Copyright a "formality". Article 5(2) prohibits such "formalities".

The Library of Congress claims it is the rightful author of the construct; that it "introduced the modern separability test" through regulation and that Congress "essentially lifted" that language into statute. (See: *Copyright at 125 – 1870 Law Important to Building LC's Collections,* by Jeanne Smith, Sept. 4, 1995)

23

For forty years, *Chevron* deference created an exception to this foundational commitment — agencies, not courts, determined statutory meaning when Congress had been ambiguous. The Supreme Court eliminated that exception in *Loper Bright Enterprises v. Raimondo,* 603 U.S. 369 (2024).

Seventy-two years of avoidance end when *Loper-Bright* meets Justice Douglas's warnings.

## CONCLUSION

An amicus does not seek relief. For the foregoing reasons, Alvaro E. Siman respectfully requests leave to file this brief, which offers the Court a perspective not provided by either party: the origin, the scientific falsity, and the discriminatory reach of the doctrines on which the refusal rests, and the technological and historical juncture at which artificial intelligence now places them. The Court should not resolve the meaning of 'authorship' on a record that omits the origin, the falsity, and the exclusionary reach of the very doctrines being applied.

Respectfully submitted,

_____

Alvaro E. Siman, *Pro Se*
221 Donax Ave., Unit 1, Imperial Beach, California 91932
Dated: June 3, 2026

24